Vol 22 - 1

07:41:18  1          IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
          2                    DALLAS DIVISION

          3  UNITED STATES OF AMERICA          (   3:07-CR-289-M
                           Government,         (
          4                                    (
             VERSUS                            (   DALLAS, TEXAS
          5                                    (
                                               (   August 10, 2009
          6  DONALD W. HILL (1)                (
             D'ANGELO LEE (2)                  (
          7  SHEILA D. FARRINGTON (3)          (
             DARREN L. REAGAN (7)              (
07:41:18  8  RICKEY E. ROBERTSON (10)          (
                           Defendants.         (   8:15 a.m.

          9                       Volume 22
         10            TRANSCRIPT OF JURY TRIAL
                     THE HONORABLE BARBARA M.G. LYNN
         11        UNITED STATES DISTRICT JUDGE, and a jury

         12  A P P E A R A N C E S:

         13  FOR THE GOVERNMENT:        MARCUS BUSCH
                                        SARAH SALDANA
         14                             CHAD E. MEACHAM
                                        LEIGHA SIMONTON
         15                             UNITED STATES DEPARTMENT OF JUSTICE
                                        NORTHERN DISTRICT OF TEXAS
         16                             U.S. Courthouse, Third Floor
                                        Dallas, Texas 75242
         17                                   214.659.8600

         18  FOR THE DEFENDANT:
             DONALD W. HILL (1)         RAY JACKSON
         19                             THE JACKSON LAW FIRM
                                        3811 Turtle Creek Blvd
         20                             Suite 600
                                              Dallas, TX 75219
         21                                   214/651-6250
                                        rjackson@jacksonfirm.net
         22
             D'ANGELO LEE (2)           DOUGLAS C. GREENE
         23                             GREENE LAW FIRM
                                        2000 E. Lamar Street
         24                             Suite 600
                                        Arlington, TX 76006
         25                                   817/303-2141
                                        greenelawfirm@sbcglobal.net

Vol  22 - 2

07:41:18  1

2   SHEILA D. FARRINGTON (3)   VICTOR D. VITAL
                             JONATHAN R. MUREEN
3                            Baker Botts LLP
                             2001 Ross Ave
4                            Dallas, TX 75201
                                 214/953-6832
5                            victor.vital@bakerbotts.com

6
    DARREN L. REAGAN (7)     THEODORE P. STEINKE, JR.
7                            LAW OFFICE OF TED STEINKE
                             770 Founders Square
07:41:18  8                  900 Jackson Street
                             Dallas, Texas 75202
9                                214.747.7148

10
    RICKEY E. ROBERTSON (10) DARLENE C. CLAYTON-DECKARD
11                           ANGELA A. DOWNES
                             THE DECKARD LAW OFFICE
12                           2351 W Northwest Highway
                             Suite 2110 LB 34
13                           Dallas, TX 75220
                                 214/220-9335
14                           darlenedeckard@aol.com

15
    COURT REPORTER:          P. SUE ENGLEDOW RPR/CSR NO. 1170
16                           P.O. Box 50711
                             Dallas, Texas 75250
17                               214.753.2325
                             sengledow@sbcglobal.net
18

19  proceedings reported by mechanical stenography, transcript
    produced by computer.
20

21

22

23

24

25

```
07:41:18   1                    P R O C E E D I N G S
                                     Volume 22
           2                      August 10, 2009
                                      8:15 a.m.
           3                      JURY TRIAL

           4

           5        (Judge enters the courtroom)

           6             THE COURT:  All right.  Be seated, please.

           7        Are we ready to proceed with admission of defense

           8   exhibits?

           9             MR. VITAL:  Yes, your Honor.

          10             THE COURT:  All right.  Mr. Vital.

          11             MR. VITAL:  Jon is going to handle that.

          12             THE COURT:  Okay.  Mr. Mureen.

08:18:38  13             MR. MUREEN:  For Sheila Hill we will offer all of

          14   our remaining exhibits with a few exceptions.

          15        First, regarding the wiretaps, we have cross-designated

          16   wiretaps, and to avoid confusion what we're going to do is we

          17   have gone through and found all the calls that the government

          18   has not designated and we will designate those ourselves and

          19   offer transcripts for those, but we're going to rely on the

          20   government to call the transcripts so that people don't get

          21   confused.

          22        Does that make sense?

          23             THE COURT:  No.  I mean, what I heard you say is

          24   that you're not going to redesignate what they designated.

          25   Okay.  But there were things that they had not designated that
```

08:19:27  1  you were are designating.

2        MR. MUREEN:  That's right.  But we are also -- as

3  far as the calls go that they have not designated, the

4  transcripts have errors in them, as you saw that first day,

5  misspelling of Cheryl, and our staff is going back through

6  them.

7        So what we want to do is come back with all the

8  transcripts they have not created, give them to the government

9  and offer them at once.  That will be within the next week,

10  but that just takes time to do that.

11        THE COURT:  All right.  Well, what I want you to do

12  is to give something like the government gave me so I don't

13  have to go through my list and figure out what's in or not in.

14  So what I want you to do is give me a list that shows what you

08:20:07  15  say is in, and then I'll admit all the others.

16        MR. MUREEN:  Okay.  You're talking about for all the

17  exhibits that we're doing this morning?

18        THE COURT:  Yes.  But if you want to give me those

19  now, I just want to make sure we have an agreed consolidated

20  list.  If you want to give me the new ones now to use this

21  time wisely, that's fine.

22        MR. MUREEN:  Are you --

23        THE COURT:  Just give me the new exhibits.

24        MR. MUREEN:  Read off the names of the exhibits that

25  are already in?

08:20:34  1          THE COURT:  No.

        2          MR. MUREEN:  Okay.  Read off the exhibits that we

        3  want to be in that are not?

        4          THE COURT:  I'm going to start over with you,

        5  Mr. Mureen.

        6      Have a cup of coffee.

        7          MR. STEINKE:  We will give you a mulligan, your

        8  Honor.

        9          THE COURT:  Okay.  Give me the new exhibits right

       10  now, and then when you're done with that, after you give me

       11  the transcripts and the new wiretaps, then you will give me a

       12  consolidated list of all of the exhibits that you have

       13  admitted.

       14          MR. MUREEN:  Okay.  The defense offers Exhibits 1

08:21:05 15  through 9, 11 through 62.

       16          MR. MEACHAM:  The government has objections in that

       17  range, and that's probably all the objections has to those

       18  exhibits.

       19          THE COURT:  Which ones?

       20          MR. MEACHAM:  12, 15, 41, 42, 44 and 50.

       21          THE COURT:  All right.

       22          MR. MUREEN:  64 through 69.

       23          THE COURT:  64 through 69.

       24          MR. MUREEN:  82 through 85, 87 through 102-A, 104

       25  through 109 and 117.

08:22:06  1        THE COURT:  Okay.  So you have given me the six you

          2   object to and no others, Mr. Meacham?

          3        MR. MEACHAM:  There are no other objections to

          4   Sheila Hill.

          5        THE COURT:  I take it no other defendants object?

          6        (No response.)

          7        THE COURT:  Then the Court admits the following

          8   exhibits:  1 through 9, 11, 13, 14, 16 through 40, 43, 45

          9   through 49 and 51 through 62.  I have excluded the six the

         10   government objected to.  64 through 69, 82 through 85, 87

         11   through 102-A, 104 to 109 and 117.

         12        MR. MUREEN:  We also offer the following Brian

         13   Potashnik Exhibits:  22, 36, 64, 75, 95, 102, 115, 192 through

         14   194, 205, 206, 287, 296, 298, 300, 316, 318, 320 through 322,

08:23:48 15   325, 326, 328 and 330 through 331.

         16        THE COURT:  Any objection to those?

         17        MR. MEACHAM:  I'm sorry, your Honor, I have got a

         18   number of notes written down.

         19     The first Brian Potashnik Exhibit that was offered was

         20   22?

         21        THE COURT:  Yes.

         22        MR. MEACHAM:  Most of the government's objections

         23   are prior to that.

         24     The government also objects -- I don't think they were

         25   called out, but I want to make sure.  The government also

08:24:13  1   objects to Brian Potashnik 56.

2            THE COURT:  They didn't call that, Mr. Meacham.

3            MR. MEACHAM:  Okay.  I'm just trying to double

4   check.  61, 240 through 249.  I don't think they did either.

5   I'm just double-checking.

6            THE COURT:  No.

7            MR. MEACHAM:  260 or 262.

8            THE COURT:  Any objection from defense counsel for

9   any of those?

10           MR. STEINKE:  No.

11           THE COURT:  The following exhibits are also

12   admitted.

13      Brian Potashnik numbers 22, 36, 64, 75, 95, 102, 115, 192

14   through '94, 205, 206, 287, 296, 298, 300, 316, 318, 320

08:24:56 15   through '22, 325, 326, 328, 330 through '31.

16      All right.  Mr. Jackson.

17           MR. JACKSON:  Yes, your Honor.

18      We would offer -- we hadn't made any offer so far yet, so

19   I believe that we offer Defendants' Exhibits 1 through 59.

20   And I determined this weekend -- I'll supplement it -- but my

21   Exhibit Number 2 is supposed to be John Lewis' financial

22   records, and I think I doubled another exhibit, so I will get

23   the proper exhibit for my Exhibit Number 2 and supplement that

24   and have it into the Court's file, but as numbered and as

25   titled we would offer Exhibits 1 through 59 subject to number

08:25:51  1    2 being Mr. Lewis' IOLTA records.

2         MR. MEACHAM:  The government objects to Defense

3    Exhibit Number 56 only.

4         THE COURT:  All right.  1 through 59 including

5    corrected number 2 are admitted with the exception of 56.

6         THE COURT:  Okay.

7         MR. JACKSON:  We would also like to offer Brian

8    Potashnik Exhibit Numbers 299 and 310.

9         THE COURT:  Any objection to those?

10        MR. MEACHAM:  No, your Honor.

11        THE COURT:  Those are also admitted.

12   All right.  Mr. Greene.

13        MR. GREENE:  Thank you, your Honor.

14   We have offered Exhibit Number 1.

08:26:35 15       THE COURT:  I don't want to hear what you have

16   offered.  I want to know what you haven't offered.

17        MR. GREENE:  We want to offer Exhibit Number 10,

18   Exhibit Number 11, Numbers 14, 20, 21, 27 -- I believe that's

19   already been offered -- 31, 33, 34, 35, 36, 37, 39, 40, 45,

20   47, 50.  Also 136, 138, 139.

21   Your Honor, the ones in the middle are the tapes, and

22   quite frankly we haven't gone through them enough to come up

23   with the transcripts, and we are in the same position as

24   Mr. Mureen, so we would ask that we be allowed some leeway on

25   that.

08:27:43  1          THE COURT:  All right.

2          MR. GREENE:  The other one is Exhibits 140, 141,

3    142, 143, 144, 145, 146, 147.

4          THE COURT:  Are you finished?

5          MR. GREENE:  Yes.

6          THE COURT:  Objections?

7          MR. MEACHAM:  The government objects to Defense

8    Exhibits 33 through 40.  I don't know if he offered every one

9    of those.  The government objects to those.

10         THE COURT:  Any other objections?

11         MR. MEACHAM:  Yes, your Honor.

12         45, 136, 140, 141, 142, 143, 144, 145 and 146.

13         Let me look at 147 real quick.

14         No objection to 147.

08:28:49 15         THE COURT:  All right.  Any other defense

16   objections?

17         (No response.)

18         THE COURT:  All right.  The following Lee Exhibits

19   are admitted:  10, 11, 14, 20, 21, 27, 31, 47, 50, 138, 139

20   and 147.

21         The others you will have to prove up.  They're not agreed

22   to.

23         MR. GREENE:  Yes, your Honor.

24         THE COURT:  All right.  Mr. Steinke.

25         MR. STEINKE:  We would offer Reagan Exhibits 2

08:29:18 1    through 14, Reagan Exhibits 16, 17, 19 and 20.

2         On my exhibit list is Reagan Exhibit 18.  That is the

3    Allen McGill plea agreement, but in reading it, your Honor,

4    that was before the local rule went into effect.

5         THE COURT:  Let's not be specific about that.

6         MR. STEINKE:  So rather than offer it into evidence,

7    I would suggest just using it the same way we did the other

8    document.

9         THE COURT:  That's fine.

10        Any objection to those?

11        MR. MEACHAM:  Objection to Number 17 only.

12        THE COURT:  All right.  2 through 14, 16, 19 and 20

13   are admitted.

14        All right.  Mr. Robertson.

08:30:06 15        MS. DECKARD:  Your Honor, we would offer Rickey

16   Robertson Exhibits 1 through 75, and we are filing this

17   morning the Title III transcripts that we have filed a month

18   ago, two months ago in the month of May.  We're filing those

19   as exhibits as well.  That's Exhibit 82 through 100.

20        THE COURT:  Any objection to those?

21        MR. MEACHAM:  Government objects to Exhibit Numbers

22   1, 9 and 10 and all of the draft transcripts that Ms. Deckard

23   has marked as 82 to 100.

24        MS. DECKARD:  These are not transcripts.  These are

25   the actual tapes that you had given me.  The tapes that you

08:30:57  1    didn't designate, we're designating.

2              MR. MEACHAM:   No objection to the recordings.

3              THE COURT:   I thought you said transcripts too.

4              MS. DECKARD:   I'm sorry.   These are the Title III

5    recordings.

6              THE COURT:   You're not offering transcripts?

7              MS. DECKARD:   No.   Just the recordings.

8              MR. MEACHAM:   All the Title III recordings are in

9    evidence.   There may be consensual meetings, I'm not sure.

10             THE COURT:   Well, they're saying you didn't put in

11   all of them.

12             MS. DECKARD:   These are the ones you did designate.

13   These are the counter-designations of the Title III

14   recordings.

08:31:24 15             MR. MEACHAM:   No objection.

16             THE COURT:   Then Robertson Exhibits 1 through 75

17   except for 1, 9 and 10 and 82 through 100 are admitted.

18        All right.   Anything else to take up before we bring in

19   the jury?

20             MS. SALDANA:   Your Honor, the government does have a

21   matter that occurred over the weekend that we need to apprise

22   the Court of, if we could do that in chambers.

23             THE COURT:   Okay.   Do defendants object to their

24   counsel meeting with the Court in chambers without them being

25   present?

08:31:57  1        Mr. Hill?

      2              MR. HILL:  No, I don't, your Honor.

      3              THE COURT:  Ms. Hill?

      4              MS. HILL:  No, I don't.

      5              THE COURT:  All right.  Mr. Lee?

      6              MR. LEE:  No objection.

      7              THE COURT:  Mr. Robertson?

      8              MR. ROBERTSON:  No.

      9              THE COURT:  Mr. Reagan?

     10              MR. REAGAN:  No.

     11              THE COURT:  All right.  I'll see y'all in chambers.

     12              MR. WILLIAMS:  All rise.

     13        (Brief recess.)

     14        (Judge enters the courtroom.)

08:50:27 15              THE COURT:  All right.  Bring in the jury.

     16        (Jury returned to the courtroom.)

     17        (Court opening.)

     18              THE COURT:  Good morning.

     19        Ladies and gentlemen.  Sorry to have kept you a bit.

     20   When that happens we're doing something in here that I think

     21   will be helpful to you in the long run.

     22        I'm going to take a moment of personal privilege here,

     23   and tell you that yesterday we lost one of our court security

     24   officers, John Littlejohn, who had been with us for a long

     25   time.

08:52:13  1       I think you all know from your good experience with

2     Mr. Williams that our court security officers are really vital

3     to our court system.  They protect us, but they're also our

4     friends.  We admire them very much.

5          Most of our court security officers were law enforcement

6     officials before they came to us, and they contribute a great

7     deal to the Court.  So I'm going to ask that we just have a

8     moment of silence in memory of Mr. Littlejohn.

9               THE COURT:  Thank you.

10          All right.  You may proceed, Mr. Greene.

11               MR. GREENE:  Thank you, your Honor.

12                    *KATHY NEALY*, (Sworn)

13     having been previously sworn, testified as follows:

14                 *CROSS-EXAMINATION (Cont'd)*

08:52:50 15    BY MR. GREENE:

16     Q.    Good morning, Ms. Nealy.  I'll give you a second to get a

17     drink of water.

18     A.    Good morning.

19     Q.    Just to kind of recap a little bit what we were going

20     over Friday, when we broke we were discussing the things that

21     Mr. Fisher did not tell you about.  Okay.  And we were talking

22     about he didn't tell you about the contract with Mr. Fantroy,

23     right?

24     A.    Yes.

25     Q.    Nor did he tell you that he was recording conversations

08:53:39  1   for the FBI?

2   A.    Yes.

3   Q.    Right.  All right.  And he also didn't tell that he was

4   recording conversations -- your conversations?

5   A.    Yes.

6   Q.    All right.  At the break what we were trying to do was

7   play one of those particular conversations.

8   A.    Yes.

9   Q.    And I'll tell you that that conversation took place on

10  February 9, 2005 at approximately 5:40 in the evening.

11  A.    Okay.

12  Q.    Okay.  He was talking about a change of the guard in

13  District 5.  All right?

14  A.    Okay.

08:54:11 15         MR. GREENE:  Mr. Allen, if you would, play

16  Defendants' Exhibit 89, and start it around the 13:45 mark.

17       Your Honor, we don't have a transcript.

18         THE COURT:  All right.

19  (Audiotape clip, DLX 89 played.)

20         MR. GREENE:  Can you hear it?

21  (Nodding heads up and down.)

22  (Audiotape clip, DLX 89 played.)

23         MR. GREENE:  Pause one second.

24  BY MR. GREENE:

25  Q.    Ms. Nealy, can you hear yourself on that tape?

08:56:05   1    A.    Uh-huh.

          2    Q.    That's you talking?

          3    A.    Yeah.

          4    Q.    You're talking to Bill Fisher?

          5    A.    Yes.

          6    Q.    Okay.   And initially you're talking about the Strong

          7    Mayor Campaign?

          8    A.    Yes.

          9              MR. GREENE:   Continue.

         10         (Audiotape clip, DLX 89 played.)

         11    BY MR. GREENE:

         12    Q.    Ms. Nealy, I -- I know you're cleaning up the water

         13    there.

         14    A.    That's all right.

09:03:29  15    Q.    You heard the comments about Mr. Fisher waiting on the

         16    changing of the guard?

         17    A.    Uh-huh.

         18    Q.    He was talking about District 5?

         19    A.    Uh-huh.

         20    Q.    The council person for District 5 is Don Hill.  Is that

         21    right?

         22    A.    Yes.

         23    Q.    The CPC commissioner was D'Angelo Lee?

         24    A.    Uh-huh.

         25    Q.    You are aware that Mr. Reagan was involved prior to that

09:03:46  1   with the contract with Mr. Fisher, correct?

2   A.   Not really in the contractual relationship, no.

3   Q.   All right.   But when you were -- I'll give you a second

4   there.

5   A.   That's fine.

6   Q.   And that was the -- that was the contract and then going

7   through the --

8   A.   Well, can I complain?

9   Q.   Well, hold on.

10   The contract and then going through the procedure to get

11   zoning things changed.   That was the triangle stuff that you

12   were talking about, right?

13   A.   I mean -- ask the question again.

14   Q.   All right.   The contract with Mr. Reagan and Mr. Fisher,

09:04:24 15   along with having to get that approved, which you had to go

16   through CPC and city council to get approved, that was the

17   triangle thing you were talking about on the tape, right?

18   A.   Yes.

19   Q.   Okay.   And what I wanted to talk to you about was you

20   told us yesterday -- I believe your -- Friday -- your

21   testimony was that in January of 2005 you were terminated by

22   Mr. Fisher's company, right?

23   A.   I can't answer that in just a yes or no question, so can

24   I expand on that?

25   Q.   Well, let me ask it to you this way.

09:05:01  1      Were you working for Mr. Fisher's company after January

2      of 2005?

3      A.   It reduced dramatically.  I continued to call because we

4      still had an outstanding payment, but that's why I told him

5      that I didn't mind talking with him, because perhaps -- I want

6      to say it was late January -- that he had told me in one of

7      those conversations that Darren and D'Angelo said don't talk

8      to me anymore, talk to them.

9      Q.   But as of January 2005 you were --

10     A.   I stopped billing.

11     Q.   Okay.  All right.  Now -- and you would call him when you

12     had some questions about the bill, correct?

13     A.   Yes.  I would call and my office would call.

14     Q.   Now, this is a conversation where Mr. Fisher called you,

09:05:51 15     correct?

16     A.   Okay.

17     Q.   Correct?

18     A.   I guess yes.

19     Q.   Well, I mean, are you agreeing with me on that?

20     A.   They got into a conversation.  You went -- I mean --

21     Q.   Fair enough.

22     A.   It was a conversation on who -- we were having together,

23     and I guess he called me.

24     Q.   That's what I was getting at.

25          Now, you are aware that this is the FBI case, and the FBI

09:06:16   1   had certain wiretaps going on.

2       And are you aware that the wiretaps are generally the FBI

3   would intercept calls out of the air, and you're aware of

4   that, that's how it works, right?

5   A.   You know what, sir?

6   Q.   You don't know?

7   A.   I don't know.

8   Q.   All right. Okay. All right. And the point that I was

9   going to make was that the person who's calling doesn't know

10   they're being recorded, and the person who's receiving the

11   call doesn't know they're being recorded, right?

12   A.   I don't know how this works.

13   Q.   All right.

14   A.   I mean, as I said on Friday, I didn't know anything about

09:06:53 15   the FBI tapes. I didn't know about any taping at all to

16   anybody.

17   Q.   Fair enough.

18       But are you aware now that Mr. Fisher was the only person

19   who had the ability to dictate who he was going to call, and

20   who he was going to record? Are you aware of that?

21   A.   I don't know if it came from Bill Fisher, or if it was

22   the FBI. I mean, I don't know.

23   Q.   All right. Because you didn't know you were being

24   recorded obviously, right?

25   A.   That is correct.

09:07:23  1   Q.   Do you think that a person -- do you think that it would

2   be trustworthy for a person to call you and record you in the

3   middle of an FBI investigation and not let you know about it?

4   Do you think that's a person you can trust?

5   A.   I don't know.

6   Q.   You don't know?

7        All right.

8   A.   I mean, I haven't done anything wrong.  I tried to help

9   Bill Fisher.  So -- I mean, it didn't matter whether I was

10  being chased or not.  I mean, the truth is the truth, so

11  that's the only thing I can deal with.

12  Q.   Exactly.  That's what we're trying to get at.

13       Now, would you agree, though, if he has the ability to

14  control who he's calling and control the nature of that

09:08:03 15 conversation --

16  A.   Sir, you're repeating the same thing over and over again.

17  Q.   Hold on.  Thank you, ma'am.

18       But my question is, given that, don't you think he's sort

19  of like the director of his own little reality show?

20  A.   Sir, I don't know.

21  Q.   Wouldn't you agree with me on that?

22  A.   I do not know.  I can't answer that.

23  Q.   Well, let me ask you this.

24       Do you remember years ago they used to have this show

25  called Candid Camera.  I think now the new version is called

09:08:28  1     Punked.   Have you ever seen those?

2                    MR. MEACHAM:   Objection.

3                    THE COURT:   Overruled.

4          Excuse me.

5          Overruled.   You may answer.

6     BY MR. GREENE:

7     Q.    I'll give you a second over there.

8     A.    Okay.

9     Q.    Are you all set?

10    A.    Uh-huh.  I can look and see when you are talking.

11    Q.    Okay.  But my point is that the joke of the show was that

12    the actors didn't know they were being recorded, and they

13    would set up these scenarios and get people making all --

14    A.    I watched Candid Camera.

09:09:06  15   Q.    So you remember that that was the brunt of the joke,

16    right?

17    A.    If there was a joke.  I don't think this is a joke.

18    Q.    Exactly.  It wasn't not funny, exactly.  And this isn't

19    funny either?

20    A.    At all.

21    Q.    Bill Fisher was the director in this entire situation.

22          Are you aware of that?

23    A.    No.

24    Q.    Okay.  Now, you wouldn't normally do anything illegal,

25    would you?

09:09:29 1   A.   No.

2   Q.   In this situation, as far as you know, you didn't do

3   anything improper, did you?

4   A.   No.

5   Q.   So would there be any reason that Mr. Fisher would decide

6   he needed to call you with the authorization from the FBI to

7   tape record people?

8   A.   Can I explain that?

9   Q.   I'm asking you.

10   A.   Well, I can't do that in a yes or no question.

11   Q.   Yes.  You can explain it.

12   A.   When we found out the morning at the Original House of

13   Pancakes that there was no longer support from the

14   councilman -- we were walking to the car.

09:10:03 15   Q.   Okay?

16   A.   Saleem Jafar turned around to me and said, "So when did

17   you find out?"

18   Q.   Hold on.  I don't want you making --

19   A.   What I'm --

20          THE COURT:  Wait.  Wait.  Wait.  Ms. Nealy, just a

21   moment.  There are things that you can't testify to, and if

22   counsel feels that you are going there he may change his

23   question.

24          THE WITNESS:  Okay.

25          THE COURT:  Go ahead.

09:10:24   1          MR. GREENE:   Thank you, your Honor.

2     BY MR. GREENE:

3     Q.   Now, by the way, were you aware that Bill Fisher's Dallas

4     West Village project had already passed the City Plan

5     Commission in December of 2005?  Are you aware of that?

6     A.   I know that that part was moving forward as far as the

7     planning commission.

8     Q.   All right.  That had already happened.

9          Okay.  That was the board that Mr. Lee served on?

10     A.   (Nodding head up and down.)

11     Q.   Now, my last area is we were talking about -- we were

12     talking Friday about the speaking -- that you were speaking

13     with Mr. Lee and his experience -- his inexperience as a CPC

14     commissioner, correct?  Do you remember that question on

09:11:14  15     Friday?

16     A.   But I didn't agree that he was inexperienced because they

17     do a training when they first came in, and he was a

18     developer.

19     Q.   All right.  But do you remember that line of questioning

20     on Friday?

21     A.   Okay.

22     Q.   And now I want to play for you a tape that was made on

23     May 20, 2005 at 9:46 a.m. between yourself and Don Hill.

24     A.   Okay.

25     Q.   I'm just going to play a portion of the tape because the

09:11:41  1    jury has already heard some of it.

2         MR. GREENE:  Your Honor, we would rather -- it's

3    quicker just to play the tape than put the transcript up.

4         If your Honor could flip that to Mr. Mureen.

5         THE COURT:  Okay.

6         MR. GREENE:  Your Honor, just for the record, I see

7    a picture of us, so I imagine that's -- something broke down.

8         THE COURT:  Okay.

9    (Audiotape played.)

10        MR. GREENE:  Thank you.

11   BY MR. GREENE:

12   Q.   All right.  That's your voice on that tape, correct?

13   A.   Yes.

14   Q.   You were talking to Mr. Hill, correct?

09:13:14 15   A.   Yes.

16   Q.   This was before the FBI investigation happened that you

17   were aware of, right?

18   A.   Right.

19   Q.   This was before you had to hire an attorney, correct?

20   A.   Yes.

21   Q.   This was before you had to be subpoenaed to come testify?

22   A.   Right.

23   Q.   Before you spoke to the government at all?

24   A.   Uh-huh.

25   Q.   Correct?

09:13:33  1    A.    Yes.

2              MR. GREENE:   Nothing further.

3              THE COURT:   All right.   Thank you.

4        All right.   Who's next up?

5        Mr. Jackson.

6                    *CROSS-EXAMINATION*

7    BY MR. JACKSON:

8    Q.    Good morning Ms. Nealy.

9    A.    Good morning.

10   Q.    You and I have never met before, have we?

11   A.    No.   We talked on the phone.

12   Q.    Yes, ma'am.

13        You have known Don for more than 20 years, correct?

14   A.    Yes.

09:14:06  15   Q.    And I believe that you have known him even as a council

16   member.   Before this October 27th day you had known him for

17   four years as a council member?

18   A.    Yes.

19   Q.    And you had even done business in Don's district before

20   October 27th, is that correct, of 2004?

21   A.    What do you mean?

22   Q.    You had done business in his district meaning that you

23   had had clients that you represented in this district before?

24   A.    That we had to have support on issues, yes.

25   Q.    And in fact you were a consultant with Masterplan on a

09:14:39  1   Southwest Housing development that was in Don's district.  Do

2   you recall that?

3   A.    Uh-huh.   Yes.

4   Q.    I believe that that deal was the Pemberton Hill project?

5   A.    Yes.

6   Q.    I believe that that deal had opposition from a slum lord.

7         Do you recall that?

8   A.    Yes.

9   Q.    Okay.

10   A.    The one on Loop 12?

11   Q.    Right.

12   A.    Yes.

13   Q.    As a result of that I believe you indicated that Brian

14   Potashnik offered to team up with Reverand Johnson for

09:15:16  15   support.

16         Do you remember that?

17   A.    Yes.

18   Q.    And you also recall that Brian Potashnik pledged $50,000

19   to Reverand Johnson's CDC?

20   A.    Yes.

21   Q.    And that was Brian Potashnik's idea to partner with

22   Reverand Johnson, was it not?

23   A.    Yes.

24   Q.    And you would agree with me that Brian Potashnik is very

25   politically savvy?

09:15:40  1    A.    Yes.

2    Q.    Okay.  And Don Hill never asked Brian Potashnik to team

3    up with Reverend Johnson, did he?

4    A.    No, not to my knowledge.

5    Q.    Since then I believe -- and let me establish -- I mean, I

6    guess you established some of your -- some of your clients and

7    some of the things you have done in the City of Dallas and all

8    around the country.  Is that correct?

9    A.    Yes.

10    Q.    And you're pretty tight in Southern Dallas.

11         Would you agree with that?

12    A.    Yes.

13    Q.    And there are invoices that are stilled owed to you by

14    Brian Potashnik that he refused to pay, correct?

09:16:34 15    A.    Someone else has resolved those issues.

16    Q.    Okay.

17    A.    They were paid.

18    Q.    Okay.  And -- but initially Brian Potashnik wasn't

19    worried about making you upset about not paying you your

20    invoices?

21    A.    I don't know.  Because my invoices came through

22    MasterPlan.  So I invoiced -- even though they would say

23    Southwest Housing project on them, Masterplan would pay me my

24    dollars.

25    Q.    Did -- in any prior deal that you had before October 27,

09:17:08   1    2004 did Don Hill ever try to bribe one of your clients, or

        2    take a bribe from one of your clients?

        3    A.    No, not to my knowledge.

        4    Q.    Have you ever seen prior to October 27, 2004 Don ask one

        5    of your clients for anything that was illegal?

        6    A.    No.

        7    Q.    Did he ever ask for anything that was illegal in support

        8    of him voting in their favor?

        9    A.    No.

        10   Q.    You operate with integrity, don't you?

        11   A.    Sure.

        12   Q.    And you didn't engage in bribery when you recommended

        13   Fantroy to Bill Fisher, did you?

        14   A.    No.

09:17:48   15   Q.    Did the government tell you that you had committed

        16   bribery?

        17   A.    No.   Can I explain?

        18   Q.    No.

        19   A.    I had some exposure.

        20         THE COURT:   Just answer the question.

        21   BY MR. JACKSON:

        22   Q.    You understand that this is not a City ethics case,

        23   right?

        24   A.    Yes.

        25   Q.    And so let me then just ask -- let me ask you.

09:18:11  1        Do you know from your personal -- okay.  You indicated

2    that you had some exposure.  Explain that.

3    A.    Because we continued to -- after we found out that there

4    was a contract and continuing to talk to Mr. Fantroy, because

5    you're not supposed to be talking to him, and that's what he

6    exposed.

7    Q.    That would have been an ethical violation?  You are

8    talking about exposure, ethical violation?

9    A.    It could be ethical and legal.

10    Q.    Well, yeah.  Let me back up, because an ethical is legal.

11        They could have brought you up on state ethics charges,

12    violations?  Is that what you're saying?

13    A.    Now, you know, you lawyers gets real good with them

14    words.  So all I'm saying is legally there could be a problem

09:19:10 15    to continue to talk with Mr. Fantroy while -- when he had

16    recused himself when we found out that there was a contract.

17    Q.    But you didn't bribe?

18    A.    No, I did not.

19    Q.    Did Don Hill accept a bribe from Bill Fisher under your

20    watch?

21    A.    I don't know exactly what you're saying.

22    Q.    Well --

23    A.    What do you mean "under my watch"?

24    Q.    I'm saying while you were a consultant for Bill Fisher

25    did Don Hill accept a bribe from Bill Fisher?

09:19:46  1   A.    I don't know.

2   Q.    While -- you understand that Homes of Pecan Grove was

3   passed, right?

4   A.    At Simpson Stuart?

5   Q.    Yes.

6   A.    Yes.

7   Q.    Okay.  And I understand that you -- for the Memorial Park

8   Townhomes that you missed out on a success fee by it not being

9   passed.

10   A.    Right.

11   Q.    You said that you believed that Don screwed your client,

12   correct?

13   A.    Yes.  May I explain that?

14   Q.    Go ahead.

09:20:27  15   A.    For many months we had the support, and then all of a

16   sudden it went the other way.

17   Q.    Right.

18   A.    Two weeks before the vote.  And then in those two weeks

19   every day we were flipping, trying -- turning trying to answer

20   the questions, provide information, that was at the last

21   minute requested of us.  So -- and then for him -- then he

22   flipped and said he was not going to support that and support

23   some apartments across the street as opposed to townhomes and

24   single-family homes.  He had spent upwards to $400,000.

25   That's how I concluded that yes, he was screwed.

09:21:08   1    Q.   Right.   If I was in your position I would probably feel

2    the same way.   We're going to talk about some of those

3    changes, okay, in just a moment.

4         I think you indicated in that vein when you were speaking

5    with Mr. Vital on Friday that you were unaware of some of the

6    changes that had occurred at City Hall regarding projects that

7    were within a mile of each other.

8         Do you recall that testimony?

9    A.   Right.

10   Q.   And you had indicated -- well, you have spoken on several

11   occasions with the FBI, have you not?

12   A.   Yes.

13   Q.   In any of those conversations with the FBI did they ever

14   explain to you those changes that occurred in September of

09:21:57   15   2004 with the City's criteria?

16   A.   No.

17   Q.   Do you recall them showing you a -- or at least telling

18   you about a contract that Sheila Hill had with Brian

19   Potashnik.

20        Do you recall that?

21   A.   Yes.

22   Q.   Okay.   And I believe that your testimony was that changed

23   everything.

24        Do you recall that?

25   A.   (No response.)

09:22:27  1    Q.    Or that would explain everything?

2    A.    Yes.

3    Q.    Do you know whether or not this contract with Sheila

4    Farrington-Hill was signed after the decision was made to

5    support Brian Potashnik?

6    A.    (No response.)

7    Q.    Do you know?

8    A.    Do I know?

9    Q.    Right.  Do you know when it was signed?

10    A.    I can't remember what was on the document.  I want to say

11    it was five days before.  Something like that.

12    Q.    You are aware, are you not, that two weeks before this

13    vote that Don Hill was not supporting the Memorial Park

14    Townhomes?

09:23:16  15    A.    He said he was having problems with it, yes.

16          MR. JACKSON:  Well, let's look at -- if we could,

17    look at it.  It's already been admitted.

18          Let's look at Reagan 20.

19    BY MR. JACKSON:

20    Q.    This is an e-mail from Bill Fisher.

21          Do you see that?

22    A.    Yes.

23    Q.    To AMC1229.  And do you know if that's Allen McGill's

24    e-mail address?

25    A.    No.

09:23:59  1    Q.    Okay.  This is dated 10-13-2004.

        2          Do you see that?

        3    A.    Yes.

        4    Q.    Two weeks before the October 27th vote?

        5    A.    What was the question again?

        6    Q.    Was it two weeks before the October 27th vote?

        7    A.    Yes.

        8    Q.    Okay.  It reads, "The development appears to be a

        9    none-starter," and he's talking in this case about the Dallas

       10    West Village, "and he met yesterday with Mayor Don Hill," but

       11    Don wasn't the mayor at that time, was he?

       12    A.    No.  Deputy mayor.

       13    Q.    Deputy Mayor Pro Tem?

       14    A.    Right.

09:24:37 15    Q.    "And he indicated a support for Southwest Housing

       16    development on Scyene."

       17          Do you see that?

       18    A.    Yes.

       19    Q.    So at least on 10-13 he was aware that -- at least aware

       20    that Don was no longer supporting the Dallas West Village, and

       21    was supporting the Scyene project.

       22          Do you recall?

       23    A.    See, I wasn't -- I didn't do a lot on Dallas West

       24    Village.  My focus was on the Memorial Park Townhomes.

       25    I had Memorial Park Village Fair and the Simpson Stuart

09:25:12  1    project.  But there was some things that were done on that,

2    but that really didn't matter to me at that point.

3    Q.    Wouldn't he have found that out at the meeting that you

4    had at the Original House of Pancakes?

5    A.    The meeting at the Original House of Pancakes strictly

6    talked about Memorial Park.

7    Q.    Then let's continue to talk about that.

8          You are aware that developers like Brian Potashnik and

9    Bill Fisher, they will do different things to curry favor with

10   politicians?

11   A.    (No response.)

12   Q.    Are you aware of that?

13   A.    No.

14   Q.    Well, are you aware that -- obviously that Fisher gave a

09:25:59 15   contract to Fantroy to curry favor?  You're aware of that,

16   aren't you?

17   A.    After it happened, yes, but it was -- Leon Backes was the

18   owner there.  So I don't think it was single decision made by

19   Bill Fisher.

20   Q.    Well, do you understand that that was done to curry

21   favor?

22   A.    I don't know why they did it.

23   Q.    Well, okay.  You understand that at the time Bill Fisher

24   was opposing -- I mean, that Fantroy was opposing the project?

25   A.    Yes.

09:26:32 1    Q.    Okay.   And then after Fantroy was opposing the project he

2    was given a contract for security?

3    A.    Okay.

4    Q.    And it's your testimony that that was not done to curry

5    favor with Fantroy?

6    A.    I can see how you could come to that conclusion.

7    Q.    Okay.   We know that Brian Potashnik gave a contract to

8    Sheila Hill, right?

9    A.    (No response.)

10    Q.    You know that now?

11    A.    Yes.

12    Q.    But what I guess what we need to determine for this jury

13    is, why did Don Hill decide to start voting and -- on behalf

14    of Brian Potashnik and not Fisher.

09:27:17 15         So when you went through the criteria, and you only went

16    through some of them with Mr. Vital, the criteria that changed

17    on September 20, 2004 that was in Brian Potashnik's Exhibit

18    37, but what you saw was that based on that criteria that if

19    the City followed its criteria that the votes would have been

20    exactly as they occurred that day.

21         Do you recall that?

22    A.    (No response.)

23    Q.    Based on the zoning issues.

24         Do you recall that?

25    A.    I'm listening to you.

09:27:54  1    Q.   Do you remember that?

2    A.   I'm trying -- I'm trying to reflect back.

3    Q.   Then let's -- if we could --

4    A.   You don't have to put up a document or something?

5    Q.   We'll do that.

6         MR. JACKSON:   Can we put up Brian Potashnik 37.

7    Okay.   If we could scroll through the pages, please.

8    Okay.   If we can go back one page.

9    I want you to highlight the top portion, please.

10    I want to try --

11         MR. MEACHAM:   Object to the repetitive line of

12    questioning.   I think this is the fifth time we have covered

13    this line, the second time at least with Ms. Nealy.

14         THE COURT:   We will have you move along, Counsel,

09:28:38 15    but you may cover this.

16    BY MR. JACKSON:

17    Q.   Let me do it real quick, because you said you didn't

18    remember this, so I want to make sure that you remember seeing

19    the document.

20         But on the left side are the DHFC projects which were

21    Brian Potashnik's, and on the right side are the TDHCA

22    projects which were Leon Backes and Bill Fisher.

23         Do you see that?

24    A.   Yes.

25         MR. JACKSON:   If you could scroll out, please?

09:29:07   1        If we good to the next page.

2        Next page, please.

3        Next page.

4        Okay.  Highlight the top portion.

5    BY MR. JACKSON:

6    Q.    Now, I want you to look at this.

7        You were shown this, because it shows how the City was

8    determining how they were going to approve projects within one

9    mile of each other.

10        Does you that refresh your memory at all?

11   A.    Yes, it does.  Can I explain something?

12   Q.    No.  I just wanted to make sure -- it -- it refreshed

13   your memory.

14   A.    Okay.

09:29:39  15   Q.    Does it refresh your memory?

16   A.    Yes.

17   Q.    Okay.  And you learned, did you not, that the City of

18   Dallas was giving preferences to local bonds, meaning that

19   bonds that were done by DHFC versus TDHCA bonds.

20        Do you see that?

21   A.    I see that.  But can I explain something?  Could I add --

22   explain?

23   Q.    We're going to go through the question.  We only have a

24   limited amount of time.

25        So you see that the projects there, that they're --

09:30:19  1    they're given preferences to DHFC over TDHCA.

2         Do you see that?

3    A.    But I need to add something to what I'm saying.

4              THE COURT:  He's just asking if you see that.

5    A.    Yes, I do see that.

6    BY MR. JACKSON:

7    Q.    Okay.  Do you know why the City of Dallas was giving a

8    preference to the DHFC bond over TDHCA?

9    A.    Do you want my opinion?

10   Q.    Well, I -- I -- I mean, if you know.  I don't want your

11   opinion, but if you know.

12   A.    Yes.  I was going to factor in that the people on the

13   city staff didn't like Bill Fisher.

14   Q.    We'll get to that.  We'll get to that in just a minute.

09:31:05 15   A.    So this was a way to also come up with some criteria to

16   whereas he would have less points and not be able to get his

17   projects too.

18   Q.    So you think Brian Potashnik had something to do with the

19   City changing their policies and procedures?

20   A.    I know that there was a kind of a dislike of Bill Fisher

21   at City Hall, and we were challenged with that always.

22   Q.    We'll get to the dislike of Bill Fisher.

23        But do you think that Brian Potashnik had anything to do

24   with the City approving -- or putting a preference over local

25   bonds versus states bonds?

09:31:40  1  A.    I don't know how they came to that conclusion.

2     (Sotto voce discussion between Jackson and Vital.)

3         MR. JACKSON:   Your Honor, I apologize.   There was

4  one exhibit I left off earlier.   Brian Potashnik 45, I would

5  like to offer into evidence.

6         THE COURT:   Any objection to Brian Potashnik 45?

7         MR. MEACHAM:   No, your Honor.

8         THE COURT:   It's admitted.

9         MR. JACKSON:   Thank you, your Honor.   I apologize.

10     If we could get that on the screen.

11  BY MR. JACKSON:

12  Q.    This is a memo from -- this is a memo to the Housing and

13  Neighborhood Development Corporation, and a few members of the

14  council.

09:32:32  15     Do you see that?

16  A.    Yes.

17  Q.    Okay.

18         MR. JACKSON:   If we could go to page -- not -- page

19  9 of that exhibit, please.

20     If we could look under the revenue area, please.

21  BY MR. JACKSON:

22  Q.    Now, it shows here in this memo that the revenue for the

23  City that they were going to receive through the DHFC, the

24  City's finance corporation was going to receive $85,000

25  through closing, plus an annual fee of 15,000 for a minimum of

09:33:26   1    15 years until the bonds are paid.

2         Do you see that?

3    A.    Yes.

4    Q.    So that for each project that was using local bonds the

5    City was going to make a lot of money every year, was it not?

6    A.    Yes.

7              MR. JACKSON:   Now, if we look on the bottom it shows

8    that for each -- on the same square.  I apologize.

9    BY MR. JACKSON:

10   Q.    At the bottom of that square for each project funded

11   through TDHCA the City receives $1,500 for due diligence and

12   $500 a year for compliance monitoring.

13        Do you see that?

14   A.    Yes.

09:34:01  15   Q.    That's a significant difference that the City was going

16   to receive if they went with the local bonds as opposed to the

17   state bonds.

18        Do you see that?

19   A.    Yes.

20   Q.    And that would be a good reason why the City was pushing

21   to approve projects that were having local bonds versus state

22   bonds.

23        Would you agree with that?

24   A.    The City would also get the property tax.

25   Q.    Pardon me?

09:34:21  1   A.   The City would also get the property tax.

2   Q.   Well, we're not talking about the property taxes.

3   A.   Because that's a benefit too.

4   Q.   Hold on.  I understand that.  But we're not talking about

5   the property taxes.  We're talking about the bonds.

6        The City has a preference for local bonds because they

7   were going to get $100,000 a year, 100,000 -- or 85,000 and

8   10,000 and 15,000 versus $1,500 and $500 a year.

9        Do you see that?

10   A.   I'm reading.

11   Q.   You indicated earlier that Don started to change or

12   waiver his support for Bill Fisher on or about October 2004,

13   right?

14   A.   Yes.

09:35:02  15   Q.   He had a lot of questions concerning Bill Fisher's deals,

16   didn't he?

17   A.   Yes.

18   Q.   Can you tell this jury where those questions were coming

19   from?

20   A.   He had questions and the staff was asking questions too.

21   Q.   Are you aware of the questions that Don was asking that

22   he was getting from other council members and staff regarding

23   Bill Fisher's projects?

24   A.   He asked questions about the financials, and we provided

25   them.  As well as the state decides they have to go through a

09:35:36  1   rigorous test because the dollars come from the state and

2   federal.

3              MR. JACKSON:  Your Honor, I object to nonresponsive.

4              THE COURT:  Sustained.  Just answer the question.

5   BY MR. JACKSON:

6   Q.   Are you aware that the questions that Don had he was

7   getting from other city council members and city staff?

8   A.   I was aware of some of them.

9   Q.   Okay.  Are you aware that Don was trying to get the

10   answers so he could drum up enough support to get Bill

11   Fisher's deals passed in spite of the criteria?

12        Are you aware of that?

13   A.   Okay.

14   Q.   Are you aware of that?

09:36:07 15   A.   I don't know why he was -- they were asking the

16   questions.  We were just trying to answer the questions.

17   Q.   Who is Theresa O'Donnell?

18   A.   Director of Planning.

19   Q.   In fact, Don called a meeting for Bill Fisher to meet

20   with her, and talk about that Memorial Park Townhomes, did he

21   not?

22   A.   We did meet with Theresa and Don.

23   Q.   You would consider this a proactive move.

24        Would you agree with that?

25   A.   We were trying to answer all the questions so that the --

09:36:39  1    try to get -- so we could get approval of the project.

2    Q.    Don began to bring city staff to the meetings with you

3    and Bill Fisher.

4         Isn't that also correct?

5    A.    We always had city staff at meetings.  I mean, from time

6    to time.

7    Q.    Don began to want to meet with certain contractors that

8    Bill Fisher was going to use, correct?

9    A.    Yes.

10   Q.    He wanted to know who the real estate agent was going to

11   be to try to help sell the homes that he was proposing?

12   A.    Yes.

13   Q.    And Don was asking a lot of questions about Bill Fisher's

14   ability to do the development, wasn't he?

09:37:15  15   A.    Yes.

16   Q.    And the concept of the single-family homes that you were

17   going to build, you're aware that Don met with the potential

18   builder?

19   A.    We arranged for them to come up.

20   Q.    And even after meeting with him the city staff still had

21   questions about whether Bill Fisher could do the deal, right?

22   A.    Yes.

23   Q.    And Don begin to let you know that some of Bill Fisher's

24   deals were not going to be approved, didn't he?

25   A.    Yes, he continued to say that.

09:37:52  1   Q.   Are you aware that city staff believed that your client,

2   Bill Fisher, was going to in essence flip that property?

3   A.   No.

4   Q.   Are you aware that Don even took Ryan Evans, who was the

5   Assistant City Manager, out to the site himself so he could

6   look at it?

7   A.   No.

8   Q.   Okay.  Would it surprise you if Don took Ryan Evans out

9   there?

10   A.   No.

11   Q.   If he did take Ryan Evans out there, would that be

12   further evidence that Don was trying to sell your Memorial

13   Park Townhomes deal?

14   A.   Okay.

09:38:26 15   Q.   Would you agree with that?

16   A.   Yes.

17   Q.   And at this time in October 2004 Bill Fisher was no

18   longer partners with Leon Backes.  Is that right?

19   A.   Right.

20   Q.   He was basically in a new partnership?

21   A.   Yes.

22   Q.   And you had known Bill Fisher since -- I guess you had

23   been working with Bill Fisher since 2002 when he was with

24   Southwest Housing?

25   A.   Yes.

09:38:55  1    Q.   So between 2002, 2004 Bill Fisher was in his third

       2   arrangement, was he not?

       3    A.   (No response.)

       4    Q.   I mean, he went from Southwest Housing, right?

       5    A.   (Nodding head up and down.)

       6    Q.   To a partnership -- is that right?

       7    A.   Yes.

       8    Q.   Then he went into the agreement or arrangement that he

       9   started doing business with Leon Backes?

      10    A.   Yes.

      11    Q.   Then after Leon Backes he was in business with -- is it

      12   Saleem Jafar?

      13    A.   They were always together.

      14    Q.   So who was he in partners with on the third one?

09:39:27 15    A.   (No response.)

      16    Q.   He was a partner with Saleem, but not with Leon Backes

      17   anymore, right?

      18    A.   Right.

      19    Q.   And you -- are you aware that Bill Fisher during this --

      20   Bill Fisher was bouncing $1,000 checks to city council

      21   persons?

      22    A.   I remember one that did happen.

      23    Q.   You're aware that Maxine Reese came to you to get her

      24   money, didn't she?

      25    A.   She told me about it.

09:39:53   1    Q.    You would agree that that would probably make the council

2    people feel pretty well suspicious about your client's ability

3    to do a deal?

4    A.    But it was corrected.

5    Q.    Well, that's not my question.

6          Writing thousand dollars checks that are bouncing would

7    make city council persons uneasy about doing deals with Bill

8    Fisher.

9          Would you agree with that?

10    A.    (No response.)

11    Q.    Well, would you accept a check from another person that

12    gave you a hot check?

13    A.    I would ask them if it's hot or is it good.

14    Q.    And -- and -- and certainly you wouldn't feel easy about

09:40:27  15    giving somebody a bill for $80,000 when they are writing you

16    hot checks for 1,000, right?

17    A.    (No response.)

18    Q.    I mean, you want to know that your money is going to be

19    good, right?

20    A.    Yes.

21    Q.    You would have questions about that?

22    A.    Yes.

23    Q.    Are you also aware that Bill Fisher at this time was

24    having to live with his -- in one of his attorney's houses

25    because he had been evicted?

09:40:53 1    A.    No.

2    Q.    Are you aware -- well, you're aware that he didn't pay

3    you all your money, right?

4    A.    That's not a yes or no.  Can I explain?

5    Q.    Well, we'll move forward.  You explained that the other

6    day.

7          You understand that Leo Chaney was a big supporter of

8    Brian Potashnik, right?

9    A.    Yes.

10   Q.    And you are aware that the mayor was a big supporter of

11   Brian Potashnik, right?

12   A.    Yes.

13   Q.    And you are aware that the mayor didn't like you?

14   A.    Yes.

09:41:20 15   Q.    If she came in here and told people that she did like

16   you, but y'all just didn't talk a lot, that would not be true,

17   would it?

18   A.    Professionally.  We deal with each other professionally.

19         The reason for the dislike had to do with Tom Dunning.  I

20   was supporting Tom Dunning, who ran against her.

21   Q.    She didn't like you for that?

22   A.    (No response.)

23   Q.    Is that a yes?

24   A.    Excuse me?

25   Q.    The court reporter has to take the answer.

09:41:47 1    A.    What's the question?

2    Q.    I'll withdraw the question.

3        Are you aware that Bill Fisher's former partner, Leon

4    Backes, told the mayor that your client wasn't able to do the

5    deal?

6        MR. MEACHAM:   Objection to hearsay, what Leon Backes

7    told anyone.

8        THE COURT:   That's sustained.

9        Ladies and gentlemen, you're instructed to disregard the

10   question.

11   BY MR. JACKSON:

12   Q.    You are aware, are you not, that there were serious

13   concerns about Bill Fisher's financial situation, and there

14   were concerns -- questions concerning his character coming

09:42:20 15   from city staff?

16   A.    Can you explain "character"?

17   Q.    Well, what do you think character is?

18   A.    I can explain -- they just didn't like Bill Fisher.  They

19   didn't like the way he dressed.  I mean, it was really kind of

20   interesting.  I mean, in my opinion.

21   Q.    That's fair.

22   A.    There were questions -- they went to financial, but he

23   didn't wear a suit.  He just wore a shirt and a pair of

24   slacks.  They didn't like that.

25       You know what I mean?

09:42:52  1    Q.    I understand.

2          Are you aware that the person over housing, Jerry

3    Killingsworth, didn't trust your client?

4    A.    I just became aware that he didn't trust him.

5    Q.    Are you aware that he thought that your client was

6    suspicious?

7    A.    No.

8    Q.    And all over city hall it was rumored that your client,

9    Bill Fisher, did not have the financial wherewithal to do this

10   project, Memorial Park Townhomes.

11         Are you aware of that?

12   A.    I heard about the rumor.

13   Q.    Do you know what battles on your behalf Don was taking

14   down at city hall with everyone trying to convince them that

09:43:28 15   Bill Fisher could do this deal?

16   A.    It was on my behalf?

17   Q.    Well, when I say "your behalf," I mean your client's

18   behalf, but you were his consultant.

19         Let me ask it a different way.

20         Bill Fisher had an uphill battle at city hall, right?

21   A.    Okay.

22   Q.    Okay.  Don was speaking to you and getting questions

23   answered, right?

24   A.    We were all answering questions, yes.

25   Q.    Do you know what Don did with those answers once y'all

09:44:01  1    gave them to him?

2    A.   We had staff that was at some of the meetings.  I'm sure

3    he talked to them about it.

4    Q.   If he talked to them, do you know what battles he was in

5    fighting on your behalf -- or your client's behalf?

6    A.   No.

7    Q.   In this situation where the projects are within a mile it

8    wasn't good enough for Don to say I like your project -- or

9    city council say I like your project, they had to like your

10   project -- when I say "your," I'm talking about Bill Fisher --

11   his project more than Southwest Housing because they can only

12   approve one, right?

13   A.   Right.   As to the rule you can only approve one.

14   Q.   The difference with the Homes of Pecan Grove that was

09:44:56 15   approved versus the Memorial Townhomes is that the Simpson

16   Villas project had opposition, right?

17   A.   (No response.)

18   Q.   Do you recall seeing the exhibit from Mr. Vital showing

19   that the Homes of Pecan Grove -- I mean, the Simpson Villas

20   had opposition?

21        Do you recall that?

22   A.   Yes.

23   Q.   And even with the Simpson Villas having opposition, Don

24   still almost didn't get your Homes of Pecan Grove passed,

25   right?

09:45:29 1    A.    It was passed.

2    Q.    But before it was passed do you recall the mayor going on

3    and on about Bill Fisher's financials and the vote being

4    passed for another day, right?

5    A.    (No response.)

6    Q.    Do you recall that?

7    A.    Can I explain?

8    Q.    No.   If I don't make my question clear, let me know and

9    I'll re-ask it.

10   A.    Okay.   Re-ask it.

11   Q.    On October 27th Don attempted to get the Homes of Pecan

12   Grove passed, right?

13   A.    Yes.

14   Q.    On October 27th the mayor went on and on about your

09:45:57 15   client's financials?

16   A.    Okay.

17   Q.    Do you recall that?  Do you recall Mitch Rasansky saying

18   to -- about your client's deal, he wanted to know if he was

19   financially able to do the deal?

20         Do you recall that?

21   A.    Okay.

22   Q.    Because of that the deal wasn't approved on October 27th,

23   the deal was held over.

24   A.    Okay.

25   Q.    Do you recall that?

09:46:16  1    A.    Yes.

2    Q.    But Don wanted it approved that day?

3    A.    Right.

4    Q.    So even though there was opposition to the other project,

5    there was still a fight just to get the Homes of Pecan Grove

6    passed?

7    A.    Yes.

8    Q.    Are you aware that on your Memorial Park Townhomes deal

9    that Bill Fisher had entered into a contract with Reverand

10   Johnson?

11   A.    He was talking to Reverand Johnson about doing -- helping

12   with some of the minority vendors, and some other parts of the

13   project.

14          MR. JACKSON:   If we could have Brian Potashnik

09:47:04 15   Exhibit 299, please.   It's been admitted into evidence.

16   BY MR. JACKSON:

17   Q.    This is an e-mail from Bill Fisher to Reverend Johnson.

18         Do you see that?

19   A.    Yes.

20   Q.    And he says, "Here's an agreement on the Laureland site

21   on Camp Wisdom."

22         And the Laureland site on Camp Wisdom would be the

23   Memorial Park Townhomes, right?

24   A.    Yes.

25          MR. JACKSON:   If we can go to page 2 of that

09:47:27  1   exhibit.

2          Okay.  And if we could have the whole exhibit, please.

3          Go to page 3.

4   BY MR. JACKSON:

5   Q.   Okay.  And this is where Bill Fisher starts to talk to

6   Mr. Johnson about compensation, and he is going to pay him

7   $50,000, do you see that, the total compensation?

8   A.   Yes.

9   Q.   And as part of that he's going to get -- if you look

10  under -- under point two, he's going to use his best efforts

11  to obtain a letter of support from Royce West.

12         Do you see that?

13  A.   Okay.

14  Q.   And so he was -- he was -- he was getting ready to -- or

09:48:19 15  entered into an agreement, or contemplated an agreement with

16  Reverend Johnson on the same Memorial Park Townhomes that you

17  were already a consultant on, right?

18  A.   Yes.  But this was different.

19  Q.   But you could have gotten the support from Royce West,

20  couldn't you, a support letter?

21  A.   A support letter, yes.  But this was -- these dollars are

22  totally different, and it's not like what my agreement was.

23  Q.   I understand.

24  A.   Mine was different.

25  Q.   But he's -- he's  -- he's going into an agreement with

09:48:53  1    Reverand Johnson, and you as his consultant may not have known

       2    that.

       3    A.    He said he was going to use Reverend Johnson for the CDC.

       4    He did say that.  I hadn't seen the document, but he did say

       5    he was going to be using Reverend Johnson, because he was

       6    going to some of the meetings.

       7          MR. JACKSON:  Let's go to Brian Potashnik Exhibit 3,

       8    please.

       9    BY MR. JACKSON:

      10    Q.    Before we get to that, let me ask you this.

      11          We were talking earlier -- I asked you about some of the

      12    battles that Don was taking on your behalf -- on your client's

      13    behalf.

      14          I want to show you.

09:49:49  15          MR. JACKSON:  I'll use the Elmo, if I can, please.

      16    BY MR. JACKSON:

      17    Q.    A transcript from Government's Exhibit 5414.  Okay.  This

      18    is a recorded conversation between D'Angelo Lee and your

      19    client, Bill Fisher.

      20          And on page 22 of 73, if we start on page 15 -- I mean,

      21    on line 15.

      22          Do you see that?

      23    A.    Okay.

      24    Q.    It says, "Laura did not want any of the tax credit stuff

      25    done.  She fought us on every way.  She got the teams behind

09:50:40  1    the scene fighting the financials and fighting the entire

2    process.  She essentially said, and you knew this, she said

3    there were -- there was going to be no tax credit deals done

4    this year.  She literally made that statement.  She said --

5    she said that she would fight everything that comes.  It's

6    been -- I mean, I tell people I can show you the battle

7    wounds."

8        Do you see that?

9    A.    Yes.

10   Q.    So back in reference to the wars that Don was fighting on

11   your behalf, but you said you wasn't aware of any of that, you

12   didn't know?

13   A.    You said me.

14   Q.    Well, when I said you, I mean on behalf --

09:51:27 15  A.    We had -- there was a whole discussion about tax credit

16   deals in the Southern Sector period, and Laura was against tax

17   credit properties, period.

18   Q.    But you know that Laura voted for Scyene and Laureland

19   deals for Brian Potashnik?

20   A.    Yes.

21   Q.    Okay.  So when I talked about you -- let me ask you this

22   way.

23       You and Don have a personal relationship, don't you?

24   A.    Uh-huh.

25   Q.    Don respects you a lot, doesn't he?

09:51:56  1    A.    Yes.

2    Q.    Respects your counsel?

3    A.    Yes.

4    Q.    Probably respects you a lot more than he respected Bill

5    Fisher.

6         So when I say that he is working on your behalf, I'm

7    saying that you have influence with Don, right?

8    A.    (No response.)

9    Q.    That's part of that leverage you talk about?

10   A.    Okay.

11   Q.    Right?

12   A.    (No response.)

13   Q.    You agree with that?

14   A.    Okay.

09:52:15 15   Q.    Do you agree with that?

16   A.    Okay.

17   Q.    Well, I don't know what "okay" means.

18   A.    Okay, yes.

19   Q.    Okay.  So if he's fighting -- if he's fighting, then he's

20   fighting to support something that you're doing.  Maybe not

21   necessarily Bill Fisher.

22        Would you agree with that?

23   A.    He liked the project.  Also, -- I mean, when you talk

24   about that leverage, I also try to bring quality projects to

25   the table.  People generally go along with me for that,

09:52:44  1    because of what I bring to the table as projects.  It's not

2    just about me.

3    Q.    Well, let me -- you and Don, y'all eat dinner together,

4    right?

5    A.    Sure.

6    Q.    You had good times at sporting events?

7    A.    Sure.

8    Q.    So -- I mean, you could come to his office whenever you

9    wanted to?

10   A.    I scheduled an appointment.

11   Q.    But any time you called, you can get in?

12   A.    I can get in just like anybody's office.

13   Q.    So when -- when -- when it comes Kathy Nealy, you have

14   political pull or leverage, do you not?

09:53:17 15   A.    We're trying to have a good business.

16   Q.    I understand that.

17        So if you go into the building and you are asking Don to

18   do something -- and we won't use Steinke as an example, but

19   anybody else may not be able to get in the door so quick, or

20   get something done like you, and that's from years of

21   experience.

22        Do you agree with that?

23   A.    Okay.  Sure.

24        MR. JACKSON:  Okay.  Let's go to Brian Potashnik

25   Exhibit 310, please.

09:53:51   1        I think we admitted it earlier.

           2        If it's not admitted, we would ask that we admit Brian

           3   Potashnik 310.

           4             THE COURT:  It is.

           5             MR. JACKSON:  Okay.  If we can go to page 3 of this

           6   exhibit, please.

           7   BY MR. JACKSON:

           8   Q.   This is City Plan Commission on Laureland, Memorial Park.

           9        Do you see that as the owner?

          10   A.   Yes.

          11   Q.   Would that be the Bill Fisher deal?

          12   A.   Yes.

          13   Q.   And you see right here it already has that the staff

          14   recommendation is denial, right?

09:54:36  15   A.   Yes.

          16   Q.   Okay.

          17             MR. JACKSON:  If we could go to page 5 of that

          18   exhibit.

          19        Highlight under staff analysis.

          20        Okay.  The third paragraph here.

          21   BY MR. JACKSON:

          22   Q.   "Staff is concerned about the amount of undeveloped land

          23   that is zoned for multi-family uses in the area, and adjacency

          24   issues as it relates to the location of the proposed

          25   multi-family uses to an existing single-family uses.  The

09:55:08  1   applicant proposes a 20 foot set backup -- building setback is

2   not an adequate distance to buffer and/or screen the adjacent

3   family developments."

4       Do you see that?

5   A.   Yes.

6           MR. JACKSON:   If we can scroll down some more,

7   please.

8   BY MR. JACKSON:

9   Q.   "The City zoning map reveals that there are several

10   tracts of undeveloped land in the areas that are zoned for

11   multi-family.   Staff believes that the applicant could

12   construct their multi-family projects in these existing

13   multi-family districts without rezoning."

14       So you understand that the staff and the people at the

09:55:47 15   City believed that instead of taking single-family zoning and

16   putting multi-family housing, that y'all could use other land

17   that's close or adjacent to it and do the project without the

18   need for rezoning?

19   A.   Staff always disagrees.   I mean, we go back and forth

20   with them denying for various reason.   This was -- he had

21   already worked out an arrangement regarding the land, to

22   purchase the land.

23   Q.   Well, I understand that, but my question is, was that an

24   initial concern already brought from the staff?

25   A.   Well, we were working through the land.   That's why it

09:56:25 1  became so expensive on this project, because they did

2  infrastructure, so Bill had to have various engineers go out,

3  and as far as the architects and just really take a look at

4  all those logistics involved.

5  Q.   So was that a yes?

6  A.   I don't know the question.

7  Q.   Let me ask the question again.

8  A.   Okay.  Ask the question again.

9  Q.   It was clear that the city staff already had concerns

10  about the use of the property?

11  A.   Yes.

12  Q.   Okay.  Thank you.

13       At the end of the day Bill Fisher got exactly what he was

14  hoping for, didn't he?

09:57:01 15  A.   No.

16       MR. JACKSON:  Okay.  Well, let's look at Brian

17  Potashnik 54, which I think is already admitted into evidence.

18       If we highlight that bottom half right there.

19  BY MR. JACKSON:

20  Q.   Bill Fisher says, "Here is how I would like to ask -- to

21  seek a consensus on the project.  Village Fair to Leon Backes.

22  Southwest Housing would get Cherrycrest Villas, Scyene and

23  Laureland."

24       Right?

25  A.   Bill Fisher was trying all --

09:57:31 1    Q.    No. My question is, is that what he has right here?

2    A.    This is one of his suggestions, yes.

3    Q.    That's what happened, right?

4    A.    (No response.)

5    Q.    As far as Laureland goes -- as far as Southwest Housing?

6    They got Cherrycrest, Scyene and Laureland?

7    A.    You're talking about -- I mean, I wasn't really focusing

8    on Southwest Housing because they were a competitor of ours.

9    Q.    Then -- and on --

10   A.    I can speak for Village Fair and --

11   Q.    And Bill Fisher got Homes of Pecan Grove and Dallas West

12   Village, did he not?

13   A.    At the time of this memo, no.

14   Q.    Eventually Bill Fisher got what he was hoping to get by

09:58:15 15  getting Pecan Groves?

16   A.    Eventually, yes.

17             THE COURT:   Stop.

18             MR. MEACHAM:   There were two votes for Dallas West

19   Village pending, a tax credit vote --

20             THE COURT:   What's the legal objection?

21             MR. MEACHAM:   The question is misleading.

22             THE COURT:   Overruled.

23   BY MR. JACKSON:

24   Q.    We have seen evidence that Dallas West Village was passed

25   on May 11th.

09:58:36  1        Were you there?  Do you know?

2    A.    No.

3    Q.    Based on the City's criteria that Mr. Vital went through

4    with you, and some of which I went through with you, can you

5    tell this jury if Don Hill made his decision to vote for

6    Laurel and for Potashnik -- scratch that.

7        Based on the criteria that we have shown you -- that I

8    went over with you today, and Mr. Vital went over with you on

9    Friday, can you tell this jury if Don made a decision to vote

10   in support of Southwest Housing over Bill Fisher for any

11   reason other than the City's criteria?

12   A.    I can't answer that.

13   Q.    Okay.  Well, that's what this jury --

14   A.    No.  No.  Because he wasn't -- Southwest Housing wasn't

09:59:36 15   each an issue in our conversations.

16   Q.    But my question is, after the September 20th -- after

17   September 20th when the criteria changed at the City of

18   Dallas, do you know whether Don Hill voted in support of

19   Southwest Housing because of the City criteria?

20   A.    No.

21   Q.    So you don't know why he voted that way?

22   A.    No.

23   Q.    If he voted based on the City's criteria, then he was in

24   line with what the City wanted, right?

25   A.    (No response.)

10:00:06  1        The City wanted more money on the local bonds, right?

2    A.    (No response.)

3    Q.    That was their preference, right?

4    A.    Is that a question?

5    Q.    Yeah, it was a question.

6    A.    What's the question?

7    Q.    The City wanted more money because they were going to

8    get --

9    A.    I don't know.  That came up in a meeting that was not

10   part of the discussion anymore.

11   Q.    So --

12   A.    I can't follow what you are saying.

13   Q.    Well, what I'm saying is, there are things happening at

14   the City that you don't know about?

10:00:37 15  A.    Well, how can I say yes or no to that?

16   Q.    Well, but -- so what I'm just trying to figure out for

17   this jury is that you're not saying that it happened a certain

18   way?

19   A.    (No response.)

20   Q.    I mean, if you --

21   A.    That was not a part of -- the criteria was not a part of

22   discussions that we had.

23   Q.    All right.  Fair enough.

24         You indicated on direct that you didn't know that Don was

25   meeting with Brian Potashnik, right?

10:01:00  1   A.    Yes.

2   Q.    Is there some legal obligation that Don has to tell you

3   about everybody that he's meeting with at city hall?

4   A.    No.

5   Q.    If Potashnik -- who is also trying to get his deal done,

6   wanted to meet with Don Hill, he can do that, can't he?

7   A.    Yes.

8         MR. JACKSON:   If we could see Government's Exhibit

9   668, page 231, please Ms. Christensen.

10        If you would highlight the 1:30 time frame.

11  BY MR. JACKSON:

12  Q.    You were asked whether you knew that Darren Reagan was

13  meeting with Don Hill.

14        Do you recall that question?

10:01:40 15   A.    Yes.

16  Q.    Okay.   You would agree with me that you're not the only

17  person in Southern Dallas who has leverage with public

18  officials?

19  A.    Yes.

20  Q.    And Darren Reagan would have some leverage, wouldn't he?

21  A.    Yes.

22  Q.    And he's been around almost as long as you, I guess, in

23  the Dallas political scene?

24  A.    Yes.

25  Q.    And he knows, like you, a lot of public officials from

10:02:07  1    Southern Dallas?

2    A.    Yes.

3    Q.    What did Don and Darren Reagan meet about?

4    A.    I don't know.

5    Q.    Okay.  I just wanted to make sure that we are not

6    suggesting anything to the jury.

7              MR. JACKSON:  May we have Government's Exhibit

8    2024, please, Mr. Christensen.

9    BY MR. JACKSON:

10   Q.    This is the exhibit that -- I believe that you said that

11   you provided to the government?

12   A.    Yes.

13   Q.    This is your actual file from your office?

14   A.    Yes.

10:02:37 15       Can I explain?

16   Q.    No.  I just wanted to make sure it was your file.

17             MR. JACKSON:  If we can go to page 16 of this

18   document.

19       Highlight consulting services down here.

20   BY MR. JACKSON:

21   Q.    This is an invoice from you to Provident Realty.  Is that

22   right?

23   A.    Yes.

24   Q.    For your detail here, all that you put is 45 and

25   Laureland and 39 and Simpson Stuart, right?

10:03:07  1   A.   Oh, but there is also be another document that explains

2   some of the meetings.

3   Q.   Well, on your invoice that you have that's all that's on

4   there, right?

5   A.   That's all that's on this particular document right here.

6        MR. JACKSON:   If we can go to page 22.

7        And if we highlight this.

8   BY MR. JACKSON:

9   Q.   Odyssey Residential Holdings.  We see there that you

10  received a success fee for Pecan Grove?

11  A.   Okay.

12  Q.   $20,000?

13  A.   Uh-huh.

14       THE COURT:   Excuse me.  Say yes or no.

10:03:40 15  A.   Yes.

16       MR. JACKSON:   If we can go to page 24.

17  BY MR. JACKSON:

18  Q.   This was a meeting that you had on West Village, I guess,

19  with Don Hill being involved?  Or at least he came and left?

20  A.   Yes.

21       MR. JACKSON:   Page 25.

22  BY MR. JACKSON:

23  Q.   Here's an invoice for $20,000, and on the invoice the

24  only things you put on here are the hours and what project,

25  right?

10:04:12   1   A.   As I said, there is some backup information that goes --

2   sir, may I explain?

3   Q.   No, ma'am.

4        THE COURT:   All right.   Just answer the question,

5   please.

6   BY MR. JACKSON:

7   Q.   That's what on your invoice?

8   A.   That's what's on a portion of the invoice.

9   Q.   This is in the document that you provided the government,

10   right?

11   A.   I guess.

12        MR. JACKSON:   Okay.   Well, let's look at page 36.

13   If we can start on page 2 of that exhibit.

14   I mean -- I'm sorry.   37.

10:04:47   15   BY MR. JACKSON:

16   Q.   It starts as -- these are e-mails, it's from Laura Brown,

17   and Laura Brown, does she work for you?

18   A.   No.

19   Q.   Does she work for Bill Fisher?

20   A.   Yes.

21   Q.   Okay.   She received a message today from Toni -- and Toni

22   is with your office, right?

23   A.   Yes.

24   Q.   She wants to know what time a courier can pick up a check

25   for $7,500, and she knows nothing about the check, right?

10:05:10   1   A.   Okay.

2            MR. JACKSON:   If we can go back to page 36.

3        Highlight the bottom half.

4    BY MR. JACKSON:

5    Q.   This is from Bill Fisher to Laura Brown, Saleem Jafar and

6    Belinda Carmikle.   And it says that you have -- that, "She" --

7    Kathy Nealy -- "has outstanding bills to us for about 60,000."

8        Do you see that?

9    A.   Yes.

10   Q.   "We need to start sending her something on these

11   accounts.   She's not owed zero."

12   A.   Yes.

13   Q.   "I have discussed the possibility of a substantial

14   billing adjustment form, a review for her bills.   My hands are

10:05:42 15   tied in doing this until I get her bills per project from

16   September '04 to current to compare in contrast to charges for

17   each month on each account.   The analysis has been raised

18   before, and is the only ability we will have to cut these

19   bills back."

20       Do you see that?

21   A.   Yes.

22           MR. JACKSON:   Okay.   Now, if we can go to page 39 of

23   this exhibit.

24       And if we can highlight where the handwritten parts

25   start.

10:06:12  1    BY MR. JACKSON:

2    Q.    This is -- this is a -- was this created from your

3    company, Kathy Nealy & Associates, the initial billing part of

4    it?

5    A.    I don't do the billing.  Toni Bryant does the billing,

6    who is my daughter.  I don't think that this is my document,

7    though.  But my daughter does all the billing.  All I do is

8    just tell her what the hours are.

9    Q.    This is a document that reflects the -- the --

10           MR. JACKSON:  Let's pan back out, please.

11   BY MR. JACKSON:

12   Q.    Does it reflect the items you were working on, the number

13   of hours you were working on the date of invoice, the amount

14   due?

10:06:49 15   A.    Yes.

16           MR. JACKSON:  Okay.  Now, if we can highlight again

17   the handwritten portion.

18   BY MR. JACKSON:

19   Q.    One month you have 196 hours, it looks like on the first

20   line, and it's equated to 9.8 hours a day for 20 days, and at

21   the back half of that it says "impossible."

22        Do you see that?

23   A.    Okay.

24   Q.    And below that you will see 178 hours, which equals 8.9

25   hours that you are saying you are working on this project a

10:07:20  1  day for 20 days, and at the back of that it says "not

2  credible."

3  A.    Whatever.

4  Q.    Okay.

5  A.    My work was my work.  I work seven days a week 24 hours a

6  day, you know.

7  Q.    Exactly.

8  A.    All -- you know, when you send in all bills, I put in

9  what my hours are.  What they put out is fine.  What they

10  discuss is fine.  I know what they owe me.

11  Q.    There you go.

12        And when you submit your billing and when you do your

13  work, you're doing the work?

14  A.    Yes.

10:07:49 15  Q.    Regardless of what they think about it?

16  A.    That's correct.

17  Q.    Very good.

18        You mentioned at the time that Bill Fisher's deals were

19  not approved, and he had paid out between 3 and 400,000, is

20  that what you said, based upon the pre-development costs?

21  A.    Uh-huh.

22        THE COURT:  Say yes or no.

23  A.    Yes.

24  BY MR. JACKSON:

25  Q.    On the Southwest Housing deal that they lost, the Simpson

10:08:12   1   Villas, how much are they paid in development costs?

2   A.   Who?  Southwest Housing?

3   Q.   Yes.

4   A.   I didn't do Southwest Housing.

5   Q.   I understand.  So you don't know how much -- they lost

6   that deal, how much had they paid in development costs?

7   A.   I have no idea.

8   Q.   And this was your first -- well, this may have been your

9   first or second time dealing with a case from start to finish

10   in this type of tax credit case?

11   A.   Right.

12   Q.   Can you tell this jury whether or not 3 or 400,000 may be

13   risk of doing these deals when you are going head to head,

14   because when you go head to head somebody has got to lose,

10:08:48  15   right?

16   A.   But this one is different.  The cost on this one was

17   different.

18   Q.   But you don't know what the cost was on Simpson Villas,

19   right?

20   A.   No.

21   Q.   So what I'm asking you is, have you done enough of these

22   to know whether or not when these two deals are going head to

23   head obviously -- well, let me ask you this.

24        Obviously to get this thing from start to being approved

25   there are pre-development costs, right?

10:09:12   1    A.    Yes, there is pre-development costs.

2    Q.    They have got to pay people like you, they have got to

3    pay engineers and other people working on some of the initial

4    infrastructure, right?

5    A.    Right.

6    Q.    You're not saying that on the deals that Brian Potashnik

7    lost, that he wasn't paying the same thing?

8    A.    This was about townhomes and single-family homes.  The

9    other projects are multi-family projects.

10   Q.    My question is, how much had Brian Potashnik spent?

11   A.    I don't know what Brian Potashnik spent.

12   Q.    So if he spent 3 to $400,000, then he would be in the

13   same position that Bill Fisher was in when he lost his deal?

14   A.    Okay.

10:09:52   15   Q.    Isn't it true that it's common for African-American

16   council persons to suggest developers who are also

17   African-Americans to work on those contracts?

18   A.    You can give them -- provide them a list.  You're not

19   supposed to say this -- choose this person.

20   Q.    Right.  But my question is, isn't it true -- or is it

21   true that it's common for them to ask that developers use

22   African-American contractors?

23   A.    Yes.

24   Q.    And isn't it a reality of doing business in the Southern

25   Sector of Dallas that the people of the community would rather

10:10:24  1    see individuals who resemble the community?

2    A.    True.

3    Q.    Isn't it true that historically -- scratch that.

4          Don wanted to make sure there was minority participation,

5    didn't he?

6    A.    Yes.

7    Q.    And you have known him for a while, and he's always been

8    that way, hasn't he?

9    A.    Yes.

10   Q.    And as you said, that's not uncommon for the Southern

11   Sector?

12   A.    Right.

13   Q.    It's not uncommon or illegal for people in the Southern

14   Sector to recommend different minority or African-American

10:10:58  15   contractors?

16   A.    Right.

17   Q.    Did Don ever tell you that unless you use a particular

18   contractor, your deals wasn't going to get passed?

19   A.    Not with me, no.

20   Q.    Isn't it true that in your role as a consultant your

21   client sometimes would ask you -- or request from you a

22   minority vendor list?

23   A.    Yes.

24   Q.    What is a minority vendor list?

25   A.    The City of Dallas has a list of minority vendors.  Many

10:11:30  1    times during city projects you have to be registered with the

2    North Texas Counsel of Governments, who also has a list.

3    Q.   When you're doing business in the Southern Sector of

4    Dallas, what type of minorities are they looking for?

5    A.   They range from black, brown, women.

6    Q.   I know what minorities range from, but what are they

7    asking you to do?

8        When you are working in the Southern Sector they're

9    wanting you to utilize African-American contractors.  Is that

10   correct?

11   A.   They're not specifically saying that, no, sir.  They say

12   minorities.  When we say minorities, that covers a whole

13   group.

14   Q.   When -- when -- let me ask you this, because you

10:12:14 15   understand that --

16   A.   Because of -- remember now the council districts reflect

17   black and brown.  I mean, you can't -- I mean, it's a

18   combination of both.

19   Q.   Well, let me ask you this, because you have been

20   recommended -- or contractors are recommended by other public

21   officials like Royce West, right?

22   A.   Okay.

23   Q.   Right?

24   A.   Uh-huh.

25   Q.   John Wiley Price, right?

10:12:38  1    A.    Yes.

2    Q.    And while there may be instances where the word -- let me

3    scratch that.

4         Do you know the particular vendors that Royce West

5    generally recommended?

6    A.    No.

7    Q.    Do you recall giving that information when you were

8    talking to the FBI?

9    A.    About Royce West?

10   Q.    Right.  The particular vendors that he would recommend?

11   A.    No, I don't know.

12   Q.    When asked by Bill Fisher for security companies you gave

13   him two names, right?

14   A.    Yes.

10:13:17 15   Q.    Who were they?

16   A.    Mr. Vilaal and Mr. Fantroy.

17   Q.    What race is Vilaal?

18   A.    Both of them are black.

19        THE REPORTER:  Could you repeat that?

20        THE WITNESS:  James Fantroy.

21        THE COURT:  No, the other one.

22        THE WITNESS:  Vilaal, V-I-L-A-A-L.

23   BY MR. JACKSON:

24   Q.    Isn't it true, Ms. Nealy, that you have been accused of

25   being a recipient of a consulting contract of an elected

10:13:45  1 | official forcing developers to use you in the Inland Port

2 | development?

3 | A.    No.

4 | Q.    That has not been accused?

5 | A.    No.  I haven't heard that.

6 | Q.    Now, what is Mayor Miller's track record for economic

7 | development in the Southern Sector?

8 |            MR. MEACHAM:  Objection to relevance.

9 |            THE COURT:  Sustained.

10 | BY MR. JACKSON:

11 | Q.    You understand -- you know what the Southwest Center Mall

12 | is -- area, right?

13 | A.    Yes.

14 | Q.    Well, has Laura Miller developed the Southwest Center

10:14:13  15 | Mall?

16 |            MR. MEACHAM:  Same objection.

17 |            THE COURT:  That's overruled.  You may answer.

18 | BY MR. JACKSON:

19 | Q.    Has Laura Miller developed did any economic development

20 | at Southwest Center Mall?

21 | A.    The developer that went in -- it was actually General

22 | Mills, because it was -- Leon Backes looked at Southwest

23 | Center Mall.  But, again, General Mills out of Chicago --

24 |            THE COURT:  Do you mean General Growth?

25 |            THE WITNESS:  Did I say that wrong?

10:14:46  1          THE COURT:  Yes.

2     A.    General Growth out of Chicago, yes.

3     BY MR. JACKSON:

4     Q.    Has there been any development to this day?

5     A.    Southwest Center Mall, no.

6     Q.    When Laura Miller confronted Bill Fisher at the city

7     council meeting that you talked about, did you feel like her

8     actions were personal?

9     A.    Yes.

10    Q.    Do you believe she had an agenda?

11    A.    It was obvious she didn't like Bill Fisher.

12    Q.    Were you present at the library when she attacked your

13    client, Bill Fisher?

14    A.    Yes.

10:15:27 15   Q.    In your opinion was that personal, that attack?

16    A.    Yes, it was personal.

17    Q.    Do you believe that she brought the media -- in your

18    opinion she brought the media to the meeting.  Is that right?

19    A.    I don't know if she brought the media.  The media was

20    there.

21    Q.    Do you know that the federal lien that -- well, do you

22    recall that she utilized the fact that your client had a

23    federal tax lien, right?

24    A.    Yes.

25    Q.    Do you know that that information -- that tax lien was

10:15:57  1    given to her by your client's biggest competitor, Southwest

2    Housing?

3    A.    He told us that.

4    Q.    Who told you that?

5    A.    Bill Fisher.

6    Q.    Told you that Potashnik gave it to her?

7    A.    Oh, yes.

8    Q.    Do you know that Laura Miller was meeting with Brian

9    Potashnik about your client and getting dirt on him?

10    A.    No.  I know that Bill Fisher kept saying that -- from

11    different times that Laura Miller got that information from

12    Brian Potashnik.

13    Q.    Are you aware that Brian Potashnik was Laura Miller's

14    biggest supporter, wasn't he, or one of them?

10:16:30  15    A.    He was one of her supporters.

16    Q.    Bill Fisher worked for Brian Potashnik before he left the

17    company, right?

18    A.    Yes.

19    Q.    And Brian Potashnik was very upset about Bill Fisher

20    leaving his company, wasn't he?

21    A.    I'm not sure.  I guess.

22         THE COURT:  All right.  Let's move along, Counsel.

23    BY MR. JACKSON:

24    Q.    Are you aware of an incident that took place between

25    Brian Potashnik and Fantroy at city hall?

10:16:57  1    A.    I heard about one.

2    Q.    Okay.  Are you aware that Brian Potashnik was trying to

3    use the security contracts to make Fantroy vote in his favor?

4    A.    Now, that is hearsay that y'all are talking about.

5    Q.    Well, if you don't know --

6    A.    (Laughter.)

7    Q.    You know Brian Potashnik, you have worked with him

8    through MasterPlan, correct?

9    A.    Yes.

10   Q.    Was he afraid or timid when it came to dealing with

11   minority council persons?

12   A.    No, he spoke up to whoever he was speaking to.

13   Q.    In your opinion, was he worried or concerned about

14   upsetting a minority council member?

10:17:45  15   A.    I have no idea -- I mean, I wasn't around Brian Potashnik

16   that much.

17   Q.    At some point Darren Reagan sent a letter opposing

18   multi-family development in the Southern Sector.

19         Do you recall testifying about that?

20   A.    Now, what now?

21   Q.    That Darren Reagan sent a letter on behalf of BSEAT

22   opposing multi-family development in the Southern Sector?

23   A.    Yes.

24   Q.    You were advised to meet with Mr. Reagan not only by Don

25   Hill, but by Leo Chaney and Fantroy as well, correct?

10:18:32   1   A.   Yes.

2   Q.   And you are aware that Darren Reagan had the ability to

3   mobilize hundreds of people when he needed to, right, for a

4   march or for a picket?

5   A.   100?

6   Q.   Right.

7   A.   I don't know about hundreds.  He was able to get people.

8   Q.   Okay.  You actually met with Darren Reagan and Allen

9   McGill at the Pappadeaux, right?

10   A.   Yes.

11   Q.   Isn't it true that during the meeting with Darren Reagan

12   that he emphasized he wanted to support mixed-use development

13   with a retail component?

14   A.   Yes.

10:19:07   15        THE COURT:  Counsel, how much longer do you have

16   with the witness, please?

17        MR. JACKSON:  I have three pages of notes.  So --

18        THE COURT:  Translate that.

19        MR. JACKSON:  About ten minutes.

20        THE COURT:  All right.  Who else has examination?

21   Anyone?

22     (No response.)

23        THE COURT:  We'll go ahead and take our 15-minute

24   recess now, ladies and gentlemen.

25        MR. WILLIAMS:  All rise for the jury.

10:20:20  1        (Jury retired from the courtroom.)

2        (Brief recess.)

3            THE COURT:  All right.  Be seated.

4            THE COURT:  All right.  Mr. Jackson, I have got my

5    clock on you.

6            MR. JACKSON:  We're synchronized.

7            THE COURT:  You just wasted about 15 seconds.

8    BY MR. JACKSON:

9    Q.    Isn't it a fact that while you were meeting with -- while

10   Bill Fisher was meeting with Mr. Reagan at Pappadeaux that it

11   was Bill Fisher who recommended that Mr. Reagan work on the

12   Dallas West Village?

13   A.    What do you mean?

14   Q.    Well, who brought up the idea of Mr. Reagan working on

10:38:01 15   the Dallas West Villas (sic)?

16   A.    The way that I -- I mean, can I explain?

17   Q.    Who recommended it?

18   A.    There was conversation about retail and Bill Fisher said

19   the project that he had that had retail on it was the one that

20   was Dallas West Village.

21   Q.    Okay.  And you didn't ask him to do that, did you?

22   A.    No.

23   Q.    And Don never instructed you to meet with Darren Reagan

24   and enter into a contract with him, did he?

25   A.    No, not enter into a contract.

10:38:47 1  Q.    And he's never asked you to meet with anybody and enter

2  into a contract, has he?

3  A.    No.

4  Q.    You testified that you told Don about D'Angelo Lee.  Is

5  that right?

6  A.    Yes.

7  Q.    And I believe that you told Don that D'Angelo shouldn't

8  talk about his own developments when he's meeting with another

9  development, correct?

10 A.    We had many discussions.  That was one of them.

11 Q.    In fact, basically what you were saying was he needed to

12 know which hat he's wearing?

13 A.    In that respect for that time because he was going over

14 the line.

10:39:28 15 Q.    And isn't it true that Don agreed with you that D'Angelo

16 needed to know what hat he was wearing?

17 A.    Not at first.

18           MR. JACKSON:   Let's play, if we could, on

19 Mr. Mureen's computer Sheila Hill 6761, about 15 seconds of

20 that.

21 A.    What?

22     (Audiotape clip, SHX 6761 played.)

23 BY MR. JACKSON:

24 Q.    Okay.  Is that when he agreed with you on D'Angelo

25 knowing which hat he should be wearing?

10:40:24  1    A.    This is way after -- I mean, this is 2005.  We started

2    these conversations of me talking to him in 2004.

3    Q.    That ain't my question.

4          On that question he agreed with you that he needed to

5    know which hat he was wearing?

6    A.    Okay.

7    Q.    Is that a yes?

8    A.    What was the question?

9    Q.    In that conversation he just agreed with you he needed to

10   know which hat he was wearing?

11   A.    Yes.

12   Q.    This birthday party that you were talking about, you said

13   that you talked about campaign limits.

14         Do you recall that?

10:40:57 15   A.    Yes.

16         MR. JACKSON:  If we could see Sheila Hill Exhibit

17   Number 10, please, Ms. Christensen.

18         And if we can go to the next page, please.

19   BY MR. JACKSON:

20   Q.    Have you ever seen this agreement here from the -- it's a

21   professional services agreement from the Myriad Group, who was

22   hosting -- or putting on this party for Don Hill?

23   A.    No.

24   Q.    Are you aware that they were an event planner for that?

25   A.    No.

10:41:36  1    Q.    Are you aware that all the money that was collected from

2    people who were sponsoring this party went to pay this event

3    planner?

4    A.    No.

5    Q.    Are you aware that none of the money that was given to

6    sponsor this party went to Don Hill?

7    A.    That needs to be explained.

8    Q.    Well, my question is simple.

9    A.    Because they were asking for money for Don Hill's

10   birthday party, not about the event planner.  That was the

11   discussion that I had with D'Angelo and others.

12   Q.    Well, it was going for his birthday party.

13         Do you know if any of the money went to Don Hill?

14   A.    I was not trying to be a part of any of that.

10:42:18 15    Q.    I understand.

16   A.    I don't know where the money went.

17   Q.    But you talked about campaign contribution limits.

18   A.    Because he was asking -- number one, we were in the midst

19   of issues being before the council, and we were -- and he was

20   also trying -- the amount that he was trying to ask for was

21   $2,500 up.  That is -- there was a problem with that.  That's

22   what I was explaining.

23   Q.    What I'm asking -- and I hear what you are saying.

24         What I'm asking you about is when you made a statement to

25   this jury about being over a campaign contribution amount,

10:42:52  1    what I'm asking you is if none of the money goes to a campaign

2    candidate, it's not considered a campaign contribution if it's

3    for his birthday party.

4    A.    Sir, they didn't need to be giving at all, not my

5    clients.  You can't do that.

6    Q.    Well, that's different because you're changing it a

7    little bit.

8          I'm not asking you whether or not it was good for you to

9    advise your client to give or not.  What I'm going to is

10   whether or not you -- whether or not it was against the law

11   for somebody to contribute as a sponsor to a birthday party

12   and --

13   A.    In my opinion it was wrong.

14              MR. MEACHAM:   Object on the grounds that it calls

10:43:30  15   for a legal conclusion.

16              THE COURT:   Overruled.

17   BY MR. JACKSON:

18   Q.    Now, you -- you -- you indicated that you were introduced

19   to MasterPlan from Forrest Smith?

20   A.    No, that's not what I said.

21   Q.    Okay.  Who did Forrest Smith introduce you to?

22   A.    Leon Backes.

23   Q.    Are you aware of whether or not it was -- whether or not

24   Forrest Smith came to Don Hill and he recommended you?

25   A.    No.

10:44:01   1    Q.   So it could be that you got involved in all of this with

2    Leon Backes and everything else because of a recommendation

3    from Mr. Donald Hill?

4    A.   I don't know.

5    Q.   When you talk about that Memorial Park Townhomes site,

6    Bill Fisher didn't own that property, did he?  He didn't own

7    the dirt?

8    A.   He was in the process of buying it.  Right.  It was still

9    owned by somebody else.

10   Q.   He didn't own the dirt?

11   A.   No.

12   Q.   Brian owned the dirt for his project across the street,

13   didn't he?

14   A.   Yes.  Well, I don't know.  I really don't know.

10:44:38  15   Q.   If he did own it, that would be a difference between that

16   project and Brian's project in terms of ownership?

17   A.   Yes.

18   Q.   Okay.  There wasn't a contract in -- with Bill Fisher's

19   case with a homebuilder.  There wasn't a contract in place,

20   was there?

21   A.   I don't know what legal documents they had.

22            MR. JACKSON:  I have no further questions.

23            THE COURT:  All right.  Thank you.

24        All right.  Mr. Meacham.  Redirect.

25                    *REDIRECT EXAMINATION*

10:45:08   1    BY MR. MEACHAM:

  2    Q.    As to that last point, Ms. Nealy, you were asked a series

  3    of questions on Friday about whether or not Bill Fisher was

  4    able to show Don Hill he had contracts with somebody to build

  5    homes on this Memorial Park Townhomes site.

  6        Do you recall that?

  7    A.    Yes.

  8    Q.    Okay.  My question -- a couple of questions -- what, if

  9    anything, did Don Hill ask you about seeing a contract with

  10    such a homebuilder?

  11    A.    We were not asked to provide a contract.  He wanted to

  12    know -- he wanted to see the people who were going to develop

  13    it, the real estate agents, and we were able to identify some

  14    people over a couple of days.

10:45:50  15    Q.    When you found out those were questions or concerns that

  16    Mr. Hill had, what did you do about it?

  17    A.    We tried to answer all questions.

  18    Q.    Took people to him to meet?

  19    A.    Yes.

  20    Q.    As it was just pointed out, Odyssey Residential Holding,

  21    or the company Bill Fisher worked for, did not own Memorial

  22    Park Townhomes, correct?

  23    A.    No.

  24    Q.    They needed two or three things to happen before they

  25    were going to be able to move forward with their development.

10:46:17   1    Is that correct?

  2            MR. VITAL:   Objection, leading.

  3            THE COURT:   Sustained.

  4    BY MR. MEACHAM:

  5    Q.   Which of the two were before the council coming up close

  6    to October 27, 2004, if you recall?

  7    A.   Could you repeat that?

  8    Q.   What needed to happen before Bill Fisher could actually

  9    purchase the land, develop it, put in the infrastructure, and

  10    then bring a builder on to build homes?

  11    A.   It needed to pass the planning commission as well as city

  12    council.

  13    Q.   If those two things had happened, what would have

  14    happened with his contract to buy the property?

10:46:54  15    A.   Then he would move forward to purchase the property.

  16    Q.   Then after all that and after construction started, what

  17    would happen with the builder?

  18    A.   Then they would be able to move forward.

  19    Q.   Do you know how many months, if not years, it would take

  20    before the homes to move forward on that piece of property?

  21            THE COURT:   For the?

  22    BY MR. MEACHAM:

  23    Q.   For the home portion, the single-home portion, to move

  24    forward on that property?

  25    A.   There was going to take place after -- Bill was putting

10:47:17  1   the infrastructure in so that it would be easier to have a

2   developer to develop on the property.  The townhomes went in

3   first.

4   Q.   What do you recall about -- we will just call them hot

5   checks that Bill Fisher wrote Maxine Thornton-Reese?

6   A.   He wrote the checks and then something happened -- I want

7   to say something happened with the account, and then he made

8   good on the checks.

9   Q.   Do you recall the time frame of that?

10   A.   He turned it right around.

11   Q.   What I'm asking is at what point in time did this occur?

12   A.   Back during the spring.

13   Q.   Of an election year cycle?

14   A.   Yes.

10:48:02  15   Q.   Which are odd years.  Is that correct?

16   A.   That's correct.

17   Q.   Would that have been 2005?

18   A.   It was either '5 or '3.

19   Q.   But it wouldn't have been October 4, 2004?

20   A.   No.

21        MR. VITAL:  Your Honor, object to the leading

22   question.

23        THE COURT:  Sustained.

24   BY MR. MEACHAM:

25   Q.   Let me ask it this way.

10:48:26   1        If the jury had heard -- or if there is a wiretap

2    conversation in evidence dealing with hot checks to Maxine

3    Thornton-Reese in the time frame of April or March of 2005,

4    what election cycle would that be in relation to?

5    A.    2005.

6    Q.    You mentioned earlier that at some point Brian Potashnik

7    or Southwest Housing owed you money, but somebody paid off the

8    invoices.

9          Who paid those off?

10   A.    Bill Fisher and Willie Cochran.

11   Q.    Why did Bill Fisher and Willie Cochran pay you debts owed

12   by Southwest Housing?

13   A.    Because I continued to bring it up.

14   Q.    What legal responsibility did Bill Fisher have for those

10:49:13  15   debts?

16   A.    Reputation.

17   Q.    Whose reputation?

18   A.    His.

19   Q.    That was important to him?

20   A.    Oh, yeah.  Because we were -- when I first started with

21   Provident Bill Fisher was not there, and then he came on.  So

22   he was a part of that outstanding invoice, and I raised that

23   issue.

24   Q.    What did he do?

25   A.    He resolved the issue.

10:49:42  1    Q.    I think you tried to explain your answer a couple of

2    times about his outstanding balance with you and the invoices

3    and things.

4         I would like to give you an opportunity to do so now.

5         What would you like to tell the jury about his

6    outstanding balance to you?

7    A.    We tried to work out an arrangement because of the amount

8    of the invoices.  So what he started doing is paying down a

9    little bit at a time, and I didn't have a problem with that,

10   because that's not my only -- I also had Leon Backes that I

11   was dealing with along with all of my other clients.

12        So I could work with him -- as long as I was going to get

13   my money I didn't have a problem trying to work through all of

14   that, because he had spent an enormous amount of money for

10:50:29 15  everything to go wrong.

16   Q.    You talked about Nealy & Associates -- or Kathy Nealy &

17   Associates being a business that you worked out of your house

18   at times.  Is that correct?

19   A.    Yes.

20   Q.    How many employees through the years at various times has

21   Kathy Nealy & Associates employed?

22   A.    It varies.  I mean, I have -- when I do political

23   campaigns it could go up to over 200 people.

24   Q.    That are working for you at one time during that

25   campaign?

10:50:59  1  A.   Yes.   Then just an ongoing-forward basis, two or three,

2  you know, like full time.   And then I have part-time people

3  that work with me from project to projec.

4  Q.   You were also asked several questions about the fact that

5  Bill Fisher was recording you and you didn't know it?

6  A.   That's correct.

7  Q.   Was there something else you wanted to mention about that

8  process that you didn't get a chance to earlier?

9  A.   As far as the taping?

10  Q.   Yes, ma'am.

11  A.   I didn't know that Bill Fisher was wired.   I didn't know

12  that Bill Fisher had gone to the FBI.

13  I did know that when we went to breakfast that morning

14  out in the parking lot Saleem Jafar turned around to me and

10:51:46  15  said, "So when did you find out?"

16  THE COURT:   Excuse me just a moment.

17  MR. JACKSON:   Objection, hearsay.

18  THE COURT:   Hearsay.

19  MR. MEACHAM:   It's not offered for the truth of

20  matter.

21  THE COURT:   For what purpose is it offered?

22  MR. MEACHAM:   To establish her knowledge and

23  concerns about Bill Fisher recording her at the FBI's request.

24  THE COURT:   The objection is overruled.

25  You are to consider this for that limited purpose, ladies

10:52:08  1    and gentlemen.  Just to explain the witness' conduct.

2    BY MR. MEACHAM:

3    Q.    What issue was raised at that breakfast meeting at the

4    Original Pancake House on October 12, 2004?

5    A.    They wanted to know when did I find out about this.  It

6    was -- and many times if you are working on a case and there

7    are other African-Americans or black people involved, then

8    people think if you know something good or bad that everybody

9    knows something good or bad.

10         So they thought that Don might have told me before then,

11   and I was just finding that out.  So I could see why they were

12   trying to accuse -- think that I had knew some information

13   prior to that, of which I did not.

14   Q.    That would be my next question.

10:52:58 15        What, if anything, did you know prior to that meeting?

16   A.    Nothing.  Nothing.

17              MR. MEACHAM:  Let's look at Government's Exhibit

18   3131.

19   BY MR. MEACHAM:

20   Q.    Ms. Nealy, this is an e-mail from Don Hill to Glenda

21   Aguirre dated October 25, 2004.

22         There is a creation date down at the bottom and delivery

23   time around 2 -- between 2:00 and 2:30 p.m. in the afternoon.

24         And the message states, "Hold D'Angelo in my office.

25   This is a different kind of meeting."

10:53:29  1      Do you recall meeting with Mr. Hill at that exact point

2    in time?

3    A.   (No response.)

4         MR. MEACHAM:   Why don't we look at Government's

5    Exhibit 668, page 261.

6    BY MR. MEACHAM:

7    Q.   Mr. Hill's calendar.  At 2:00 in the afternoon do you

8    read that where it says?

9    A.   "Kathy Nealy, Bill Fisher, Carol Reed and Saleem Jafar."

10   Q.   So during the time of this meeting Mr. Hill sends the

11   e-mail to Glenda Aguirre to keep D'Angelo out.

12        What was the purpose of that, if you know?

13        MR. VITAL:   Objection, your Honor, to the sidebar

14   side question.

10:54:09  15        THE COURT:   All right.  Just answer the question,

16   please.

17   A.   What was the question?

18   BY MR. MEACHAM:

19   Q.   What was the purpose of sending the e-mail about keeping

20   D'Angelo outside because this is a different kind of

21   meeting?

22        MR. JACKSON:   Your Honor, I object.  Establish a

23   foundation.

24        MR. VITAL:   Speculation.

25        THE COURT:   If you know, you may answer.  If you

10:54:28  1    don't, don't.

2    A.    Because he wasn't part of our meeting.

3    BY MR. MEACHAM:

4    Q.    Let me ask it this way.

5          How many different types of meetings did Don Hill have

6    with you, Bill Fisher, Carol Reed and Saleem Jafar about these

7    developments that were coming up, if you know?

8    A.    I don't remember.

9    Q.    During the 2004, 2005 time frame what -- what did you

10   know about the number of state employees that were actually

11   members of BSEAT?

12   A.    What's the question again?

13   Q.    How many members did BSEAT have -- how many state

14   employee members --

10:55:18  15   A.    I don't know.

16   Q.    -- did BSEAT have in 2004, 2005?

17   A.    I don't know.

18   Q.    Can you name any?

19   A.    (No response.)

20   Q.    Or do you know of any?

21            MR. STEINKE:   Objection.   She said she didn't know.

22            THE COURT:   Sustained.

23   BY MR. MEACHAM:

24   Q.    We have heard a lot about these criteria -- new criteria

25   that were developed.

10:55:47  1     I want to ask you in relation to the Rosemont at

2    Laureland project, the Southwest Housing property across the

3    street from Memorial Park Townhomes, what do you know, if

4    anything, about the opposition to that that Carol Brandon and

5    James Fantroy, or either one of them, raised?

6    A.    In relationship to the project?

7    Q.    Uh-huh.

8    A.    When this was -- ended up being on the table for

9    discussion Carol tried to meet with Don to find out more

10    information about it, because it was -- a portion of it was in

11    Don's district, and a portion of it was in Mr. Fantroy's

12    district, but she wasn't able to meet with him.

13    Q.    Did you find that odd?

14    A.    Yeah.  Because he usually was meeting with her.

10:56:40 15    Q.    Who carried -- or let me rephrase my questions.

16         Who did the CPC work for District 5 during that long

17    absence of an appointee from District 5?

18    A.    Carol Brandon.

19    Q.    Working closely with Mr. Hill?

20    A.    Yes.

21    Q.    Based on your understanding of the relationship between

22    Mr. Hill and Mr. Potashnik, what's the likelihood that

23    Mr. Fantroy is going to be supportive of a Southwest Housing

24    development in his district?

25         MR. JACKSON:  Your Honor, object, calls for

10:57:06  1    speculation.

2                     THE COURT:   If you have a basis from your experience

3        to answer, you may.   Otherwise, decline to do so, please.

4        A.    That was after they had the fallout in city hall.

5        Q.    So after that what was the likelihood that Mr. Potashnik

6        was going to get something approved in District 8?

7        A.    None.

8        Q.    Zero, correct?

9        A.    Correct.

10       Q.    What Southwest Housing development outside of District 8

11       would Mr. Fantroy or his plan commissioner Carol Brandon

12       support, if you know?

13       A.    What's the question?

14       Q.    Would they be supportive of Southwest Housing at any

10:57:40 15      location?

16       A.    No.

17       Q.    Again, we have heard a lot about this criteria and how

18       the criteria somehow explains the votes, correct?

19       A.    Yes.

20       Q.    If that criteria were so important to Mr. Hill, then

21       explain to the jury, if you would, why he never had one

22       conversation with you about those criteria in relation to

23       those projects?

24                    MR. JACKSON:   Your Honor, I object unless she has

25       foundation as to what Mr. Hill is thinking.

10:58:07  1          THE COURT:  Rephrase your question.  Sustained.

2    BY MR. MEACHAM:

3    Q.    How many times did Mr. Hill sit down with you and Bill

4    Fisher or anybody else in relation to Memorial Park Townhomes

5    or Pecan Grove or the Provident property and talk about this

6    new criteria with you and tell you what it meant and what the

7    issues were and how it was going to affect his decision?

8    A.    We were not briefed on that.

9    Q.    So how many conversations did Mr. Hill have with you

10   about those issues?

11   A.    The criteria, none.  We were just asked questions to

12   bring financials, you know, just different things from --

13   every day it was a different question.

14   Q.    Nothing about the criteria, but financial, developer,

10:58:50 15  contractors, things of that nature?

16   A.    Yes.

17   Q.    How were those issues different in District 8 in relation

18   to Pecan Grove than they were in District 5 in relation to

19   Memorial Park Townhomes?

20          MR. JACKSON:  I object.  That's been asked and

21   answered.

22          THE COURT:  Overruled.  You may answer.

23   BY MR. MEACHAM:

24   Q.    How were the financial concerns any different based upon

25   the Pecan Grove project that was about four miles straight

10:59:16  1    down the same road?

2    A.    The financials was the same.

3          MR. MEACHAM:   Thank you, ma'am.

4    I'll pass the witness.

5          THE COURT:   Thank you.

6          MR. JACKSON:   May I have recross?

7          THE COURT:   No.

8    Ms. Nealy, you may step down.   Thank you.

9    You may call your next witness.

10         MR. BUSCH:   The United States call Allen McGill.

11         THE COURT:   Mr. McGill, come on up here to the

12   front, please.

13   Stand right here in front of this lady, the court

14   reporter.

10:59:59 15   Raise your right hand, please.

16   State your name for the record, and spell your last name.

17         THE WITNESS:   Allen McGill.   A-L-L-E-N, M-C-G-I-L-L.

18   (Witness sworn by the Court at 11:00 AM.)

19         THE COURT:   Let me go over a couple of things with

20   you.

21   First, please speak directly into the microphone.

22   Don't nod your head or say uh-huh or huh-huh because the

23   court reporter may not know what you're talking about.

24   Please wait for the questioner to finish the question,

25   and then hopefully you and he will not be talking at the same

11:00:37 1     time.

2              All right.  Mr. Busch.

3                   MR. BUSCH:  Thank you, your Honor.

4                   *ALLEN McGILL*, (Sworn)

5     was called as a witness by the government, having been first

6     duly sworn, testified as follows:

7                   *DIRECT EXAMINATION*

8     BY MR. BUSCH:

9     Q.    Mr. McGill, please introduce yourself to the jury.

10           Where are you from?

11    A.    I was born in Thomasville, Georgia.

12    Q.    All right, sir.  What is your -- where did you go to high

13    school?

14    A.    I went to high school in Thomasville, Georgia.

11:01:00 15   Q.    After high school what did you do?

16    A.    After high school I entered the U.S. military, U.S. Army.

17    Then went on to college at Benedict College in Columbia, South

18    Carolina.

19    Q.    Did you receive a degree?

20    A.    Yes, I did.

21    Q.    What was that degree?

22    A.    Business administration.

23    Q.    Basically after college describe your work history.

24    A.    My work history briefly, I have been involved in

25    non-profit organizations and education.  I have taught at

11:01:36  1    community colleges, and I worked in various non-profits.

2    Q.    What kind of work did you do in non-profits?

3    A.    Mainly administrative.

4    Q.    Okay.  What brought you to the Dallas area at some point

5    in your life?

6    A.    I relocated to Dallas to pursue private business.  At the

7    time this area was booming, and I was in the computer

8    business.

9    Q.    At some point did you become acquainted with Darren

10    Reagan and the organization known as the Black State Employees

11    Association of Texas?

12    A.    Yes, I did.

13    Q.    Do you recall approximately when that was?

14    A.    I believe it was in 1988 or '89.

11:02:15 15    Q.    What was your initial impression of Darren Reagan?  And

16    I'll refer to the Black State Employees Association of Texas

17    as BSEAT.  What was your initial impression of both Darren

18    Reagan and BSEAT?

19    A.    Very positive.  I went to -- after some investigation

20    I -- it looked like an organization that I wanted to be

21    associated with.

22    Q.    Did you become associated with BSEAT?

23    A.    I did.

24    Q.    In what capacity?

25    A.    As a volunteer.  I volunteered, as I had on various

11:02:55  1    things that non-profits are usually involved in.

2    Q.    Would you tell us what some of those things were that you

3    did with BSEAT in those early years?

4    A.    Mainly I supported the efforts of -- to organize job

5    fairs or to organize -- help organize pickets, to get out

6    correspondence.  It was any number of events that may have

7    been coming that if I had some time I would volunteer.

8    Q.    During those early years were there other members of

9    BSEAT as far as you knew?

10    A.    Yes.

11    Q.    How was that information retained, if you recall?

12    A.    Yes.

13    Q.    How did you know there were other members?

14    A.    The records -- I assumed they were kept in the BSEAT

11:03:53 15    office or by Darren, I'm not sure, but I know that there were

16    other members attending at that time.

17    Q.    How many members would attend on any sort of a regular

18    basis?

19    A.    It would vary depending upon the issues.  It could be 25,

20    30, 35 members.

21    Q.    Now, over time did that change?

22    A.    Yes, it did.

23    Q.    How did that change?

24    A.    Well, over time we held fewer meetings.  So naturally

25    there -- members started to fall off.  Didn't come out to

11:04:33  1    meeting as regularly.

2    Q.    Okay.  So by the time you get to the year, let's say 2002,

3    any members of BSEAT?

4    A.    No.  Because we didn't have any meetings.

5    Q.    I'm sorry?

6    A.    We did not have any -- we didn't see any members.

7    Q.    So from about -- at some point -- I have asked you about

8    2002 forward to let's say 2005, which is the end period of

9    this indictment, there were no meetings and no members as far

10   as you knew?

11   A.    That's correct.

12   Q.    Okay.  Now, you mentioned picketing.

13        What was the goal of Darren Reagan and BSEAT in regards

14   to picketing?

11:05:25 15   A.    We -- often to help bring about some change that we saw

16   as being needed, whether it was in areas of employment or

17   trying to get businesses to locate south of the Trinity or

18   other issues.

19   Q.    So what would be done to a business to achieve those

20   goals?

21   A.    I'm not certain I understand the question.

22   Q.    Well, in regard to picketing just tell us how that would

23   be accomplished.  Where would the picketers come from and how

24   long would the pickets last and what would be the goals?

25   A.    Well, the goals would depend upon what the issues were

11:06:13   1   with any particular business that group had decided to picket
          2   it.
          3        The picketing would last until we understood that what we
          4   were trying to do had been accomplished, or that we were told
          5   that the picketing could be withdrawn.
          6   Q.   Okay.   Why did you participate in picketing businesses?
          7   A.   Because I saw it as an effective way to help bring about
          8   some of the changes that we were trying to bring about.
          9   Q.   Those changes that you are talking about, were those
         10   important to you?
         11   A.   Very.
         12   Q.   Important to the community?
         13   A.   Yes.
         14   Q.   All right.   During this time frame, though, were you
11:06:58  15   aware of whether or not picketing would stop when Darren
         16   Reagan was paid some sum of money, or given some benefit?
         17   Were you aware of that?
         18   A.   No, I was not.
         19   Q.   All right.   Now, as a result of the picketing were some
         20   bank branches opened in South Dallas as far as you recall?
         21   A.   Yes.
         22   Q.   Some restaurants relocated?
         23   A.   Yes.
         24   Q.   Outside of picketing do you think those things would have
         25   happened?

11:07:28  1    A.    I don't believe so.

2    Q.    Okay.  Now, in this early time frame of 2001, 2002 or

3    2000 did you -- first of all, did you have a leadership

4    position in BSEAT?

5    A.    Yes, I did.

6    Q.    What was your title?

7    A.    I was vice chair.

8    Q.    Were you also an officer?

9    A.    Yes.

10   Q.    What was that?

11   A.    President of CDC.

12   Q.    Okay.  So BSEAT was one organization, and it also had a

13   community development corporation?

14   A.    Yes.

11:08:07  15   Q.    Okay.  As president of BSEAT and the CDC and vice chair

16   of the board were you ever given access to the bank records of

17   BSEAT?

18   A.    No.

19   Q.    Were you called upon to write checks on behalf of

20   BSEAT?

21   A.    No.

22   Q.    Were you called upon to make deposits on behalf of

23   BSEAT?

24   A.    No.

25   Q.    So you were unaware of the financial condition and what

11:08:28  1    happened to the money that flowed into the BSEAT.

2         Is that a fair statement?

3    A.    That is correct.

4    Q.    Now, during this time period, again, around 2000 or so --

5    I'm just throwing that number out there just to orient us --

6    did BSEAT become involved in the development of a retail

7    center?

8    A.    Yes, it did.

9    Q.    All right.  Do you recall approximately when that was?

10   A.    I believe it was 1998 or '99.

11   Q.    Okay.  What was the name of that retail development?

12   A.    West Cliff Shopping Center.

13   Q.    How did that come about?

14   A.    The West Cliff Shopping Center was a dilapidated retail

11:09:14 15   structure located at Loop 12 and Hampton that was in

16   bankruptcy.  BSEAT acquired it out of bankruptcy.

17   Q.    Where was the funding obtained for BSEAT to acquire that

18   center out of bankruptcy?  Do you recall?

19   A.    From a group of banks.

20   Q.    What did BSEAT and you and Darren Reagan do at that

21   point?

22   A.    After the property was acquired out of bankruptcy we

23   sought to get construction financing and to have the project

24   pushed out -- torn down and a new set of buildings.

25   Q.    Was a new center built?

11:09:56  1    A.    Yes.

2    Q.    I believe we have seen some photographs.  I don't recall

3    the exhibit, but we have seen some aerial photographs.  There

4    appears to be a large grocer and some other businesses.  Is

5    that about right?

6    A.    Yes.

7    Q.    So in this process of buying this West Cliff Shopping

8    Center out of bankruptcy and demolishing it, were funds raised

9    to build the new development?

10    A.    Yes.

11    Q.    Who was involved in that process?

12    A.    Mainly Darren, myself and Gail Terrell.

13    Q.    Who is Gail Terrell?

14    A.    She's my wife.

11:10:30 15    Q.    Did she also have a leadership role to some degree in

16    BSEAT?

17    A.    Yes, she did.

18    Q.    So the three of you sought financing for this new

19    development?

20    A.    Yes, we did.

21    Q.    Was it obtained?

22    A.    Yes.

23    Q.    Was there an investor, including banks?

24    A.    Yes.

25    Q.    Whose was the investor?

11:10:50  1   A.   TRI.

2   Q.   Where were they located out of, or do you know?

3   A.   New York.

4   Q.   How much did the investor put into the West Cliff

5   Shopping Center?

6   A.   Approximately $1 million.

7   Q.   Were there some bank involved that provided construction

8   financing?

9   A.   Yes.

10   Q.   Do you recall how much that was approximately?

11   A.   I believe it was about 5.6 or $7 million.

12   Q.   Once West Cliff Shopping Center was rebuilt, what role

13   did you and your wife Gail play in that development?

14   A.   As it was being constructed we oversaw generally the --

11:11:38  15        MR. JACKSON:   Your Honor, I object to that answer

16   being nonresponsive to the question.

17        THE COURT:   That's sustained.  Ask your question

18   again.

19        MR. BUSCH:   Your Honor, if I may, I'll back up one

20   question.

21        THE COURT:   All right.

22   BY MR. BUSCH:

23   Q.   During the construction -- or preconstruction phase, what

24   role did you or Gail Terrell play in that part of it?

25   A.   We helped to negotiate some of the contracts with

11:12:09  1    potential construction companies.

2    Q.    The general contractor, was the general contractor a

3    minority company?

4    A.    No, it was not.

5    Q.    All right.  So the general contractor is hired to build

6    the project, and there are some subcontractor also hired?

7    A.    Yes.

8    Q.    You were involved in those negotiations with the general

9    contractor and the subcontractors?

10    A.    Yes.

11    Q.    Were some of the subcontractors minority subcontractors?

12    A.    I believe so, yes.

13    Q.    All right.  So while the development is being built were

14    you involved in the lease-up or looking for tenants?

11:12:55 15    A.    Yes.

16    Q.    Were tenants located and found to lease the various

17    spaces?

18    A.    Yes.

19    Q.    Including a grocer?

20    A.    Yes.

21    Q.    Do you recall who that was?

22    A.    Albertson's.

23    Q.    Is Albertson's still there?

24    A.    No.

25    Q.    Is there another grocer there in that spot?

11:13:14  1    A.    Yes, there is.

2    Q.    So moving forward, how -- some years have passed.  Was a

3    decision ultimately made to sell the West Cliff Shopping

4    Center?

5    A.    Yes.

6    Q.    Why was that decision made?

7    A.    There was some feelings on our part that the market was

8    growing a bit soft, and it was time to consider an exit

9    strategy.

10   Q.    So what was done to find a purchaser for the West Cliff

11   Shopping Center?

12   A.    We made a pretty intensive effort to locate potential

13   buyers from across the country.

14   Q.    When a purchaser was found, or a buyer, what was done

11:14:09  15   then?

16   A.    That buyer -- or those potential buyers were contracted

17   and potential selling prices were discussed.

18   Q.    Was a sale ultimately consummated?

19   A.    Yes, it was.

20   Q.    Let me direct your attention to -- was the investor still

21   an investor, the retail initiative, TRI, that you talked about

22   they put in a million dollars?

23   A.    Yes.

24   Q.    Did the investor expect to receive a return on the

25   investment of the sale of West Cliff?

11:14:48  1    A.    Yes.

2    Q.    Was an effort done by you and Mr. Reagan to deprive the

3    investor --

4                MR. STEINKE:  Excuse me, Judge.  May we approach?

5                THE COURT:  Yes.

6         (Discussion at the bench.)

7                MR. STEINKE:  This is obviously 404(b) material that

8    Mr. Busch told me he was not going to go into.

9                MR. BUSCH:  The Court and defendant were noticed

10   about a year and a half ago.  These exhibits have been

11   admitted into evidence that relate to this.  Not only a

12   telephone conversation where they speak about these events,

13   what they're going to do with these documents, but the

14   document itself.  So I don't believe I ever gave Mr. Steinke

11:15:32 15   the impression that we would not go into this matter.

16               MR. STEINKE:  Marcus, on Friday I asked you if you

17   were going to go into this before I was going to make any

18   objections to these documents, and you said no.

19        None of the documents relate to the bankruptcy or the

20   sale or any alleged fraud involving the sale.

21        And so I said, you're not going to go into it --

22               THE COURT:  I'll send the jury out.

23        (Back from the bench.)

24               THE COURT:  Ladies and gentlemen, I'm sorry.  I'm

25   Going to send you back to the jury room for a couple of

11:15:55  1    minutes.   Maybe five minutes.

2         MR. WILLIAMS:   All rise for the jury.

3         (Jury retired from the courtroom.)

4              THE COURT:   All right.   Mr. McGill, I'm going to

5    have you step outside for just a moment, please, sir.

6              THE COURT:   All right.   Mr. Busch, make a proffer of

7    what we're about to hear so I have a context, please.

8              MR. BUSCH:   Your Honor, the government intends to

9    offer evidence that this agreement of the limited partnership

10    to facilitate the sale was a fraudulent document, that

11    Mr. Reagan told Mr. McGill to sign the name of the investor to

12    the document knowing that it was a forgery, that they both did

13    this, and that this document was used to consummate the sale.

14         I gave the defendant notice via 404(b) notice, and I

11:17:33  15    don't recall the date, but I'm thinking it's in the summer of

16    2007 whenever that deadline was to give notice.   I gave that

17    notice.   There was no objection -- or no motion in limine ever

18    filed in that regard.

19         This document is Government's Exhibit 3296.   It's been

20    admitted into evidence.   No objection by Mr. Reagan.

21         There is a telephone conversation that's contemporaneous

22    with the creation of this document, March 22, 2005.   That has

23    also been admitted into evidence without objection.

24         Mr. Steinke asked me last week whether the government was

25    going to offer evidence regarding the bankruptcy of BSEAT that

11:18:20  1    it went into after the sale of this West Cliff Shopping

2    Center.

3        I advised Mr. Steinke that the government would not go

4    into that bankruptcy.  That's the bankruptcy that was forced

5    on BSEAT after this fraudulent transaction was uncovered by

6    the investor in New York.

7        So I did advise that I would not go into that bankruptcy,

8    which is after the sale of this West Cliff Shopping Center.

9        That's the only thing that I said that the government

10   would not go into during this trial.  It was still under

11   investigation.

12            THE COURT:   Mr. Steinke.

13            MR. STEINKE:   On Friday morning before we discussed

14   all of those government's exhibits that had not yet been put

11:19:04 15   into evidence I asked Marcus whether -- Mr. Busch whether or

16   not any of the remaining documents that had not been admitted

17   into evidence had anything to do with West Cliff Shopping

18   Center or alleged fraud involving it, including any bankruptcy

19   fraud.  He assured me no.

20       Now, obviously it's in.  The evidence is in.

21       My argument now is under 404(b) this evidence does

22   absolutely nothing to establish any motive scheme identity

23   involving any extortion attempt alleged in count 15 of the

24   indictment.

25       And under 302 the prejudicial value far outweighs -- or

11:19:51  1   the prejudicial value far outweighs any benefit of this

2   evidence to the jury.

3          THE COURT:  Well, is the March 22, 2005 telephone

4   conversation confirming this fraudulent forgery of the

5   documents?

6          MR. BUSCH:  Yes, it's a discussion clearly about it.

7          THE COURT:  All right.  Well, my view is that the

8   objection has been waived, but in addition to that, the Court

9   would admit it anyway under 404(b).

10      The 403 objection is overruled if the Court would have to

11  get there, but my view is that the objection has been waived.

12      There is a difference of opinion about what was said, and

13  I'm not crediting one of you over the other, but I don't have

14  any record to review.  So I can't conclude that there was an

11:20:44 15  agreement on this when I have two different versions of it.

16      I don't have any way of concluding that.  I'm not in a

17  position to determine that one of you are more credible than

18  the other is about it.

19      Are there any witnesses to the conversation?

20          MR. STEINKE:  I don't know whether it was overheard

21  or not by anybody else.

22          MR. BUSCH:  I wouldn't have offered these documents

23  and had them admitted -- the telephone conversation and this

24  particular document, but for the sole reason to establish what

25  the Court finds is 404(b) evidence.

11:21:17  1         THE COURT:  For the record, Mr. Busch, to make sure

2   that the record is complete, what is the government's theory

3   of the relevancy as to these documents?

4         MR. BUSCH:  It goes to the conduct between these two

5   defendants.  I mean, they're talking about what they're doing

6   with Bill Fisher in the same context as what they're doing

7   with this investor.

8         THE COURT:  All right.  It is the Court's view that

9   the timing of these and the commonality in persons involving

10   an entity that is charged to have been involved in a

11   falsification of activities with relation to the charges here

12   makes this conversation relevant and admissible.  So the Court

13   overrules the objection.

14      Is there anything else you want for purposes of the

11:22:10 15   record, Mr. Steinke?

16         MR. STEINKE:  No, ma'am.

17         THE COURT:  Bring back the jury.

18     (Jury returned to the courtroom.)

19         THE COURT:  Court time and real-time are the same.

20   I think that was five minutes.

21      All be seated, please.

22      All right.  Mr. Busch, you may proceed.

23         MR. BUSCH:  Thank you, your Honor.

24   BY MR. BUSCH:

25   Q.   Mr. McGill, I want to direct your attention to

11:23:31  1  Government's Exhibit 3296.

2       Do you recognize the first page of this document?

3  A.    Yes, I do.

4  Q.    Okay.  Does it appear to be some sort of agreement of

5  limited partnership entered into between West cliff Shopping

6  Plaza, Inc.?

7  A.    Yes.

8  Q.    And those other parties executing this document.  Is that

9  correct?

10  A.    Yes.

11  Q.    All right.  Now, if we look to page 16 of this document

12  does it appear to be signed by Darren Reagan as president of

13  West Cliff Shopping Plaza, Inc.?

14  A.    Yes.

11:24:23 15  Q.    Was that an entity that was formed to oversee the

16  construction of this West Cliff Shopping Center?

17  A.    Yes.

18  Q.    Does it also appear to be signed by Darren Reagan on

19  behalf of Black State Employees Association of Texas CDC?

20  A.    Yes.

21  Q.    Now, at the time of the sale --

22       THE COURT:  Excuse me just a minute.

23       Mr. Steinke, do you want me to give the jury a special

24  instruction with respect to 404(b)?

25       MR. STEINKE:  Yes, ma'am.

11:24:50  1          THE COURT:  All right.  I will.

2          All right.  Thank you.

3          Go ahead.  I'm not going to do it yet.

4     BY MR. BUSCH:

5     Q.    At the time of the sale in March of 2005 -- first of all,

6     was there any black state employees as members of BSEAT?

7     A.    Earlier on, yes.

8     Q.    But in the -- in this millennium, in the 2000s?

9     A.    Not that I was aware of.

10    Q.    By this time frame, by March of 2005, none?

11    A.    None that I'm aware of.

12    Q.    Let's look at the next page, page 17.

13          It appears to have a signature on it.

14          Do you see that signature on that page?

11:25:41 15   A.    Yes, I do.

16    Q.    It appears to have been signed on behalf of someone who

17    is the president of TRI, Inc.  Is that correct?

18    A.    Yes.

19    Q.    TRI was the retail initiative, the investor?

20    A.    That's correct.

21    Q.    Who put this signature on this document?

22    A.    I signed that.

23    Q.    Why did you sign this document saying -- or affix a

24    signature of someone as the president of TRI?

25    A.    It was suggested to me by Darren.

11:26:13  1          THE COURT:  Ladies and gentlemen, I'm going to give

2      you a special instruction at this time.

3          No one, neither Mr. McGill nor Mr. Reagan, have been

4      charged with any criminal offense that is of any concern to

5      you in this case with respect to the signing of these

6      documents.

7          They're being offered for a limited purpose, if you find

8      them to be relevant, the subject of whether they prove motive,

9      opportunity, intent, preparation, plan, knowledge, identity or

10     absence of mistake or accident with respect to the crimes

11     charged in this case.

12         In other words, if you find these documents to be

13     relevant to the charges in this matter you may consider them

14     for that purpose, but not in connection with any direct claim

11:26:59  15   with respect to the documents themselves.

16         Any objection to that instruction?

17             MR. STEINKE:  No, ma'am.

18             THE COURT:  All right.  Thank you.

19     BY MR. BUSCH:

20     Q.   Mr. Reagan suggested that you sign this document as

21     president of TRI.  Is that correct?

22     A.   That's correct.

23     Q.   What was the purpose of this?

24     A.   In order to facilitate the sale of this shopping center.

25     Q.   And to do what to TRI's interest in this property?

11:27:27   1    A.     To delay -- or to keep them from getting their

2    interest.

3    Q.     Now, let me direct your attention back to the time frame

4    of 2002 and 2003.

5           What information did you and/or Darren Reagan receive

6    regarding affordable housing developments in the Dallas area,

7    either from the Texas Department of Housing and Community

8    Affairs or any other source?

9    A.     Well, from the state we received a list of potential

10   developers in this area of affordable housing.

11   Q.     Why did you do that?

12   A.     Well, we had an interest in where those housing

13   developments were going to be built and by whom.

14   Q.     What was your interest?

11:28:36  15    A.     We had an interest in knowing where they were going to be

16   built because in some parts of our community many felt that we

17   had too many multi-family housing developments in our

18   community.  So we certainly had an interest from that

19   standpoint.

20   Q.     Was that your only interest?

21   A.     Not the only interest.  We wanted to also know for our

22   own personal gain potentially who was going to be building

23   these units.

24   Q.     What did you mean by your own person gain?

25   A.     Well, there may have been an opportunity for us to

11:29:19  1  partner or otherwise earn -- have an opportunity to earn --

2  get some money from some of the developers.

3  Q.   How would you get money from developers?

4  A.   Well, there was a way to perhaps politically pressure

5  them or pressure them through the communities, then we would

6  have an opportunity to do that.

7  Q.   Was that one of your motives, to find where these

8  developments were going to be proposed and to become involved

9  with developers?

10  A.   Yes.

11  Q.   All right.  Before we go any further, Mr. McGill, were

12  you in fact charged and indicted by the grand jury in this

13  particular case?

14  A.   Yes.

11:30:06  15  Q.   And were you charged along with Darren Reagan, Rickey

16  Robertson, D'Angelo Lee and Don Hill with engaging in count 15

17  of this indictment, conspiracy to commit extortion?

18  A.   Yes.

19  Q.   Were you also charged with Sheila Farrington and Don Hill

20  and D'Angelo Lee in count 16, a substantive extortion count?

21  Do you recall that?

22  A.   Yes.

23  Q.   All right.  Now, before this case -- before I took this

24  case to the grand jury did you receive a letter from me on

25  behalf of the United States Department of Justice?

11:30:48  1    A.    I did.

2    Q.    As a result of receiving that letter advising you that

3    you were a target of an investigation did you decide to come

4    in and speak to me and the agents?

5    A.    I did.

6    Q.    Why did you make that decision, Mr. McGill?

7    A.    Because I knew that I had committed an offense, and I

8    needed an opportunity to just do the right thing.

9    Q.    In fact, did I advise you that you had the right to have

10    an attorney advise you before you spoke with us?

11    A.    Yes.

12    Q.    What decision did you make, sir?

13    A.    I made a decision to continue to speak without an

14    attorney.

11:31:27  15    Q.    Why did you make that decision?

16    A.    I had made up my mind.  I really didn't feel that I

17    needed an attorney at that point.

18    Q.    But at some point an attorney was appointed to represent

19    you.

20          Is that your understanding?

21    A.    That's correct.

22    Q.    Is that attorney in fact in this courtroom?

23    A.    Yes, he is.

24    Q.    Is that Derrick Brown?

25    A.    Yes.

11:31:48  1    Q.    He's been with you from that point to this point?

      2    A.    Yes.

      3    Q.    Okay.   Of course, this event was after the search

      4    warrants were executed across the City of Dallas on June 20,

      5    2005?

      6    A.    That's correct.

      7    Q.    Let me stop there for a second.

      8          Did the FBI search your residence?

      9    A.    Yes.

     10    Q.    How did you find their conduct and their behavior in

     11    searching your residence?

     12    A.    Professional.

     13    Q.    How did you -- how would you characterize your experience

     14    with the FBI throughout the public phase of this case that --

11:32:35 15    of you have been aware of, from the search warrant to the

     16    present?

     17    A.    Professional.

     18    Q.    Have you had occasion to meet with special agents Don

     19    Sherman and Allen Wilson in this case?

     20    A.    Yes.

     21    Q.    So based on your experience with the FBI and the agents

     22    you responded to the target letter and you came in and you

     23    began to cooperate.   Is that fair?

     24    A.    That's correct.

     25    Q.    As a result of your cooperation did you then make the

11:33:08  1    decision to plead guilty in this case?

2    A.    Yes, I did.

3    Q.    Do you recall pleading guilty to a conspiracy to commit

4    extortion?

5    A.    Yes.

6    Q.    As part of your plea agreement do you understand that the

7    maximum exposure that you have is five years?

8    A.    That's correct.

9    Q.    And that a fine may be assessed?

10   A.    That's correct.

11   Q.    That restitution may be ordered by the Court, or may not

12   be ordered by the Court.

13         Do you understand that?

14   A.    Yes.

11:33:37  15   Q.    That property may or may not forfeited.  It's up to the

16   judge.

17   A.    That's correct.

18   Q.    That if the Court accepts your plea agreement with the

19   United States is it your understanding that the government

20   will dismiss the other charges that are against you?

21   A.    Yes.

22   Q.    Now, having said all that, is there any other promise or

23   guarantee made to you by the government?

24   A.    No.

25   Q.    Okay.  Do you recognize Don Hill in this courtroom?

11:34:14   1    A.    Yes, I do.

2    Q.    And now Sheila Farrington-Hill?

3    A.    Yes.

4    Q.    D'Angelo Lee?

5    A.    Yes, I think so.  I'm not certain I see D'Angelo Lee.

6         Yes, I do.

7    Q.    Okay.  Darren Reagan?

8    A.    Yes.

9    Q.    And Rickey Robertson.  Do you know him?

10    A.    No, I do not.

11    Q.    You do not know Mr. Robertson?

12    A.    No.

13    Q.    Is there any question in your mind whether or not you are

14    guilty of the offense of extortion in this case?

11:34:54  15   A.    No.

16    Q.    Now, where I left off we were talking getting information

17    on these affordable housing developers, and you said one of

18    the motives was to see if you and Darren Reagan could somehow

19    profit by --

20          MR. STEINKE:  Objection, leading.

21          THE COURT:  Sustained.

22    BY MR. BUSCH:

23    Q.    Let's get back to where we were a few minutes ago.

24         You had spoken about your motivation for getting this

25    information.

11:35:25   1        Do you recall ever speaking out either here in the City

2   of Dallas or in Austin against multi-family housing?

3            MR. STEINKE:   Objection, leading.

4            THE COURT:   Sustained.

5   BY MR. BUSCH:

6   Q.    What efforts did you and Mr. Reagan make in indicating

7   either your support or opposition to affordable housing?

8   A.    We at one time, or perhaps more, spoke before councils in

9   opposition to multi-family developments.

10  Q.    Let me direct your attention now to Government's

11  Exhibit 382, it will pop up on your screen, and ask you if you

12  recognize this letter dated August 24, 2004?

13  A.    Yes, I do.

14  Q.    The jury has seen this letter several times already.

11:36:33  15        What was your motivation, or that of Mr. Reagan, in

16  preparing this letter?

17  A.    The motivation was to -- well, this letter was to request

18  a moratorium on all applications on multi-family housing that

19  would have helped in delaying possibly in the developer's

20  application that was pending for approval.

21  Q.    Who was this letter presented to?

22  A.    I believe that that letter was given to the city council

23  members.

24  Q.    Was there a follow-up physical presentation by you and

25  Mr. Reagan to the city council?

11:37:27  1    A.    Yes.

2    Q.    Was that the following day on the 25th of August?

3    A.    I believe so.

4    Q.    What happened during that presentation?  Did you or

5    Mr. Reagan or both of you speak?

6    A.    I believe both of us spoke.  I spoke in opposition of, I

7    believe to multi-family developments at that time.

8    Q.    Frankly, what concern did you really have about the

9    number of units that were being built?  Was that your

10   motivation, or was it something else?

11   A.    It was our primary motivation was to delay the projects.

12   We needed to have -- delay the projects in order to help get

13   our deal done.

14   Q.    What do you mean by "our deal done"?

11:38:23 15  A.    Well, we had -- we were trying to negotiate a contract

16   with one or more of the developers, and if there was some

17   delay then perhaps that would put pressure on the developer to

18   help speed their agreement with us.

19   Q.    All right.  Do you recall who the developers were in this

20   August time frame of 2004?

21   A.    The two developers that I'm aware of is Fisher and

22   Potashnik.

23   Q.    Do you know whether or not a contract was ever executed

24   with Brian Potashnik?

25   A.    I'm not aware of one being executed.

11:39:02   1    Q.    Are you aware of a contract being executed with Bill
        2    Fisher?
        3    A.    Yes.
        4    Q.    I'm going to direct your attention now to Government's
        5    Exhibit 303, and ask you to take a look at that document.
        6    A.    (Witness peruses document.)
        7    Q.    Now, let's look at the -- do you recall ever seeing this
        8    letter or this memorandum?
        9    A.    I don't recall it, no.
       10    Q.    Okay.  Let's look at Government's Exhibit 315, page 14.
       11          Do you recognize this calendar?
       12    A.    Yes.
       13    Q.    Whose calendar is it?
       14    A.    That's my calendar.
11:40:08  15    Q.    Let me direct your attention to September 20, 2004.
       16          Do you see that entry?
       17    A.    Yes.
       18    Q.    The 11:30 says Kathy and Bill Fisher.
       19          Who was Kathy?
       20    A.    Kathy Nealy.
       21    Q.    Does that indicate a meeting that you participated in on
       22    September 20th at 11:30 with Kathy Nealy and Bill Fisher?
       23    A.    Yes.
       24    Q.    Pappadeaux.  Is that a restaurant?
       25    A.    Yes.

11:40:36  1   Q.   All right.  After that meeting was there another meeting

2   or event indicated in your calendar?

3   A.   Yes.

4   Q.   1:30, city hall.  Is that with council members Fantroy

5   and Hill?

6   A.   Yes.

7   Q.   Let's talk first about the lunch at Pappadeaux with Kathy

8   Nealy and Bill Fisher.

9        Do you recall who else attended that lunch?

10   A.   Darren, D'Angelo and myself.

11   Q.   Do you recall what the topic of conversation was?

12   A.   I believe that the topic of conversation was who was

13   going to coordinate between the developer and the council

14   person.

11:41:21  15   Q.   What do you mean by that?

16   A.   In the case of dealing with the developers, who was going

17   to be the person that really was in charge of talking directly

18   to the developer and directly to the council person.

19   Q.   What did Mr. Reagan say in that regard?

20   A.   Darren indicated that he wanted to be that person.

21   Q.   What did D'Angelo Lee say in that regard?

22   A.   I believe that D'Angelo indicated that he wanted to be

23   that person.

24   Q.   Was there anything else of substance discussed during

25   this lunch meeting that you recall?

11:42:05  1    A.    Not that I recall.

2    Q.    Then at 1:30 did you have a meeting at city hall with

3    Fantroy and Hill?

4    A.    I believe so.

5    Q.    Do you recall who else may have participated in that

6    meeting?

7    A.    No, I do not.

8    Q.    Do you recall what was said during that meeting?

9    A.    No, I do not.

10   Q.    Let's look now at Government's Exhibit 218.

11         Do you recognize this e-mail from you to Bill Fisher?

12   A.    Yes, I do.

13   Q.    Would you read this e-mail to the jury, please.

14   A.    The subject is "business referral."

11:42:58  15        The date is 9-21-04.

16         It's from Allen McGill to Bill Fisher.

17              THE COURT:  Everyone has it.  The jury all has it.

18   They can see it.  Any particular questions you want to direct

19   them to.

20              MR. BUSCH:  Thank you, your Honor.

21   BY MR. BUSCH:

22   Q.    The first sentence you said, "Darren and I appreciate the

23   candor and openness."

24         What did you mean by that?

25   A.    I think I expected the negotiations -- the discussions to

11:43:36  1    be much more acrimonious than it turned out to be.

2    Q.    Why did you expect that?

3    A.    Because we were asking for a piece of the action.

4    Q.    In spite of asking for a piece of the action, what was

5    Bill Fisher's demeanor?

6    A.    As I recall, he was pretty open.

7    Q.    Did you tell him that -- in this third sentence did you

8    ever tell him that Gail Terrell was your wife?

9    A.    No, I did not.

10    Q.    Why did you not tell Bill Fisher that Gail Terrell was

11    your wife?

12    A.    Well, I wanted to maintain the -- that appearance of

13    there was no relationship, because I was making a referral,

14    and the issue never came up.

11:44:35  15              MR. BUSCH:   Now, let's look at Government's Exhibit

16    303, page 25.

17    BY MR. BUSCH:

18    Q.    The bottom part is your e-mail.

19          Is that the response from Mr. Fisher at the top?

20    A.    Yes.

21    Q.    Now, I want to direct your attention to Brian Potashnik

22    327.

23          We have seen this before the jury.

24          Were you aware of the contents of this letter?

25    A.    Yes.

11:45:26  1        MR. BUSCH:  Okay.  If we scroll down.

2   BY MR. BUSCH:

3   Q.   First of all, did this letter come from Bill Fisher?

4   A.   Yes, I think it did.

5        MR. BUSCH:  Okay.  If we scroll down to the next

6   page.

7   BY MR. BUSCH:

8   Q.   Number 1, the total compensation of 55,000, and there is

9   some other factors in that.

10       Do you see that?

11  A.   Yes, I do.

12  Q.   At the end of paragraph 2, your group --

13  A.   I'm sorry?

14  Q.   I think it may be "use best efforts to obtain a support

11:46:10 15 letter from Don Hill and Senator Royce West."

16       Is that approximately what it says?

17  A.   Yes.

18  Q.   Okay.  That you, referring to Darren Reagan and yourself

19  and at least three people should appear at these public

20  hearings and support the project.

21       Was that your understanding?

22  A.   Yes.

23  Q.   Now, you were aware of this letter.  Is that correct?

24  A.   Yes, I am -- I was.

25  Q.   Were you aware of a counter by Darren Reagan to Bill

11:46:52  1    Fisher?

2    A.    No, I was not.

3          MR. BUSCH:   Let's look at Government's Exhibit 314.

4    BY MR. BUSCH:

5    Q.    Were you aware of this letter that went back to Bill

6    Fisher on September 20th, about a week later?

7    A.    I don't believe I had seen this letter at the time.

8          MR. BUSCH:   Okay.   Let's look at paragraph number 1.

9    BY MR. BUSCH:

10   Q.    In parentheses after the word "several of our close and

11   preferred consultants," it has your wife and the name of

12   Ms. Debra Kirvin.

13         Do you recall who Debra Kirvin was at the time?

14   A.    Yes.   I believe that's -- she and Darren were married at

11:47:44 15  the time.

16         MR. BUSCH:   If we continue on down.   Scroll down,

17   please.

18   BY MR. BUSCH:

19   Q.    Let's look at that last paragraph at the bottom.

20         Did you know Alton Scott?

21   A.    No.

22   Q.    Did you know Richard Williams?

23   A.    No.

24   Q.    Did you know Clifton Kirvin?

25   A.    I may have met him.

11:48:10  1    Q.    Did any of these three -- well, the first two you did not

2    know.   Did Clifton Kirvin have any involvement as far as you

3    knew as president of BSEAT with BSEAT?

4    A.    No, not that I'm aware of.

5                MR.  BUSCH:   Now, let's look at Government's

6    Exhibit 1938.

7    BY MR. BUSCH:

8    Q.    Do you recall whether or not you saw this contract, or

9    this proposal back on October 8, 2004?

10   A.    Yes, I believe so.

11               MR.  BUSCH:   If we look down towards the bottom half

12   of the page, please.

13   BY MR. BUSCH:

14   Q.    It appears that the term -- or the amount of 150,000 has

11:49:01 15   been stricken and 100,000 has been written in its place and

16   50,000 as a retainer or refundable initial payment has been

17   reduced to 10,000 and the 1,500 per hour has been crossed out.

18         Do you see those changes?

19   A.    Yes.

20   Q.    There are some other changes.

21         Do you recognize the initials in the right margin as the

22   person who made those changes?

23   A.    No.   I understand that may have been Bill Fisher, but I

24   don't know his handwriting, so I can't say it.

25   Q.    Did you make these changes?

11:49:36  1    A.    No, I did not make those changes.

        2    Q.    Do you think Darren Reagan would have made those changes

        3    knocking down the dollar amounts and eliminating the $1,500

        4    per hour?

        5              MR. STEINKE:  Well, objection to foundation.

        6              THE COURT:  That's sustained.

        7    BY MR. BUSCH:

        8    Q.    Do you recognize any of the handwriting as Darren

        9    Reagan's?

       10    A.    No.

       11              MR. BUSCH:  Let's look at page 4 of this document.

       12    BY MR. BUSCH:

       13    Q.    At the bottom in that same handwriting that we saw on the

       14    first page it says, "Agreement includes Exhibit A attached,

11:50:08 15    which is incorporated and fully integrated into this

       16    agreement," and those same initials.

       17              MR. BUSCH:  Let's move on to about page 6, and look

       18    at that Exhibit A, and in particular, paragraph C.

       19    BY MR. BUSCH:

       20    Q.    Do you recall reading this paragraph back then in October

       21    of 2004?  Have you seen this document?

       22    A.    Yes.

       23    Q.    "Company represents and warrants that no compensation of

       24    any kind -- or nature or kind will be paid to anyone who is an

       25    employee or an elected official in the City of Dallas or

11:50:45  1    Dallas County."

2         What did that mean to you?

3    A.   That no money should be paid in any manner to a public

4    official or city council person.

5    Q.   Was this a provision that -- this Exhibit A, was this

6    something that Mr. Fisher interjected into this agreement?

7    A.   Yes.

8    Q.   Now, if we look back at -- without going back -- that

9    $1,500 an hour, there has been some testimony or comments

10   about the 1,500.

11        Who at BSEAT earned $1,500 an hour back in 2003?

12   A.   No one that I knew.

13   Q.   All right.  Anybody paid a salary -- hourly or salary at

14   BSEAT as far as you knew?

11:51:42 15  A.   Only Darren.

16   Q.   Only Darren.

17        Do you know whether or not he was billing anybody at

18   $1,500 an hour?

19   A.   Not that I'm aware of.

20   Q.   Were there any other paid employees other than Darren --

21   Reagan or paid individuals other than Darren Reagan at BSEAT?

22   A.   Not that I'm aware of.

23   Q.   So now looking at the West Cliff Shopping Center, were

24   there any paid employees of BSEAT at that time in managing the

25   West Cliff Shopping Center?

11:52:15  1    A.    No.

        2    Q.    All right.  This agreement --

        3          MR. BUSCH:  If we look back at page 1.

        4    BY MR. BUSCH:

        5    Q.    I'm now going to ask you to look at another agreement,

        6    and see if you recognize this document.

        7          MR. BUSCH:  Government's Exhibit 146.

        8    BY MR. BUSCH:

        9    Q.    First of all, there is a cover letter.

       10          Does that cover letter appear to be to someone by the

       11    name of Brian?

       12    A.    Yes.

       13    Q.    Do you know which Brian that might be?

       14    A.    I don't know for certain.  It could be Brian Potashnik.

11:53:15 15    Q.    Okay.  Is that -- do you see the second paragraph, "I'm

       16    in the process of scheduling a meeting with Councilman Don

       17    Hill and State Senator Royce West regarding the projects"?

       18    A.    Yes.

       19    Q.    What impression do you get from that statement in a

       20    letter to a developer by Darren Reagan?

       21    A.    That Darren had the ability to meet with these two

       22    individuals.

       23    Q.    What would the message be sent, if any?

       24    A.    That basically he has juice to -- with these two

       25    individuals.

11:53:52  1          MR. BUSCH:  All right.  Let's look at Government's

2      Exhibit 153-F, please.

3      BY MR. BUSCH:

4      Q.    Does this agreement look similar to the other agreement

5      that we looked at that was sent to Bill Fisher?

6      A.    Yes.

7      Q.    All right.  We look down here in the middle of this -- or

8      near the bottom of this paragraph, and it has the good faith

9      effort contracting outreach initiative goal of 40 percent plus

10     participation.

11         Are you aware of what the state requirement is for

12     developers who receive tax credits or tax-exempt bonds to

13     build these projects in the State of Texas?

14     A.    No, I'm not.

11:54:45 15          MR. BUSCH:  If we look at the next page of this

16     document, and we look at the top here of this top paragraph.

17     BY MR. BUSCH:

18     Q.    It has $125,000 fee, 15,000 as initial retainer, and

19     balance at the closing of the bonds.

20         Is it somewhat similar to the other contract that Darren

21     Reagan sent to Bill Fisher?  The dollar amounts are a little

22     different, but are they somewhat similar?

23     A.    Yes, it is.

24     Q.    Now, the date of this document was October 14.

25         Do you know what happened at city hall on October 27,

11:55:26  1    2004 in relation to these two developers, Brian Potashnik and

2    Bill Fisher?

3    A.    I don't recall.

4    Q.    Okay.  Are you aware whether or not some projects were

5    voted up or down --

6              MR. STEINKE:  To which we object.  He said he didn't

7    recall.

8              THE COURT:  If you are attempting to refresh his

9    recollection, you may ask that question, but not for other

10   purposes.

11             MR. BUSCH:  Thank you, your Honor.

12   BY MR. BUSCH:

13   Q.    Are you aware of whether or not any projects were voted

14   up or down in October of 2004 with the Dallas City Council?

11:55:57 15   A.    Yes.

16   Q.    Were you there?

17   A.    I believe so.

18   Q.    What is it that you recall from that event?

19   A.    I believe that -- I believe that some of those projects

20   were approved and some were not.  I don't have a clear

21   recollection of that meeting.

22   Q.    Now, let me direct your attention to another city council

23   meeting here in Dallas.

24             MR. BUSCH:  Government's Exhibit 1549.

25   BY MR. BUSCH:

11:57:35  1   Q.   Do you recall whether or not you were --

 2         MR. BUSCH:  If we look at page 2.

 3   BY MR. BUSCH:

 4   Q.   The top of it refers to a project Chickory Court, Simpson

 5   Stuart, related to Homes of Pecan Grove.

 6      Are you familiar with the Homes of Pecan Grove project of

 7   Bill Fisher?

 8   A.   Yes.

 9   Q.   Do you recall whether you were at the city council on

10   November 10th when a vote was had on that particular project?

11   A.   I believe so.

12   Q.   What was the purpose of you being at the city council on

13   November 10, 2004?

14   A.   I believe that we were there to make certain that action

11:58:26 15   was taken on that particular project that we wanted to see

16   happen.

17   Q.   Did you in fact speak on behalf of that project?

18   A.   (No response.)

19   Q.   Or do you recall?

20   A.   I don't recall whether I spoke on that project at that

21   time or not.

22   Q.   Did you appear in favor of that project?

23   A.   Yes, I did.

24   Q.   Why did you do that?

25   A.   I believe because at that time we had our -- we had our

11:58:52  1   deal -- or we were working on our deal at that time with Bill

2   Fisher.

3           MR. BUSCH:   Okay.   If we look at the next exhibit,

4   Government's Exhibit 1591.

5   BY MR. BUSCH:

6   Q.   I think you will see dated at the top is November 10,

7   2004.   It says, "The following individuals addressed the city

8   council regarding the resolution."

9        Do you see your name in that group?

10   A.   Yes.

11   Q.   Did you know Abdul Karriem?

12   A.   No.

13   Q.   Did you know Eugene Thomas?

14   A.   Yes.

11:59:22 15   Q.   Did you know Reverend H.J. Johnson?

16   A.   Yes.

17   Q.   Did you know Charletta Compton?

18   A.   I believe so.

19   Q.   Then there is Darren Reagan, Al Lipscomb.

20        Did you know Mr. Lipscomb?

21   A.   Yes.

22   Q.   Did you know Ms. Norman?

23   A.   Yes.

24   Q.   Did you know Ron Ferguson?

25   A.   I don't believe so.

11:59:40  1    Q.    So you and Darren Reagan were there on November 10th

2    addressing the council in favor of it and then Don Hill moves

3    to approve the resolution and it passed.

4         Is that your recollection?

5    A.    Yes.

6    Q.    Do you know whether or not during this time period

7    whether Darren Reagan had meetings with Don Hill not in your

8    presence?

9    A.    I believe so.

10   Q.    Do you know where those meetings took place generally?

11   A.    I believe some of them maybe at city hall.

12   Q.    Do you know where else in the community some of those

13   meetings may have taken place?

14        MR. VITAL:   Your Honor, I think I need to object to

12:00:36  15   foundation.

16        THE COURT:   If you know, you may answer.  If you

17   don't, don't answer.

18   A.    At one of the Starbucks.

19   Q.    Do you recall that location?  Or one of those Starbucks?

20   A.    I believe it was the one on Camp Wisdom.

21        MR. BUSCH:   Let's look at Government's Exhibit 76.

22   BY MR. BUSCH:

23   Q.    At the very top in small print it says Donald W. Hill

24   Deputy Mayor Pro Tem.

25        So I represent to you that this is one of the calendars

12:01:23   1   for Don Hill.

2   Do you see where I made that reference?

3   A.   Yes.

4   Q.   If we look down in the lower left-hand corner for

5   November 16th, Tuesday, the first entry has a meeting with

6   Darren Reagan at the Starbucks on Camp Wisdom.

7   Do you see that?

8   A.   Yes.

9   Q.   Now, that was -- this meeting appears to have taken

10   place -- or is scheduled for 8:45 to 9:00 a.m. On Tuesday,

11   November 15, 2004.

12   Let me ask you, did you have a meeting that day with some

13   of the individuals in this case?

14   A.   Could you refresh me as to what date we're talking about?

12:02:16  15   Q.   November 16th.

16   A.   I don't have a clear recollection of meeting with anyone

17   else on that date without recollection.

18   Q.   Let me direct your attention to Government's Exhibit 315

19   again, I believe that's your calendar.

20   MR. BUSCH:   If we could look at page 25.

21   May I approach the witness, your Honor?

22   THE COURT:   Yes, you may.

23   BY MR. BUSCH:

24   Q.   I hand you what's been marked -- or is in evidence as

25   Government's 315.

12:02:55  1        Does that appear to be your calendar?

2    A.    Yes, it is.

3    Q.    Okay.  There is a Post-It Note on page 25.

4        Is that your handwriting?

5    A.    Yes, it is.

6    Q.    Does that reflect a meeting with Don Hill at that

7    Starbucks that morning?

8    A.    Yes, it does.

9    Q.    Now, do you recall whether or not later that day that you

10   had a meeting at Pappadeaux?

11       MR. JACKSON:  Your Honor, I'm sorry.  I'm going to

12   object.  That doesn't say that he actually met Don Hill.

13       THE COURT:  That's overruled.

14   BY MR. BUSCH:

12:03:35 15   Q.   You may answer the question.

16   A.    I'm sorry.  The question is whether I met with Don?

17   Q.    If there was a meeting later that day at a Pappadeaux

18   Restaurant that evening for dinner?

19   A.    I believe so.

20   Q.    Do you recall who was there at that dinner at Pappadeaux?

21   A.    I believe at that meeting was myself, Darren.  And I'm

22   not sure who else showed up at the meeting.  I just don't

23   recall at this time.

24   Q.    Do you recall what the discussion was at that dinner at

25   Pappadeaux?

12:04:28  1    A.    I'm certain it was to discuss what had happened regarding

2    the housing developments, and any other business that we may

3    have been talking about.

4    Q.    Do you recall if any of these other individuals that you

5    have discussed also attended that dinner?

6          MR. GREENE:   Your Honor, I object.  It's been asked

7    and answered.

8          THE COURT:   Overruled.

9    A.    No.  I don't have a clear recollection of who else

10   attended that meeting.

11   BY MR. BUSCH:

12   Q.    Do you recall whether or not D'Angelo Lee attended

13   that dinner --

14         MR. GREENE:   Again, I would object.  It's the third

12:05:08 15  time, and he says he doesn't recall.

16         THE COURT:   Overruled.

17   A.    What I recall is that there were at least two meetings,

18   and I'm not certain of the number of attendees at the second

19   meeting.  I know that there were more people there than Darren

20   and myself.  I can't be certain at this point whether or

21   not -- or who the other individuals that were at that dinner

22   meeting were.

23   Q.    You said there are two meetings.

24         Are you referring to two meetings at Pappadeaux?

25   A.    Yes.

12:06:03  1    Q.    All right.  Let's talk about the meeting that you have a

2    clear recollection about.  Okay?

3    A.    Yes.  The meetings that I have a clear recollection about

4    attended by D'Angelo, Kathy, myself, Darren.

5    Q.    When you say D'Angelo, are you referring to D'Angelo Lee?

6    A.    Yes, I am.

7    Q.    Kathy Nealy?

8    A.    Yes.

9    Q.    Okay.  Do you recall what was the topic of discussion

10    during that meeting, that dinner?

11    A.    That meeting, as I recall, involved who was going to be

12    the spokesperson for -- who was going to control projects and

13    events between the council person and the developer.  The

14    developers that wanted to put projects over in our area.

12:07:05 15    Q.    What was Darren Reagan's input in that discussion?

16    A.    Basically that he wanted to be that person.

17    Q.    What was D'Angelo Lee's input in that discussion?

18    A.    That he wanted to be that person.

19    Q.    Was there a discussion about the use of minority

20    contractors?

21          MR. GREENE:  I object to asked and answered.

22          THE COURT:  Overruled.

23          MR. GREENE:  Repetitive.

24          THE COURT:  Overruled.

25    A.    Yes, I believe so.

12:07:31   1   BY MR. BUSCH:

2   Q.   How about deed restrictions?

3   A.   Yes.

4   Q.   Do you recall what the discussion was about deed

5   restrictions?

6   A.   Other than there was discussion about deed restrictions,

7   I don't recall specifically what the deed restrictions were.

8   Q.   Let me direct your attention to Government's Exhibit

9   317.

10        Do you see this document that's before you?

11   A.   Yes, I do.

12   Q.   It says that, "The attached documents should mirror the

13   deed restrictions."

14        Do you recall -- do you recognize the handwriting on this

12:08:18  15   first page?

16   A.   Yes, I do.

17   Q.   Who is that?

18   A.   Darren.

19        MR. BUSCH:   If we look at the next page.

20   BY MR. BUSCH:

21   Q.   If we look at these deed restrictions, did you

22   participate in the formation of these deed restrictions

23   starting with the BSEAT CDC community-based CDC will be

24   admitted into the ownership of the project."

25        Did you participate in the creation of those deed

12:08:49   1    restrictions that started with that sentence and continues to

2    the bottom of the page?

3    A.    I believe I had some input into that.

4    Q.    Okay.  What was the -- what was your motivation in

5    attempting to impose these deed restrictions on the developer,

6    Bill Fisher?

7    A.    We wanted to get a piece of the business, and we wanted

8    to impose as many minority subcontractors as possible.

9    Q.    What was ultimately your goal or your purpose or your

10    motive in imposing as many minority contractors as possible?

11    A.    Well, we were going to receive money back from these

12    contractors if -- the subcontractors if we could.

13    Q.    What do you mean by that?  How would you receive money

14    back from the subcontractors?

12:09:48  15    A.    By them kicking it back.

16    Q.    All right.  Let me move further ahead now to January of

17    2005, and ask you to look at Government's Exhibit 167.

18          Do you recognize the outside of that folder?

19    A.    Yes, I do.

20    Q.    Do you recognize the handwriting, sir?

21    A.    Yes.

22    Q.    Whose is it?

23    A.    That's Darren's writing.

24    Q.    If we look inside this folder, page 2, it appears to be a

25    contract with independent contractor, and it -- the first

12:10:46  1    sentence of the first paragraph, it's between BSEAT and Gail

2    Terrell doing business as Terrell & Associates.  Is that

3    correct?

4    A.    Yes, it is.

5    Q.    Okay.  If we look at page 2 -- well, I'm sorry.

6          If we look at the bottom of page 1, "The client will pay

7    contractor $1,500 a week."

8          Were you aware of this contract that was being sought

9    between your wife and BSEAT CDC?

10    A.    Yes.

11          MR. BUSCH:  If we look at the last page, page 4.

12    BY MR. BUSCH:

13    Q.    Do you recognize the signatures on this page?

14    A.    Yes, I do.

12:11:35 15    Q.    Whose signatures are on this page?

16    A.    Darren's and Gail Terrell.

17    Q.    What was the purpose of this agreement?  Why would there

18    be a need to have a consulting agreement between your wife and

19    BSEAT CDC?

20    A.    The contract was to provide consulting services to the --

21    the Fisher, the housing developer.  It was a direct means for

22    me to get paid.

23    Q.    For you to get paid?

24    A.    Yes.

25    Q.    Unbeknownst to Bill Fisher because Gail Terrell was not

12:12:15   **1**   disclosed as your wife?

  **2**          MR. VITAL: Object to leading.

  **3**   A.   That's correct.

  **4**          THE COURT: Don't lead the witness.

  **5**   BY MR. BUSCH:

  **6**   Q.   How would you get paid through this contract from the

  **7**   developer, Bill Fisher?

  **8**   A.   Through the contract with Gail Terrell.

  **9**   Q.   What information, if any, did you or Mr. Reagan or Gail

  **10**   give Bill Fisher that established the marital relationship

  **11**   between you and Gail Terrell?

  **12**   A.   None.

  **13**   Q.   Now, let me direct your attention to Government's

  **14**   Exhibit 168.

12:12:59   **15**       For the record, can you recognize the handwriting on this

  **16**   folder?

  **17**   A.   Yes, I do.

  **18**         MR. BUSCH: May I approach the witness for a moment?

  **19**         THE COURT: Yes, you may.

  **20**   BY MR. BUSCH:

  **21**   Q.   Contained within this folder --

  **22**         MR. BUSCH: If we look at page 2 of the exhibit.

  **23**   BY MR. BUSCH:

  **24**   Q.   Does it appear to be another contract between BSEAT CDC

  **25**   and another entity, let's say?

| | | |
|---|---|---|
| 12:13:31 | 1 | A.    Yes. |
| | 2 | Q.    Who is HD and Ola Reagan, the d/b/a is HDOJ & Associates? |
| | 3 | A.    HD and Ola Reagan are Darren's parents. |
| | 4 | Q.    Does it appear -- the second paragraph, does it also |
| | 5 | relate to the Homes of Pecan Grove? |
| | 6 | A.    Yes, it does. |
| | 7 | Q.    Were you aware of this particular contract? |
| | 8 | A.    No, I was not. |
| | 9 | Q.    As an officer of BSEAT CDC why was it that you weren't |
| | 10 | aware of this contract? |
| | 11 | A.    I have no idea other than it was never given to me. |
| | 12 | Q.    Let me direct your attention now to Government's |
| | 13 | Exhibit 321. |
| | 14 | Do you recognize this document, Mr. McGill? |
| 12:14:42 | 15 | A.    I'm not certain that I received a copy of this, but I |
| | 16 | think I have seen it since. |
| | 17 | Q.    It's a letter written to who? |
| | 18 | A.    Mr. Jafar. |
| | 19 | Q.    Who did you know Mr. Jafar to be? |
| | 20 | A.    I believe he was one of the owners, I believe, in |
| | 21 | business -- he was one of the owners of one of the housing |
| | 22 | developments. |
| | 23 | Q.    Okay.  It looks like it says Odyssey Residential |
| | 24 | Holdings? |
| | 25 | A.    Yes. |

12:15:25   1   Q.    Who was associated with that, Mr. Fisher, or

           2   Mr. Potashnik?

           3   A.    I believe Mr. Fisher.  I believe.

           4   Q.    Now, let's look at the first paragraph.

           5         THE COURT:  We're going to stop when you're done

           6   with this exhibit.

           7         MR. BUSCH:  Yes, ma'am.  I just have a few more

           8   questions, if you would like me to --

           9         THE COURT:  That's fine.

          10   BY MR. BUSCH:

          11   Q.    It says, that last sentence, "Due to Bill's insistence,

          12   strong arm and hostage-holding tactics to get me to initial

          13   the revisions, I did so on a tentative basis."

          14         This letter was written --

12:16:06  15         MR. BUSCH:  If we look at page 5 of this exhibit --

          16   or page 4.

          17         Perhaps page 3.

          18   BY MR. BUSCH:

          19   Q.    All right.  It was written by Darren Reagan.  Is that

          20   right?

          21   A.    Yes.

          22         MR. BUSCH:  Now, if we go back to that first

          23   paragraph, that sentence I read.

          24         If we highlight the sentence of the first paragraph.

          25         The last sentence in that first paragraph, if we would

12:16:37 1    highlight it.

2    BY MR. BUSCH:

3    Q.    When you see Darren Reagan writing and about someone

4    else's insistence, strong arm and hostage-holding tactics,

5    what is your impression?

6    A.    Well, it's a bit ironic.

7            MR. BUSCH:   Let's look at page 4 of this exhibit.

8    BY MR. BUSCH:

9    Q.    Does that appear to be an invoice to BSEAT approved by --

10   do you recognize the handwriting that's in blue on this

11   exhibit?

12   A.    Yes, I do.

13   Q.    Is that Mr. Reagan's?

14   A.    Yes, it is.

12:17:13 15   Q.    Were you aware of this $4,000 invoice for monthly car

16   allowance, and monthly cellular phone allowance?

17   A.    No, I was not.

18           MR. BUSCH:   Lastly, page 7.

19   BY MR. BUSCH:

20   Q.    Does it appear that the exhibit was sent by certified

21   mail?

22   A.    Yes.

23           MR. BUSCH:   Your Honor, I have concluded with that

24   exhibit.

25           THE COURT:   All right.  Ladies and gentlemen, we'll

12:17:52   1    go ahead and take our lunch recess.  We'll resume at 25

2    minutes of 2.

3         All rise for the jury.

4         (Jury retired from the courtroom.)

5         (Lunch recess.)

6              THE COURT:  All right.  Mr. Busch.

7              MR. BUSCH:  Your Honor.

8    BY MR. BUSCH:

9    Q.   Mr. McGill, I'm going to ask you is --

10             MR. BUSCH:  Is the mic on?

11        There we go.

12        Thank you, your Honor.

13   BY MR. BUSCH:

14   Q.   Mr. McGill, I'm going to ask you to look now at

13:39:33  15   Government's Exhibit 1958.

16             MR. BUSCH:  If we could go off the Elmo, back to the

17   United States.

18        Thanks.

19   BY MR. BUSCH:

20   Q.   What was BSEAT's involvement going to be in particular --

21   we have seen the contracts going back and forth and the

22   revisions and all of that.  Ultimately a contract was signed

23   regarding Pecan Grove.

24        What was your organization with Darren Reagan, and that

25   of your wife Gail, what was your organization's interest in

| | | |
|---|---|---|
| 13:40:16 | 1 | establishing a certain goal of minority contractors and having |
| | 2 | a list of preferred contractors? |
| | 3 | A.    Well, that would ensure that a certain number of |
| | 4 | subcontractors received work that we knew and could count on |
| | 5 | and that we could possibly receive money back from. |
| | 6 | Q.    Looking at this document do you recall this memo being |
| | 7 | created by your wife Gail? |
| | 8 | A.    Yes, I do. |
| | 9 | Q.    Okay.  And what was the purpose of this particular memo? |
| | 10 | Was it sent to potential contractors? |
| | 11 | A.    Yes. |
| | 12 | Q.    Did you have a list -- when I say "you," you, Darren |
| | 13 | Reagan, have a list of preferred subcontractors? |
| | 14 | A.    Yes. |
| 13:41:11 | 15 |                 MR. BUSCH:  If we could scroll down. |
| | 16 | BY MR. BUSCH: |
| | 17 | Q.    And in this letter it says that there should be -- a |
| | 18 | certain amount of data should be provided that's related to |
| | 19 | the items that are enumerated on this letter. |
| | 20 |        Is that a fair statement? |
| | 21 | A.    Yes. |
| | 22 | Q.    Now, I want to direct your attention -- if you see at the |
| | 23 | top of this document -- the top of the page it appears to have |
| | 24 | been faxed on -- can you read the date? |
| | 25 | A.    February 1, 2005. |

13:41:54   1   Q.   Faxed by whom?

2   A.   I'm assuming it was faxed by Gail.

3   Q.   Well, if you look at the attention in the from, who does

4   it appear to be from?

5   A.   From Gail Terrell to contractors.

6   Q.   I'm sorry.  If you are looking at the handwritten portion

7   above the printed portion.

8   A.   It says from Dr. Darren Reagan to Saleem Jafar.

9   Q.   All right.  Now, if we can look at the -- were you aware

10   during this time frame -- or beginning in about a few days

11   from February 1st that the FBI was involved in the

12   investigation of this matter?

13   A.   Yes.

14   Q.   I mean, you're aware of that now.  Were you aware that

13:42:52  15   the FBI was involved back in February of 2005?

16   A.   I'm not certain I was aware at that time.

17   Q.   Okay.  If I -- the search that occurred at your house

18   occurred towards the end of June of 2005?

19   A.   Yes.

20   Q.   Was that the first information or knowledge that you had

21   that the FBI was involved in this investigation?

22   A.   I believe so.  It may have been an article or speculation

23   about it prior to that, but I don't have a clear recollection.

24   Q.   Okay.  But in any event, at the time of this memo in

25   February you were aware or unaware that the FBI was actively

13:43:30  1  investigating these matters?

2  A.   I don't believe I was at this time.

3  Q.   All right.   During this time frame a number of telephone

4  conversations were recorded between you and Darren Reagan.

5       Are you aware of that now?

6  A.   Yes.

7  Q.   We're going to play clip number 3 of Government's

8  Exhibit 5450, a telephone conversation on February 8, 2005 at

9  4:35 p.m.

10       (Audiotape clip 3, GX 5451 played.)

11  BY MR. BUSCH:

12  Q.   All right.   First of all, do you recognize your voice and

13  that of Darren Reagan?

14  A.   Yes, I do.

13:46:23  15  Q.   When you talk about Bill Fisher pleading and begging and

16  all of that, what are you referring to?

17  A.   The contract that we had put forward to Bill, and he was,

18  I believe, pretty reluctant about wanting to sign that, or

19  agreeing to the conditions.

20  Q.   If it was a legitimate business deal, why would he be

21  pleading and begging?

22  A.   Well, we had made it clear to him either sign this or his

23  deal wouldn't go through.

24  Q.   What do you mean by "his deal wouldn't go through"?

25  A.   Politically he wouldn't be able to get the support to

13:47:03  1    push his deal through.

2    Q.    Who was Darren Reagan working with in that regard?

3    A.    He was working with Don.

4    Q.    Don who?

5    A.    Hill.

6    Q.    Okay.  In the last sentence of this clip there is talk

7    about $180,000 invoice by RA-MILL.

8    A.    Yes.  I don't have a recollection of just what that was

9    in reference to at this time.

10   Q.    Did you know at that time who was involved with RA-MILL?

11   A.    I have no idea.

12          MR. BUSCH:  If we could play now clip 8 from that,

13   please, Ms. Christensen.

14          (Audiotape clip 8, GX 5451 played.)

13:49:16 15   BY MR. BUSCH:

16   Q.    Whose contract would expire at the end of the month?

17   A.    It may have been Bill Fisher's contract.  I'm not certain

18   of that.

19   Q.    On a piece of property?

20   A.    Yes.

21   Q.    Was this conversation in regards to one of his projects

22   that he wanted to get approved at the city council?

23   A.    Yes.

24   Q.    When you say that Darren Reagan was working with Don

25   Hill, what was Don Hill doing that was causing or allowing you

13:49:45    1    and Darren Reagan to put pressure on Bill Fisher?

        2    A.    It could have been delaying a project, or putting a

        3    project off until an indefinite date.

        4            MR. BUSCH:   Now, let's play the last clip on this

        5    regarding, 5450, clip 9, please.

        6        (Audiotape clip 9, GX 5451 played.)

        7    BY MR. BUSCH:

        8    Q.    So what did Darren Reagan mean when he said that they

        9    have poisoned the well?

        10    A.    Well, I think he meant that instead of Bill Fisher coming

        11    to him and dealing with him on this deal.

        12        (Audiotape clip 9, GX 5451 played.)

        13            MR. BUSCH:   Pause that.

        14    BY MR. BUSCH:

13:52:12  15    Q.    Please continue.

        16    A.    Bill had tried to deal with someone else, perhaps

        17    D'Angelo or someone else.

        18            MR. BUSCH:   Okay.   Please continue.

        19        (Audiotape clip 9, GX 5451 played.)

        20            MR. BUSCH:   Pause it.

        21    BY MR. BUSCH:

        22    Q.    Reagan says, "That flushed him on back to D'Angelo."

        23            What did he mean by that when he was talking to you?

        24    A.    Well, it meant that Fisher was unable to further any

        25    discussions with Darren about the deal, so he had to go back

13:54:25 | 1 | to D'Angelo to talk about how to get it done.

2 | MR. BUSCH:  Please continue.

3 | (Audiotape clip 9, GX 5451 played.)

4 | BY MR. BUSCH:

5 | Q.    Which guys are going to get money?

6 | A.    I'm assuming that he means RA-MILL and others.

7 | MR. BUSCH:  Please continue.

8 | (Audiotape clip 9, GX 5451 played.)

9 | BY MR. BUSCH:

10 | Q.    All right.  Mr. McGill, a couple of days after this there

11 | is another telephone conversation between you and Darren

12 | Reagan February 10, 2005 at 10:25 p.m.

13 | MR. BUSCH:  It's Government's Exhibit 5460, clip

14 | 1, please.

13:44:03 15 | (Audiotape clip 1, GX 5461 played.)

16 | MR. BUSCH:  Pause it.

17 | BY MR. BUSCH:

18 | Q.    Mr. McGill, why is Darren Reagan talking to you about

19 | he's not going to talk on the telephone with Fisher, and he's

20 | not going to go to his office to meet with him, but rather he

21 | wanted to meet him in a restaurant where it's noisy?

22 | A.    Darren believed that Fisher was wired.

23 | Q.    This is as early as February 10, 2005.

24 | Is that the date of this call?

25 | A.    Yes.

13:58:08   1              MR. BUSCH:  Please continue.

2              (Audiotape clip 1, GX 5461 played.)

3              MR. BUSCH:  Stop there.

4    BY MR. BUSCH:

5    Q.   Were you aware that -- do you know Prentice Gary?

6    A.   Yes, I do.

7    Q.   Who is Prentice Gary?

8    A.   He's a major developer mainly involved in family projects

9    here in Dallas.

10   Q.   Is that someone that you know Bill Fisher had a

11   relationship with?

12   A.   I didn't know that Bill Fisher had a relationship.

13              MR. BUSCH:  All right.  Now, let's go to clip 2 of

14   this conversation, please.

13:44:03  15              (Audiotape clip 2, GX 5461 played.)

16              MR. BUSCH:  Let's listen to clip 3 of this

17   particular call.

18              (Audiotape clip 3, GX 5461 played.)

19   BY MR. BUSCH:

20   Q.   Mr. McGill, I notice your demeanor is different in court

21   today than what I hear on these recordings.

22        What do you have to say about those comments that you and

23   Reagan are making about Bill Fisher squirming, begging,

24   pissing bricks, those various comments that are on these

25   recordings that we have heard up to this point?  What do you

14:03:13  1  have to say about that?

2  A.    Pretty damn awful.

3  Q.    The next day you have a conversation with Darren Reagan

4  on February 11, 2005 at 10:44 a.m.

5          MR. BUSCH:  Please, play 5464.

6          MR. JACKSON:  Your Honor, I object to playing the

7  recordings as being repetitious.

8          THE COURT:  Overruled.

9     (Audiotape clip, GX 5465 played.)

10          MR. BUSCH:  Stop it there.

11  BY MR. BUSCH:

12  Q.    Mr. McGill, do you remember this conversation -- the rest

13  of this conversation?  We're not going to listen to it, but

14  you continue to talk about the deferred developer fee and

14:05:30 15  other costs associated with these projects?

16  A.    Yes.

17  Q.    Why is it that you and Mr. Reagan are discussing the

18  deferred developer fee?

19  A.    We were looking for a target of opportunity to increase

20  our end.

21  Q.    What do you mean by that?

22  A.    If we can find where there is money that's going to

23  directly to the developer, and then it gives us an opportunity

24  to up our demand.

25  Q.    Later that day at 6:06 p.m. you have another conversation

14:06:02  1    with Mr. Reagan.

2              MR. BUSCH:  Government's Exhibit 5468, clip 2.

3              (Audiotape clip 2, GX 5469 played.)

4    BY MR. BUSCH:

5    Q.    Mr. McGill, are you talking about Dallas West Village?

6    A.    Yes.

7    Q.    Is that the one project that's still pending that keeps

8    getting passed at the city council?

9    A.    Yes.

10             MR. BUSCH:  I'm going to skip through the rest of

11   this conversation, but if you could get to the -- about a

12   minute from the end, Ms. Christensen.

13             (Audiotape clip 2, GX 5469 played.)

14             MR. BUSCH:  Let's stop there.

14:08:38 15  BY MR. BUSCH:

16   Q.    Mr. McGill, are you talking about sharing, or were you

17   talking about extorting?

18   A.    Extorting.

19             MR. BUSCH:  Please continue.

20             (Audiotape clip 2, GX 5469 played.)

21   BY MR. BUSCH:

22   Q.    What are you talking about earlier when you said that

23   the -- what was it the -- contributing to the Kitty, what was

24   meant by that phrase?

25   A.    That would be the fund that would be used to kickback

14:09:25  1  funds to Darren and myself.

2  Q.   All right.  Let me direct your attention now to

3  Government's Exhibit 1965.

4      It appears to be a campaign fund-raiser from Don Hill.

5      Do you see that document?

6  A.   Yes.

7  Q.   Dated February 16, 2005 around the time of these phone

8  calls?

9  A.   Yes.

10  Q.   If we look down he says he's hosting an evening business

11  mixer fundraiser.

12      Did you and Darren Reagan talk about this particular

13  letter that was mailed to Bill Fisher?

14  A.   I believe so.

14:10:09 15  Q.   All right.  The next call is on same the day, February

16  16, 2005 at 7:03 p.m.

17        MR. BUSCH:  Government's Exhibit 5472, clip 1.

18      (Audiotape clip 1, GX 5473 played.)

19        MR. BUSCH:  Let's stop there.

20  BY MR. BUSCH:

21  Q.   Mr. McGill, do you recall this conversation?

22  A.   Yes, I do.

23  Q.   How do you feel about these comments about Bill Fisher?

24  A.   Pretty bad.

25  Q.   The clip --

14:11:04   1          MR. BUSCH:   May I have a moment, your Honor?

2          THE COURT:   Yes.

3      (Sotto voce discussion between Busch and Meacham.)

4          MR. BUSCH:   Your Honor, may I approach the bench?

5          THE COURT:   Yes.

6      (Discussion at the bench.)

7          THE COURT:   Okay.

8          MR. BUSCH:   Mr. Meacham brought up the issue of the

9      redactions that the Potashniks have sought, and there was an

10     agreement where the Court, I think, decided that those

11     redactions were not relevant any longer since the

12     Potashniks --

13         THE COURT:   They weren't being pursued by the other

14     defendants.  I established that on the record.

14:11:59  15         MR. BUSCH:   There is a clip here that's one of

16     those.  I just wanted to make sure before I played it.

17         THE COURT:   Those are not excluded now.  They were

18     excluded before.

19         MR. BUSCH:   Thank you, your Honor.

20         THE COURT:   We'll have to wait a minute because I

21     think one of them stepped out.

22      (Back from the bench.)

23         THE COURT:   Just wait for just a moment, please.

24     All right.  Mr. Busch, thank you.

25         MR. BUSCH:   Now, we'll play the second clip from

14:13:21   1   that recording, clip 2.

2           (Audiotape clip 2, GX 5473 played.)

3                MR. BUSCH:  Stop it there.

4           Put that back up.  Just the text.

5   BY MR. BUSCH:

6   Q.   Reagan talks about Brian.  Is that Brian Potashnik?

7   A.   I would assume so.

8   Q.   Okay.  "Don and them made him line up."

9        Don refers to Don Hill?

10  A.   I would assume so.

11               THE COURT:  The screens are not working now.

12               THE WITNESS:  Yes.  Mine is, your Honor.

13  BY MR. BUSCH:

14  Q.   The next conversation occurred on February 18, 2005.

14:14:13  15          MR. BUSCH:  It's Government's Exhibit 5474, clip 2,

16  please.

17          (Audiotape clip 1, GX 5475 played.)

18  BY MR. BUSCH:

19  Q.   Did you recognize the voice of Don Hill on this tape?

20  A.   Yes, I did.

21  Q.   All right.

22               MR. BUSCH:  Let's play clip 3.

23          (Audiotape clip 3, GX 5473 played.)

24  BY MR. BUSCH:

25  Q.   Was it your understanding that Darren Reagan told Don

14:15:45  1    Hill that the agreements were signed and money was flowing,

2    that --

3                MR. STEINKE:   To which we object to a leading

4    question.

5                THE COURT:   Sustained.

6    BY MR. BUSCH:

7    Q.   What was your understanding as to when Don Hill, if ever,

8    would vote to approve this project at city hall?

9    A.   If and when the project was approved and the -- we would

10   have started to receive our money, or we would have already

11   gotten it.

12   Q.   But before approving the project what would have to

13   happen with you and Darren Reagan and Bill Fisher?

14   A.   The deal would have to be done.

14:16:26 15   Q.   Okay.  Was there -- what conversation was there around

16   this time about whether or not Bill Fisher was recording his

17   conversations with Darren Reagan and Don Hill?

18   A.   Well, there was some suspicion that Don (sic) was

19   recording the conversations in some manner.

20   Q.   That Don was recording?

21   A.   I'm sorry.  That Mr. Fisher was recording it in some

22   manner.

23   Q.   What was Don Hill's demeanor about that possibility?

24   A.   I don't recall anything about Don's demeanor.

25   Q.   What was Darren Reagan's demeanor about that?

14:17:04   1   A.   He was highly suspicious.

2   Q.   Okay.   What evidence -- was there any evidence that Don

3   Hill represented BSEAT during this time frame, 2003 to 2005,

4   in any capacity as an attorney?

5   A.   Not that I'm aware of.

6   Q.   I'm going to direct your attention to an event that

7   occurred at Friendship West Baptist Church and ask you if you

8   recall being at that church and receiving a phone call from

9   Darren Reagan on February 22, 2005?

10   A.   I do.

11   Q.   All right.

12        MR. BUSCH:   Let's play Government's Exhibit 5498.

13        (Audiotape clip, GX 5499 played.)

14   BY MR. BUSCH:

14:18:36  15   Q.   Do you recall what the nature of the meeting was at the

16   church?

17   A.   I believe it was a referendum on the strong mayor.

18   Q.   Was Don Hill present?

19   A.   I believe so.

20   Q.   Darren Reagan -- what was purpose of this call?

21   A.   It was to set up a payoff.

22   Q.   Let me direct your attention to some photographs.

23        MR. BUSCH:   Government's Exhibit 5121.

24   BY MR. BUSCH:

25   Q.   Do you recognize this location, Mr. McGill?

14:19:12 1   A.    Yes, I do.

2   Q.    And what is that location?

3   A.    It's Friendship West.

4   Q.    If we scroll through these photos, do you recognize the

5   BMW that's in the front of this photograph?

6   A.    From later.  I'm not certain whose car that is.  I can

7   only guess.

8   Q.    Okay.  We have seen a number of photographs.  I'm just

9   going to speed that up.

10      From this location, besides Don Hill -- well, let me ask

11   you this.

12      Were you present when a meeting took place in this

13   parking lot?

14   A.    Yes.

14:19:51 15   Q.    Who was there at that meeting?

16   A.    I was there, Darren was there and D'Angelo was there.

17   Q.    Was Don Hill also involved in that meeting, or had that

18   already taken place?

19   A.    I did not see Don Hill at that time.

20   Q.    At the time that you were talking to D'Angelo Lee and

21   Darren Reagan?

22   A.    That's right.

23   Q.    Was that before or after the exchange after money?  Or do

24   you know?

25   A.    I don't know.

14:20:24 1     MR. STEINKE:  That's a really leading question.  We

2    object.

3     THE COURT:  That's sustained.  Rephrase your

4    question, please.

5    BY MR. BUSCH:

6    Q.    You said there was a payoff at the church.

7     Was that at -- this meeting with D'Angelo and Darren, was

8    that before or after the payoff, using your words?

9    A.    I'm sorry.  Would you rephrase, please?

10    MR. BUSCH:  Okay.  Well, let's go through the

11   photographs.

12    I think -- let's get to about 20 or 25.

13   BY MR. BUSCH:

14   Q.    Do you recognize that individual?

14:21:07 15  A.    Yes, I do.

16   Q.    Is that Darren Reagan?

17   A.    Yes.

18    MR. BUSCH:  Scroll to about 25.

19   BY MR. BUSCH:

20   Q.    Okay.  Do you recognize the other individual with

21   Mr. Reagan?

22   A.    Yes.

23   Q.    Who is that?

24   A.    That's D'Angelo Lee.

25    MR. BUSCH:  Okay.  Continue to scroll.

14:21:28   1   BY MR. BUSCH:

        2   Q.   All right.  Is this that location there at Friendship

        3   West Baptist Church?

        4   A.   Yes, it is.

        5          MR. BUSCH:  Continue to scroll.

        6      Stop.

        7   BY MR. BUSCH:

        8   Q.   Do you recognize --

        9          MR. BUSCH:  The picture before this.  35.

       10   BY MR. BUSCH:

       11   Q.   Do you recognize the individual in that car?

       12   A.   I believe I do.

       13   Q.   Who was that?

       14   A.   I believe that's Don Hill.

14:21:55  15   Q.   Okay.  Were you there when this encounter took place that

       16   we see in this photograph?

       17   A.   No.

       18   Q.   What do you know about this payoff at the church?

       19   A.   I know what Darren told said to me, that it had

       20   happened.

       21   Q.   Do you know how much money Darren Reagan paid Don Hill in

       22   this parking lot?

       23   A.   No, I don't believe I do.

       24   Q.   Okay.  Why did Darren Reagan pay this money to Don Hill

       25   in the parking lot?

14:22:39   1              MR. STEINKE:  Objection, foundation.

           2              THE COURT:  If you know.

           3    A.    I don't know.

           4    BY MR. BUSCH:

           5    Q.    All right.  There is a telephone conversation --

           6              MR. BUSCH:  Let's go to Government's Exhibit 5506,

           7    clip 2.

           8          (Audiotape clip 2, GX 5507 played.)

           9              MR. BUSCH:  Stop it here for a second.

          10    BY MR. BUSCH:

          11    Q.    This call is on February 23rd.  It's the day after the

          12    photographs, and the event that occurred at church.

          13          At that point in time what information did you have that

          14    Bill Fisher had paid money to Darren Reagan and BSEAT?

14:25:05  15    A.    I didn't have any information other than what Darren had

          16    told me about that.

          17    Q.    All right.  If I represent to you -- and the jury has

          18    already seen financial records for $22,500 being paid to

          19    Darren Reagan the day before on the 22nd before the meeting at

          20    the church, what information did you have from Darren Reagan

          21    that he had received $22,500 the day before?

          22    A.    I don't believe that he told me that.

          23    Q.    The jury has seen evidence that on January 31st Bill

          24    Fisher paid $85,000 to BSEAT.

          25          What information did you have that Bill Fisher paid

14:25:53  1    $85,000 to BSEAT, the entity that you were the president of,

2    on January 31, 2005?

3    A.   I did not know that.

4    Q.   The jury has seen evidence that other payments were paid

5    by Bill Fisher in October of 2004, in the fall of 2004, 5,000

6    and $7,000, what information did you have as the president of

7    BSEAT that those payments had been made?

8    A.   I don't believe I knew about either of those payments.

9            (Audiotape clip 2, GX 5507 played.)

10               MR. BUSCH:  Stop there.

11   BY MR. BUSCH:

12   Q.   Mr. McGill, what did you mean when you said, "It kept a

13   proper distance between Don and whatever, that one stroke"?

14   A.   It meant that put some separation between Don and the

14:27:54  15   money.

16               MR. BUSCH:  Please continue.

17           (Audiotape clip 2, GX 5507 played.)

18               MR. BUSCH:  Stop there.

19   BY MR. BUSCH:

20   Q.   What is Darren Reagan referring to, "I show him what the

21   balance due on that is"?

22   A.   I would assume that he means that there is --

23               MR. STEINKE:  Objection to an assumption by the

24   witness.

25               THE COURT:  Sustained.  If you don't know, say you

14:29:23   1   don't know.

2   A.    What he meant --

3   BY MR. BUSCH:

4   Q.    Excuse me, Mr. McGill.

5        What information did you have that Darren Reagan and

6   BSEAT expected to receive additional --

7            MR. STEINKE:   To which we object to a leading

8   question.

9            THE COURT:   That's overruled.   You may answer the

10   question.

11   BY MR. BUSCH:

12   Q.    What information did you have that BSEAT expected to

13   receive any additional funds if there was a balance due?

14   A.    We expected to get additional money from our share of the

14:29:57  15   increased developer's fee and from any subcontractors that we

16   could get money from.

17            MR. BUSCH:   Please continue.

18        (Audiotape clip 2, GX 5507 played.)

19            MR. BUSCH:   All right.   Let's stop there.

20   BY MR. BUSCH:

21   Q.    Mr. McGill, let me show you Government's Exhibit 73, and

22   I'll represent to you this document was found in Sheila

23   Farrington-Hill's residence.

24            MR. BUSCH:   Government's Exhibit 73.

25   BY MR. BUSCH:

14:31:02   1   Q.    Do you recall having seen this document before on any

           2   occasion?

           3   A.    I'm not certain I have seen this document before.

           4   Q.    All right.  Entitled month of February 2005, the BSEAT

           5   CDC Project Management Team?

           6   A.    Yes.

           7   Q.    Now, if we look down at total amount pay due/prompt pay

           8   we see 50,000, and then the handwriting, do you recognize

           9   whose handwriting that is?

          10         MR. STEINKE:  Well, your Honor, I object.  The

          11   witness said he's never seen the document.  Foundation.

          12         THE COURT:  That's overruled.  You may say if you

          13   recognize the handwriting.

          14   A.    That's Darren's handwriting.

14:31:44  15   BY MR. BUSCH:

          16   Q.    All right.  We see 10,000 being subtracted from 50, and

          17   40,000 still being owed and approved by and whose signature is

          18   that?

          19   A.    That's Fisher's signature, I believe.

          20   Q.    The initials on the right.

          21         But on the left, the approved?

          22   A.    That's Darren's signature.

          23   Q.    Do you know why this document would be at Sheila

          24   Farrington-Hill's residence?

          25   A.    I have no idea.

14:32:32   1          MR. BUSCH:  Back to 5506, clip 3.  That same

2      conversation on February 23rd.

3          (Audiotape clip 3, GX 5507 played.)

4      BY MR. BUSCH:

5      Q.   Mr. McGill, there has been a document introduced in this

6      case that suggests that you made campaign contributions to Don

7      Hill.

8          Let me direct your attention to Government's Exhibit

9      559.

10         On the left side of this envelope there is the word --

11     I'm not sure what the first word is, but the second word is

12     "campaign contribution."

13         Do you see where I am on this document?

14     A.   Yes.

14:34:16  15     Q.   Then there is the abbreviation for the word received,

16     2-22-05.

17         Do you see that?

18     A.   Yes.

19     Q.   It said a 1,000 from D'Angelo Lee, a 1,000 from Toska

20     Lee, a 1,000 from Sheila Farrington, 780 from Darren Reagan

21     and $880 from Allen McGill.

22         Do you see that?

23     A.   Yes, I do.

24     Q.   Is that true?

25     A.   No, it's not.

14:34:38  1    Q.    On February 22, 2005 did you make a contribution of $880

       2    to Don Hill?

       3    A.    No, I did not.

       4    Q.    Have you ever in your life made a contribution of $880 to

       5    Don Hill?

       6    A.    No, I have not.

       7    Q.    I direct your attention now to Government's Exhibit 1817.

       8          MR. BUSCH:   Page 3.

       9    BY MR. BUSCH:

      10    Q.    This is a candidate officeholder report of Don Hill.   The

      11    jury has already seen this document.

      12          MR. BUSCH:   If we could look at page 4.

      13          Then continue on to page 35.

      14    BY MR. BUSCH:

14:35:25 15    Q.    It lists a number of contributions.

      16          MR. BUSCH:   We look at the next page, 36.

      17    BY MR. BUSCH:

      18    Q.    All right.   On this campaign disclosure form, page 36,

      19    government's Exhibit 1817 it says that Allen McGill on

      20    February 2, 2005 made a $1,000 contribution to the campaign of

      21    Don Hill.

      22          Do you see that?

      23    A.    Yes, I do.

      24    Q.    Is that a true statement?

      25    A.    No, it's not.

14:35:56  1    Q.    Have you ever made a $1,000 contribution to Don Hill?

       2    A.    No, I have not.

       3    Q.    Have you ever made any contributions -- political

       4    contribution to Don Hill?

       5    A.    Yes.

       6    Q.    Do you recall when that was?

       7    A.    I believe it was the night of his birthday party

       8    celebration, or New Year celebration.  One or the other.

       9    Q.    Do you remember the amount of the contribution that you

      10    made?

      11    A.    $100.

      12    Q.    Was that by cash or check?

      13    A.    Cash.

      14    Q.    Is that the only campaign contribution you have ever made

14:36:33 15    to Don Hill?

      16    A.    That's the only contribution I ever made.

      17    Q.    All right.  Now, let's -- going back to this payoff

      18    behind the church that you describe, let's listen to

      19    Government's Exhibit 5500.

      20        (Audiotape clip, GX 5501 played.)

      21    BY MR. BUSCH:

      22    Q.    Do you recall that conversation?

      23    A.    Yes, I do.

      24    Q.    What are you and Darren Reagan talking about?

      25    A.    We're talking about the successful pressure that had been

14:38:16   1   put on Bill Fisher to get him to close the deal.

2   Q.   Were there ever any occasions -- well, what occasion, if

3   any, do you recall talking with Darren Reagan about Don Hill's

4   ability to pull items off the agenda at city hall?

5   A.   Yes.   I have heard -- I have heard Darren mention that

6   occasion.

7   Q.   All right.   Let's listen to a call on March 4, 2005.

8         MR. BUSCH:   Government's Exhibit 5536, clip 2.

9         (Audiotape clip 2, GX 5537 played.)

10   BY MR. BUSCH:

11   Q.   So what was your understanding about D'Angelo Lee's

12   involvement in all of this?

13   A.   That he was an active player.

14   Q.   Another conversation on March 7, 2005 between Darren

14:42:18  15   Reagan and yourself.

16         MR. BUSCH:   Government's Exhibit 5540, clip 1.

17         (Audiotape clip 1, GX 5541 played.)

18         MR. BUSCH:   Okay.

19   BY MR. BUSCH:

20   Q.   Now, let's go to a call later that day at 3:16 p.m.,

21   March 7, '05, between yourself and Darren Reagan.

22         MR. BUSCH:   5446, clip 3.

23         (Audiotape clip 3, GX 5547 played.)

24         MR. BUSCH:   I'm sorry.   I gave you the wrong number.

25   5546.   Clip 3.

14:47:25  1        (Audiotape clip 3, GX 5547 played.)

2              MR. BUSCH:  All right.  Let's stop there.

3    BY MR. BUSCH:

4    Q.    What does it mean if Bill Fisher doesn't sign any

5    contract, or amended contracts, what happens to his projects?

6    A.    They die.

7              MR. BUSCH:  Let's play clip 4.

8        (Audiotape clip 4, GX 5547 played.)

9              MR. BUSCH:  Let's stop there.

10        If we could fast forward about a minute or two.  Go about

11   a minute.

12        (Audiotape clip 3, GX 5547 played.)

13             MR. BUSCH:  Let's go another minute, please.

14        (Audiotape clip 3, GX 5547 played.)

14:49:45 15             MR. BUSCH:  Let's go another minute.

16        (Audiotape clip 3, GX 5547 played.)

17   BY MR. BUSCH:

18   Q.    Now, Mr. McGill, earlier in your testimony we talked

19   about this document that you forged the signature of somebody

20   with the Retail Initiative.

21        Do you recall that testimony today?

22   A.    Yes, I do.

23   Q.    There is a telephone conversation that occurred on

24   March 22, 2005 at 7:08 p.m.

25             MR. BUSCH:  It's Government's Exhibit 5880.

14:50:43  1       Let's play that conversation.

2            (Audiotape clip, GX 5881 played.)

3                MR. BUSCH:  Let's stop there.

4    BY MR. BUSCH:

5    Q.   What are you and Darren talking about, doing a dummy

6    what?

7    A.   Partnership agreement.

8                MR. BUSCH:  Please continue.

9            (Audiotape clip, GX 5881 played.)

10                MR. BUSCH:  Let's stop there.

11   BY MR. BUSCH:

12   Q.   Whose address is that, 5801 Marvin D. Love Freeway?

13   A.   It's BSEAT.

14   Q.   It's that also the address of the Retail Initiative?

14:52:41 15  A.   No, it was not.

16   Q.   The P.O. Box, using the same P.O. Box, would that be

17   true, in Retail Initiative P.O. Box here in Dallas?

18   A.   No.

19                MR. BUSCH:  Please continue.

20            (Audiotape clip, GX 5881 played.)

21                MR. BUSCH:  Let's stop there.

22   BY MR. BUSCH:

23   Q.   Okay.  Mr. Reagan (sic), we looked at Government's

24   Exhibit 3296.

25                THE COURT:  Mr. McGill.  You said Mr. Reagan.

14:55:56  1            MR. BUSCH:  I apologize.

        2   BY MR. BUSCH:

        3   Q.    Mr. McGill, if we look again at Government's Exhibit

        4   3296, page 18, do we see an address there for TRI with that PO

        5   Box just as was discussed in that conversation with Darren

        6   Reagan?

        7   A.    Yes.

        8   Q.    Okay.  But the P.O. Box is -- that's actually BSEAT's

        9   P.O. Box.  Is that right?

       10   A.    Yes, it is.

       11   Q.    Mr. McGill, why did you plead guilty to committing the

       12   conspiracy of extortion with Darren Reagan, D'Angelo Lee and

       13   Don Hill?

       14            MR. JACKSON:  Your Honor, asked and answered.

14:56:47 15            THE COURT:  Overruled.

       16   A.    Because I am guilty of extortion.

       17            MR. BUSCH:  Thank you.  No further questions.

       18            THE COURT:  Cross-examination.

       19            MR. STEINKE:  Yes, ma'am.

       20            THE COURT:  Mr. Steinke.

       21                    *CROSS-EXAMINATION*

       22   BY MR. STEINKE:

       23   Q.    Good afternoon, Mr. McGill.  My name is Ted Steinke.  I

       24   represent Darren Reagan.

       25        I don't believe you and I have ever met before, have we?

14:57:53 1    A.    No, we have not.

2    Q.    Okay.  When you came to Dallas in the late 1980s how did

3    you happen to find out about BSEAT?

4    A.    I believe I saw an announcement about a meeting -- or I

5    heard an announcement about a meeting.

6    Q.    Why were you looking for an organization like that?

7    A.    I was looking for an organization that played an active

8    role in the black community.

9    Q.    Why is that?

10   A.    Because that's what I have been involved in much of my

11   adult life.

12   Q.    Where have you been involved in that prior to coming to

13   Dallas?

14   A.    In Denver, Colorado and Brooklyn, New York.

14:58:53 15   Q.    And what kinds of things was BSEAT doing that you wanted

16   to get involved with?

17   A.    They were interested in discrimination issues and in

18   trying to bring additional retail into the Southern Sector of

19   Dallas.

20   Q.    Were those things that you became interested in as well?

21   A.    That's correct.

22   Q.    You joined BSEAT sometime, I believe you said, in 1988 or

23   1989?

24   A.    Yes.

25   Q.    Gail Terrell did also, or was that later?

14:59:38   1   A.   That was later, I believe.

2   Q.   When did y'all get married?

3   A.   In '02.

4   Q.   2002?

5   A.   Yes.

6   Q.   So it's safe to say that you and Gail Terrell -- is it

7   Terrell or Terrell?

8   A.   Terrell.

9   Q.   Terrell.   That you and Gail Terrell were working at BSEAT

10   before you were married?

11   A.   Yes.

12   Q.   Were you volunteers or were you getting paid?

13   A.   Volunteers.

14   Q.   Okay.   Among the things that BSEAT did was host an annual

15:00:17  15   banquet and award presentation, correct?

16   A.   That's correct.

17   Q.   What role did you play in that banquet and awards

18   presentation?

19   A.   I helped to solicit corporations to help generally with

20   coordinating the activities that went into organizing the

21   banquet.

22   Q.   And was a program prepared so that attendees at the

23   awards banquet and presentation could see what BSEAT had been

24   doing the past year?

25   A.   That's correct.

15:01:01  1   Q.    Were you an integral part in preparing these programs?

        2   A.    Yes.

        3   Q.    Okay.  We have already had introduced into evidence

        4   Defendants' Reagan Exhibit Number 2.

        5         MR. STEINKE:  Do we have that, Ms. Christensen?

        6         No.  Okay.  I guess we'll do it with the Elmo then.

        7   BY MR. STEINKE:

        8   Q.    Okay.  Does this appear to be the program for Saturday

        9   October 17, 1992?

       10   A.    Yes, it does.

       11   Q.    This was held at the Loews Anatole Hotel in Dallas,

       12   correct?

       13   A.    That's correct.

       14   Q.    Okay.  Going to page 2 of this Defendant Reagan's Exhibit

15:02:26 15   Number 2 this gives a brief history of BSEAT, correct?

       16   A.    Yes, it does.

       17   Q.    It says that it was organized in 1989, and "the purpose

       18   is to provide a structured support base for the minority state

       19   government employees and others who are under represented and

       20   disadvantaged regardless of their race, color, sex, religion

       21   or national origin."

       22         Was that your understanding of one of the things that

       23   BSEAT was doing?

       24   A.    Yes, it is.

       25   Q.    Did you support that?

15:02:56  1    A.    Yes, I did.

2    Q.    As part of the program for the people who were invited

3    did you prepare an operations overview kind of detailing what

4    BSEAT had done the past year?

5    A.    Yes, I did.

6    Q.    And in this particular one saying that in 1992, the

7    fiscal year, more than 250 ongoing business meetings and

8    discussions with major corporations, public agencies, small

9    businesses, civic organizations and community-based

10    organizations.

11         That actually happened?

12    A.    Yes, it did.

13    Q.    Did you play a role in a lot of those meetings?

14    A.    Yes, I did.

15:03:49 15    Q.    What was the purpose of those meetings?

16    A.    To encourage business to locate south of the Trinity

17    River, and to increase minority employment.

18    Q.    And to increase the interest of banks coming in to your

19    area of Dallas.

20         Did you help conduct neighborhood tours?

21    A.    Yes, I did.

22    Q.    Pointing out locations where banks could put a branch?

23    A.    That's correct.

24    Q.    Among other things?

25    A.    That's correct.

15:04:19  1    Q.   Do we see here in the operations overview that you

2  prepared that among the people who toured Southeast Oak Cliff

3  in the fiscal year 1992 was Tom Hoaglin, the president and CEO

4  of BankOne, correct?

5    A.   Yes.

6    Q.   And John Adams, the chairman, and Terry Wilson, the vice

7  chairman of Texas Commerce Bank?

8    A.   Yes.

9    Q.   David Berry, Jim Richards and others with Bank of

10  America?

11    A.   Yes.

12    Q.   Mike Cornwall, president and CEO of Guaranty Federal

13  Bank?

14    A.   Yes.

15:05:03 15    Q.   And Norman Brinker of Brinker International?

16    A.   Yes.

17    Q.   And the purpose of those tours was what?

18    A.   To familiarize corporate level senior managers with the

19  market in the neighborhoods that we were asking them to serve.

20    Q.   You were also interested, were you not, in the lack of

21  retail in Southeast Oak Cliff?

22    A.   Yes.

23    Q.   In fact, did you prepare in this 1992 program a

24  demographic -- not a study, but a demographic listing of the

25  area of Southeast Oak Cliff?

15:05:47  1   A.    Yes, I did.

2   Q.    Okay.  It reflects that the total number of households in

3   the area was 33,750?

4   A.    Yes.

5   Q.    The average household income was 29,000 -- almost $30,000

6   a year?

7   A.    Yes.

8   Q.    And the total number of banks in Southeast Oak Cliff was

9   what?

10   A.    Total number of banks was zero.

11   Q.    Total number of grocery chains?

12   A.    One.

13   Q.    How about restaurants?

14   A.    Zero.

15:06:14 15   Q.    How about movie theaters?

16   A.    Zero.

17   Q.    How about pawn shops?

18   A.    75.

19   Q.    Check-cashing places?

20   A.    50.

21   Q.    So it looks to me like the only retail of importance was

22   a Minyard's Food Store, correct?

23   A.    Yes.

24   Q.    Did BSEAT, among other things, hold job fairs?

25   A.    Yes, they did.

15:06:49  1    Q.    What was the purpose of job fairs?

2    A.    To provide an opportunity close to home for potential

3    Africans to come in and apply for jobs with companies that had

4    openings.

5    Q.    Did you and Darren Reagan and BSEAT invite corporations

6    and businesses to come to these job fairs?

7    A.    Yes, we did.

8    Q.    Did you report on these job fairs in the programs?

9    A.    Yes.

10    Q.    Okay.   This is the 1992 job placement and resume referral

11    assistance program.

12        Do you know who coordinated that?

13    A.    Yes, I do.

14    Q.    Who was that?

15:07:37 15    A.    The three people who are pictured here.   Connie Buford,

16    Valerea Murphy and Odell Lee.

17    Q.    They were volunteers also?

18    A.    Yes.

19    Q.    But they had -- they had a special interest in matching

20    up members of the Southeast Oak Cliff community in jobs?

21    A.    Yes.

22    Q.    And among the companies who came and participated on

23    June 6, 1992 are all of these companies, correct?

24    A.    Yes.

25    Q.    The jury can read those for themselves, but it included

15:08:17  1    the Dallas Police Department, correct?

2    A.    Yes.

3    Q.    A number of banks and grocery stores and restaurants?

4    A.    Yes.

5    Q.    Okay.  How many job fairs would BSEAT hold each year?

6    A.    I believe at one time we were holding two per year.

7    Q.    Two per year.  Okay.

8          Did BSEAT also have a legal fund?

9    A.    Yes.

10   Q.    Would you explain to the jury what the purpose of the

11   BSEAT Legal Fund, Inc. was?

12   A.    To sponsor what we call -- there is a pro bono clinic

13   where we would bring volunteer lawyers, mainly housing

14   complaints and other types of complaints would have an

15:09:20 15  opportunity to come and get some kind of advice about what

16   they needed to get the issues resolved.

17   Q.    And pro bono of course means for free?

18   A.    Yes.

19   Q.    So basically BSEAT was bringing lawyers into Southeast --

20   was this actually done in Southeast Oak Cliff?

21   A.    Yes, it was.

22   Q.    In a store front.

23         Do you remember where it was?

24   A.    I believe it was in -- I think we used mostly local

25   churches.

15:09:56   1    Q.    Okay.   And volunteer lawyers would come in -- they

2    weren't paid, were they?

3    A.    No, they were not.

4    Q.    They were volunteering their time?

5    A.    Yes.

6    Q.    They would assist local citizens, and here you say

7    between 15 and 25 clients per week.   Is that about right?

8    A.    Yes.

9    Q.    And among the things that they handled were housing

10   discrimination?

11   A.    Yes.

12   Q.    Employment discrimination?

13   A.    Yes.

14   Q.    Consumer and finance problems?

15:10:26  15   A.    Yes.

16   Q.    Family law such as divorce or child custody?

17   A.    Yes.

18   Q.    And these were for clients who could not afford to hire

19   their own attorney, correct?

20   A.    That's correct.

21   Q.    It also says that the program was receiving between 25

22   and 35 calls per day for your assistance.

23   A.    That's correct.

24   Q.    And did BSEAT also award scholarships to high school

25   seniors each year?

15:11:10  1    A.    Yes, they did.

2    Q.    Whose idea was it to start giving scholarships?

3    A.    That was my idea.

4    Q.    A very noble idea, correct?

5    A.    Thank you.

6    Q.    Right?

7    A.    (No response.)

8    Q.    Here in the program are photographs taken at the

9    Garden -- the Civic Garden Center.

10         Is that in Fair Park?

11   A.    Yes, it is.

12   Q.    And Dr. Yvonne Ewell, who was a DISD board member, was

13   the keynote speaker, correct?

14   A.    That's correct.

15:11:43 15   Q.    And there were over 250 people who attended?

16   A.    That's correct.

17   Q.    Somebody from Brinker International was there?

18   A.    Yes.

19   Q.    And then at the bottom this is a scholarship committee,

20   correct?

21   A.    Yes.

22   Q.    That's Gail Terrell, who is your wife now?

23   A.    Yes.

24   Q.    And then Connie Buford, Valerea Murphy, Linda Morgan and

25   Sheryl Colclough?

15:12:17  1    A.    Yes.

2    Q.    Besides the job fair -- job fairs, the scholarships, the

3    pro bono legal work that was being done, did BSEAT also become

4    involved in workshops dealing with the Community Reinvestment

5    Act and Business Development and Procurement?

6    A.    Yes, we did.

7    Q.    How many of these yearly would you do?

8    A.    I think at least one a year.

9    Q.    What would be the purpose of it?

10   A.    To give an opportunity for small business people to have

11   an opportunity to meet procurement managers in business for --

12   with hopefully the outcome of small business operators getting

13   a chance to bid on business.

14   Q.    Okay.  There at the bottom is a photograph of Michael

15:13:29  15   Dulan, the district director of NationsBank and my client,

16   Darren Reagan, and Joyce Foreman, the owner of Foreman's

17   Office Products, correct?

18   A.    That's correct.

19   Q.    I assume both Michael Dulan and Joyce Foreman were there

20   giving their advice to small business people?

21   A.    That's correct.

22   Q.    Then finally on Reagan's Exhibit Number 2 BSEAT also gave

23   out a community service award every year, didn't it?

24   A.    Yes, it did.

25   Q.    What was the purpose of the Community Service Award?

15:14:16  1    A.    To recognize companies that we felt had made a

2    significant contribution toward the vision that we had as an

3    organization.

4    Q.    What was that vision?

5    A.    To increase procurement opportunities, employment

6    opportunities and addressing other issues we have had on our

7    agenda.

8    Q.    And in 1992 the award went to Thomas Hoaglan, the

9    president and chief operating officer of BankOne, correct?

10    A.    That's correct.

11    Q.    Why did BSEAT award this Community Service Award in 1992

12    to Thomas Hoaglin?

13    A.    Because he had gone a long ways towards helping to make

14    banking and credit more available in our community, and he was

15:15:11  15    very sympathetic to some of the things that the organization

16    was trying to do.

17    Q.    In fact, there is a photograph here of Darren Reagan, Tom

18    Hoaglin, Mayor Steve Bartlett.  He was the mayor of Dallas?

19    A.    Yes.

20    Q.    And a much younger looking Allen McGill?

21    A.    Yes.

22              THE COURT:  Is that a convenient point to break?

23              MR. STEINKE:  Yes, ma'am.

24              THE COURT:  Ladies and gentlemen, we will be in

25    recess for 15 minutes.

15:15:44  1          MR. WILLIAMS:  All rise for the jury.

2          (Jury retired from the courtroom.)

3          THE COURT:  How long would you anticipate?

4          MR. STEINKE:  At least another hour for me, your

5     Honor.

6          THE COURT:  How long, Mr. Jackson?

7          MR. JACKSON:  30 to 45 minutes.

8          THE COURT:  Well, I don't think you're going to get

9     to another witness.

10          MR. BUSCH:  Thank you, your Honor.

11          (Jury returned to the courtroom.)

12          THE COURT:  All right.  Be seated, please.

13     Mr. Steinke.

14     BY MR. STEINKE:

15:38:59 15  Q.    Mr. McGill, I believe on direct examination you also said

16     that one of the things that BSEAT did was picket, correct?

17  A.    Yes.

18  Q.    And that you believed that in certain circumstances

19     picketing was a legitimate constitutional exercise, correct?

20  A.    Yes.

21  Q.    And in Reagan's Exhibit Number 2 the 1992 program there

22     are actually some photographs of people picketing, and in this

23     case it was First Gibraltar Bank.

24          Do you recall that?

25  A.    Yes, I do.

15:39:39  1  Q.    And the reason for the picketing was that out of 167

2  branches statewide there was zero branch managers, correct?

3  A.    That's correct.

4  Q.    Zero African-American department heads?

5  A.    Yes.

6  Q.    Zero African-American senior management?

7  A.    Yes.

8  Q.    And out of 167 statewide branches only one

9  African-American female supervisor?

10  A.    That's correct.

11  Q.    You felt that that ought to be rectified?

12  A.    Yes.

13  Q.    In 1993 the award presentation was held at the Loew's

14  Anatole Hotel on October 30th, correct?

15:40:32  15  A.    That's correct.

16        MR. STEINKE:   I'm referring now for the record to

17  Reagan's Number 3, which has been admitted into evidence.

18  BY MR. STEINKE:

19  Q.    There was an introductory letter to the attendees from

20  you, correct?

21  A.    That's correct.

22  Q.    At the bottom, after welcoming everybody, you say a

23  special word to Darren Reagan.

24        "Your leadership and courage is what makes the Black

25  State Employees Association of Texas an effective

15:41:06  1    community-based organization."

2         Correct?

3    A.    That's correct.

4    Q.    Then you say, "Please stay on the battle field.  Aluta

5    Continua."

6         What does that mean?

7    A.    Continue to struggle, I think.

8    Q.    Okay.  That year in 1993 you selected three individuals

9    for the Community Service Award, correct?

10   A.    I did not select them, no.

11   Q.    BSEAT selected them?

12   A.    Yes.

13   Q.    And that was Michael Dulan of NationsBank, David Berry of

14   Bank of America, and Rick Parsons of NationsBank?

15:41:50 15   A.    That's correct.

16   Q.    Now, besides the pro bono legal work and the job fairs

17   and the scholarships did BSEAT also have what is called a

18   grievance redress committee?

19   A.    Yes, it did.

20   Q.    That was chaired by Euna Robertson, correct?

21   A.    That's correct.

22   Q.    Would you tell the jury what the grievance redress

23   committee did?

24   A.    The grievance redress committee tried to help individuals

25   that had complaints against mainly agencies that delivered

15:42:40  1    social services.

        2    Q.    And what kinds of complaints would be handled?

        3    A.    Not receiving checks on time or couldn't get certified or

        4    those kinds of issues.

        5    Q.    Okay.  According to -- did you write this report too?

        6    A.    No, I did not.

        7    Q.    But according to this report it said referrals were made

        8    to the EEOC, the Department of Labor, Department of Education,

        9    Office of Civil Rights Compliance and private attorneys?

       10    A.    That's correct.

       11    Q.    Then it lists a number of things that happened in the

       12    year 1992, 1993, correct?

       13    A.    Yes.

       14    Q.    And BSEAT was proud of that, weren't you?

15:43:28 15    A.    Yes.

       16    Q.    BSEAT was also involved in community stabilization

       17    projects, wasn't it?

       18    A.    Could you help me with that?

       19    Q.    Well, here in the 1993 program at the bottom there is a

       20    view of the Village Fair Shopping Center, Loop 12 and I-345, a

       21    BSEAT stabilization project.

       22        Can you describe to the jury what that is.  A BSEAT

       23    stabilization project.

       24    A.    I'm thinking that this was a project that -- a potential

       25    project that we had looked at in terms of revitalization.

15:44:32  1    Q.    Okay.   There was a time in 1992 when the residents of

2    Southeast Oak Cliff were fighting the closing of a K-Mart,

3    correct?

4    A.    That's correct.

5    Q.    In fact, BSEAT organized a number of protests concerning

6    that, didn't it?

7    A.    We did.

8    Q.    Is that you there on the right-hand side in the white

9    shirt -- or the white jacket talking to this group of people?

10   A.    It is.

11   Q.    Okay.   The purpose was to do what?

12   A.    To try and get K-Mart to consider -- reconsider closing

13   the store.

14   Q.    Okay.   In this program there is a document from the City

15:45:21 15  of Dallas dated December 17, 1992 written by Darren Reagan in

16   which the author says, "The City is very interested in the

17   economic stability of the Southeast Oak Cliff community, and

18   has taken steps."

19        Then they talk about the different steps the City has

20   taken including identifying owners and available lease space

21   within Village Fair Shopping Center, conducting personal

22   interviews with tenants, mail surveys to area residents and

23   trying to figure out what do with the K-Mart building if the

24   K-Mart actually leaves?

25   A.    That's correct.

15:46:05 1    Q.   Then at the bottom in the last paragraph it says, "The

2    City of Dallas is committed to your efforts to revitalize

3    Southeast Oak Cliff, and will continue to work with your

4    organization to identify and promote minority business

5    development."

6       This is signed by Dennis Martinez, Director of Economic

7    Development Department of the City of Dallas.

8       Did you see that letter?

9    A.   Yes.

10    Q.   Okay.   There was also a letter in here from BankOne dated

11    November 24, 1992 talking about a meeting that the author of

12    this letter had with you and Allen McGill expressing an

13    interest in pursuing -- or expressing an interest in pursuing

14    with appropriate employees of BankOne the following things.

15:47:05 15       Minority participation, minority procurement, new branch

16    locations and loan activity in minority communities.

17       Were those things really important to you and BSEAT?

18    A.   Yes, they were.

19    Q.   And you met with a senior official of BankOne to try to

20    get the process started, correct?

21    A.   That's correct.

22    Q.   And who was the banking officer that you met with?

23    A.   Jerry Killingsworth.

24    Q.   He's now the head of the City of Dallas Department of

25    Housing, correct?

15:47:34   1    A.    Yes, sir, I believe so.

2    Q.    And on October 7, 1993 there was a meeting with the

3    University of Texas system board of regents.

4          Were you there at that meeting?

5    A.    Yes, I was.

6    Q.    Can you tell the jury what happened?

7    A.    I believe that this -- the meeting -- I don't have a

8    clear recollection of what happened at the meeting, but I

9    think that this was a meeting where we had -- we got an

10   agreement with UT to provide consideration for student

11   scholarships and some other items.

12   Q.    Okay.  Did it also have to do with a vacancy at the

13   University of Texas at Dallas in the presidency?

14   A.    Yes, it did.

15:48:47  15   Q.    Okay.  I'm not going to go over all of the books, the

16   programs that are in evidence, but this is the one in

17   September 10, 1994, and it is Reagan's Exhibit 4.

18         Okay.  That was at the Loew's Anatole?

19   A.    Yes.

20   Q.    And the keynote speaker was who?

21   A.    Ron Kirk.

22   Q.    At the time he was the Secretary of State of Texas?

23   A.    Yes.

24   Q.    Later became mayor of Dallas?

25   A.    Yes.

15:49:18  **1**   Q.    Now he is the United States Trade Representative,

**2**   correct?

**3**   A.    That's correct.

**4**   Q.    And then at this particular event you honored local

**5**   African-American leaders in higher education, right?

**6**   A.    Yes.

**7**   Q.    Among those was the new president of the University of

**8**   Texas at Dallas, Dr. Franklyn Jennifer?

**9**   A.    Yes.

**10**   Q.    Okay.  And African-American presidents of Texas Women

**11**   University, Paul Quinn, El Centro and Brookhaven, right?

**12**   A.    That's correct.

**13**   Q.    Now, in 1994 you also mentioned things that have been

**14**   done by the various parts of BSEAT.

15:50:29 **15**       Up at the top, "The Black State Employees Association of

**16**   Texas, Inc. conducting public forums, filing class actions,

**17**   sponsoring career fairs, fund raising, awards banquets,

**18**   technical assistance to NBO."

**19**       What is an NBO?

**20**   A.    Neighborhood-based organizations.

**21**   Q.    And the residents, right?

**22**   A.    Yes.

**23**   Q.    Okay.  You have a social service fund that sponsors

**24**   scholarships and career fairs?

**25**   A.    Yes, that's correct.

15:51:00   1    Q.    And the legal fund, which you have already talked about,

2    that provides pro bono work?

3    A.    Yes.

4    Q.    Then we see on the left-hand side the BSEAT Community

5    Development, Inc.

6          Can you tell -- is that the CDC?

7    A.    Yes, it is.

8    Q.    Can you tell the jury what the purpose of the CDC was?

9    A.    It was mainly to acquire property or rehabilitation or

10   construct new projects.

11   Q.    Okay.  Did it also include being involved in obtaining an

12   ownership interest in development projects?

13   A.    Yes, it was.

14   Q.    Okay.  Were you an officer of the CDC?

15:51:39  15   A.    Yes, I was.

16   Q.    And did -- was one of the purposes of the CDC not only to

17   get an ownership interest in the developments, but to also

18   maybe share in the management of those projects?

19   A.    Yes.

20   Q.    Okay.  So when you and Darren Reagan were talking to Bill

21   Fisher about getting an ownership interest in his projects

22   that would have been in line with what the CDC was originally

23   set up for, right?

24   A.    Well, what we were talking about were acquiring an

25   interest that would benefit ourselves.

15:52:26  1   Q.   But one of the things that the CDC was set up to do

2   was -- I'll get to that in a minute -- but one of the things

3   the CDC was set up to do was to acquire, if possible, an

4   ownership interest in projects and developments, correct?

5   A.   That's correct.

6   Q.   You stated that in response to a question from the

7   prosecution that BSEAT sort of changed in the time frame 2000,

8   2002, 2003.

9        Do you recall saying that?

10  A.   Yes, I do.

11  Q.   Okay.   Let me show you the program from the 14th Annual

12  Banquet and Awards Presentation at the Renaissance Dallas

13  Hotel on November 8, 2003.   Do you recognize this?

14  A.   Yes, I do.

15:53:59 15       MR. STEINKE:   For the record, your Honor, this is

16  Defendants' Exhibit Reagan 13.

17  BY MR. BUSCH:

18  Q.   And did you help Mr. McGill prepare this program?

19       THE COURT:   Excuse me.   That's Mr. McGill.

20       MR. STEINKE:   I said McGill?

21  BY MR. STEINKE:

22  Q.   Did you help, Mr. McGill -- that is a comment there.

23       Mr. McGill, I got ahead of myself.

24       Mr. McGill, did you help prepare this program?

25  A.   Yes, I did.

15:54:32  1    Q.    Not that you helped yourself, but you helped prepare the

        2    program?

        3              THE COURT:   Okay.   I'm sorry I mentioned it.

        4         (Laughter)

        5    BY MR. STEINKE:

        6    Q.    Among the things that was in the program was a letter of

        7    congratulations from Congresswoman Eddie Bernice Johnson?

        8    A.    Yes.

        9    Q.    And in her second paragraph she writes, "BSEAT is widely

       10    recognized as one of the most effective socioeconomic engines

       11    powering African-American communities in the State of Texas,

       12    right?

       13    A.    Yes.

       14    Q.    This is in the year 2003, correct?

15:55:11 15    A.    Yes.

       16    Q.    And in this program is a letter from Governor Rick Perry

       17    dated November 5, 2003, correct?

       18    A.    Yes.

       19    Q.    Okay.   And it says that, "The Texans of the 21st Century

       20    reflects our vision, ingenuity and enterprise in working

       21    towards a future of excellence."

       22         And he congratulates BSEAT on recognizing the work of

       23    Dr. Franklyn Jennifer, the president of UT Dallas, correct?

       24    A.    That's correct.

       25    Q.    Then there is next to it a proclamation, senate

15:56:11 1    proclamation 295 from the State of Texas Senate, right?

2    A.    Yes.

3    Q.    And it also mentions that BSEAT in 2003 was honoring

4    Dr. Franklyn Jennifer?

5    A.    That's correct.

6    Q.    Then there is a letter dated November 7, 2003 from the

7    City of Dallas saying that, "I appreciate the opportunity to

8    express my support of the Black State Employees Association of

9    Texas celebrating its 14th Annual Banquet.  I am truly

10   impressed with this organization, would like to commend them

11   for making the effort to recognize corporations, individuals

12   and members for their contributions, commitment and community

13   service toward further development and enhancement of the

14   African-American community."

15:57:17 15       Right?

16   A.    That's correct.

17   Q.    Who signed that letter?

18   A.    Laura Miller.

19   Q.    There is a page in this 2003 program that talks about the

20   partnership of BSEAT and Bally Total Fitness.

21       Do you see that?

22   A.    Yes.

23   Q.    It says, "Historic donation of over $300,000 in exercise

24   equipment to the Dallas Independent School District."

25       Can you tell the jury what this is referring to, and what

15:58:01  1    role BSEAT played in this?

2    A.    This has -- I'm not certain what year the donation was

3    actually made.

4    Q.    But what was the purpose of the donation?  How was it

5    used?

6    A.    It was -- Bally's decided to donate its used equipment,

7    equipment that they currently used in many of their spas to

8    BSEAT, and BSEAT in turn donated much of that equipment, not

9    100 percent of it, to ISDs in the metropolitan areas.

10   Q.    Including DISD?

11   A.    Yes.

12   Q.    This says that DISD got about $300,000 worth of

13   equipment?

14   A.    I assume so.

15:59:06 15   Q.    And in the place for advertisements there is an

16   advertisement for Terrell & Associates, right?

17   A.    Yes, it is.

18   Q.    That's Gail Terrell, your wife?

19   A.    Yes, it is.

20   Q.    And in this it says that she and her company provide

21   consulting services for project coordination planning,

22   budgeting, contract negotiations, event planning, project

23   coordination financing and development team coordination.

24       Does she in fact -- is she able to provide all those

25   services?

15:59:44   1    A.    Yes.

         2    Q.    It's legitimate, isn't it?

         3    A.    Her company is legitimate, yes.

         4    Q.    And the last one I want to talk about is the one that

         5    occurred on October 23, 2004 at the Renaissance Hotel,

         6    Reagan Exhibit Number 14.

         7         Do you recognize that?

         8    A.    Yes, I do.

         9    Q.    On the front cover is a photograph of the West Cliff

        10    Shopping Plaza, correct?

        11    A.    Yes, it is.

        12    Q.    And it says it was owned and developed by BSEAT?

        13    A.    Yes.

        14    Q.    That in fact is true, isn't it?

16:00:36  15    A.    Yes.

        16    Q.    Or it was developed and owned at one time by BSEAT?

        17    A.    Yes.

        18    Q.    Was this award presentation and banquet in October of

        19    2004 the last one that BSEAT did?

        20    A.    I believe so, yes.

        21    Q.    That was because in June of 2005 the FBI came and raided

        22    the offices?

        23    A.    Well, it was the last one that we did, yes.

        24    Q.    Okay.  If there had been one in 2005 it would have taken

        25    place in October or November of 2005?

16:01:31 1    A.    That was the normal time, yes.

2    Q.    The target letter that you got from Marcus Busch, do you

3    recall when you got that?

4    A.    I believe it may have been in the late summer of '05

5    maybe.

6    Q.    And you said that you knew you had committed an offense,

7    and you looked for the opportunity to do the right thing?

8    A.    Yes.

9    Q.    Because you knew all along that you had committed a

10    offense, didn't you?

11    A.    I'm not certain I understand your question.

12    Q.    Well, did you believe you were committing an offense

13    while you were doing what you have described to the jury?

14    A.    Yes, I did.

16:02:44 15    Q.    After the FBI raided the BSEAT offices in June of 2005,

16    did you believe that you had committed an offense?

17    A.    (No response.)

18    Q.    Mr. McGill?

19    A.    I believe so, yes.

20    Q.    Okay.  Yet you met with the FBI eight days after the

21    raid, did you not?

22    A.    I don't recall, but it was close after.

23    Q.    Well, you met with two FBI agents in June of 2005,

24    correct?

25    A.    That's correct.

16:03:26   1    Q.    You know that they were taking notes and they reduced

         2    what you told them to a document that's called a 302?

         3    A.    Yes.

         4            MR. STEINKE:   May I approach?

         5            THE COURT:   Yes, you may.

         6    BY MR. STEINKE:

         7    Q.    Okay.   Now, did that help refresh your memory as to the

         8    date?

         9    A.    As to the date, yes.

        10    Q.    It was June 28, 2005?

        11    A.    That's correct.

        12    Q.    In this interview with the FBI did you ever tell them

        13    anything about your involvement in an extortion ring?

        14    A.    I don't believe that I used the word "extortion."

16:04:08  15    Q.    Did you ever tell them that you were involved in getting

        16    money from public officials, or giving money to public

        17    officials?   Did you ever tell them that?

        18    A.    No, but I had not.

        19    Q.    But in fact all through this interview with the FBI you

        20    maintained that BSEAT was a legitimate corporation, and that

        21    you and Darren Reagan had done nothing wrong.   Isn't that

        22    right?

        23    A.    No, I did not say that.

        24    Q.    Okay.   If you had admitted wrongdoing in 2005 why do you

        25    think it took two years for the FBI and the U.S. Attorney's

16:04:52  1    Office to send you a target letter.

2                    MR. BUSCH:   Objection, it's irrelevant.  It calls

3        for speculation.

4                    THE COURT:   Excuse me.  If you know, you may answer.

5        If you don't, don't speculate.  Otherwise overruled.

6        BY MR. STEINKE:

7        Q.   Let me ask it this way.

8             Did you confess to the FBI on June 28, 2005 and tell them

9        that you knew you had committed an offense and you were

10       looking for the opportunity to do the right thing?

11       A.   I didn't use those words, no.

12       Q.   It wasn't until two years later that you tell the jury

13       that that's what you did?

14       A.   That's correct.

16:05:33 15      Q.   Now, we talked about the plea agreement that you have,

16       and you testified that under the plea agreement the only

17       promises you got were, number one, that the government would

18       dismiss the indictment against you after the case is over,

19       correct?

20       A.   Yes, I believe so.

21       Q.   And number two, that there was a five-year maximum term

22       of imprisonment you were looking at?

23       A.   That's correct.

24       Q.   So those were the only two terms that you can recall?

25       A.   Well, there is one other, and that is that the government

16:06:40   1   has the option of -- of putting forth a motion for a downward
         2   revision.
         3   Q.   Okay.  And you're of course referring to the fact that in
         4   the government's discretion they can reward you for what is
         5   called substantial assistance, correct?
         6   A.   That's correct.
         7   Q.   Did they tell you what substantial assistance means?
         8   A.   They didn't tell me -- no, they did not.  It's up to them
         9   to determine what that is.
        10   Q.   Okay.  Do you understand that it includes testifying
        11   against the defendants here?
        12   A.   Yes.
        13   Q.   Okay.  But there is one other promise that they made to
        14   you, isn't there?
16:07:30  15        Didn't they also promise that they would not bring any
        16   additional charges against you out of your conduct, or based
        17   upon your conduct.  Isn't that true?
        18   A.   Yes, I believe so.
        19   Q.   Okay.  You testified about some signature that you forged
        20   involving the sale of the West Cliff Shopping Center.
        21        Do you have an agreement that you're not going to be
        22   prosecuted for that forgery?
        23   A.   That's correct.
        24   Q.   Okay.  Do you understand that forgery is also a state
        25   crime?

16:08:12   1   A.    Yes, I do.

  2   Q.    Do you have a guarantee that the State of Texas is not

  3   going to prosecute you for that forgery?

  4   A.    I do not.

  5   Q.    When you were discussing the plea agreement with the

  6   government did they also tell you that if you pled guilty they

  7   would not prosecute your wife, Gail Terrell?

  8   A.    No, they did not.

  9   Q.    Apparently she was involved in forging that signature,

  10   wasn't she?

  11   A.    No, she was not.

  12   Q.    Well, wasn't she on the audiotape discussing it with you

  13   and Darren Reagan?

  14   A.    Yes, she was.

16:08:48  15   Q.    So did she know that that signature was forged?

  16   A.    She did not.

  17   Q.    She did not.

  18        Okay.  So the government -- tell me what conversation you

  19   had with the government about whether or not they would

  20   prosecute your wife?

  21   A.    We did not have a conversation about prosecuting my wife.

  22   Q.    It never came up?

  23   A.    It never came up.

  24   Q.    You told the jury that you were guilty of extortion?

  25   A.    That's right.

16:09:21  1  Q.    Define extortion.  What are you guilty of?

2  A.    Exerting pressure on a developer to delay or have his

3  project killed if he doesn't pay money to me.

4  Q.    Okay.  And how much money did any developer pay to you?

5  A.    Zero.

6  Q.    I'm sorry?

7  A.    Not any.

8  Q.    So your plan of extortion was to exert pressure on a

9  developer or developers by delaying or stopping their projects

10  so that they would pay you money?

11  A.    That's correct.

12  Q.    Okay.  You did not get one dime?

13  A.    No, I did not.

14  Q.    You testified regarding Government's Exhibit 382, and

16:10:21  15  that is the moratorium letter that Darren wrote on August

16  24th.

17        You saw that earlier today?

18  A.    Yes, I did.

19  Q.    And you told the jury that the motivation in preparing

20  that letter was that it would help in possibly delaying

21  pending applications?

22  A.    Yes, I did.

23  Q.    What did you mean by that?

24  A.    Well, I meant that moratorium on a developer's project,

25  particularly those that are under closer deadlines, means that

16:11:00  1    they would need to get their project approved as quickly as

2    possible.  So any moratorium would put a great deal of

3    pressure on a developer to try to move the project as best he

4    could.

5    Q.    Well, I thought a moratorium is where the City said we

6    were not going to allow your projects to go forward.

7          Isn't that your understanding of the moratorium?

8    A.    Well, the City -- the city council gives their approval,

9    yes.

10   Q.    Well, if your plan is to put pressure on the developers

11   to get their projects going very fast, tell me and the jury

12   how stopping their projects with a moratorium is going to help

13   you in your plan?

14   A.    I'm sorry.  I didn't understand the question.

16:11:48 15   Q.    If your plan is to get the developers to start moving

16   their projects faster -- and that's your plan, correct?

17   A.    No, that's not my plan.

18         My plan is to get paid.  If that means that I need to

19   slow the project down or have the project stopped or speed the

20   project up.

21   Q.    Okay.  I may have misunderstood, but I thought you said

22   that you were trying to put pressure on the developers so they

23   would speed up their projects.

24         I assume so that you could get paid faster.

25         Does that make sense?

16:12:26  1    A.    Your statement makes sense, but I didn't use the word

2    "speed up."

3    Q.    Okay.  Were you actually hoping to speed up the projects

4    so you would be paid faster?

5    A.    Well, if that happens, certainly.

6    Q.    So if that was the case, tell me how asking the city

7    council to do a moratorium and to stop all projects was going

8    to help you get paid faster?

9    A.    Because the developer was not cooperating.

10   Q.    No.  But how was that going to help you get paid faster?

11   A.    Give us more time to muscle the developer around.

12   Q.    Okay.  When you spoke at the city council on August 25,

13   2004 were you also aware that Jerry Killingsworth was in favor

14   of the moratorium?

16:13:18 15    A.    Yes, I believe so.

16   Q.    That mayor Laura Miller was in favor of the moratorium?

17   A.    Yes.

18   Q.    And Mr. Busch asked you when you were talking about the

19   moratorium what your primary concern was, and you said our

20   primary motivation was to delay to help get our deals done.

21        And he asked you what deals are you talking about, and

22   you said we're -- we were trying to negotiate contracts with

23   one or more developers, and if there was a delay, that would

24   put pressure on them.

25        Do you remember that?

16:13:56  1    A.    Yes, I do.

2    Q.    And you said the two developers were Bill Fisher and

3    Brian Potashnik?

4    A.    Yes.

5    Q.    Now, this was an August 25, 2004 city council meeting,

6    correct?

7    A.    I believe so.

8    Q.    If one of the developers that you were putting pressure

9    on was Bill Fisher, can you explain to the jury why Bill

10   Fisher did not meet you and Darren Reagan until November or

11   October of 2004?

12   A.    I can't explain that.

13   Q.    All right.  When did you first meet Bill Fisher?

14   A.    I don't recall specifically.

16:14:40 15    Q.    In fact, it was September 20, 2004, wasn't it?

16   A.    I don't recall.

17   Q.    Well, you were at the meeting at Pappadeaux?

18   A.    Yes, I was.

19   Q.    Had you ever seen Bill Fisher before then?

20   A.    I'm not certain.

21   Q.    Okay.  If -- you sent an e-mail to Bill Fisher the next

22   day, September 21st, telling him what a pleasure it was to

23   meet him, would that indicate that you probably hadn't met him

24   before?

25   A.    Yes.

16:15:06   1   Q.   So when you told this jury on direct examination that on
           2   August 25, 2004 one of the developers that you were trying to
           3   put pressure on was Bill Fisher, that was not true, was it?
           4   A.   I'm sorry.  I didn't follow your question.
           5   Q.   All right.  I'll do it a little slower, and I'll speak a
           6   little softer.
           7        When you told this jury that on August 25, 2004 when you
           8   wanted the moratorium from the city council that you did it to
           9   put pressure on developers, correct?
          10   A.   Yes.
          11   Q.   And one of the developers specifically that you were
          12   trying to put pressure on was Bill Fisher?
          13   A.   Yes.
          14   Q.   So can you explain to the jury why the first time you met
16:15:53  15   him was more than a month later?
          16   A.   Well, I'm not certain that I met Bill -- that was the
          17   first time I met Bill Fisher.  It may not have been.
          18        However, if I have the dates mixed up, then I apologize
          19   for that, but I know the motivation of what I did.
          20   Q.   Now, I understand the motivation that you are talking to
          21   the jury about.
          22        My question is, prior to the September 20th lunch or
          23   dinner at the Pappadeaux what specific pressure had you put on
          24   Bill Fisher?
          25   A.   I don't recall.

16:16:46  1    Q.    All right.  If in fact the first time you met him was

2    September 20, 2004 that means that what you told this jury on

3    direct examination is not true.  Isn't that correct?

4    A.    Well, what I'm saying is that I'm not certain that is the

5    first time I had spoken to Bill.

6    Q.    You testified concerning a number of e-mails and

7    telephone conversations that were intercepted where the phrase

8    recommended business partners was used?

9    A.    Yes.

10    Q.    Can you explain to the jury what recommended business

11    partner means?

12    A.    Those would be subcontractors that came with the referral

13    from Darren and myself.

14    Q.    And a referral to one of the developers?

16:18:08 15    A.    Yes, it would be.

16    Q.    Like Bill Fisher?

17    A.    Yes.

18    Q.    Okay.  And I believe you told the jury that these were

19    contractors or subcontractors who you hoped would kick money

20    back?

21    A.    Yes.

22    Q.    Can you tell the jury what specific discussions you had

23    with these recommended business partners to make sure that

24    they would kick money back to you before you recommended them?

25    A.    I did not have a conversation with them.

16:18:42  1 Q. Oh, you did not?

2 A. No, I did not.

3 Q. But I assume that you and Darren discussed these

4 recommended business partners before you submitted a list to

5 Bill Fisher?

6 A. No, we did not.  Some of the recommended business

7 partners I did not know and had not seen before.

8 Q. If you were counting on these recommended business

9 partners that you did not know and had never met hoping they

10 were going to kick money back to you in this kickback scheme,

11 how could you be sure that was going to happen?

12 A. I wasn't sure.

13 Q. When you met Bill Fisher on September 20, 2003, two days

14 later he sent a proposed contract to you and Darren, correct?

16:20:11  15 A. (No response.)

16 Q. Would it help if you saw that contract?

17 A. Yes, it would.

18   MR. STEINKE:  May I approach?

19   THE COURT:  Yes.

20 BY MR. STEINKE:

21 Q. I show you what's been admitted into evidence as BP 327.

22 A. Yes.

23 Q. Okay.  You testified that when you e-mailed Bill Fisher

24 and said -- this was on -- this is Government's Exhibit 218.

25   Where it says you appreciated the candor and openness,

16:21:05   1    especially without having to raise everyone's blood pressure.

2         Do you see that?

3    A.    Yes, I do.

4    Q.    You testified on direct examination that you expected an

5    acrimonious discussion?

6    A.    Yes.

7    Q.    If this was the first time you met with Bill Fisher, why

8    did you expect an acrimonious discussion?

9    A.    I suppose for two reasons.

10        One -- and, again, I would just repeat that.  That may

11   have been the first time I met Bill Fisher, but I'm not

12   certain that that was the first time that I had spoken with

13   him.

14   Q.    Okay.

16:21:48  15   A.    Just based on Darren and my conversation where we were

16   asking for a piece of his action.

17   Q.    A piece of the action.  I believe that's what you

18   testified on direct examination, a piece of the action.

19   A.    I thought that it would be a tougher conversation.

20   Q.    What did you mean -- what did you consider to be a piece

21   of the action?  What were you asking for?

22   A.    We were asking for a percentage of the developer's fee.

23   Q.    Do you remember what that percentage was?

24   A.    Yes, I did.  I believe that the last number I heard was

25   50 percent of developer's fee.

16:22:28  1  Q.    50 percent.   Okay.   And on September 20, 2004 it's your

2  testimony to this jury that you and Darren told Bill Fisher

3  that you wanted 50 percent of the developer's fee?

4  A.    (No response.)

5  Q.    Correct?

6  A.    I'm not certain I understand your question.

7  Q.    Well, you testified that the last number was 50 percent,

8  the percentage of the development fee, and I'm asking you, is

9  it your testimony to the jury that on -- or at this meeting on

10  September 20, 2004 that you and Darren Reagan and Kathy Nealy

11  and Bill Fisher discussed a 50 percent ownership in the

12  development fee?

13  A.    No, I don't believe that's what I'm testifying.

14  Q.    Okay.

16:23:27 15  A.    What I recall is that the last revision of the contract

16  that I saw, the fee had been increased to 50 percent.

17  Q.    I'm talking about at this meeting.

18      What percentage of the development fee did you want?

19  A.    I don't know what the percentage was.   I don't recall

20  what the percentage was at that meeting.

21  Q.    If the reason that you and Darren are doing this is to

22  get a piece of the action, you're telling this jury that you

23  and Darren didn't discuss in advance how much of a piece of

24  the action you wanted?

25  A.    I'm not saying that we didn't discuss it.   I'm just

16:24:08  1    saying that I don't recall what that percentage was at this
         2    time.
         3    Q.    Would you agree with me that that percentage of the
         4    development fee was an integral part of this extortion plot?
         5    A.    (No response.)
         6    Q.    It was an important part of it, wasn't it?
         7    A.    I believe so.
         8    Q.    You have pled guilty to that?
         9    A.    Yes, I have.
         10   Q.    And you don't remember the integral part of this
         11   extortion plot today?
         12   A.    No, I do not.
         13   Q.    All right.  But you said that this percentage of the
         14   development fee on September 20, '04 was discussed openly
16:24:49 15   there at the meeting, correct?
         16   A.    I did not say that.
         17   Q.    Well, was it discussed?
         18   A.    I don't know what was discussed.
         19   Q.    Well, didn't you say on direct examination that Bill
         20   Fisher was open to it?
         21   A.    If that -- if I used that term in my note that I sent
         22   back to him.
         23   Q.    Well, but I believe you testified that we were asking for
         24   a piece of the action.
         25         And Marcus Busch said, and how did Bill Fisher react.

16:25:19  1       And you said Fisher was open to it.

2    A.    Well --

3    Q.    Was he?

4    A.    I mean that he didn't say no.

5    Q.    Okay.  So that tells me then that the percentage of the

6    ownership was discussed at this meeting?

7    A.    I don't know for certain that it was or was not, because

8    I can't recall whether the percentages was discussed or not.

9    Q.    Well, if the percentage of the ownership was an integral

10   part of this extortion scheme, doesn't it make sense that you

11   would go to the meeting and say, Bill Fisher, we want X

12   percentage of the ownership if that in fact is what you were

13   talking about?  Doesn't that make sense, Mr. McGill?

14   A.    It makes sense.  It's just I do not recall what the

16:26:04  15   percentage was, because the percentage changed over time.

16            THE COURT:  All right.  Mr. Steinke, we're going to

17   take a stretch break here.

18            MR. STEINKE:  Yes, ma'am.

19            THE COURT:  All right.  Thank you.

20   BY MR. STEINKE:

21   Q.    Mr. McGill, you would agree with me, would you not, that

22   October 27, 2004 was a very important date in your extortion

23   plot?

24   A.    Would you remind me what October 27th was.

25   Q.    October 27th is when the Dallas City Council had a number

16:28:07  1    of projects of both Brian Potashnik and Bill Fisher pending

       2    before it?

       3    A.    Yes.

       4    Q.    And the object of your extortion plot was to get the city

       5    council to approve the projects which you wanted approved?

       6    A.    Yes.

       7    Q.    All right.  Of the projects that were pending on

       8    October 27, 2004 tell the jury which projects you wanted

       9    approved?

      10    A.    Without seeing the list now, I wouldn't be able to repeat

      11    those projects, other than Pecan Grove, Dallas West Village.

      12    Q.    Those were Bill Fisher's projects?

      13    A.    (No response.)

      14    Q.    Do you know?

16:28:52 15    A.    Yes, I do know.  And I believe both of those were Bill

      16    Fisher's projects.

      17    Q.    You believe they were his projects?

      18    A.    Yes.

      19    Q.    So can you tell the jury on October -- well, let me ask

      20    it this way.

      21         One of the pivotal points in an extortion plot is to have

      22    the Dallas City Council in this case vote on the projects you

      23    wanted approved, correct?

      24    A.    That's correct.

      25    Q.    All right.  Can you tell the jury how the council voted

16:29:30  1    on October 27, 2004?

2    A.    No.

3          I would like to amend my answer.

4          What we -- what we needed to have the Dallas City Council

5    to follow the action that would help us.  If that meant to

6    have the projects approved, then we needed to have them

7    approved.  If they needed to be delayed, then we needed to

8    have them delayed.

9    Q.    So on October 27, 2004 tell the jury which projects you

10   wanted delayed, and which projects you wanted approved to help

11   you get money in this extortion plot?

12   A.    Well, eventually we would have wanted to have projects --

13   Bill Fisher's projects approved of those -- that was the

14   developer that we were working with.

16:30:24  15   Q.    Okay.  The Dallas City Council vote was very important in

16   your extortion plot, wasn't it?

17   A.    Yes, it was.

18   Q.    Because if they voted the right way, you would get money?

19   A.    Yes.

20   Q.    So did you keep tabs on how they voted?

21   A.    At that time I did.

22   Q.    Okay.  How did they vote?

23   A.    I believe that the projects were approved, but I don't

24   have a clear recollection of what happened then.

25   Q.    Isn't it a fact you have no clue what happened on

16:30:51  1    October 27, 2004?

2              MR. BUSCH:   Your Honor, that's argumentative, and I

3    would ask Mr. Steinke to show Mr. McGill the --

4              MR. VITAL:   He's --

5              THE COURT:   Counsel, I'll control the courtroom.

6        The objection is overruled.   You may answer the question.

7    BY MR. STEINKE:

8    Q.   Mr. McGill, do you have any knowledge factually of what

9    the Dallas City Council did on October 27, 2004?

10   A.   Yes.   I had the minutes from that meeting at that time,

11   and in fact I may have even made a note in the margin of the

12   minutes.   I just simply don't recall all the details of this

13   meeting of three or four years ago.

14   Q.   Well, I'll ask you then, since the meeting was a pivotal

16:31:40 15   part of the extortion plot, did you win or lose in the

16   October 27th, vote?

17   A.   I don't recall.

18   Q.   You don't know whether you won or lost on October 27th?

19   A.   No, I don't recall.

20   Q.   Okay.   You mentioned Pecan Grove and Dallas West Village.

21        And have you ever been out to either project or either

22   project site?

23   A.   Yes, I have.

24   Q.   Okay.   And during this time you were extorting money from

25   Bill Fisher?

16:32:34   1   A.    During what time?

2   Q.    Well, around October 27, 2004 what had Bill Fisher done

3   to guarantee you that -- well, let me rephrase that.

4         What had you told Bill Fisher concerning the vote at the

5   Dallas City Council?

6   A.    I don't recall if I spoke to Bill Fisher to tell him

7   anything.

8         Normally that's not the way it would happen.   Darren

9   would be the one speaking directly to Bill.

10   Q.    So when you have told the jury everything that was going

11   on with Don Hill, that was information you got from somebody

12   else?

13   A.    No, it was not.   Normally -- on occasion I was involved

14   with meetings with Don or -- and some on occasion with Bill.

16:33:33  15   Q.    When did those meetings start with Don?

16   A.    I don't recall the dates.   I would need to have my memory

17   refreshed on those dates.

18            MR. STEINKE:   Well, I can't find it.

19         I'll move on to something else.   I'm sorry.

20   BY MR. STEINKE:

21   Q.    At the Pappadeaux meeting, the first one, do you recall

22   that?

23   A.    I recall having two meetings.

24   Q.    I believe you said that one of the meetings you didn't

25   have a really good memory of what happened, but at the other

16:35:04　1　meeting you had a pretty good recollection?

2　A.　Yes.

3　Q.　The meeting that you had the really good recollection,

4　when did that take place?

5　A.　I'm not certain which of the two dates that it happened,

6　but it happened.

7　Q.　At the meeting that you have a really clear recollection

8　on, who was present?

9　A.　Kathy Nealy, myself, Darren, D'Angelo Lee.

10　Q.　Was Bill Fisher?

11　A.　I don't -- I don't believe Bill Fisher was there.

12　Q.　Okay.  And this is the one where y'all were trying to

13　figure out who was going to be the spokesperson?

14　A.　Yes.

16:35:45　15　Q.　Who was going to control the projects?

16　A.　Yes.

17　Q.　Okay.  And I believe you said that Darren wanted to

18　control it, and D'Angelo Lee wanted to control it?

19　A.　Yes.

20　Q.　What decision was made?

21　A.　I don't know if a decision was made at that time.

22　Q.　You also said that you talked at this meeting about

23　minority contractors?

24　A.　Yes.

25　Q.　And what was the purpose of that discussion?

16:36:16   1    A.    To emphasize the need to get minority contractors

2    involved in these projects with the chosen developer.

3    Q.    And you also discussed the deed restrictions?

4    A.    I believe so at that meeting.  I believe so.

5    Q.    What were the deed restrictions that you discussed?

6    A.    One of the deed restrictions had to do with BSEAT

7    becoming a participating partner with Bill Fisher.

8    Q.    Okay.  And that was one of the original ideas when the

9    BSEAT CDC was first created, wasn't it?

10    A.    Yes, it is.

11    Q.    Okay.  So asking for an ownership interest is not

12    inconsistent with the reason that the CDC was formed in the

13    first place, is it?

14    A.    No, it's not.

16:37:13  15    Q.    Okay.  Can you describe to the jury how the deed

16    restrictions fit into your extortion plot?

17    A.    Well, it helped to re-enforce our demands on him.

18    Q.    Demands on him?

19    A.    Yes.

20    Q.    How would that help the extortion plot?

21    A.    Well, if we were -- if he accepted all of the deed

22    restrictions and we are a participating partner, then that

23    means possibly there would be more money for us to split up

24    among ourselves.

25    Q.    And in this extortion plot at this point in time how much

16:37:58  1    money had Bill Fisher given you?

2    A.    None.

3    Q.    Okay.  I believe you testified that you had input into

4    those deed restrictions?

5    A.    I don't believe so.

6             MR. STEINKE:  May I have a moment, your Honor?

7             THE COURT:  Yes.

8    BY MR. STEINKE:

9    Q.    Mr. McGill, do you recall in your August 2007 meeting

10   with the FBI after you had gotten the target letter you met

11   with them again, correct?

12   A.    Yes, I did.

13   Q.    Do you remember discussing with them the deed

14   restrictions?

16:39:42 15   A.    No, I don't remember all of the subjects that were gone

16   over.

17   Q.    Do you remember telling them that you were not familiar

18   with the communication in the deed restrictions?

19   A.    Well, what I recall about the deed restriction is that a

20   consultant actually put -- I believe the top -- put together

21   most of the deed restriction in consulting in terms of -- gave

22   those deed restrictions to Darren.  And I believe that he

23   amended the deed restrictions.  And I think that -- I believe

24   I saw them at that point.

25   Q.    But didn't you tell the jury that you had input into

16:40:19   1    those deed restrictions?

2    A.    Well, the part that talked about BSEAT CDC was the part

3    that was added, and I believe that I had input into that.

4    Q.    Do you remember telling the FBI in August of 2007 that

5    you were not familiar with the communication to Suzan Kedron

6    on November 19, 2004 regarding those deed restrictions?

7    A.    I just -- I do not recall that --

8            MR. STEINKE:   May I approach?

9            THE COURT:   Yes.   But let the witness finish before

10   you move on.

11           MR. STEINKE:   I'm sorry.

12   BY MR. STEINKE:

13   Q.    Mr. McGill.

14   A.    I simply may not recall it at that time.

16:41:00  15   Q.    So you didn't recall it in August of 2007, but you now

16   recall it in August of 2009?

17   A.    Yes.

18   Q.    Okay.   The subcontractors that you and Darren picked out

19   who would kick money back, did you ever get any money kicked

20   back to you from any subcontractor?

21   A.    No.

22   Q.    No?

23   A.    No.

24   Q.    Now, the BSEAT contract with Terrell & Associates in

25   Exhibit -- Government's Exhibit 167, you talked about that

16:41:50  1    with the jury, correct?

2    A.    Yes.

3    Q.    All right.  Was that a contract between Bill Fisher and

4    Terrell & Associates, or BSEAT and Terrell & Associates?

5    A.    BSEAT.

6    Q.    Who was going to pay Terrell & Associates?  BSEAT?

7    A.    Yes.

8    Q.    You said that this contract between BSEAT and Terrell &

9    Associates was a way for you to get paid?

10   A.    Yes.

11   Q.    But in fact if you were going to get paid, the money was

12   coming from Darren Reagan?  BSEAT, correct?

13   A.    That's correct.

14   Q.    Did you get any money out of this contract?

16:42:29  15   A.    No, I did not.

16   Q.    Okay.

17                THE COURT:  How are we coming, Counsel?

18                MR. STEINKE:  I'm sorry?

19                THE COURT:  How are we coming on the time?

20                MR. STEINKE:  I will be finished by 5:00.

21                THE COURT:  Let's see if you can move a little more

22   quickly.

23                MR. STEINKE:  I'll be finished by 5 till.

24                THE COURT:  Let's just go.

25                MR. STEINKE:  Now, if I could have, Ms. Christensen,

16:43:07  1    Government's Exhibit 5450, the transcript.

2         If I could have page 5.

3    BY MR. STEINKE:

4    Q.   Mr. McGill, this is an intercepted conversation between

5    you and Darren Reagan on February 8, 2005 that the government

6    played during your direct examination.  And --

7              MR. STEINKE:  If you could scroll down.

8    BY MR. STEINKE:

9    Q.   Where Bill Fisher asks if the contracts are going to move

10   forward.

11             MR. STEINKE:  Then if you could go to page 6,

12   please.

13        If you could scroll down.

14        Okay.  That's good.

16:44:01 15   BY MR. STEINKE:

16   Q.   Darren Reagan said, "You asked me to try to get this

17   thing passed, but I doubt that it's going to happen in this

18   fashion, because we're going to have to work on some

19   additional commitments, really tighten it up, and get

20   something in writing."

21        Now, by commitments you were talking about minority

22   subcontractors, correct?

23   A.   When we are talking about -- yes, the subcontractors and

24   our contract.

25   Q.   But it says commitments?

16:44:28   1   A.    Yes.

2   Q.    And don't you understand in your conversations with

3   Darren Reagan that that concerned the minority subcontractors?

4   A.    Yes.   And our contract.

5   Q.    I thought you already had a contract with Bill Fisher?

6   A.    I'm not certain that we had it tightened down as we would

7   like to have had it at that point.

8   Q.    Didn't BSEAT have a contract with Bill Fisher's company

9   for Pecan Grove that paid it $120,000, and a contract with

10   Dallas West Village that paid it a hundred and something

11   thousand dollars?

12   A.    I'm not sure if it had been consummated at this point.

13   Q.    Well, if I represent to you that both of those contracts

14   had been signed in October or November of 2004, would that

16:45:21  15   change your --

16   A.    Yes.

17   Q.    But you just didn't know about the contracts?

18   A.    I found out about some -- about the BSEAT contract later.

19   I didn't know at the time it was signed.

20   Q.    All right.   So you and Darren are involved in this

21   extortion plot, but you don't know that the contracts have

22   been signed?

23   A.    That's correct.

24   Q.    You said that you believed that Bill Fisher was wired?

25   A.    Yes.

16:45:57  1    Q.    All right.  And so if he was wired would that indicate

2    that he was under -- that was involved in some kind of

3    criminal investigation?

4    A.    What I said was that Darren believed that Bill Fisher was

5    wired.

6    Q.    Did you share that belief?

7    A.    I didn't have an opinion one way or another.

8    Q.    Weren't you laughing about it on one of the audiotapes?

9    A.    I don't recall whether we were laughing about that.

10    Q.    About going to the back of the restaurant where it's

11    loudest?

12    A.    Yes.

13    Q.    Did you think Bill Fisher might be wired?

14    A.    I didn't have any idea.  But if Darren believed that he

16:46:31  15    was wired, then I suggested that he take some kind of

16    precaution.

17    Q.    If Darren believed that he was wired, wouldn't that

18    indicate to you that there was some kind of criminal

19    investigation was going on?

20    A.    Not necessarily.

21    Q.    Did that possibility bother you?

22    A.    If my conversations were being taped and I did not know

23    it, yes, it would have.

24    Q.    But that didn't stop you from engaging in this

25    conspiracy?

16:47:00  1    A.    It didn't stop me from having the conversations that I

        2    had.

        3    Q.    You said that the church meeting on February 22, 2005 was

        4    to set up a payoff?

        5    A.    Yes.

        6    Q.    You were involved in the planning of that?

        7    A.    No.

        8    Q.    You weren't?

        9    A.    Well, I'm not certain what you mean by "planning."

       10    Q.    Well, were you involved in discussions with Darren about

       11    who was going to get the payoff money?

       12    A.    Yes.   Darren discussed it with me either a bit before or

       13    after.

       14    Q.    Okay.

16:47:41 15    A.    Or maybe both.

       16    Q.    Now, were you involved in the discussion with Darren

       17    about how much money you were going to make -- you were going

       18    to give in this payoff?

       19    A.    How much I was going to get?

       20    Q.    No.   How much y'all were going to give?

       21    A.    I'm sorry.   How much?

       22    Q.    How much you and Darren were going to give in this

       23    payoff, did you and Darren discuss that?

       24    A.    I don't recall an amount coming up.

       25    Q.    All right.   Was this the first payoff that y'all had

16:48:08  1    made?

2    A.    So far as I know.

3    Q.    You would agree with me that the payoff would be an

4    integral part of this extortion plot?

5    A.    Yes.

6    Q.    And you're telling the jury that you have no idea how

7    much y'all had decided to pay a public official there?

8    A.    What I recall is that I don't believe that there was an

9    amount mentioned.  That was more terms like, well, I'm going

10   to split it up, I'm going to divide it up, or I'm going to

11   break something off.

12   Q.    You don't know how much money was involved, do you?

13   A.    I don't believe that I ever knew the total amount.

14   Q.    Yet you call it a payoff?

16:48:55 15   A.    Yes.

16   Q.    Couldn't it have been more easily -- or just as easily a

17   contribution?

18   A.    I don't believe so.

19   Q.    Well, in fact, didn't you and Darren in a number of

20   conversations after this was done talking about it in terms of

21   a contribution?  The word "contribution" was raised several

22   times, wasn't it?

23   A.    I believe that Darren used the word "contribution."

24   Q.    But you didn't correct him?

25   A.    No, I did not.

16:49:28  1    Q.   You say that Darren never told you about the payments

        2    that Bill Fisher had paid to him, specifically $85,000 on

        3    January 31, '05, he never told you about that?

        4    A.   I don't believe that he ever did.

        5    Q.   Do you know the circumstances under which that payment

        6    was made?

        7    A.   No, I do not.

        8    Q.   Do you know whether or not it was payment on a

        9    legally-binding contract?

        10   A.   I have no idea.

        11   Q.   You're not trying to say that that money was extorted

        12   from Bill Fisher?

        13   A.   I'm only saying that I don't believe I knew about it.

        14   Q.   The 22,500 or February 22nd, you didn't know about that?

16:50:17 15   A.   No, I did not.

        16   Q.   You're not telling the jury that that money was extorted

        17   from Bill Fisher, are you?

        18   A.   What I am saying is I did not know about the payment.

        19   Q.   So you're involved in this extortion scheme, and yet you

        20   didn't know about any of the extortion payments?

        21   A.   That's correct.

        22   Q.   We have heard the number -- we have heard it several

        23   times, the conversation that was recorded where y'all talked

        24   about sweating Bill like a pig?

        25   A.   Yes.

16:51:25  1    Q.    And right after those words are used y'all are talking

2    about his weight and losing weight, weren't you?

3    A.    Yes.

4    Q.    The fact that he was burning up calories?

5    A.    Yes.

6    Q.    Finally, Mr. McGill, you never got any money from Bill

7    Fisher?

8    A.    No.

9    Q.    Never got any money from Darren Reagan?

10    A.    No.

11    Q.    All right.  And in fact didn't you feel betrayed by

12    Darren?

13    A.    No.

14    Q.    No.  Do you remember meeting with the FBI on June 28,

16:52:32 15    2005, which was eight days after the FBI raid?  Do you

16    remember that?

17    A.    Yes, I do.

18    Q.    Do you remember telling the FBI that you felt betrayed by

19    the fact that Reagan did not share any of the money with you?

20    A.    I don't remember using the word "betrayed."  I'm sure

21    that I did.  If I did, I think it was more disappointment that

22    I felt.

23              MR. STEINKE:  May I approach?

24              THE COURT:  Yes.

25    BY MR. STEINKE:

16:53:11  1    Q.    This is on page 5 of the 302.

       2    A.    Yes.

       3    Q.    Does that refresh your memory?

       4    A.    Yes, it does.

       5    Q.    You felt betrayed?

       6    A.    Yes.

       7    Q.    Is that why you are testifying the way you are today?

       8    A.    No.

       9          MR. STEINKE:   That's all I have, your Honor.

      10          THE COURT:   Do you have any questions, Ms. Deckard?

      11          MS. DECKARD:   No, I have no questions of this

      12    witness.

      13          THE COURT:   Mr. Greene.

      14          MR. ALLEN:   Your Honor, Mr. Greene has no questions

16:53:36 15    for this witness.

      16          THE COURT:   All right.   Mr. Jackson?

      17          MR. JACKSON:   Yes, your Honor.

      18          THE COURT:   Are you going to have any questions,

      19    Mr. Vital?

      20          MR. VITAL:   Yes, your Honor.

      21          THE COURT:   How long will you be, Mr. Vital?

      22          MS. DECKARD:   Fifteen minutes maybe.

      23          THE COURT:   How long will you be, Mr. Jackson?

      24          MR. JACKSON:   15, 20 minutes.

      25          THE COURT:   Okay.   Let's Get started.

| | |
|---|---|
| 16:54:05 | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 16:54:39 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

*CROSS-EXAMINATION*

BY MR. JACKSON:

Q.   Mr. McGill, my name is Ray Jackson.  I represent
Mr. Hill, the citizen accused in this matter.

I believe you testified on direct about the things that
you believed, what you thought, what you assumed, but what I
want to kind of go at is what you knew.  Okay?

A.   Yes.

Q.   Let's start with the February 22nd date behind Friendship
West.

You testified that you had a phone call from Reagan that
day, and asked if Mr. Hill was there, right?

A.   Yes.

Q.   Now, when Mr. Hill -- Mr. Reagan gave an envelope of
money in it to Mr. Hill, were you there?

A.   No, I was not there.

Q.   Are you aware of whether Mr. Reagan told Mr. Hill that
this was a political contribution?

A.   No, I'm not aware.

Q.   Are you aware of Mr. Reagan told Mr. Hill that a thousand
of this is from Mr. McGill?

A.   No, I'm not.

Q.   So if he did that, and you were shown this chart that had
your -- you were shown the exhibit that had your name on the
envelope.

16:55:05  1     Do you recall that?

2   A.   Yes, I do.

3   Q.   Okay.  So you don't know if -- you can't tell this jury

4   whether or not Mr. Reagan told Mr. Hill that day this is a

5   political contribution, and this is how it's divided out?

6   A.   No, I cannot.

7        MR. JACKSON:   Okay.  Let's go to Government's

8   Exhibit 5504, and let's do the transcript only, please.

9        If we can go to the second page, please.

10       Okay.  If we can go -- start -- highlight line 4.

11       Go on down, please.

12  BY MR. JACKSON:

13  Q.   All right.  This is a call that occurred on the --

14  between Mr. Reagan and Don on February 23, 2005.  Okay?

16:56:07  15  A.   Yes.

16  Q.   And you wasn't a part of this phone call, but this call

17  on line 6, Mr. Hill says, "Thank you, man.  Appreciate you,

18  man.  That -- and I want you to know that that's really --

19  that's really going to help me.  It's really going to help our

20  campaign.  It's going to help everything."

21       Okay.  Now, Mr. Hill says there that the money that

22  Mr. Reagan gave him was going to help the campaign.

23       Do you see that?

24  A.   Yes.

25  Q.   In fact, after this conversation you then have a

16:56:40  1    conversation with Mr. Reagan --

2         MR. JACKSON:   And that's Government's Exhibit 5506,

3    and if we could just have the transcript, please.

4    BY MR. JACKSON:

5    Q.    You were played a portion of this conversation with

6    Mr. Busch, and since it was -- some of it was played, we will

7    go to the transcript.

8         MR. JACKSON:   If we can go to page 2 of this,

9    please.

10        Go to page 3, please.

11        Page 5, please.

12        Thank you.   That helps.

13   BY MR. JACKSON:

14   Q.    All right.   At the top of this line 2 Reagan tells you,

16:57:50  15   "Damn.   Well, it's -- what is this?   What is this for?"

16        Reagan in this conversation is telling you about what

17   happened when he met Don at the church, right?

18   A.    Yes.

19   Q.    Reagan is telling you when he met Don what Don tells him

20   is -- when he gives him the money is like what is this for,

21   right?

22   A.    Yes.

23   Q.    Then he told Don, he says, "Brother, that's a

24   contribution."

25        Do you see that?

16:58:21  1    A.    Yes, I do.

2    Q.    Okay.  And on several occasions in conversations when you

3    and Mr. Reagan spoke you talked about that money that day in

4    contribution form or campaign form, right?

5    A.    Well, I don't -- I don't recall how many times we talked

6    about it, but we may have talked about it at least once.

7    Q.    You mean -- it was never talked about and never said, you

8    know what, Don, this money wasn't for a contribution, this

9    money was your cut.

10        Y'all never said that, did you?

11   A.    No.

12   Q.    Now, let's talk about what Don knew.  Okay?

13        There were conversations played between you and

14   Mr. Reagan where you and Mr. Reagan are talking from BSEAT's

16:59:10 15   standpoint -- let me back up for one second.

16        When Reagan is explaining up here on line 2 and he says

17   Don says, you know, well, what is this, then that tells you

18   that Don didn't know what was coming, right?  He wasn't

19   expecting it?

20   A.    I can't say what Don expected or didn't.

21   Q.    If he was expecting it, he wouldn't be saying, you know,

22   what is this, I appreciate it that you giving me my money,

23   right?

24   A.    I don't know.

25   Q.    Well, if I hand you something and you say what is this,

16:59:48  1    that means that you don't know what it is and you wasn't

2    expecting it, right?

3    A.    If you gave it to me in an envelope I might say what is

4    this.

5    Q.    And he talks about -- well, let me go to the next

6    question.

7         When we talk about those conversations that you were

8    having with Darren Reagan, those conversations were private

9    conversations between and you Darren, right?

10   A.    Yes.

11   Q.    Mr. Hill is not on the phone listening to you and Darren

12   talk about whatever plans you have for BSEAT, or having

13   additional roles with Bill Fisher, right?

14   A.    No.

17:00:23 15   Q.    How much of that can you tell this jury that Don knew?

16   A.    I can't tell the jury that Don knew about any of those

17   conversations.

18   Q.    Don is a council person, right?

19   A.    That's correct.

20   Q.    How well do you know Don?

21   A.    Very well.

22   Q.    Do you know Don is a big advocate of economic development

23   in the Southern Sector?

24   A.    Yes.

25   Q.    Do you know he's also a big advocate of African-American

17:00:43  1   contractors?

2   A.    Yes.

3   Q.    Are you also aware that Darren Reagan has -- we'll call

4   it leverage with Don Hill?

5   A.    Yes.

6   Q.    Meaning that Darren has been around a long time, he knows

7   these council persons, right?

8   A.    Yes.

9   Q.    And he can get an audience with a council person whenever

10   he wants to?

11   A.    Yes.

12   Q.    And he can ask his council person if something is not

13   going right out here where we are opposing or doing anything,

14   delay the vote.

17:01:13  15       He can do that, can't he?

16   A.    Apparently.

17           THE COURT:   Is that a convenient breaking point?

18           MR. JACKSON:   Sure, it is, your Honor.

19           THE COURT:   Ladies and gentlemen, we are going to

20   start tomorrow 15 minutes later than I told you at 8:45

21   instead of 8:30.

22       Okay.  Have a nice evening.  All rise.

23       (Jury retired from the courtroom.)

24           THE COURT:   All right.  Mr. McGill, we'll see you at

25   8:45.

17:02:07   1        Be seated.  I have a couple of things that I want to talk

2   to the lawyers about.

3        All right.  I have organized your list of witnesses, and

4   I took only the witnesses that you all said yes.  Didn't

5   include any of your probablies.  So that means that this lists

6   that I have here is the best case scenario.

7        There are 60 witnesses on that list counting all of the

8   defense and -- and there are overlaps which I have eliminated,

9   and that includes Don Hill and Sheila Hill testifying based on

10   their attorney's statements that they would.  I'm not

11   including any others, and I'm not inquiring as to whether any

12   defendants are testifying.  I'm just telling you what I've

13   counted.

14        We have 41 days of trial left on the schedule, and some

17:03:10  15   of those are partial days.  By my count we're 21 days of

16   testimony now.  That's my count.  So I don't know how we're

17   going to do it.  25 -- just so the numbers are clear -- 25 of

18   these are government witnesses, and 35 are defense witnesses.

19   That's eliminating all overlap.

20             MR. BUSCH:  I think the government figures we'll be

21   a little less than 25.  I'm telling the Court that.  It may be

22   closer to 20.

23        I also suggested to the Court last week with the nature

24   of the witnesses, we got through, I think, ten witnesses last

25   week, and I think most of the remaining government witnesses

17:04:01    1    are relatively short.

2    Mr. McGill obviously is not short.

3    Mr. Fisher, who's next will be even longer.

4    But after that I believe Andrea Spencer, perhaps will be

5    about the same length as Mr. McGill, but most of the remaining

6    government witnesses outside of the financial analyst, David

7    Garcia, and Agent Sherman will be relatively short.

8    So I imagine we will be able to go through these

9    witnesses -- most of the remaining witnesses outside of the

10    ones I highlighted fairly expeditiously.

11    THE COURT:  Well, here's what we're going to be

12    doing on Wednesday afternoon after the jury leaves.

13    The jury -- we're recessing early on Wednesday, and I'll

14    remind everyone that we have a half hour lunch break, and a

17:04:52    15    half hour means a half hour.  So you all figure out how you're

16    going to eat in half hour.  Because it doesn't mean 45

17    minutes, and we're not sitting around for waiting for anybody

18    to get back.

19    If you need another half an hour after we recess I'll

20    give it to you.  Then we're going to come back in here and I'm

21    going to go through every one of these witnesses on my list

22    and find out what they're about and how long they're going to

23    take.

24    MR. BUSCH:  Your Honor, may -- I would simply ask --

25    I think that would be perhaps create problems for all parties.

17:05:31   1    If the government may respond in camera ex parte, and the

2    defendants responds in camera ex parte as to the anticipated

3    testimony from the remaining witnesses.  I don't think the

4    defendants are going to disclose that weeks in advance to the

5    government.  And likewise.

6         So we'll be happy to discuss that.

7              THE COURT:  Well, I'm not going to require much, and

8    if -- I don't know on what basis I'm not going to require the

9    government to do that, but we'll give it a shot and you all

10   may say can we go in camera and then I'll do it, but as

11   general proposition I'm not going to do it.  I'll be open to

12   that as needed, but most of these witnesses it's not going to

13   be necessary to do it.  So I will read out right now so you

14   all have it, the list.

17:06:29  15        The other thing we're going to do, and I don't need to do

16   it with you, we don't need to do this on Wednesday, but the

17   reason I'm suggesting it doesn't need to be Wednesday, you all

18   may find this part productive to do Thursday or Friday.  I'll

19   actually be amenable to doing all of this on Thursday or

20   Friday, but they're already here.  You guys are in the

21   building and they're not.  So I'm trying to avoid them having

22   to come back for this exercise since I think they would rather

23   go back to their offices for a couple of days.

24        I don't care -- I mean, if everybody agrees that this

25   will all be done in camera that's fine with me.  I don't think

17:07:11   1   you all need to know.   Only I do.

2   So -- all right.   I'll accept that suggestion, Mr. Busch.

3   So you guys can come up here.   I'll work you in on

4   Thursday or Friday, and I'll hear you all on Wednesday, and

5   they'll go away.   And that will -- and I will turn off my link

6   here, and I'll clear the courtroom.   That will be a private

7   conversation between us, and we'll transcribe that separately,

8   but I have got to have a feeling for where we're going here

9   because I'm nervous about the time frame.

10   The other thing that I would like you all to do, we have

11   been working on the charge, and as is usual, I think that the

12   best thing here is for you all to sit down with each other

13   with your drafts so that I only have to sort out the real

14   disputes, and not just some stylistic differences.

17:08:12   15   So I think that would be a productive use of time, and

16   you might deputize one or more defense counsel for that first

17   run.   That's without prejudice to any and all objections.   I

18   don't think you need to have the whole gang of you in on that.

19   But you can handle that as you would, but I would like to be

20   working on that as we go.

21   Because after this week we have got three weeks of no

22   days off.   So I know that's hard on all of you.   I'm very

23   sympathetic to it.   It's less hard on me, but it's hard on me

24   too.   We all have other things to do, and I understand that.

25   If there is something that I can do to ease your lives a

17:08:57   1    bit, I will.  So if there is something that you all want to
           2    suggest to me, I'm not going to be offended by any suggestion
           3    anybody might make.
           4        All right.  I'm going to read the names out to the
           5    defense counsel.
           6        Do you want me to do that, or do you feel like you have
           7    that?
           8        (No response.)
           9            THE COURT:  I'll read both.  It won't take but a
          10    minute.
          11        All right.  This is the defense counsel list.
          12        I'll tell you what.  Sue, why don't we help them out
          13    here, and you just type these separately for each of them, and
          14    run them for them.
17:09:25  15        Can we do that?
          16            COURT REPORTER:  Yes.
          17            THE COURT:  Then tomorrow I'm going to ask Sue just
          18    to type these up for you.
          19        These can all be phonetic because if this were a spelling
          20    bee, nobody would win.
          21        That means I don't think you all spelled anybody's name
          22    right on your list.
          23        So, Sue, you don't need to worry about spelling.
          24        All right.  This is the defense's consolidated list.
          25        Susan Abbey.

17:09:52  1        Leon Backes.

2        Venita Benitez.

3        Genita Boyd.

4        Connie Buford.

5        Jeff Carpenter.

6        Comer Catrell.

7        Kevin Dean.

8        Warren Ellis.

9        Domingo Garcia.

10        C.B. Green.

11        Billy Greer.

12        Frederick Hannah.

13        Barry Henry.

14        Saleem Jafar.

17:10:18 15        Madeleine Johnson.

16        Daniel Jones.

17        Phillip Kirkpatrick.

18        Eric Maas.

19        Jason Matlock.

20        Gary Mayberry.

21        Toska Medlock Lee.

22        Beverly Mitchell-Brooks.

23        Mary Poss.

24        Ken Reese.

25        Carroll Robinson.

17:10:56   1          Carolyn Smith.

2          Mary Suhm.

3          Gail Terrell.

4          Nicole Thigpen.

5          Reverend Otis Tucker.

6          Pastor Curtis Wallace.

7          Harry Wright.

8          Don Hill.

9          Sheila Farrington-Hill.  Just put possibly next to those.

10          Michael Williams.

11          I left him out.

12          That's one of Mr. Robertson's designations.

13          Okay.  That's actually 61 counting the Hills.  36 defense

14   witnesses.

17:12:03  15          Do you want me to call yours out, and have Sue do that as

16   well?  Do a separate list here for the government?

17          Anthony Board.

18          Martin Burrell.

19          William Cothrum.

20          Jon Donahue.

21          Bill Fisher.

22          Herb Frison.

23          David Garcia

24          Prentice Gary.

25          Tammy Holloway.

17:12:30  1          Carrie Holmes.

2          George Hull.

3          Mark Jones.

4          Frank Jordan.

5          Brent Kroener.

6          John Lewis.

7          Ann Lott.

8          Tim Lott.

9          Matt Martin.

10          Richard Pace.

11          Kent Plemons.

12          Kyle Robertson.

13          Don Sherman.

14          Andrea Spencer.

17:13:00 15          Stanley Spigel.

16          Brett Wilkinson.

17          Now, if upon reflecting when you all -- since you're

18     meeting with me privately, if some of these people are going

19     to get put on the maybe list, then so be it.

20          If you -- I'm not telling you that you can't reach down

21     and grab somebody off of that probable list, but if they are

22     really in your mind yeses, I want to know that right now,

23     because anybody that's called as a witness that's not on this

24     list that I'm working with, you're going to have to convince

25     me about.

17:13:40  1       All right.  I did not include the -- I think you and

2    Mr. Busch both said there was one possible custodian of

3    records, and I didn't include either one.  Even that was more

4    than slightly possible, I didn't include them because I

5    figured that would be a short witness if necessary.

6         Okay.  With reference to the jury charge, I'm assuming

7    that you will be able to get me something sometime next week.

8    That's what I'm hoping.

9         Is that possible that you all can have a conference the

10   latter part of this week?

11            MR. BUSCH:  I'll make our facility available and

12   send an e-mail and perhaps on Thursday or Friday we'll get

13   together.

14            THE COURT:  Again, it's not going -- this is the

17:14:26 15   first in a multi-step process, but it would be more productive

16   for you to sort that out rather than for us to spend our time

17   on that.

18        All right.  Anything else for today?

19        (No response.)

20            THE COURT:  I'm not anticipating that I'm going to

21   meet with you before court tomorrow, so if you anticipate

22   something else you want to talk to me about, let me know now.

23        (No response.)

24            THE COURT:  Okay.  I'll see you in the morning then.

25            MR. GREENE:  Your Honor, there probably is going to

17:14:51  1   be a matter on the motion in limine, because I believe

2   Mr. Fisher is getting ready to come up after this.

3       THE COURT:  Y'all have a seat then.

4       Okay.  What is the issue that you want to raise?

5       MR. GREENE:  On the government's motion in limine in

6   regard to Mr. Fisher, I'm assuming they're going to get to him

7   probably at some point tomorrow.

8       THE COURT:  Well, I haven't changed my mind on this

9   theory that you have advocated that Mr. Fisher -- that you're

10  attempting to get in his prior conviction, which was reversed,

11  because you think that gives him the motive; that is, a

12  vengeful motive with respect to the FBI that motivated his

13  conduct.

14      That was the argument that was made, and I considered

17:15:52  15  that before.  I don't think that is relevant, but if it is, I

16  have excluded it under Rule 403.  I remain of the same view.

17  I don't think anything has happened in the trial to cause me

18  to re-think that.

19      Is there something I haven't already considered that you

20  want to say about that?

21      MR. GREENE:  Yes, your Honor.

22      I think your Honor had indicated earlier in trial based

23  on some testimony that you thought that it may be admissible

24  if Mr. Fisher took the stand.  The government wasn't sure if

25  they were going to actually call Mr. Fisher.  It's not his

17:16:31   1   motive against the FBI.  It's his motive to use the FBI to

2   shut down these defendants because of what happened to him

3   previously.

4       That is -- I think his motive is clearly reflected in his

5   lawsuit in that he suggests -- well, he doesn't suggest.  He

6   point blank says that the -- and accused the FBI in a lawsuit

7   of manufacturing testimony, coercing the testimony of

8   witnesses.

9       I think our defense is that Mr. Potashnik was coerced by

10   the FBI to enter a plea of guilty, and that's been -- I think

11   everybody's position in this situation.  And the same was

12   insinuated with Mr. McGill.  So I think that that's an

13   integral part of all defendants' defense.

14       And --

17:17:26 15       THE COURT:  Okay.  Well, I'm sorry, Mr. Greene,

16   pardon me.  That was rude.  I didn't mean to step on you.

17       MR. GREENE:  That's okay, your Honor.

18       That's the crux of Mr. Fisher's argument.  That's what he

19   alleged in a pleading in which the Fifth Circuit actually

20   found that the government had withheld certain Brady evidence,

21   which would add credence to that theory that the government

22   can manufacture a case, and force people to plead guilty.

23       There were informants in that particular case who ended

24   up pleading guilty and testifying against Mr. Fisher in which

25   Mr. Fisher was acquitted.  That was the basis of his lawsuit.

17:18:06  1   That's -- our argument is that is exactly what was happening

2   in this particular case.

3         THE COURT:  Well, I remain of the same view that I

4   was.

5         The officers that were involved in that civil suit

6   brought by Mr. Fisher are not involved in this matter at all,

7   as far as I have been told.

8         Mr. Fisher's view that those agents acted improperly with

9   respect to witnesses does not have any relevance in terms of

10  establishing that any agents in this case acted improperly.

11        The Court is of the view that there is a clear 403 issue

12  here, and that any probative value of it is outweighed by its

13  prejudicial impact.

14        So I don't recall saying that -- I mean, I can imagine

17:18:56 15  testimony that Mr. Fisher might give.

16        For example, if Mr. Fisher were to take the stand and say

17  I am of the -- and you can't bait him into this.  I'm not

18  giving you a road map, but if on direct Mr. Fisher said I

19  trust the FBI more than anyone I have met in my whole life,

20  and every person that works for the FBI is completely

21  credible, well, that might open the door to a lawsuit where he

22  says otherwise.  But I don't remember saying that the fact

23  that he testifies would in and of itself make this issue

24  admissible.  I wasn't of that opinion, and I'm not of that

25  opinion now.

17:19:47   1        So I haven't heard anything that has caused me to change

2     my ruling on the limine.  You all have your objection, and you

3     may do whatever you want to do to develop this testimony

4     outside the presence of the jury.  Of course, I'll permit you

5     to make a bill.

6        If something occurs during the trial that opens it, then

7     you can come up here and approach the bench, but don't be

8     asking questions that are going to cause him to have to talk

9     about it, and then argue that the cat is out of the bag.  I'm

10    not going to permit it.

11       In fact, I'm going to be vigilant about making sure that

12    doesn't happen.

13            MR. GREENE:  Your Honor, the only instance that I

14    think that that would come up, quite frankly, is on that

17:20:30  15  article.  There was an article that has already been admitted

16    into evidence wherein Mr. Fisher was accused publicly of being

17    involved in a situation involving a public official,

18    Mr. Fantroy.

19       And Mr. Fisher at that point realized that he might be

20    subject to another FBI investigation, and that was the onus

21    for Mr. Fisher to go out and contact the FBI, which clearly

22    would be odd to do because of his paranoia about the prior

23    situation.

24       And he knew he had to create a situation where to get the

25    focus off of him and get the FBI off of him, he put it on

17:21:16  1    these defendants.  That's why he went around recording

2    conversations and things like that in regards to these

3    defendants.

4         As soon as the article comes up, how else would I address

5    it other than, you know, at that particular point?

6         THE COURT:  Well, he went to the FBI.  The fact that

7    he had this other -- I mean, your argument is that this --

8    from his perspective I'll call unsatisfactory experience with

9    the FBI is what sends him into the warm embrace of the FBI.

10        I'm not getting that frankly, but I'll indulge you,

11    that's your theory.

12        You may examine him about your comments that it's odd,

13    but you can't go behind what motivated him if to do that

14    you're going to develop this prior case where he was

17:22:16  15    ultimately acquitted.  I'm not permitting it.

16        I don't share your view that it handicaps your

17    presentation of the case, but even if it does, the Court is of

18    the view that the prejudicial impact outweighs its -- in my

19    view -- extremely limited probative value.

20        I don't see a probative value at all, but if there is

21    any, it's in my view clearly outweighed by the prejudicial

22    impact.

23        Those are the calls I have to make, and that's the call

24    I'm making.

25        MR. JACKSON:  That's fine, your Honor.

17:22:44　1　　　The only thing I would let the Court know is that at the

2　time he went to the FBI he had pending litigation against the

3　FBI.

4　　　　　THE COURT:  So?

5　　　　　MR. GREENE:  I'm --

6　　　　　THE COURT:  But your putting in this article and his

7　dealings with Fantroy isn't going to support your argument

8　that therefore you get to put in his prior dealings with the

9　FBI.  I'm not going to permit it based on that.

10　　　　　MR. VITAL:  Your Honor, I was just going to throw

11　away my trash, but I decided I should wait.

12　　　　　THE COURT:  Well, this might be an appropriate time

13　to put some more trash on the table, if you like.

14　　　　　MR. JACKSON:  He's very distracting, your Honor.

17:23:29　15　　　Can we get him his own personal trash can?

16　　　　　THE COURT:  I might get him one.  Yes, I might.

17　　　Just share your trash can with him, Mr. Jackson.  You

18　don't look like you have filled that up yet.

19　　　Anything else, Mr. Greene?

20　　　　　MR. GREENE:  No, your Honor.

21　　　　　THE COURT:  If you -- I'll of course permit you to

22　make a bill outside the presence of the jury whenever you want

23　to do that.

24　　　　　MR. GREENE:  Thank you, your Honor.

25　　　　　THE COURT:  Yes, Ms. Saldana.

17:23:52  1    MS. SALDANA: That was the only follow-up question

2    that I had, Judge.

3        If the Court remembers, there is already a bill based on

4    Mr. Wilson's testimony that was made on this very issue. The

5    Court excused the jury and allowed questioning in regard to

6    that.

7        Is the Court talking about another bill?

8        THE COURT: Yes. I am talking about a bill of

9    Mr. Fisher. I don't think that asking Mr. Allen questions is

10   a substitute for making a bill about Mr. Fisher.

11       They're going to have Mr. Fisher squirming himself and

12   they're going to argue that's relevant and I'm going to permit

13   that at the end when he's done. Not before.

14       So when he's finished with his testimony, at some

17:24:34  15   mutually convenient time, probably after court, you can make a

16   bill.

17       You're objecting to that?

18       MS. SALDANA: No, Judge, I was just asking about --

19       THE COURT: I don't think it's a substitute. I

20   think they can make a bill with every witness that they want

21   to interrogate that I haven't permitted.

22       MR. GREENE: Thank you, your Honor.

23       THE COURT: Anything else then?

24   (No response.)

25       THE COURT: All right. I'll see you all at 8:45.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX
VOLUME 22
AUGUST 10,  2009

**WITNESS NAME**                                      **Page**

**KATHY NEALY**
   Cross By Mr. Greene                                13

   Cross By Mr. Jackson                               24

   Re-Direct By Mr. Meacham                           85

**ALLEN McGILL**
   Direct By Mr. Busch                                99

   Cross By Mr. Steinke                               180

   Cross By Mr. Jackson                               240

| GOVERNMENT EXHIBIT | Page |
|---|---|
| GX 2024 Identified<br>Kathy Nealy's office file | 64 |
| GX 3131 Identified<br>E-mail from Don Hill to Glenda Aguirre | 92 |
| GX 668 Identified<br>Don Hill's calendar | 93 |
| GX 3296 Identified<br>Limited partnership agreement re West Cliff Shopping<br>Center | 115 |
| GX 382 Identified<br>Darren Reagan BSEAT letter to Dallas City Council | 124 |
| GX 303 Identified<br>Allen McGill folder entitled James Bill Fisher with<br>various documents | 126 |
| GX 315 Identified<br>Allen McGill 2004 year planner with handwritten notes | 126 |
| GX 218 Identified<br>E-mail from Allen McGill to Bill Fisher | 128 |
| GX 1938 Identified<br>Contract with independent contractor with handwritten<br>notes signed by Darren Reagan and Bill Fisher 10-4-04 | 132 |
| GX 146 Identified<br>Darren Reagan BSEAT letter to Brian Potashnik<br>10-14-04 | 135 |
| GX 153-F Identified<br>Contract for Independent Contractor | 136 |
| GX 1549 Identified<br>Dallas City Council resolution 11-10-04 re Pecan<br>Grove | 137 |
| GX 1591 Identified<br>City Council minutes for 11-10-04 re Pecan Grove | 139 |
| GX 76 Identified<br>Calendar of Don Hill | 140 |

1    GX 317 Identified                                            145
        Fax from Darren Reagan to Suzan Kedron re deed
2       restrictions 11-1904

3    GX 168 Identified                                            148
        HD & Ola Reagan contract re Pecan Grove 1-17-05
4
     GX 321 Identified                                            149
5       Darren Reagan BSEAT letter and invoice sent to Saleem
        Jafar 2-1-05
6
     GX 5450 Identified                                           155
7       Transcript of GX 5451

8    GX 5451 Identified                                           155
        Audiotape
9
     GX 5451 Identified                                           156
10      Audiotape

11   GX 5460 Identified                                           158
        Transcript of GX 5461
12
     GX 5451 Identified                                           158
13      Audiotape

14   GX 5464 Identified                                           160
        Transcript of GX 5465
15
     GX 5465 Identified                                           160
16      Audiotape

17   GX 5468 Identified                                           161
        Transcript of GX 5468
18
     GX 5469 Identified                                           161
19      Audiotape

20   GX 1965 Identified                                           162
        Don Hill campaign fundraiser invite 2-16-05
21
     GX 5472 Identified                                           162
22      Transcript of GX 5473

23   GX 5473 Identified                                           162
        Audiotape
24
     GX 5474 Identified                                           164
25      Transcript of GX 5475

1    GX 5475 Identified                                                      164
        Audiotape
2
        GX 5498 Identified                                                   166
3          Transcript of GX 5499

4    GX 5498 Identified                                                      166
        Audiotape
5
        GX 5506 Identified                                                   170
6          Transcript of GX 5507

7    GX 5507 Identified                                                      170
        Audiotape
8
        GX 559 Identified                                                    174
9          Bank withdrawal and deposit slips, and handwritten
           notes from Don Hill
10
        GX 5500 Identified                                                   176
11         Transcript of GX 5500

12   GX 5501 Identified                                                      176
        Audiotape
13
        GX 5536 Identified                                                   177
14         Transcript of GX 5537

15   GX 5537 Identified                                                      177
        Audiotape
16
        GX 5540 Identified                                                   177
17         Transcript of GX 5541

18   GX 5541 Identified                                                      177

19   GX 5547 Identified                                                      177
        Audiotape
20
        GX 5580 Identified                                                   178
21         Transcript of GX 5581

22   GX 5581 Identified                                                      179
        Audiotape
23

24

25

| DEFENSE EXHIBIT | Page |
|---|---|
| DLX 89 Identified<br>Audiotape | 14 |
| BPX 45 Identified<br>Memor to Housing and Neighborhood Development<br>Corporation and a few member of city council | 38 |
| BPX 299 Identified<br>E-mail from Bill Fisher to Reverand Johnson | 51 |
| BPX 310 Identified<br>City council action | 57 |
| BPX 54 Identified<br>Letter from Bill Fisher to city staff | 59 |
| SHX 6761 Identified<br>Audiotape | 81 |
| FDX 10 Identified<br>Agreement with Myriad Group | 82 |
| SHX 327 Identified<br>Letter from Bill Fisher | 129 |
| RDX 2 Identified<br>Brochure for BSEAT | 183 |
| RDX 3 Identified<br>BSEAT brochure | 194 |
| RDX 4 Identified<br>BSEAT brochure | 199 |
| RDX 13 Identified<br>Brochure | 202 |
| RDX 14 Identified<br>BSEAT brochure | 206 |

| EXHIBITS PRE-ADMITTED | Page |
|---|---|
| Sheila Farrington-Hill - Mr. Mureen | 5 |

1          *C E R T I F I C A T E:*

2

3          I, P. Sue Engledow RPR/CSR, certify that the foregoing is
        a transcript from the record of the proceedings in the
        foregoing entitled matter.

4          I further certify that the transcript fees format comply
        with those prescribed by the Court and the Judicial Conference

5        of the United States.
        This the 18th day of June, 2010.

6

7                                          */S/P. Sue Engledow*

8                                          _____
                                          P. SUE ENGLEDOW RPR/CSR No. 1170

9                                          Official Court Reporter
                                          The Northern District of Texas

10                                              Dallas Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >
., March 7, '05
177: 21
1-17-05 265: 6
10-14-04 264: 35
10-4-04 264: 31
11-10-04 264: 41,
264: 45
2-1-05 265: 10
2-16-05 265: 40
2-22-05. 174: 16
400,000 may
70: 12
9-21-04. 128: 15
August 2007
229: 9
August 24, 2004
124: 12
August 24th.
212: 15
August 25, 2004
214: 12, 215: 5,
216: 7
August 25, 2004
one 216: 2
December 17,
1992 197: 15
February 1,
2005. 153: 25
February 10,
2005 158: 12
February 10,
2005. 158: 23
February 11,
2005 160: 4
February 16,
2005 162: 7,
162: 15
February 18,
2005. 164: 14
February 1st
154: 11
February 2, 2005
175: 20
February 2005
173: 4
February 22,
2005 166: 9,
175: 1, 235: 3
February 22nd

237: 14, 240: 9
February 23,
2005. 241: 14
February 23rd.
170: 11, 174: 2
February 8, 2005
155: 8, 232: 5
February 9, 2005
14: 10
January 2005
17: 9
January 31, '05
237: 3
January 31, 2005
171: 2
January 31st
170: 23
June 20, 2005
121: 4
June 28, 2005
208: 10, 209: 8,
238: 14
June 6, 1992
187: 23
March 22, 2005
113: 3, 178: 24
March 22, 2005.
111: 22
March 4, 2005.
177: 7
March 7, 2005
177: 14
May 20, 2005
22: 23
may. 96: 3,
141: 22, 148: 19,
208: 5
May. 10: 18
November 10,
2004 138: 13
November 10,
2004. 139: 6
November 15,
2004. 141: 11
November 16th
141: 5
November 16th.
141: 15
November 19,
2004 230: 6

November 24,
1992 198: 11
November 5, 2003
203: 17
November 7, 2003
204: 6
November 8,
2003. 202: 13
October 12, 2004
92: 4
October 14.
136: 24
October 17, 1992
183: 9
October 2004
40: 12, 43: 17
October 23, 2004
206: 5
October 25,
2004. 92: 21
October 27, 2004
26: 25, 27: 4,
87: 6, 136: 25,
222: 22, 223: 8,
224: 1, 224: 9,
225: 1, 225: 9,
226: 2
October 27th
24: 16, 24: 20,
32: 4, 32: 6,
50: 11, 50: 14,
50: 22, 222: 24,
222: 25, 225: 16,
225: 18
October 4, 2004
88: 19
October 7, 1993
199: 2
October 8, 2004
132: 9
September '04
67: 16
September 10,
1994 199: 17
September 20,
'04 221: 14
September 20,
2003, two 218: 13
September 20,
2004 34: 17,

215: 15, 217: 2,
220: 1, 220: 10
September 20,
2004. 126: 15
September 21st
215: 22
$1 107: 6
$1,000 44: 20,
175: 20, 176: 1
$1,500 39: 11,
40: 8, 133: 3,
134: 9, 134: 11,
134: 18, 147: 7
$100,000 40: 7
$100. 176: 11
$120,000 233: 9
$125,000 136: 18
$180,000 156: 7
$2,500 83: 21
$20,000 65: 12,
65: 23
$22,500 170: 18,
170: 21
$30,000 186: 5
$300,000 204: 23,
205: 12
$4,000 151: 15
$400,000 71: 12
$400,000. 29: 24
$50,000 25: 18,
52: 7
$500 39: 12, 40: 8
$7 107: 11
$7,000 171: 6
$7,500 66: 25
$80,000 45: 15
$85,000 38: 24,
170: 24, 171: 1,
237: 2
$880 174: 21,
175: 1, 175: 4
'02. 182: 3
'05 207: 4
'22 7: 15
'3. 88: 18
'31. 7: 15
'5 88: 18
'89. 100: 14
'94 7: 14
'99. 105: 10

(1) 1:11, 1:36
(10) 1:15, 2:20
(2) 1:12, 1:44
(3) 1:13, 2:3
(7) 1:14, 2:12
---ooooo---
262: 1
. 0. 2: 31,
179: 16, 179: 17,
180: 8, 180: 9
/S/P 268: 11


< 1 >
1 5: 14, 6: 8,
7: 19, 7: 25, 8: 4,
10: 16, 10: 22,
11: 16, 11: 17,
130: 8, 147: 6,
158: 14, 158: 15,
159: 2, 162: 18,
164: 17, 177: 17
1,000 45: 16,
174: 19, 174: 20
1,500 132: 17
1,500. 134: 10
1. 8: 14, 131: 8,
135: 3, 162: 17,
177: 16
10 8: 17, 9: 19,
10: 22, 11: 17,
82: 17, 267: 22
10,000 40: 8,
132: 17, 173: 16
10-13 32: 19
10-13-2004. 32: 1
100 11: 17, 79: 5,
205: 9
100,000 40: 7,
132: 15
100. 10: 19,
10: 23
102 6: 13, 7: 13
102-A 5: 24, 6: 11
104 5: 24, 6: 11
109 5: 25, 6: 11
10: 25 158: 12
10: 44 160: 4
10th 138: 10,
140: 1

11 5: 15, 6: 8,
8: 18, 9: 19
11-1904 265: 3
115 6: 13, 7: 13,
264: 12
117. 5: 25, 6: 11
1170 2: 30,
268: 13
11: 00 98: 18
11: 30 126: 18,
126: 22
11th 60: 25
12 5: 20, 25: 10,
105: 15, 196: 20
124 264: 16
126 264: 19,
264: 23
128 264: 26
129 267: 25
13 6: 8, 263: 5,
267: 37
13. 202: 16
132 264: 29
135 264: 33
136 8: 20, 9: 12,
264: 37
137 264: 40
138 8: 20, 9: 19
139 9: 19, 264: 44
139. 8: 20
13: 45 14: 16
14 6: 8, 8: 18,
9: 19, 10: 1,
10: 12, 267: 3,
267: 40
14. 126: 10,
206: 6
140 9: 2, 9: 12,
264: 47
141 9: 2, 9: 12
142 9: 3, 9: 12
143 9: 3, 9: 12
144 9: 3, 9: 12
145 9: 3, 9: 12,
265: 1
146 9: 3, 264: 33
146. 9: 12, 135: 7
147 9: 13
147. 9: 3, 9: 14,
9: 20

148 265: 5
149 265: 8
14th 202: 11,
204: 9
15 5: 20, 39: 1,
53: 20, 80: 7,
81: 19, 112: 23,
119: 16, 189: 7,
192: 25, 239: 24,
245: 20
15,000 38: 25,
40: 8, 136: 18
15-minute 79: 23
15. 53: 21
150,000 132: 14
153-F 136: 2,
264: 37
1549 264: 40
1549. 137: 24
155 265: 12,
265: 15
156 265: 18
158 265: 21,
265: 24
1591 264: 44
1591. 139: 4
16 6: 8, 10: 1,
10: 12, 64: 17,
115: 11, 119: 20
160 265: 27,
265: 30
161 265: 33,
265: 36
162 265: 39,
265: 42, 265: 45
164 265: 48,
266: 1
166 266: 4, 266: 7
167 194: 1,
194: 8, 230: 25
167. 146: 17
168 265: 5
168. 148: 14
17 10: 1, 10: 11
17. 116: 12
170 266: 10,
266: 13
174 266: 16
176 266: 20,
266: 23

177 266: 26,
266: 29, 266: 32,
266: 35, 266: 37
178 68: 24,
266: 40
179 266: 43
18 180: 4
18. 10: 2
180 263: 14
1817 175: 19
1817. 175: 7
183 267: 28
18th 268: 9
19 10: 1, 10: 12
192 6: 13, 7: 13
1938 264: 29
1938. 132: 6
194 6: 14, 267: 31
1958. 152: 15
196 68: 19
1965 265: 39
1965. 162: 3
1980s 181: 2
1988 100: 14,
181: 22
1989 181: 23,
183: 17
199 267: 34
1992 184: 6,
185: 3, 185: 23,
187: 10, 192: 8,
192: 11, 193: 21,
196: 12, 197: 1
1993 194: 13,
195: 8, 196: 12,
196: 19
1994 200: 13
1998 105: 10
1: 30 63: 10,
127: 4, 128: 2


< 2 >
2 7: 21, 7: 23,
8: 1, 8: 5, 9: 25,
10: 12, 51: 25,
66: 13, 92: 23,
130: 12, 146: 24,
147: 5, 148: 22,
159: 13, 159: 15,

161: 3,  161: 13,
161: 20,  164: 2,
164: 15,  170: 8,
171: 9,  171: 17,
172: 18,  177: 9,
183: 14,  183: 15,
191: 22,  193: 21,
242: 8,  242: 14,
243: 16,  267: 28
2.  138: 2,  152: 2,
161: 2,  164: 1,
170: 7,  177: 8,
183: 4
20 8: 18,  9: 19,
10: 12,  24: 13,
58: 1,  68: 20,
69: 1,  168: 12,
239: 24
20.  10: 1,  31: 18,
246: 22
200 90: 23
2000 1: 46,
104: 3,  105: 4,
202: 7
2000s 116: 8
2001 2: 6,  104: 2
2002 43: 23,
44: 1,  102: 2,
102: 8,  104: 2,
118: 4,  182: 4,
202: 8
2003 134: 11,
166: 3,  203: 14,
204: 3,  204: 19
2003.  118: 4,
202: 8
2004 24: 20,
30: 15,  44: 1,
94: 9,  94: 16,
125: 20,  133: 21,
137: 14,  171: 5,
206: 19,  215: 11,
233: 14,  264: 24
2004.  82: 2
2005 16: 21,
17: 2,  22: 5,
88: 17,  89: 3,
94: 9,  94: 16,
102: 8,  116: 5,
116: 10,  146: 17,

154: 15,  154: 18,
166: 3,  206: 21,
206: 24,  206: 25,
207: 15,  207: 23,
208: 24
2005.  82: 1,  89: 5
2007 111: 16,
230: 4,  230: 15
2009 230: 16
2010.  268: 9
202 267: 37
2024 64: 8,  264: 3
205 6: 14,  7: 14
206 6: 14,  7: 14,
267: 40
20th 61: 16,
61: 17,  126: 22,
131: 6,  216: 22
21 8: 18,  9: 19,
246: 15
2110 2: 24
214. 659. 8600
1: 33
214. 747. 7148
2: 17
214. 753. 2325
2: 33
214/220-9335
2: 26
214/651-6250
1: 41
214/953-6832 2: 8
218 264: 26
218.  128: 10,
218: 24
21st 203: 19
22 6: 13,  6: 20,
7: 13,  53: 20
22, 500 237: 14
22.  65: 6
22nd 170: 19
231 63: 9
2351 2: 23
24 69: 5,  263: 7
24.  65: 16
240 7: 4,  263: 16
249.  7: 4
25 101: 19,
152: 1,  189: 7,
189: 21,  246: 17

25.  65: 21,
129: 16,  141: 20,
142: 3,  168: 12,
168: 18,  246: 21
250 184: 7,
190: 15
25th 125: 2
260 7: 7
261.  93: 5
262.  7: 7
27 8: 18,  9: 19
287 6: 14,  7: 14
29, 000 186: 5
295 204: 1
296 6: 14,  7: 14
298 6: 14,  7: 14
299 8: 8,  51: 15,
267: 10
2: 00 92: 23,  93: 7
2: 30 92: 23


< 3 >
3 53: 7,  57: 5,
69: 19,  70: 12,
71: 12,  155: 7,
155: 10,  159: 16,
159: 18,  164: 23,
174: 3,  177: 23,
178: 1,  178: 12,
178: 14,  178: 16,
194: 17,  242: 10,
267: 31
3.  52: 3,  150: 17,
164: 22,  174: 1,
175: 8,  177: 22,
177: 25
30 101: 20,  193: 7
300 6: 14,  7: 14
302 112: 25,
208: 2
302.  239: 1
303 126: 5,
129: 16,  264: 19
30th 194: 14
31 8: 19,  9: 19
310 56: 25,
267: 13
310.  8: 8,  57: 3
3131 264: 6

3131.  92: 18
314.  131: 3
315 126: 10,
141: 18,  264: 23
315.  141: 25
316 6: 14,  7: 14
317 265: 1
317.  145: 9
318 6: 14,  7: 14
320 6: 14,  7: 14
321 265: 8
321.  149: 13
322 6: 14
325 6: 15,  7: 15
326 6: 15,  7: 15
327 267: 25
327.  129: 22,
218: 21
328 6: 15,  7: 15
3296 180: 4,
264: 12
3296.  111: 19,
115: 1,  179: 24
33 8: 19,  9: 8
33, 750 186: 3
330 6: 15,  7: 15
331.  6: 15
34 2: 24,  8: 19
35 8: 19,  101: 20,
189: 22,  246: 18
35.  169: 9,
175: 13
36 6: 13,  7: 13,
8: 19,  175: 18,
252: 13
36.  66: 12,  67: 2,
175: 16
37 8: 19,  34: 18
37.  35: 6,  66: 14
38 267: 6
3811 1: 38
382 124: 11,
212: 14,  264: 16
39 8: 19,  64: 25,
67: 22
3: 07-CR-289-M
1: 5
3: 16 177: 20

< 4 >
4 133: 11, 151: 7,
178: 8, 267: 34
4. 147: 11,
150: 16, 175: 12,
178: 7, 199: 17,
241: 10
40 6: 8, 8: 19,
136: 9
40, 000 173: 17
40. 9: 8
400, 000 69: 19
403 113: 10,
257: 11
403. 255: 16
404(b 110: 7,
111: 14, 112: 21,
113: 9, 113: 25,
115: 24
41 5: 20, 246: 14
42 5: 20
43 6: 8
44 5: 20
45 6: 8, 8: 19,
9: 12, 38: 4,
38: 6, 64: 24,
193: 7, 247: 16,
267: 6
47 8: 20, 9: 19
49 6: 9
4: 35 155: 9


< 5 >
5 15: 18, 15: 20,
57: 17, 95: 16,
95: 17, 97: 18,
150: 15, 231: 23,
239: 1, 242: 11,
267: 46
5, 000 171: 5
5. 14: 13, 232: 2
5. 6 107: 11
50 9: 19, 173: 16,
219: 25, 220: 1,
220: 3, 220: 7,
220: 11, 220: 16
50, 000 132: 16,
173: 8
50. 5: 20, 8: 20,

186: 20
50711 2: 31
51 6: 9, 267: 10
5121. 166: 23
54 59: 17, 267: 16
5414. 53: 17
5446 177: 22
5450 155: 8,
157: 5, 232: 1,
265: 12
5451 155: 10,
156: 14, 157: 6,
157: 12, 157: 19,
158: 3, 158: 8,
265: 13, 265: 15,
265: 18, 265: 24
5460 158: 13,
265: 21
5461 158: 15,
159: 2, 159: 15,
159: 18, 265: 22
5464 265: 27
5464. 160: 5
5465 160: 9,
265: 28, 265: 30
5468 161: 2,
265: 33, 265: 34
5469 161: 3,
161: 13, 161: 20,
265: 36
5472 162: 17,
265: 42
5473 162: 18,
164: 2, 164: 23,
265: 43, 265: 45
5474 164: 15,
265: 48
5475 164: 17,
265: 49, 266: 1
5498 266: 4,
266: 7
5498. 166: 12
5499 166: 13,
266: 5
55, 000 130: 8
5500 266: 20,
266: 21
5500. 176: 19
5501 176: 20,
266: 23

5504 241: 8
5506 170: 6,
174: 1, 242: 2,
266: 10
5507 170: 8,
171: 9, 171: 17,
172: 18, 174: 3,
266: 11, 266: 13
5536 177: 8,
266: 26
5537 177: 9,
266: 27, 266: 29
5540 177: 16,
266: 32
5541 177: 17,
266: 33, 266: 35
5546. 177: 25
5547 177: 23,
178: 1, 178: 8,
178: 12, 178: 14,
178: 16, 266: 37
5580 266: 40
5581 266: 41,
266: 43
559 266: 16
559. 174: 9
56 8: 3
56. 7: 1, 8: 5
57 267: 13
5801 179: 12
5880. 178: 25
5881 179: 2,
179: 9, 179: 20
59 7: 25, 8: 4,
267: 16
59. 7: 19
5: 00. 231: 20
5: 40 14: 10


< 6 >
6 133: 17,
232: 11, 241: 17
60 246: 7
60, 000. 67: 7
600 1: 39, 1: 47
61 7: 4, 252: 13
62. 5: 15, 6: 9
64 5: 22, 5: 23,
6: 10, 6: 13,

7: 13, 264: 3
668 63: 9, 93: 5,
264: 9
6761 81: 19,
81: 22, 267: 19
69 6: 10
69. 5: 22, 5: 23
6: 06 160: 25


< 7 >
7. 151: 18
73 53: 20, 172: 21
73. 172: 24
75 6: 13, 7: 13,
10: 16, 11: 16,
186: 18
75201 2: 7
75202 2: 16
75219 1: 40
75220 2: 25
75242 1: 32
75250 2: 32
76 264: 47
76. 140: 21
76006 1: 48
770 2: 14
780 174: 20
7: 03 162: 16
7: 08 178: 24


< 8 >
8 96: 6, 96: 10,
97: 17, 156: 12,
156: 14
8. 9 68: 24
81 267: 19
817/303-2141
1: 49
82 5: 24, 6: 10,
10: 19, 10: 23,
11: 17, 267: 22
85 5: 24, 6: 10,
263: 9
85, 000 40: 7
87 5: 24, 6: 10
89 14: 16, 14: 19,
14: 22, 15: 10,
267: 3

8:15 a.m. 1:16, 3:4
8:30. 245:21
8:45 141:10, 245:20
8:45. 245:25, 261:25

< 9 >
9 5:15, 6:8, 10:22, 11:17, 38:19, 157:5, 157:6, 157:12, 157:19, 158:3, 158:8
9.8 68:20
900 2:15
92 264:6
93 264:9
95 6:13, 7:13
99 263:12
9:00 141:10
9:46 22:23

< A >
A-L-L-E-N 98:17
A. 2:21
a.m. 22:23, 141:10, 160:4
Abbey 250:25
abbreviation 174:15
Abdul 139:11
ability 18:19, 19:13, 42:14, 45:2, 67:18, 79:2, 135:21, 177:4
able 37:16, 47:4, 50:19, 56:19, 79:7, 86:4, 86:13, 86:25, 87:18, 95:12, 155:25, 205:24, 223:10, 247:8, 254:7
above 154:7
absence 95:17,

117:10
absolutely 112:22
accept 28:19, 28:25, 45:11, 249:2
accepted 228:21
accepts 122:18
access 104:16
accident 117:10
accomplished 102:23, 103:4
According 196:5, 196:7
account 67:17, 88:7
accounts 67:11
accuse 92:12
accused 74:24, 75:4, 240:4, 256:6, 258:16
achieve 102:19
acquainted 100:9
acquire 105:17, 201:9, 202:3
acquired 105:16, 105:22
acquiring 201:24
acquitted 256:25, 259:15
acrimonious 129:1, 219:5, 219:8
across 29:23, 85:12, 95:2, 109:13, 121:4
Act 191:5
acted 257:8, 257:10
action 129:3, 129:4, 138:14, 219:16, 219:17, 219:18, 219:21, 220:22, 220:24, 221:24, 224:5, 267:14
actions 76:8, 200:16
active 177:13, 181:7

actively 154:25
activities 114:11, 182:20
activity 198:16
actors 20:12
actual 10:25, 64:13
actually 75:21, 79:8, 87:8, 94:10, 142:12, 180:8, 184:11, 188:20, 193:22, 197:24, 205:3, 214:3, 229:20, 248:19, 252:13, 255:25, 256:19
Adams 185:6
add 36:21, 37:3, 256:21
added 230:3
addition 113:8
additional 172:6, 172:13, 172:14, 181:18, 210:16, 232:19, 244:13
address 31:24, 179:12, 179:14, 180:4, 259:4
addressed 139:7
addressing 140:2, 192:6
adequate 58:2
adjacency 57:23
adjacent 58:2, 58:17
adjustment 67:14
administration 99:22
administrative 100:3
admire 13:4
admissible 114:12, 255:23, 257:24
admission 3:9
admit 4:15, 57:2, 113:9
admits 6:7
admitted 5:13,

7:12, 8:5, 8:11, 9:19, 10:13, 11:17, 31:17, 38:8, 51:15, 57:1, 57:2, 59:17, 110:11, 111:20, 111:23, 112:16, 113:23, 145:24, 194:17, 208:24, 218:21, 258:15
adult 181:11
advance 220:23, 248:4
advertisement 205:16
advertisements 205:15
advice 188:15, 191:20
advise 84:9, 112:7, 120:9, 120:10
advised 78:24, 112:3
advising 120:2
advocate 244:22, 244:25
advocated 255:9
aerial 106:3
Affairs 118:8
affect 97:7
affix 116:23
afford 189:18
affordable 118:6, 118:10, 123:17, 124:7
afraid 78:10
African-american 71:15, 71:22, 72:14, 73:9, 194:4, 194:6, 194:9, 200:5, 200:10, 203:11, 204:14, 244:25
African-americans 71:17, 92:7
Africans 187:3
afternoon 92:23, 93:7, 180:23,

247: 12
agencies 184: 8,
195: 25
agenda 76: 10,
177: 4,  192: 7
Agent 42: 10,
247: 7
agents 86: 13,
120: 4,  121: 18,
121: 21,  207: 23,
257: 8,  257: 10
ago 10: 18,
19: 24,  110: 10,
123: 23,  225: 13
agree 19: 13,
19: 21,  22: 16,
25: 24,  26: 11,
39: 23,  41: 24,
43: 15,  45: 1,
45: 9,  55: 13,
55: 15,  55: 22,
56: 22,  63: 16,
221: 3,  222: 21,
236: 3
agreed 4: 19,
9: 21,  81: 15,
81: 24,  82: 4,
82: 9
agreeing 17: 19,
155: 19
Agreement 10: 3,
44: 8,  51: 20,
52: 15,  52: 22,
52: 25,  82: 20,
82: 21,  111: 9,
113: 15,  115: 4,
122: 6,  122: 18,
125: 18,  133: 14,
133: 16,  134: 6,
135: 2,  135: 5,
136: 4,  147: 17,
147: 18,  163: 10,
179: 7,  199: 10,
209: 15,  209: 16,
210: 21,  211: 5,
264: 13,  267: 23
agreements 165: 1
agrees 248: 24
Aguirre 92: 21,
93: 11,  264: 7

ahead 21: 25,
29: 14,  79: 23,
116: 3,  146: 16,
152: 1,  202: 23
ain't 82: 3
air 18: 3
Al 139: 19
Albertson
108: 22,  108: 23
alleged 110: 20,
112: 18,  112: 23,
256: 19
Allen 10: 3,
14: 15,  31: 23,
79: 8,  98: 10,
98: 17,  99: 4,
121: 19,  128: 16,
174: 21,  175: 19,
192: 20,  198: 12,
239: 14,  261: 9,
263: 11,  264: 20,
264: 24,  264: 27
allow 213: 6
allowance 151: 16
allowed 8: 24,
261: 5
allowing 156: 25
almost 49: 24,
63: 22,  186: 5
already 4: 25,
8: 19,  22: 4,
22: 8,  23: 1,
31: 17,  52: 17,
57: 13,  58: 21,
58: 24,  59: 9,
59: 17,  124: 14,
165: 10,  167: 18,
170: 18,  175: 11,
183: 3,  201: 1,
233: 5,  248: 20,
255: 19,  258: 15,
261: 3
Alton 131: 20
Aluta 195: 4
AM. 98: 18
AMC1229 31: 23
amenable 248: 19
amend 224: 3
amended 178: 5,
229: 23

America 1: 5,
185: 10,  195: 14
Among 182: 14,
184: 24,  185: 2,
186: 24,  187: 22,
189: 9,  200: 7,
203: 6,  228: 24
amount 36: 24,
57: 22,  68: 13,
83: 20,  83: 25,
90: 7,  90: 14,
132: 14,  153: 18,
173: 7,  176: 9,
235: 24,  236: 9,
236: 13
amounts 133: 3,
136: 21
analysis 57: 19,
67: 17
analyst 247: 6
Anatole 183: 11,
194: 14,  199: 18
and/or 58: 2,
118: 5
Andrea 247: 4,
253: 14
ANGELA 2: 21
Ann 253: 7
announcement
181: 4,  181: 5
Annual 38: 25,
182: 14,  202: 11,
204: 9
answer 16: 23,
19: 22,  20: 5,
27: 20,  29: 19,
41: 4,  41: 16,
41: 25,  46: 25,
61: 12,  66: 4,
75: 17,  86: 17,
90: 1,  93: 15,
93: 25,  96: 3,
97: 22,  107: 15,
140: 16,  140: 17,
142: 15,  172: 9,
209: 4,  224: 3,
225: 6
answered 48: 23,
97: 21,  143: 7,
144: 21,  180: 14

answering 48: 24
answers 41: 10,
48: 25
Anthony 252: 17
anticipate
193: 3,  254: 21
anticipated
248: 2
anticipating
254: 20
Anybody 18: 16,
56: 12,  56: 19,
81: 1,  97: 4,
113: 21,  134: 13,
134: 17,  247: 17,
250: 3,  250: 21,
253: 23
anyway 113: 9
apartments 29: 23
apologize 38: 3,
38: 9,  39: 8,
180: 1,  216: 18
Apparently
211: 9,  245: 16
appear 115: 4,
115: 12,  115: 18,
130: 19,  135: 10,
138: 22,  142: 1,
148: 24,  149: 4,
151: 9,  151: 20,
154: 4,  183: 8
appearance
129: 12
appears 32: 8,
106: 4,  116: 13,
116: 16,  132: 14,
141: 9,  146: 24,
153: 23,  162: 4
applicant 58: 1,
58: 11
application
124: 20
applications
124: 18,  212: 21
apply 187: 3
appointed 120: 18
appointee 95: 17
appointment
56: 10
Appreciate

128: 22,  204: 7,
241: 17,  243: 22
appreciated
218: 25
apprise 11: 21
approach 110: 4,
141: 21,  148: 18,
163: 4,  208: 4,
218: 18,  230: 8,
238: 23,  258: 7
appropriate
198: 14,  260: 12
approval  42: 1,
124: 20,  213: 8
approve 36: 8,
39: 21,  49: 12,
49: 13,  140: 3,
165: 8,  223: 5
approved 16: 15,
16: 16,  42: 24,
49: 15,  50: 22,
51: 2,  69: 19,
70: 24,  96: 6,
137: 20,  151: 9,
156: 22,  165: 9,
173: 17,  173: 21,
213: 1,  223: 5,
223: 9,  223: 23,
224: 6,  224: 7,
224: 10,  224: 13,
224: 23
approving 37: 24,
165: 12
Approximately
14: 10,  100: 13,
105: 9,  107: 6,
107: 10,  130: 16
April  89: 3
architects 59: 3
area 22: 11,
38: 20,  57: 23,
75: 12,  100: 4,
100: 7,  118: 6,
118: 10,  144: 14,
184: 19,  185: 25,
186: 3,  197: 22
areas 58: 10,
102: 16,  205: 9
argue 258: 9,
261: 12

argument 112: 21,
255: 14,  256: 18,
257: 1,  259: 7,
260: 7
argumentative
225: 2
Arlington 1: 48
arm 150: 12,
151: 4
Army 99: 16
around 14: 16,
21: 16,  26: 8,
63: 22,  78: 15,
88: 10,  91: 14,
92: 23,  105: 4,
162: 7,  165: 15,
214: 11,  226: 2,
245: 6,  247: 17,
259: 1
arranged 42: 19
arrangement
44: 2,  44: 8,
58: 21,  90: 7
article 154: 22,
258: 15,  259: 4,
260: 6
asks 232: 9
assessed 122: 9
assist 189: 6
assistance
187: 11,  189: 22,
200: 18,  210: 5,
210: 7
Assistant 43: 5
associated
100: 21,  100: 22,
150: 1,  160: 15
Associates 68: 3,
90: 16,  90: 17,
90: 21,  147: 2,
149: 2,  205: 16,
230: 24,  231: 4,
231: 6,  231: 9
Association
100: 11,  100: 16,
115: 19,  194: 25,
200: 15,  204: 8
assume 164: 7,
164: 10,  171: 22,
191: 19,  205: 14,

213: 24,  218: 3
assumed 101: 14,
240: 6
assuming 154: 2,
158: 6,  254: 6,
255: 6
assumption
171: 23
assured 112: 19
attached 133: 14,
145: 12
attack 76: 15
attacked 76: 12
attempt 112: 23
attempted 50: 11
attempting
137: 8,  146: 5,
255: 10
attend 101: 17
attended 127: 9,
143: 5,  143: 10,
143: 12,  144: 4,
190: 15
attendees
143: 18,  182: 22,
194: 19
attending 101: 16
attention
109: 20,  114: 25,
118: 3,  124: 10,
126: 4,  126: 15,
129: 21,  137: 22,
141: 18,  145: 8,
148: 13,  149: 12,
153: 22,  154: 3,
162: 2,  166: 6,
166: 22,  174: 8,
175: 7
Attorney 23: 19,
45: 24,  120: 10,
120: 14,  120: 17,
120: 18,  120: 22,
166: 4,  189: 19,
208: 25,  246: 10
attorneys 196: 9
audience 245: 9
audiotapes 234: 8
August 125: 2,
125: 20,  230: 4,
230: 15,  230: 16

August 10, 2009
1: 10,  3: 3
Austin 124: 2
author 197: 16,
198: 11
authorization
21: 6
available
192: 14,  197: 20,
254: 11
Ave 2: 6
average 186: 5
avoid 3: 18,
248: 21
Award 182: 15,
189: 24,  191: 23,
191: 25,  192: 8,
192: 11,  194: 13,
195: 9,  206: 18
Awards 182: 17,
182: 23,  200: 17,
202: 12
away 249: 5,
260: 11
awful 160: 2


< B >
back.  67: 19
Backes 33: 17,
35: 22,  43: 18,
44: 9,  44: 11,
44: 16,  47: 4,
47: 6,  59: 21,
75: 22,  84: 22,
85: 2,  90: 10,
251: 1
backup 58: 1,
66: 1
bad 92: 8,  92: 9,
162: 24
bag 258: 9
bait 257: 17
Baker 2: 5
balance 90: 2,
90: 6,  136: 19,
171: 21,  172: 13
Bally 204: 20,
205: 6
Bank 103: 20,

104: 16, 107: 7,
185: 7, 185: 9,
185: 13, 193: 23,
195: 14, 266: 17
banking 192: 14,
198: 22
Bankone 185: 4,
192: 9, 198: 10,
198: 14, 198: 19
bankruptcy
105: 16, 105: 18,
105: 22, 106: 8,
110: 19, 111: 25,
112: 4, 112: 7,
112: 18
banks 105: 19,
106: 23, 184: 18,
184: 22, 186: 8,
186: 10, 188: 3
Banquet 182: 15,
182: 17, 182: 21,
182: 23, 202: 12,
204: 9, 206: 18
banquets 200: 17
Baptist 166: 7,
169: 3
BARBARA 1: 20
Barry 251: 13
Bartlett 192: 18
base 183: 18
Based 34: 18,
34: 23, 61: 3,
61: 7, 61: 23,
69: 20, 95: 21,
97: 24, 121: 21,
210: 16, 219: 15,
246: 9, 255: 22,
260: 9, 261: 3
Basically 43: 20,
81: 11, 99: 23,
135: 24, 144: 16,
188: 19
basis 91: 1,
96: 2, 101: 18,
248: 8, 256: 25
basis. 150: 13
battle 48: 20,
54: 6, 195: 4
battles 48: 13,
49: 4, 53: 12

became 48: 4,
59: 1, 181: 20,
199: 24
become 100: 9,
100: 22, 105: 6,
119: 8, 191: 3
becoming 228: 7
bee 250: 20
began 42: 2,
42: 7, 121: 23
begging 155: 15,
155: 21, 159: 23
begin 42: 23
beginning 154: 10
behalf 34: 13,
48: 13, 48: 16,
48: 17, 48: 18,
49: 5, 53: 12,
53: 13, 54: 11,
54: 14, 55: 6,
78: 21, 104: 19,
104: 22, 115: 19,
116: 16, 119: 25,
138: 17
behavior 121: 10
behind 53: 25,
176: 18, 240: 9,
259: 13
belief 234: 6
believed 29: 11,
43: 1, 58: 15,
158: 22, 193: 18,
233: 24, 234: 4,
234: 14, 234: 17,
240: 6
believes 58: 11
Belinda 67: 6
below 68: 24
bench 163: 4,
258: 7
bench. 110: 6,
110: 23, 163: 6,
163: 22
Benedict 99: 17
benefit 40: 3,
103: 16, 113: 1,
201: 25
Benitez 251: 2
Bernice 203: 7
Berry 185: 9,

195: 13
Besides 167: 10,
191: 2, 195: 16
best 52: 10,
130: 14, 213: 3,
246: 6, 249: 12
betrayed 238: 11,
238: 18, 239: 5
betrayed. 238: 20
Beverly 251: 22
bid 191: 13
big 46: 7, 46: 10,
244: 22, 244: 25
biggest 77: 1,
77: 14
billing 17: 10,
67: 14, 68: 3,
68: 5, 68: 7,
69: 12, 134: 17
bills 67: 7,
67: 14, 67: 15,
67: 19, 69: 8
Billy 251: 11
birthday 82: 12,
83: 10, 83: 12,
84: 3, 84: 11,
176: 7
bit 12: 19,
13: 19, 84: 7,
90: 9, 109: 8,
151: 6, 235: 12,
250: 1
Black 73: 5,
73: 17, 74: 18,
92: 7, 100: 10,
100: 16, 115: 19,
116: 6, 181: 8,
194: 24, 200: 15,
204: 8
blank 256: 6
blood 219: 1
blue 151: 10
Blvd 1: 38
BMW 167: 5
Board 22: 9,
104: 16, 190: 12,
199: 3, 252: 17
bond 37: 8
bonds 36: 18,
36: 19, 37: 25,

39: 1, 39: 4,
39: 16, 39: 17,
39: 21, 39: 22,
40: 5, 40: 6,
62: 1, 136: 12,
136: 19
bono 188: 12,
188: 17, 191: 3,
195: 16, 201: 2
books 199: 15
booming 100: 7
born 99: 11
bother 234: 21
bottom 39: 7,
39: 10, 59: 18,
67: 3, 92: 22,
129: 18, 131: 19,
132: 11, 133: 13,
136: 8, 146: 2,
147: 6, 190: 19,
191: 14, 194: 22,
196: 19, 198: 1
Botts 2: 5
bouncing 44: 20,
45: 6
Box 2: 31,
179: 16, 179: 17,
180: 5, 180: 8,
180: 9
Boyd 251: 3
BP 218: 21
BPX 267: 6,
267: 10, 267: 13,
267: 16
Brady 256: 20
branch 184: 22,
194: 2, 198: 15
branches 103: 20,
194: 2, 194: 8
Brandon 95: 4,
95: 18, 96: 11
break 14: 6,
192: 22, 222: 17,
236: 11, 247: 14
breakfast 91: 13,
92: 3
breaking 245: 17
Brent 253: 5
Brett 253: 16
bribe 27: 1,

27: 2,  28: 17,
28: 19,  28: 25
bribery 27: 12,
27: 16
bricks 159: 24
Brief 12: 13,
80: 2,  183: 15
briefed 97: 8
briefly 99: 24
Bring 11: 18,
12: 15,  42: 2,
55: 24,  56: 1,
87: 10,  89: 13,
97: 12,  102: 15,
103: 7,  103: 8,
114: 17,  181: 18,
188: 13,  210: 15
bringing 188: 19
Brinker 185: 15,
190: 17
Brochure 267: 29,
267: 32,  267: 35,
267: 38,  267: 41
broke 13: 20,
23: 7
Brookhaven
200: 11
Brooklyn 181: 14
Brother 242: 23
brought 28: 11,
58: 24,  76: 17,
76: 18,  76: 19,
80: 14,  100: 4,
163: 8,  257: 6
Brown 66: 16,
66: 17,  67: 5,
73: 5,  73: 17,
120: 24
brunt 20: 15
Bryant 68: 5
budgeting 205: 22
buffer 58: 2
Buford 187: 15,
190: 24,  251: 4
build 42: 17,
86: 4,  87: 10,
106: 9,  108: 5,
136: 13
builder 42: 18,
87: 10,  87: 17

building 56: 17,
58: 1,  118: 22,
197: 23,  248: 21
buildings 105: 24
built 105: 25,
108: 13,  118: 13,
118: 16,  125: 9
burning 238: 4
Burrell 252: 18
Busch 99: 2,
110: 8,  111: 6,
112: 15,  114: 1,
114: 22,  152: 6,
163: 3,  163: 24,
207: 2,  214: 18,
221: 25,  242: 6,
249: 2,  254: 2,
263: 12
Business 24: 19,
24: 22,  44: 9,
44: 11,  56: 15,
71: 24,  73: 3,
90: 17,  99: 22,
100: 6,  100: 8,
102: 19,  103: 1,
128: 14,  143: 2,
146: 7,  147: 2,
149: 21,  155: 20,
162: 10,  184: 7,
184: 16,  191: 5,
191: 10,  191: 11,
191: 12,  191: 13,
191: 20,  198: 4,
217: 8,  217: 10,
217: 23,  218: 4,
218: 6,  218: 8
businesses
102: 17,  103: 6,
106: 4,  184: 9,
187: 6
buy 87: 14
buyer 109: 14,
109: 16
buyers 109: 13,
109: 16
buying 85: 8,
106: 7


< C >

C.  1: 44,  2: 20,
133: 18
Calendar 93: 7,
126: 11,  126: 13,
126: 14,  127: 2,
141: 19,  142: 1,
264: 10,  264: 48
calendars 140: 25
call 3: 22,  7: 2,
17: 3,  17: 11,
17: 13,  18: 11,
18: 19,  19: 2,
21: 6,  88: 4,
98: 9,  98: 10,
158: 24,  159: 17,
162: 15,  166: 8,
166: 20,  170: 11,
177: 7,  177: 20,
188: 12,  236: 14,
240: 11,  241: 13,
241: 16,  245: 3,
252: 15,  255: 25,
259: 8,  259: 23
called 6: 25,
17: 14,  17: 23,
19: 25,  41: 19,
56: 11,  99: 5,
104: 19,  104: 22,
195: 17,  208: 2,
210: 5,  253: 23
calling 18: 9,
19: 14
calls 3: 19,  4: 3,
18: 3,  84: 14,
95: 25,  162: 8,
189: 22,  209: 2,
259: 23
calories 238: 4
Camera 19: 25,
20: 14,  248: 1,
248: 2,  248: 10,
248: 25
Camp 51: 21,
51: 22,  140: 20,
141: 6
Campaign 15: 7,
82: 13,  83: 17,
83: 25,  84: 1,
84: 2,  90: 25,
162: 4,  174: 6,

174: 12,  175: 18,
175: 20,  176: 14,
241: 20,  241: 22,
243: 4,  265: 40
campaigns 90: 23
Candid 19: 25,
20: 14
candidate 84: 2,
175: 10
candor 128: 23,
218: 25
capacity 100: 24,
166: 4
car 21: 14,
151: 15,  167: 6,
169: 11
care 248: 24
career 200: 17,
200: 24
Carmikle 67: 6
Carol 93: 9,
94: 6,  95: 4,
95: 9,  95: 18,
96: 11
Carolina 99: 18
Carolyn 252: 1
Carpenter 251: 5
Carrie 253: 1
carried 95: 15
Carroll 251: 25
case 17: 25,
27: 22,  32: 9,
70: 9,  70: 10,
85: 19,  92: 6,
117: 5,  117: 11,
119: 13,  119: 23,
119: 24,  121: 14,
121: 19,  122: 1,
123: 14,  127: 16,
141: 13,  174: 6,
193: 23,  209: 18,
214: 6,  223: 22,
246: 6,  256: 22,
256: 23,  257: 2,
257: 10,  259: 14,
259: 17
Cash 176: 12,
176: 13
cat 258: 9
Catrell 251: 6

cause 255: 17,
258: 8
caused 258: 1
causing 156: 25
CDC 25: 19, 53: 3,
104: 11, 104: 15,
115: 19, 145: 23,
147: 9, 147: 19,
148: 24, 149: 9,
173: 5, 201: 6,
201: 8, 201: 14,
201: 16, 201: 22,
202: 1, 202: 3,
228: 9, 228: 12,
230: 2
celebrating
204: 9
celebration
176: 8
cellular 151: 16
Center 75: 11,
75: 14, 75: 20,
75: 23, 76: 5,
105: 7, 105: 12,
105: 14, 105: 18,
105: 25, 106: 8,
107: 5, 107: 12,
109: 4, 109: 11,
112: 2, 112: 8,
112: 18, 115: 16,
117: 24, 134: 23,
134: 25, 190: 9,
196: 20, 197: 21,
210: 20, 264: 14
Centro 200: 11
Century 203: 19
CEO 185: 3,
185: 12
certain 18: 1,
42: 7, 62: 17,
102: 21, 123: 5,
135: 14, 138: 14,
143: 1, 143: 18,
143: 20, 149: 15,
153: 1, 153: 3,
153: 18, 154: 16,
156: 17, 167: 6,
173: 3, 193: 18,
205: 2, 207: 11,
215: 20, 216: 16,

217: 4, 219: 12,
220: 6, 222: 7,
227: 5, 233: 6,
235: 9, 256: 20
certainly 45: 14,
118: 18, 214: 5
certified
151: 20, 196: 3
certify 268: 3,
268: 6
CHAD 1: 27
chains 186: 11
chair 104: 7,
104: 15
chaired 195: 20
chairman 185: 6,
185: 7
challenged 37: 21
chambers 11: 22,
11: 24, 12: 11
chance 91: 8,
191: 13
Chaney 46: 7,
78: 25
change 14: 12,
21: 22, 40: 11,
101: 21, 101: 23,
102: 15, 233: 15,
258: 1
changed 16: 11,
30: 22, 34: 16,
61: 17, 202: 7,
222: 15, 255: 8
changes 30: 3,
30: 6, 30: 14,
103: 8, 103: 9,
132: 18, 132: 20,
132: 22, 132: 25,
133: 1, 133: 2
changing 15: 16,
37: 19, 84: 6
character 47: 14,
47: 16, 47: 17
characterize
121: 13
charge 127: 17,
249: 11, 254: 6
charged 114: 10,
117: 4, 117: 11,
119: 12, 119: 15,

119: 19
charges 28: 11,
67: 16, 114: 11,
117: 13, 122: 20,
210: 16
Charletta 139: 17
chart 240: 23
chased 19: 10
check 7: 4,
45: 11, 45: 12,
66: 24, 66: 25,
176: 12
Check-cashing
186: 19
checks 44: 20,
45: 6, 45: 16,
88: 5, 88: 6,
88: 8, 89: 2,
104: 19, 196: 3
Cherrycrest
59: 22, 60: 6
Cheryl 4: 5
Chicago 75: 23,
76: 2
Chickory 138: 4
chief 192: 9
child 189: 16
choose 71: 19
chosen 228: 2
Christensen
63: 9, 64: 8,
82: 17, 156: 13,
161: 12, 183: 5,
231: 25
Church 166: 7,
166: 8, 166: 16,
168: 6, 169: 3,
169: 18, 170: 12,
170: 20, 176: 18,
235: 3, 242: 17
churches 188: 25
Circuit 256: 19
circumstances
193: 18, 237: 5
citizen 240: 4
citizens 189: 6
Civic 184: 9,
190: 9
Civil 196: 9,
257: 5

claim 117: 14
class 200: 16
CLAYTON-DECKARD
2: 20
cleaning 15: 12
clear 50: 8,
59: 9, 137: 20,
141: 16, 143: 9,
144: 2, 144: 3,
154: 23, 155: 22,
199: 8, 224: 24,
227: 7, 246: 17,
249: 6, 257: 11
clearly 113: 6,
256: 4, 258: 21,
259: 21
client 29: 11,
43: 1, 45: 2,
47: 4, 48: 3,
48: 5, 48: 8,
48: 17, 49: 5,
50: 15, 50: 18,
53: 12, 53: 19,
72: 21, 76: 13,
76: 22, 77: 1,
77: 9, 84: 9,
147: 6, 191: 15
clients 24: 23,
26: 6, 27: 1,
27: 2, 27: 5,
84: 5, 90: 11,
189: 7, 189: 18
Cliff 105: 12,
105: 14, 106: 7,
107: 4, 107: 12,
109: 3, 109: 10,
109: 25, 112: 1,
112: 8, 112: 17,
115: 5, 115: 13,
115: 16, 134: 23,
134: 25, 185: 2,
185: 21, 185: 25,
186: 8, 187: 20,
188: 20, 197: 2,
197: 17, 198: 3,
206: 9, 210: 20,
264: 13
Clifton 131: 24,
132: 2
clinic 188: 12

clock 80:5
close 58:17,
87:5,  131:10,
177:1,  187:2,
207:22
closely 95:19
closer 212:25,
246:22
closing 38:25,
136:19,  197:2,
197:12
clue 224:25
Cochran 89:10,
89:11
coerced 256:9
coercing 256:7
coffee 5:6
Colclough 190:25
collected 83:1
College 99:17,
99:23
colleges 100:1
color 183:20
Colorado 181:14
Columbia 99:17
combination
73:18
Comer 251:6
comes 54:5,
56:13,  259:4
coming 40:18,
47:14,  87:5,
94:7,  101:7,
157:10,  181:12,
184:18,  231:12,
231:17,  231:19,
235:24,  243:18
commend 204:10
comment 202:22
comments 15:15,
134:9,  159:22,
159:24,  162:23,
259:12
Commerce 185:7
Commission 22:5,
22:7,  57:8,
87:11
commissioner
15:23,  22:14,
96:11

commit 119:17,
122:3
commitment
204:12
commitments
232:19, 232:21,
232:25
committed 27:15,
120:7,  198:2,
207:6,  207:9,
207:16,  209:9
committee
190:19,  195:18,
195:23,  195:24
committing
180:11,  207:12
common 71:15,
71:21
commonality
114:9
communication
229:18,  230:5
communities
119:5,  198:16,
203:11
Community 71:25,
72:1,  100:1,
103:12,  104:13,
118:7,  118:16,
118:18,  140:12,
181:8,  187:20,
191:4,  191:23,
191:25,  192:11,
192:14,  195:9,
196:16,  197:17,
201:4,  204:12
community-based
145:23,  184:9,
195:1
community.
204:14
companies 74:12,
108:1,  187:3,
187:22,  187:23,
192:1
Company 16:22,
17:1,  68:3,
77:17,  77:20,
86:21,  108:3,
133:23,  205:20,

206:3,  233:8
compare 67:16
compensation
52:6,  52:7,
130:8,  133:23
competitor 60:8,
77:1
complain 16:8
complaints
188:14,  195:25,
196:2
complete 114:2
completely
257:20
Compliance
39:12,  196:9
comply 268:6
component 79:13
Compton 139:17
computer 2:38,
81:19,  100:7
concept 42:16
concern 58:24,
117:4,  125:8,
214:19
concerned 57:22,
78:13,  233:3
concerning
40:15,  47:14,
197:5,  217:6,
226:4
concerns 47:13,
47:14,  59:9,
86:15,  91:23,
97:24
conclude 113:14
concluded 29:25,
151:23
concluding
113:16
conclusion 34:6,
38:1,  84:15
condition 104:25
conditions
155:19
conduct 92:1,
114:4,  121:10,
184:20,  210:16,
210:17,  255:13
conducting

197:21,  200:16
Conference
254:9,  268:7
confess 209:8
confirming 113:4
confronted 76:6
confused 3:23
confusion 3:18
congratulates
203:22
congratulations
203:7
Congresswoman
203:7
connection
117:14
Connie 187:15,
190:24,  251:4
consensual 11:9
consensus 59:21
consider 41:23,
91:25,  109:8,
117:13,  197:12,
219:20
consideration
199:10
considered 84:2,
255:14,  255:19
consolidated
4:19,  5:12,
250:24
conspiracy
119:17,  122:3,
180:12,  234:25
constitutional
193:19
construct 58:12,
201:10
constructed
107:14
construction
87:16,  105:23,
107:7,  107:23,
108:1,  115:16
consultant
24:25,  28:24,
48:18,  52:17,
53:1,  72:20,
229:20
consultants

131: 11
consulting
64: 19,  74: 25,
147: 18,  147: 20,
205: 21,  229: 21
Consumer 189: 14
consummate
111: 13
consummated
109: 18,  233: 12
Cont'd 13: 14
contact 258: 21
Contained 148: 21
contemplated
52: 15
contemporaneous
111: 21
contents 129: 24
context 111: 7,
114: 6
Continua. 195: 5
Continue 15: 9,
28: 15,  33: 7,
120: 13,  131: 16,
157: 15,  157: 18,
158: 2,  158: 7,
159: 1,  160: 14,
161: 19,  168: 25,
169: 5,  171: 16,
172: 17,  175: 13,
179: 8,  179: 19,
195: 7,  198: 3
continued 17: 3,
28: 3,  42: 25,
89: 13
continues 146: 1
continuing 28: 4
contracted
109: 16
contracting
136: 9
Contractor
72: 18,  108: 2,
108: 5,  108: 9,
146: 25,  147: 7,
264: 30,  264: 38
contractors
42: 7,  71: 22,
72: 15,  73: 9,
73: 20,  97: 15,

144: 20,  146: 10,
146: 12,  153: 1,
153: 2,  153: 10,
154: 5,  217: 19,
227: 23,  228: 1,
245: 1
contracts 71: 17,
78: 3,  86: 4,
107: 25,  152: 21,
178: 5,  214: 22,
232: 9,  233: 13,
233: 17,  233: 21
contractual  16: 2
contrast 67: 16
contribute 13: 6,
84: 11
contributing
161: 23
contribution
83: 17,  83: 25,
84: 2,  175: 1,
175: 4,  175: 20,
176: 1,  176: 4,
176: 9,  176: 14,
176: 16,  192: 2,
236: 17,  236: 21,
240: 18,  241: 5,
243: 4,  243: 8
contribution.
174: 12,  236: 23,
242: 24
contributions
174: 6,  175: 15,
176: 3,  204: 12
control  19: 14,
144: 12,  225: 5,
227: 15,  227: 18
convenient
192: 22,  245: 17,
261: 15
conversations
13: 25,  14: 4,
14: 7,  17: 7,
30: 13,  61: 15,
82: 2,  97: 9,
155: 4,  165: 17,
165: 19,  217: 7,
233: 2,  234: 22,
235: 1,  236: 20,
243: 2,  243: 13,

244: 7,  244: 8,
244: 9,  244: 17,
259: 2
conviction
255: 10
convince 48: 14,
253: 24
cooperate 121: 23
cooperating
214: 9
cooperation
121: 25
coordinate
127: 13
coordinated
187: 12
coordinating
182: 20
coordination
205: 21,  205: 23
copy 149: 15
corner 141: 4
Cornwall 185: 12
corporate 185: 18
Corporation
38: 13,  38: 24,
104: 13,  208: 20,
267: 8
corporations
182: 19,  184: 8,
187: 5,  204: 11
corrected 8: 5,
45: 4
correspondence
101: 6
cost 70: 16,
70: 18
costs 69: 20,
70: 1,  70: 6,
70: 25,  71: 1,
160: 15
Cothrum 252: 19
Councilman
21: 14,  135: 16
councils 124: 8
Counsel  7: 8,
11: 24,  21: 22,
35: 14,  55: 2,
73: 2,  77: 22,
79: 15,  225: 5,

231: 17,  249: 16,
250: 5,  250: 11
count 112: 23,
119: 16,  119: 20,
153: 4,  246: 15,
246: 16
counted 246: 13
counter 130: 25
counter-designat
ions 11: 13
counting 218: 8,
246: 7,  252: 13
country 26: 8,
109: 13
County. 134: 1
couple 86: 8,
86: 14,  90: 1,
98: 19,  110: 25,
158: 10,  246: 1,
248: 23
courage 194: 24
courier 66: 24
course 121: 3,
188: 17,  210: 3,
258: 4,  260: 21
Courthouse 1: 31
courtroom 3: 7,
120: 22,  122: 25,
225: 5,  249: 6
courtroom.
12: 14,  12: 16,
80: 1,  111: 3,
114: 18,  152: 4,
193: 2,  193: 11,
245: 23
cover 35: 15,
135: 9,  135: 10,
206: 9
covered 35: 12
covers 73: 12
CPC 15: 23,
16: 16,  22: 13,
95: 16
create 247: 25,
258: 24
created 4: 8,
68: 2,  153: 7,
228: 9
creation 92: 22,
111: 22,  145: 25

credence 256: 21
credible 113: 17,
257: 21
credible. 69: 2
credit 53: 24,
54: 3, 54: 15,
54: 17, 60: 19,
70: 10, 192: 14
crediting 113: 13
credits 136: 12
Creek 1: 38
crime 210: 25
crimes 117: 10
criminal 117: 4,
234: 3, 234: 18
criteria 30: 15,
34: 15, 34: 16,
34: 18, 34: 19,
37: 15, 41: 11,
61: 3, 61: 7,
61: 11, 61: 17,
61: 19, 61: 23,
62: 21, 94: 24,
96: 17, 96: 18,
96: 20, 96: 22,
97: 6, 97: 11,
97: 14
Cross 263: 5,
263: 7, 263: 14,
263: 16
cross-designated
3: 17
CROSS-EXAMINATIO
N 13: 14, 24: 6,
180: 18, 180: 21,
240: 1
crossed 132: 17
crux 256: 18
cup 5: 6
current 67: 16
currently 205: 7
curry 33: 9,
33: 15, 33: 20,
34: 4
Curtis 252: 6
custodian 254: 2
custody 189: 16
cut 67: 18, 243: 9
cycle 88: 13,
89: 4

< D >
D'angelo 1: 12,
1: 44, 15: 23,
17: 7, 53: 18,
81: 4, 81: 7,
81: 15, 81: 24,
83: 11, 92: 24,
93: 11, 93: 20,
119: 16, 119: 20,
123: 4, 123: 5,
127: 10, 127: 21,
127: 22, 143: 12,
144: 4, 144: 5,
144: 17, 157: 17,
158: 1, 167: 16,
167: 20, 168: 7,
168: 24, 174: 19,
177: 11, 180: 12,
227: 9, 227: 18
D'angelo. 157: 22
D. 1: 13, 2: 3,
179: 12
d/b/a 149: 2
Damn 160: 2,
242: 15
Daniel 251: 16
DARLENE 2: 20
darlenedeckard@a
ol.com 2: 27
data 153: 18
date 68: 13,
92: 22, 111: 15,
128: 15, 136: 24,
141: 14, 141: 17,
153: 24, 157: 3,
158: 24, 208: 8,
208: 9, 222: 22,
240: 9
Dated 32: 1,
92: 21, 124: 12,
139: 6, 162: 7,
197: 15, 198: 10,
203: 17, 204: 6
dates 216: 18,
226: 16, 226: 17,
227: 5
daughter 68: 6,
68: 7

David 185: 9,
195: 13, 247: 6,
252: 23
day 4: 4, 24: 16,
29: 19, 34: 20,
46: 6, 50: 4,
51: 2, 59: 13,
68: 20, 69: 1,
69: 6, 76: 4,
97: 13, 125: 2,
141: 12, 142: 9,
142: 17, 160: 3,
160: 25, 162: 15,
170: 11, 170: 19,
170: 21, 177: 20,
189: 22, 215: 22,
240: 12, 241: 4,
243: 3, 268: 9
days 31: 11,
68: 20, 69: 1,
69: 5, 86: 14,
154: 10, 158: 10,
207: 20, 218: 13,
238: 15, 246: 14,
246: 15, 248: 23,
249: 22
deadline 111: 16
deadlines 212: 25
deal 13: 7,
19: 11, 25: 4,
25: 6, 26: 25,
42: 21, 43: 13,
45: 3, 46: 18,
47: 5, 48: 15,
50: 18, 50: 19,
50: 22, 50: 23,
51: 8, 57: 11,
63: 5, 69: 25,
70: 6, 71: 13,
125: 13, 125: 14,
139: 1, 155: 20,
155: 23, 155: 24,
156: 1, 157: 11,
157: 16, 157: 25,
165: 14, 177: 1,
213: 2
dealing 70: 9,
78: 10, 89: 2,
90: 11, 127: 16,
157: 11, 191: 4

dealings 260: 7,
260: 8
deals 40: 15,
41: 11, 42: 24,
45: 7, 54: 3,
54: 16, 54: 19,
69: 18, 70: 13,
70: 22, 71: 6,
72: 18, 214: 20,
214: 21
Dean 251: 7
Debra 131: 12,
131: 13
debts 89: 11,
89: 15
December 22: 5
decide 21: 5,
34: 13, 120: 3
decided 103: 1,
163: 10, 205: 6,
236: 7, 260: 11
decides 40: 25
decision 31: 4,
33: 18, 61: 5,
61: 9, 97: 7,
109: 3, 109: 6,
120: 6, 120: 12,
120: 13, 120: 15,
122: 1, 227: 20,
227: 21
Deckard 2: 22,
10: 22, 239: 10
decline 96: 3
deed 145: 2,
145: 4, 145: 6,
145: 7, 145: 13,
145: 21, 145: 22,
145: 25, 146: 5,
228: 3, 228: 5,
228: 6, 228: 15,
228: 21, 229: 4,
229: 13, 229: 18,
229: 19, 229: 21,
229: 22, 229: 23,
230: 1, 230: 6,
265: 2
Defendant 1: 35,
110: 9, 111: 14,
183: 14
Defendants 1: 16,

6: 5, 7: 19,
11: 23, 14: 16,
114: 5, 163: 14,
183: 4, 202: 16,
210: 11, 246: 12,
248: 2, 248: 4,
256: 2, 256: 13,
259: 1, 259: 3
DEFENSE 3: 9,
5: 14, 7: 8, 8: 2,
9: 7, 9: 15,
246: 8, 246: 18,
249: 16, 250: 5,
250: 11, 250: 24,
252: 13, 256: 9,
256: 13, 267: 1
deferred 160: 14,
160: 18
Define 212: 1
degree 99: 19,
99: 21, 106: 15
delay 118: 1,
125: 11, 125: 12,
125: 17, 212: 2,
214: 20, 214: 23,
245: 14
delayed 224: 7,
224: 8, 224: 10
delaying 124: 19,
157: 2, 212: 9,
212: 20
delivered 195: 25
delivery 92: 22
demand 160: 24
Demands 228: 17,
228: 18
demeanor 129: 5,
159: 20, 165: 23,
165: 24, 165: 25
demographic
185: 24
demolishing
106: 8
denial 57: 14
Dennis 198: 6
Denver 181: 14
denying 58: 20
Department 1: 29,
118: 7, 119: 25,
188: 1, 194: 4,

196: 8, 198: 7,
198: 24
depend 102: 25
depending 101: 19
deposit 266: 17
deposits 104: 22
deprive 110: 2
deputize 249: 16
Deputy 32: 12,
32: 13, 140: 24
Derrick 120: 24
describe 99: 23,
176: 18, 196: 22,
228: 15
described 207: 13
designate 3: 20,
11: 1, 11: 12
designated 3: 20,
3: 26, 3: 27, 4: 3
designating 4: 1,
11: 1
designations
252: 12
detail 64: 24
detailing 184: 3
details 225: 12
determine 34: 12,
113: 17, 210: 9
determined 7: 20
determining 36: 8
develop 86: 12,
87: 9, 88: 2,
258: 3, 259: 14
developed 75: 14,
75: 19, 94: 25,
206: 12, 206: 16
developer 22: 18,
75: 21, 88: 2,
97: 14, 124: 19,
125: 17, 127: 13,
127: 18, 135: 20,
144: 13, 146: 5,
147: 21, 148: 7,
159: 8, 160: 14,
160: 18, 160: 23,
172: 15, 212: 2,
212: 4, 212: 9,
212: 24, 213: 3,
214: 9, 214: 11,
219: 22, 219: 25,

220: 3, 224: 14,
228: 2
developers 33: 8,
71: 16, 71: 21,
75: 1, 118: 10,
119: 2, 119: 3,
119: 9, 123: 17,
125: 16, 125: 19,
125: 21, 127: 16,
136: 12, 137: 1,
144: 14, 212: 9,
213: 10, 213: 15,
213: 22, 214: 23,
215: 2, 215: 8,
216: 2, 216: 9,
216: 11, 217: 14
Development
25: 1, 32: 8,
32: 16, 38: 13,
42: 14, 70: 1,
70: 6, 75: 2,
75: 7, 75: 19,
76: 4, 78: 18,
78: 22, 79: 12,
81: 9, 86: 25,
95: 24, 96: 10,
104: 13, 105: 6,
105: 11, 106: 9,
106: 19, 107: 13,
108: 13, 191: 5,
198: 7, 201: 5,
201: 12, 204: 13,
205: 23, 220: 8,
220: 12, 220: 18,
221: 4, 221: 14,
244: 22, 267: 7
development.
198: 5
developments
81: 8, 94: 7,
118: 6, 118: 13,
118: 17, 119: 8,
124: 9, 125: 7,
143: 2, 149: 22,
201: 17, 202: 4
developments.
58: 3
DHFC 35: 20,
36: 19, 37: 1,
37: 8, 38: 23

dictate 18: 19
die 178: 6
difference
39: 15, 49: 14,
85: 15, 113: 12
differences
249: 14
different 33: 9,
48: 19, 52: 18,
52: 22, 52: 24,
70: 16, 70: 17,
72: 14, 77: 11,
84: 6, 92: 25,
93: 20, 94: 5,
97: 12, 97: 13,
97: 17, 97: 24,
113: 15, 136: 22,
159: 20, 197: 19
dilapidated
105: 14
diligence 39: 11
dime 212: 12
dinner 56: 3,
142: 18, 142: 20,
142: 24, 143: 5,
143: 13, 143: 21,
144: 10, 216: 23
Direct 62: 24,
99: 7, 109: 20,
114: 25, 117: 14,
118: 3, 124: 10,
126: 4, 126: 15,
128: 18, 129: 21,
137: 22, 141: 18,
145: 8, 147: 21,
148: 13, 149: 12,
153: 22, 162: 2,
166: 6, 166: 22,
174: 8, 175: 7,
193: 15, 216: 1,
217: 3, 219: 4,
219: 18, 221: 19,
232: 6, 240: 5,
257: 18, 263: 12
directly 98: 21,
127: 17, 127: 18,
160: 23, 226: 9
Director 19: 19,
20: 21, 41: 18,
191: 15, 198: 6

dirt 77:9, 85:7,
85:10, 85:12
disadvantaged
183:20
disagrees 58:19
disappointment
238:21
disclose 248:4
disclosed 148:1
disclosure
175:18
discretion 210:4
discrimination
181:17, 189:10,
189:12
discuss 69:10,
143:1, 220:23,
220:25, 235:23,
248:6
discussed 67:13,
109:17, 112:13,
127:24, 143:5,
180:5, 218:3,
220:11, 221:14,
221:17, 221:18,
222:6, 222:8,
228:3, 228:5,
235:12
discussing
13:20, 160:17,
211:5, 211:12,
229:13
Discussion 38:2,
54:15, 62:10,
83:11, 95:9,
110:6, 113:6,
142:24, 144:9,
144:15, 144:17,
144:19, 145:4,
145:6, 163:3,
163:6, 219:5,
219:8, 227:25,
235:16
discussions
62:22, 81:10,
128:25, 157:25,
184:8, 217:22,
235:10
DISD 190:12,
205:10, 205:12

dislike 37:20,
37:22, 46:19
dismiss 122:20,
209:18
disputes 249:14
disregard 47:9
distance 58:2,
171:13
distracting
260:14
District 1:1,
1:2, 1:21, 1:30,
14:13, 15:18,
15:20, 24:19,
24:22, 24:23,
25:1, 95:11,
95:12, 95:16,
95:17, 95:24,
96:6, 96:10,
97:17, 97:18,
191:15, 268:15
District. 204:24
districts 58:13,
73:16
divide 236:10
divided 241:5
Division 1:3,
268:16
divorce 189:16
DLX 14:19,
14:22, 15:10,
267:3
document. 126:6
documents 85:21,
110:13, 110:18,
110:19, 112:16,
113:5, 113:22,
114:3, 117:6,
117:12, 117:15,
145:12, 264:21
doing 4:17,
12:20, 44:9,
45:7, 51:11,
55:20, 67:15,
69:13, 70:13,
71:24, 73:3,
90:8, 114:5,
114:6, 147:2,
156:25, 179:5,
181:15, 182:24,

183:23, 207:13,
220:21, 245:13,
247:12, 248:19
dollar 133:3,
136:21
dollars 26:24,
41:1, 45:6,
52:21, 109:22,
233:11
Domingo 251:9
Donahue 252:20
Donald 1:11,
1:36, 85:3,
140:23
donate 205:6
donated 205:8
donation 204:23,
205:2, 205:4
done 5:10, 19:8,
24:19, 24:22,
26:7, 33:1,
33:20, 34:4,
36:19, 53:25,
54:3, 56:20,
63:5, 70:21,
102:19, 109:10,
109:14, 110:2,
125:13, 125:14,
150:5, 158:1,
165:14, 184:4,
188:20, 191:3,
200:14, 208:21,
214:20, 226:2,
236:20, 248:25,
261:13
door 56:19,
257:21
double 7:3
double-checking
7:5
doubled 7:22
doubt 232:17
DOUGLAS 1:44
down 6:18, 23:7,
48:14, 58:6,
64:19, 90:8,
92:22, 97:3,
98:1, 98:8,
105:24, 130:1,
130:5, 131:16,

132:11, 133:3,
136:7, 137:5,
137:14, 141:4,
153:15, 162:10,
173:7, 213:19,
232:7, 232:13,
233:6, 241:11,
249:12, 253:20,
256:2
down. 14:21,
22:10, 44:5
DOWNES 2:21
downward 210:1
draft 10:22
drafts 249:13
dramatically
17:3
dressed 47:19
drink 13:17
drum 41:10
Due 39:11,
68:14, 150:11,
171:21, 172:13
due/prompt 173:7
Dulan 191:15,
191:19, 195:13
duly 99:6
dummy 179:5
Dunning 46:19,
46:20
During 44:19,
73:1, 79:11,
88:12, 90:24,
93:10, 94:9,
95:16, 101:8,
103:14, 105:4,
107:23, 112:10,
125:4, 127:24,
128:8, 140:6,
144:10, 154:10,
155:3, 166:3,
225:24, 226:1,
232:6, 258:6


< E >
E-mail 31:20,
31:24, 51:17,
92:20, 93:11,
93:19, 128:11,

128: 13,   129: 18,
215: 21,   254: 12,
264: 7,   264: 27,
267: 11
e-mailed 218: 23
e-mails 66: 16,
217: 6
E.   1: 15,   1: 27,
1: 46,   2: 20
Earlier 38: 4,
40: 11,   53: 11,
57: 1,   89: 6,
91: 8,   116: 7,
161: 22,   178: 18,
212: 17,   255: 22
early 101: 3,
101: 8,   104: 2,
158: 23,   247: 13
earn 119: 1
earned 134: 11
ease 249: 25
easier 88: 1
easily 236: 16
easy 45: 14
eat 56: 3,   247: 16
Economic 75: 6,
75: 19,   197: 17,
198: 6,   244: 22
Eddie 203: 7
Education 99: 25,
196: 8,   200: 5
EEOC 196: 8
effect 10: 4
effective 103: 7,
194: 25,   203: 10
effort 109: 12,
110: 2,   136: 9,
204: 11
efforts 52: 10,
101: 4,   124: 6,
130: 14,   198: 2
eight 207: 20,
238: 15
either 7: 4,
20: 19,   88: 18,
95: 5,   118: 7,
124: 1,   124: 7,
155: 22,   171: 8,
225: 21,   235: 12,
254: 3

El 200: 11
elected 74: 25,
133: 25
election 88: 13,
89: 4
eliminated 246: 8
eliminating
133: 3,   246: 19
Ellis 251: 8
Elmo 53: 15,
152: 16,   183: 6
embrace 259: 9
emphasize 228: 1
emphasized 79: 12
employed 90: 21
employee 94: 14,
133: 25
Employees 90: 20,
94: 10,   100: 10,
100: 16,   115: 19,
116: 6,   134: 20,
134: 24,   183: 19,
194: 25,   198: 14,
200: 15,   204: 8
Employment
102: 16,   184: 17,
189: 12,   192: 5
encounter 169: 15
encourage 184: 16
end 59: 13,
102: 8,   130: 12,
154: 18,   156: 16,
160: 20,   161: 12,
261: 13
ended 95: 8,
256: 23
enforcement 13: 5
engage 27: 12
engaging 119: 16,
234: 24
engineers 59: 2,
71: 3
engines 203: 10
ENGLEDOW 2: 30,
268: 3,   268: 11,
268: 13
enhancement
204: 13
enormous 90: 14
enough 8: 22,

17: 21,   18: 17,
41: 10,   49: 8,
62: 23,   70: 21
ensure 153: 3
enter 80: 24,
80: 25,   81: 1,
256: 10
entered 51: 9,
52: 15,   99: 16,
115: 5
enterprise
203: 20
enters 3: 7,
12: 14
entire 20: 21,
54: 1
Entitled 173: 4,
264: 20,   268: 5
entity 114: 10,
115: 15,   148: 25,
171: 1
entry 126: 16,
141: 5
enumerated
153: 19
envelope 174: 10,
240: 14,   240: 25,
244: 3
equals 68: 24
equated 68: 20
equipment
204: 24,   205: 6,
205: 7,   205: 8,
205: 13
Eric 251: 18
errors 4: 4
especially 219: 1
essence 43: 2
essentially 54: 2
Establish 26: 5,
91: 22,   93: 22,
112: 22,   113: 24
established
26: 6,   148: 10,
163: 14
establishing
153: 1,   257: 10
estate 42: 10,
86: 13
ethical   28: 7,

28: 8,   28: 9,
28: 10
ethics 27: 22,
28: 11
Eugene 139: 13
Euna 195: 20
Evans 43: 4,
43: 8,   43: 11
evening 14: 10,
142: 18,   162: 10,
245: 22
event 82: 24,
83: 2,   83: 10,
121: 3,   127: 2,
137: 18,   154: 24,
166: 6,   170: 12,
200: 4,   205: 22
events 56: 6,
101: 6,   110: 12,
144: 13
Eventually
60: 14,   60: 16,
224: 12
everybody 63: 3,
92: 8,   194: 22,
248: 24,   256: 11
Everyone 48: 14,
128: 17,   219: 1,
247: 14
everything
30: 23,   31: 1,
54: 5,   85: 2,
90: 15,   226: 10
everything.
241: 20
evicted 45: 25
evidence 10: 6,
11: 9,   38: 5,
43: 12,   51: 15,
59: 17,   60: 24,
89: 2,   110: 11,
111: 9,   111: 20,
111: 23,   111: 25,
112: 15,   112: 17,
112: 20,   112: 21,
113: 2,   113: 25,
141: 24,   166: 2,
170: 23,   171: 4,
183: 3,   194: 17,
199: 16,   218: 21,

256: 20,  258: 16
Ewell 190: 12
ex 248: 1,  248: 2
exact 93: 1
Exactly 19: 12,
20: 18,  28: 21,
34: 20,  59: 13,
69: 7,  257: 1
EXAMINATION
79: 20,  85: 25,
99: 7,  193: 15,
216: 1,  217: 3,
219: 4,  219: 18,
221: 19,  232: 6
examine 259: 12
example 56: 18,
257: 16
excellence.
203: 21
except 11: 17
exception 8: 5
exceptions 3: 16
exchange 167: 23
excluded 6: 9,
163: 17,  163: 18,
255: 16
Excuse 20: 4,
46: 24,  65: 14,
91: 16,  110: 4,
115: 22,  172: 4,
202: 19,  209: 4
excused 261: 5
executed 121: 4,
125: 23,  125: 25,
126: 1
executing 115: 8
exercise 193: 19,
204: 23,  248: 22
exert 212: 8
Exerting 212: 2
EXHIBITS 3: 10,
3: 16,  4: 17,
4: 23,  4: 24,  5: 2,
5: 9,  5: 12,  5: 14,
5: 18,  6: 8,  6: 13,
7: 11,  7: 19,
7: 25,  9: 2,  9: 8,
9: 18,  9: 25,
10: 1,  10: 16,
10: 19,  11: 16,

110: 10,  112: 14,
267: 44
existing 57: 25,
58: 12
exit 109: 8
expand 16: 24
expect 109: 24,
129: 2,  219: 8
expected 128: 25,
172: 6,  172: 12,
172: 14,  219: 4,
243: 20
expecting
243: 19,  243: 21,
244: 2
expeditiously
247: 10
expensive 59: 1
experience 13: 1,
22: 13,  56: 21,
96: 2,  121: 13,
121: 21,  259: 8
expire 156: 16
Explain 21: 8,
21: 11,  27: 17,
28: 2,  29: 13,
30: 14,  31: 1,
36: 11,  36: 21,
36: 22,  46: 4,
47: 16,  47: 18,
50: 7,  64: 15,
66: 2,  80: 16,
90: 1,  92: 1,
96: 21,  188: 10,
215: 9,  215: 12,
216: 14,  217: 10
explained 46: 5,
83: 7
explaining
83: 22,  243: 16
explains 65: 1,
96: 18
exposed 28: 6
exposure 27: 19,
28: 2,  28: 8,
122: 7
express 204: 8
expressing
198: 12,  198: 13
extorted 237: 11,

237: 16
Extorting
161: 17,  161: 18,
225: 24
extortion
112: 23,  119: 17,
119: 20,  122: 4,
123: 14,  180: 12,
180: 16,  208: 13,
211: 24,  212: 1,
212: 8,  221: 4,
221: 11,  222: 10,
222: 22,  223: 4,
223: 21,  224: 11,
224: 16,  225: 15,
228: 16,  228: 20,
228: 25,  233: 21,
236: 4,  237: 19,
237: 20
extortion.
208: 14
extremely 259: 19


< F >
facilitate
111: 10,  117: 24
facility 254: 11
fact 24: 25,
41: 19,  76: 22,
80: 9,  81: 11,
91: 4,  119: 12,
120: 9,  120: 22,
138: 17,  185: 23,
192: 17,  197: 5,
205: 24,  206: 14,
208: 19,  210: 3,
215: 15,  217: 1,
222: 12,  224: 25,
225: 11,  231: 11,
236: 19,  238: 4,
238: 11,  238: 19,
241: 25,  257: 22,
258: 11,  259: 6
factor 37: 12
factors 130: 9
factually 225: 8
Fair 17: 21,
18: 17,  32: 25,
47: 21,  59: 21,

60: 10,  62: 23,
105: 2,  121: 23,
153: 20,  190: 10,
191: 2,  196: 20,
197: 21
fairly 247: 10
fairs 101: 5,
186: 24,  187: 1,
187: 6,  187: 8,
188: 5,  191: 2,
195: 16,  200: 17,
200: 24
faith 136: 8
fall 101: 25,
171: 5
fallout 96: 4
falsification
114: 11
familiar 138: 6,
229: 17,  230: 5
familiarize
185: 18
Family 58: 3,
159: 8,  189: 16
Fantroy 13: 22,
27: 13,  28: 4,
28: 15,  33: 15,
33: 24,  34: 1,
34: 5,  74: 16,
74: 20,  77: 25,
78: 3,  78: 25,
95: 5,  95: 11,
95: 23,  96: 11,
127: 4,  128: 3,
258: 18,  260: 7
far 4: 3,  7: 18,
21: 2,  22: 6,
59: 3,  60: 5,
91: 9,  101: 9,
102: 9,  103: 20,
112: 25,  113: 1,
132: 2,  134: 14,
236: 2,  257: 7
Farrington 1: 13,
2: 3,  119: 19,
174: 20
Farrington-hill
31: 4,  123: 2,
172: 23,  173: 24,
252: 9,  267: 46

fashion 232:18
fast 178:10,
213:11
faster 213:16,
213:24, 214:4,
214:8, 214:10
favor 27:8,
33:9, 33:15,
33:21, 34:5,
78:3, 138:22,
140:2, 214:13,
214:16
Fax 265:2
Faxed 153:24,
154:1, 154:2
FDX 267:22
February 154:15,
154:25
Federal 41:2,
76:21, 76:23,
185:12
fee 29:8, 38:25,
65:10, 136:18,
160:14, 160:18,
172:15, 219:22,
219:25, 220:3,
220:8, 220:12,
220:16, 220:18,
221:4, 221:14
feel 30:1, 45:2,
45:14, 76:7,
120:16, 162:23,
238:11, 250:6
feeling 249:8
feelings 109:7
feels 21:22
fees 268:6
felt 118:16,
192:1, 194:11,
238:18, 238:22,
239:5
female 194:9
Ferguson 139:24
few 3:16, 38:13,
123:23, 150:7,
154:10, 267:8
fewer 101:24
field 195:4
Fifteen 239:22
Fifth 35:12,

256:19
fight 51:5, 54:5
fighting 49:5,
54:1, 54:10,
55:19, 55:20,
197:2
figure 4:13,
62:16, 197:23,
227:13, 247:15
figured 254:5
figures 246:20
file 7:24,
64:13, 64:16,
264:4
filed 10:17,
111:18
filing 10:16,
10:18, 200:16
filled 260:18
Finally 191:22,
238:6
finance 38:24,
189:14
financial 7:21,
47:13, 47:22,
48:9, 97:14,
97:24, 104:25,
170:18, 247:6
financially
50:19
financials
40:24, 50:3,
50:15, 54:1,
97:12, 98:2
financing
105:23, 106:18,
107:8, 205:23
find 21:17,
91:15, 92:5,
95:9, 95:13,
109:10, 117:7,
117:12, 119:7,
121:10, 160:22,
181:3, 226:18,
247:22, 248:18
finding 92:11
finds 113:25
fine 4:21, 10:9,
16:5, 69:9,
69:10, 122:9,

150:9, 248:25,
259:25
finish 70:9,
98:24, 230:9
finished 9:4,
231:20, 231:23,
261:14
FIRM 1:37, 1:45
fiscal 184:7,
185:3
fit 228:16
Fitness 204:20
five 31:11,
111:1, 114:20,
122:7
five-year 209:21
flip 23:4, 43:2
flipped 29:22
flipping 29:19
Floor 1:31
flowed 105:1
flowing 165:1
flushed 157:22
focus 32:24,
258:25
focusing 60:7
folder 146:18,
146:24, 148:16,
148:21, 264:20
follow 62:12,
216:4, 224:5
follow-up
124:24, 261:1
followed 34:19
following 6:7,
6:12, 7:11,
9:18, 125:2,
139:7, 198:14
follows 13:13,
99:6
Food 186:22
foot 58:1
force 256:22
forced 112:4
forcing 75:1
foregoing 268:3,
268:5
Foreman 191:16,
191:19
forfeited 122:15

forged 178:19,
210:19, 211:15
forgery 111:12,
113:4, 210:22,
210:24, 211:3
forging 211:9
form 67:14,
175:18, 243:4
format 268:6
formation 145:22
formed 115:15,
228:12
former 47:3
Forrest 84:19,
84:21, 84:24
forth 58:19,
152:21, 210:1
forums 200:16
forward 22:6,
46:5, 86:25,
87:15, 87:18,
87:20, 87:24,
102:8, 109:2,
155:17, 178:10,
213:6, 232:10
fought 53:25
found 3:19,
21:12, 28:3,
28:16, 33:3,
86:15, 108:16,
109:14, 172:22,
233:18, 256:20
Foundation
93:23, 96:25,
133:5, 140:15,
170:1, 173:11
Founders 2:14
four 24:17,
97:25, 225:13
frame 63:10,
88:9, 89:3,
94:9, 103:14,
104:2, 116:10,
118:3, 125:20,
154:10, 155:3,
166:3, 202:7,
249:9
Frank 253:4
Frankly 8:22,
125:8, 258:14,

259: 10
Franklyn 200: 8,
203: 23,   204: 4
fraud 110: 20,
112: 18,   112: 19
fraudulent
111: 10,   112: 5,
113: 4
Frederick 251: 12
free 188: 17
Freeway 179: 12
Friday 13: 20,
16: 20,   18: 14,
22: 12,   22: 15,
22: 20,   30: 5,
61: 9,   86: 3,
110: 16,   112: 13,
248: 18,   248: 20,
249: 4,   254: 12
friends 13: 4
Friendship
166: 7,   167: 3,
169: 2,   240: 9
Frison 252: 22
front 98: 12,
98: 13,   167: 5,
188: 22,   206: 9
full 91: 2
fully 133: 15
Fund 161: 25,
188: 8,   188: 11,
200: 17,   200: 23,
201: 1
fund-raiser
162: 4
funded 39: 10
funding 105: 17
fundraiser
162: 11,   265: 40
funds 106: 8,
162: 1,   172: 13
funny 20: 18,
20: 19
future 203: 21


< G >
Gail 106: 12,
106: 13,   107: 13,
107: 24,   129: 8,

129: 10,   147: 1,
147: 16,   147: 25,
148: 8,   148: 9,
148: 11,   152: 25,
153: 7,   154: 2,
154: 5,   181: 25,
182: 6,   182: 9,
190: 22,   205: 18,
211: 7,   252: 3
gain 118: 22,
118: 24
gang 249: 18
Garcia 247: 7,
251: 9,   252: 23
Garden 190: 9
Gary 159: 5,
159: 7,   251: 20,
252: 24
gave 4: 12,
33: 14,   34: 7,
45: 12,   49: 1,
74: 12,   77: 6,
110: 14,   111: 14,
111: 16,   177: 24,
191: 22,   229: 21,
240: 14,   241: 22,
244: 3
General 75: 21,
75: 23,   75: 24,
76: 2,   108: 2,
108: 5,   108: 8,
248: 11
generally 18: 2,
55: 25,   74: 5,
107: 14,   140: 10,
182: 19
Genita 251: 3
gentlemen 12: 19,
47: 9,   79: 24,
92: 1,   110: 24,
117: 1,   151: 25,
192: 24,   245: 19
George 253: 2
Georgia 99: 11,
99: 14
gets 28: 13
getting 17: 24,
40: 22,   41: 7,
48: 22,   52: 14,
60: 15,   77: 9,

118: 1,   123: 16,
123: 24,   161: 8,
182: 12,   191: 12,
201: 21,   208: 15,
255: 2,   259: 10
Gibraltar 193: 23
Give 4: 8,   4: 12,
4: 14,   4: 18,
4: 20,   4: 23,   5: 7,
5: 9,   5: 10,   5: 11,
13: 16,   16: 3,
20: 7,   71: 18,
84: 9,   90: 4,
111: 16,   115: 23,
117: 1,   148: 10,
191: 10,   214: 11,
235: 18,   235: 20,
235: 22,   247: 20,
248: 9,   257: 15
given 6: 1,
10: 25,   19: 18,
34: 2,   37: 1,
77: 1,   83: 5,
103: 16,   104: 16,
124: 22,   149: 11,
229: 1
gives 160: 23,
183: 15,   213: 8,
242: 20,   255: 11
giving 36: 18,
37: 7,   45: 15,
74: 7,   84: 4,
190: 2,   191: 20,
208: 16,   243: 22,
257: 18
Glenda 92: 20,
93: 11,   264: 7
goal 102: 13,
136: 9,   146: 9,
153: 1
goals 102: 20,
102: 24,   102: 25
gotten 52: 19,
165: 11,   229: 10
Governments 73: 2
Governor 203: 16
grab 253: 21
grand 119: 12,
119: 24
great 13: 6,

213: 2
Green 251: 10
Greene 1: 44,
1: 45,   8: 12,
13: 10,   239: 13,
239: 14,   256: 15,
260: 19,   263: 5
greenelawfirm@sb
cglobal.net 1: 50
Greer 251: 11
grievance
195: 18,   195: 22,
195: 24
grocer 106: 4,
108: 19,   108: 25
grocery 186: 11,
188: 3
grounds 84: 14
Group 73: 13,
82: 21,   103: 1,
105: 19,   130: 12,
139: 9,   197: 9,
267: 23
Grove 29: 2,
49: 14,   49: 19,
49: 24,   50: 12,
51: 5,   60: 11,
65: 10,   97: 5,
97: 18,   97: 25,
138: 5,   138: 6,
149: 5,   152: 23,
223: 11,   225: 20,
233: 9,   264: 42,
264: 45,   265: 6
Groves 60: 15
growing 109: 8
Growth 75: 24,
76: 2
guarantee
122: 23,   211: 2,
226: 3
Guaranty 185: 12
guard 14: 12,
15: 16
guess 17: 18,
17: 23,   26: 6,
34: 12,   43: 22,
63: 22,   65: 18,
66: 11,   77: 21,
167: 7,   183: 6

guilty 122:1,
122:3, 123:14,
180:11, 180:16,
211:6, 211:24,
212:1, 221:8,
256:10, 256:22,
256:24
guys 158:5,
248:20, 249:3

< H >
half 59:18,
67:3, 68:21,
110:10, 132:11,
247:14, 247:15,
247:16, 247:19
Hall 30:6,
37:21, 48:8,
48:14, 48:20,
63:3, 77:25,
96:4, 127:4,
128:2, 136:25,
140:11, 165:8,
177:4
Hampton 105:15
hand 98:15,
141:24, 243:25
handicaps 259:16
handle 3:13,
249:19
handled 189:9,
196:2
hands 67:14
handwriting
132:24, 133:8,
133:13, 142:4,
145:14, 146:20,
148:15, 151:10,
173:8, 173:9,
173:13, 173:14
handwritten
67:24, 68:17,
154:6, 264:24,
264:30, 266:17
Hannah 251:12
happen 44:22,
86:24, 87:8,
87:17, 138:16,
165:13, 181:3,

218:11, 226:8,
232:17, 258:12
happened 22:8,
23:16, 33:17,
60:3, 62:17,
87:13, 87:14,
88:6, 88:7,
103:25, 105:1,
125:4, 136:25,
143:1, 169:20,
184:11, 196:11,
199:6, 199:8,
224:24, 224:25,
226:25, 227:5,
227:6, 242:17,
255:17, 256:2
happening 62:13,
257:1
happens 12:20,
178:5, 214:5
happy 248:6
hard 249:22,
249:23
Harry 252:7
hat 81:12,
81:16, 81:25,
82:5, 82:10
HD 149:2, 149:3,
265:6
HDOJ 149:2
head 22:10,
44:5, 70:13,
70:14, 70:22,
70:23, 98:22,
198:24
heads 14:21,
194:4
hear 8:15,
14:20, 14:25,
83:23, 111:7,
159:21, 249:4
heard 3:25,
15:15, 23:1,
48:12, 75:5,
78:1, 89:1,
94:24, 96:17,
159:25, 177:5,
181:5, 219:24,
237:22, 258:1
hearings 130:20

Hearsay 47:6,
78:4, 91:17,
91:18
held 50:23,
101:24, 183:11,
194:13
help 19:8,
42:11, 101:5,
102:15, 103:7,
125:12, 125:18,
182:19, 184:20,
195:24, 196:18,
202:18, 202:22,
202:24, 208:7,
212:20, 213:12,
214:8, 214:10,
214:20, 218:16,
224:5, 224:10,
228:20, 241:19,
241:20, 241:22,
250:12
helped 107:25,
124:19, 182:19,
203:1, 228:17
helpful 12:21
helping 51:11,
192:13
helps 242:12
Henry 251:13
Herb 252:22
high 99:12,
99:14, 99:15,
99:16, 189:24
higher 200:5
Highlight 35:9,
36:4, 57:19,
59:18, 63:10,
64:19, 65:7,
67:3, 67:24,
68:16, 150:24,
151:1, 241:10
highlighted
247:10
highly 166:1
Highway 2:23
Hills 252:13
hire 23:19,
189:18
hired 108:5,
108:6

Historic 204:23
historically
72:3
history 99:23,
99:24, 183:15
Hoaglan 192:8
Hoaglin 185:3,
192:12, 192:18
Hold 16:9,
19:17, 21:18,
40:4, 92:24,
186:24, 188:5
Holding 86:20,
188:6
Holdings 65:9,
149:24
Holloway 252:25
Holmes 253:1
home 87:23,
187:2
homebuilder
85:19, 86:10
Homes 29:2,
29:24, 42:11,
42:16, 49:14,
49:19, 49:24,
50:11, 51:5,
60:11, 71:8,
86:5, 87:10,
87:20, 138:5,
138:6, 149:5
HONORABLE 1:20
honored 200:4
honoring 204:3
hoped 217:19
hopefully 98:25,
191:12
hoping 59:14,
60:14, 214:3,
218:9, 254:8
host 182:14
hostage-holding
150:12, 151:4
hosting 82:22,
162:10
hot 45:12,
45:13, 45:16,
88:4, 89:2
Hotel 183:11,
194:14, 202:13,

206: 5
hour 132: 17,
133: 4, 134: 9,
134: 11, 134: 18,
193: 4, 247: 14,
247: 15, 247: 16,
247: 19
hourly 134: 13
hours 65: 24,
68: 8, 68: 13,
68: 19, 68: 20,
68: 24, 68: 25,
69: 5, 69: 9
House 21: 12,
33: 4, 33: 5,
90: 17, 92: 4,
154: 17
household 186: 5
households 186: 2
houses 45: 24
huh-huh 98: 22
Hull 253: 2
hundred 233: 10
hundreds 79: 3,
79: 7


< I >
I-345 196: 20
idea 25: 21,
70: 7, 78: 15,
80: 14, 149: 11,
156: 11, 173: 25,
190: 2, 190: 3,
190: 4, 234: 14,
236: 6, 237: 10
ideas 228: 8
identify 86: 13,
198: 4
identifying
197: 20
identity 112: 22,
117: 9
III 10: 17, 11: 4,
11: 8, 11: 13
illegal 20: 24,
27: 5, 27: 7,
72: 13
imagine 23: 7,
247: 8, 257: 14

impact 257: 13,
259: 18, 259: 22
importance
186: 21
Important 89: 19,
96: 20, 103: 10,
103: 12, 198: 17,
221: 6, 222: 22,
224: 15
impose 146: 5,
146: 8
imposing 146: 10
impossible.
68: 21
impressed 204: 10
impression
100: 15, 100: 17,
110: 15, 135: 19,
151: 5
imprisonment
209: 22
improper 21: 3
improperly
257: 8, 257: 10
in. 4: 13, 112: 20
Inc. 115: 6,
115: 13, 116: 17,
188: 11, 200: 16,
201: 5
incident 77: 24
include 201: 11,
246: 5, 254: 1,
254: 3, 254: 4
included 187: 25
includes 133: 14,
210: 10, 246: 9
Including 8: 4,
106: 23, 108: 19,
112: 18, 197: 20,
205: 10, 246: 11
income 186: 5
inconsistent
228: 12
incorporated
133: 15
increase 160: 19,
184: 17, 184: 18,
192: 5
increased
172: 15, 220: 16

indefinite 157: 3
Independent
146: 25, 204: 24,
264: 30, 264: 38
INDEX 262: 2
indicate 126: 21,
215: 23, 234: 1,
234: 18
indicated 25: 13,
28: 1, 30: 4,
30: 10, 32: 15,
40: 11, 62: 24,
84: 18, 127: 2,
127: 20, 127: 22,
255: 22
indicating 124: 6
indicted 119: 12
indictment
102: 9, 112: 24,
119: 17, 209: 18
individual
168: 14, 168: 20,
169: 11
individuals
72: 1, 134: 21,
135: 22, 135: 25,
139: 7, 141: 13,
143: 4, 143: 21,
195: 8, 195: 24,
204: 11
indulge 259: 10
inexperience
22: 13
inexperienced
22: 16
influence 55: 7
informants
256: 23
information
29: 20, 66: 1,
74: 7, 76: 25,
77: 11, 92: 12,
95: 10, 101: 11,
118: 5, 123: 16,
123: 25, 148: 9,
154: 20, 170: 13,
170: 15, 170: 20,
170: 25, 171: 6,
172: 5, 172: 12,
226: 11

infrastructure
59: 2, 71: 4,
87: 9, 88: 1
ingenuity 203: 20
initial 58: 24,
68: 3, 71: 3,
100: 15, 100: 17,
132: 16, 136: 18,
150: 12
initially 15: 6,
26: 18
initials 132: 21,
133: 16, 173: 20
Initiative
109: 21, 116: 19,
136: 9, 178: 20,
179: 14, 179: 17
Inland 75: 1
input 144: 15,
144: 17, 146: 3,
229: 3, 229: 25,
230: 3
inquiring 246: 11
inside 146: 24
insinuated
256: 12
insistence
150: 11, 151: 4
instance 258: 13
instances 74: 2
instead 58: 15,
157: 10, 245: 21
instructed 47: 9,
80: 23
instruction
115: 24, 117: 2,
117: 16
integral 183: 1,
221: 4, 221: 10,
222: 9, 236: 4,
256: 13
integrated
133: 15
integrity 27: 10
intends 111: 8
intensive 109: 12
intent 117: 9
intercept 18: 3
intercepted
217: 7, 232: 4

interest 117: 25,
118: 2,  118: 12,
118: 14,  118: 15,
118: 18,  118: 20,
118: 21,  152: 25,
184: 18,  187: 19,
198: 13,  201: 12,
201: 17,  201: 21,
201: 25,  202: 4,
228: 11
interested
181: 17,  181: 20,
185: 20,  197: 16
interesting
47: 20
interjected
134: 6
International
185: 15,  190: 17
interrogate
261: 21
interview
208: 12,  208: 19
interviews
197: 22
introduce 84: 21,
99: 9
introduced
84: 18,  174: 5,
183: 3
introductory
194: 19
investigating
155: 1
investigation
19: 3,  23: 16,
100: 19,  112: 11,
120: 3,  154: 12,
154: 21,  234: 3,
234: 19,  258: 20
investment
109: 25
investor 106: 23,
106: 25,  107: 4,
109: 20,  109: 21,
109: 24,  110: 3,
111: 11,  112: 6,
114: 7,  116: 19
invite 187: 5,
265: 40

invited 184: 2
invoice 64: 21,
65: 3,  65: 23,
66: 7,  66: 8,
68: 13,  89: 22,
151: 9,  151: 15,
156: 7,  265: 9
invoiced 26: 22
invoices 26: 13,
26: 20,  26: 21,
89: 8,  90: 2,  90: 8
involvement
132: 2,  152: 20,
177: 12,  208: 13
involving
110: 20,  112: 18,
112: 23,  114: 9,
210: 20,  258: 17
IOLTA 8: 1
ironic 151: 6
irrelevant 209: 2
Isds 205: 9
issue 61: 15,
89: 23,  89: 25,
92: 3,  129: 14,
163: 8,  255: 4,
257: 11,  257: 23,
261: 4
issues 24: 24,
26: 15,  34: 23,
57: 24,  83: 19,
97: 7,  97: 10,
97: 17,  101: 19,
102: 18,  102: 25,
181: 17,  188: 16,
192: 6,  196: 4
items 68: 12,
153: 19,  177: 4,
199: 11
itself 110: 14,
257: 23


< J >
jacket 197: 9
Jackson 1: 36,
1: 37,  2: 15,
7: 16,  24: 5,
38: 2,  80: 4,
193: 6,  239: 16,

239: 23,  240: 3,
260: 17,  263: 7,
263: 16
Jafar 21: 16,
44: 12,  67: 5,
91: 14,  94: 6,
149: 18,  149: 19,
154: 8,  251: 14,
265: 10
Jafar. 93: 9
James 74: 20,
95: 5,  264: 20
January 16: 21,
17: 1,  17: 6,
146: 16
Jason 251: 19
Jeff 251: 5
Jennifer 200: 8,
203: 23,  204: 4
Jerry 48: 2,
198: 23,  214: 13
Jim 185: 9
job 101: 4,
186: 24,  187: 1,
187: 6,  187: 8,
187: 10,  188: 5,
191: 2,  195: 16
jobs 187: 3,
187: 20
John 7: 21,
12: 24,  73: 25,
185: 6,  253: 6
Johnson 25: 14,
25: 19,  25: 22,
26: 3,  51: 10,
51: 11,  51: 17,
52: 6,  52: 16,
53: 1,  53: 3,
53: 5,  139: 15,
203: 7,  251: 15,
267: 11
joined 181: 22
joke 20: 11,
20: 15,  20: 17
Jon 3: 13,  252: 20
JONATHAN 2: 4
Jones 251: 16,
253: 3
Jordan 253: 4
Joyce 191: 16,

191: 19
JR 2: 12
Judge 1: 21,  3: 7,
12: 14,  110: 4,
122: 16,  261: 2,
261: 18
Judicial 268: 7
juice 135: 24
June 268: 9
June 154: 18,
206: 21,  207: 15,
207: 23
Justice 1: 29,
119: 25


< K >
K-mart 197: 2,
197: 12,  197: 23,
197: 24
Karriem 139: 11
Kathy 13: 12,
56: 13,  67: 7,
68: 3,  90: 16,
90: 21,  93: 9,
126: 18,  126: 19,
126: 20,  126: 22,
127: 7,  144: 4,
144: 7,  220: 10,
227: 9,  263: 4,
264: 4
Kedron 230: 5,
265: 2
keep 93: 11,
118: 1,  224: 20
keeping 93: 19
keeps 161: 7
Ken 251: 24
Kent 253: 11
kept 12: 19,
77: 10,  101: 14,
171: 12
Kevin 251: 7
keynote 190: 13,
199: 20
kick 217: 19,
217: 24,  218: 10,
230: 19
kickback 161: 25,
218: 10

kicked 230: 19
kicking 146: 15
killed 212: 3
Killingsworth
48: 3,  198: 23,
214: 13
kind 13: 19,
37: 20,  47: 19,
92: 25,  93: 20,
100: 2,  133: 24,
184: 3,  188: 15,
234: 2,  234: 15,
234: 18,  240: 7
kinds 181: 15,
196: 2,  196: 4
Kirk 199: 21
Kirkpatrick
251: 17
Kirvin 131: 12,
131: 13,  131: 24,
132: 2
Kitty 161: 23
knocking 133: 3
knowing 81: 25,
111: 12,  118: 15
knowledge 26: 4,
27: 3,  91: 22,
117: 9,  154: 20,
225: 8
known 24: 13,
24: 15,  24: 16,
43: 22,  53: 1,
72: 7,  100: 10
knows 63: 25,
66: 25,  92: 9,
245: 6
Kroener 253: 5
Kyle 253: 12


< L >
L.  1: 14,  2: 12
Labor 196: 8
lack 185: 20
Ladies 12: 19,
47: 9,  79: 24,
91: 25,  110: 24,
117: 1,  151: 25,
192: 24,  245: 19
lady 98: 13

Lamar 1: 46
land 57: 22,
58: 10,  58: 16,
58: 21,  58: 22,
58: 25,  87: 9
large 106: 4
last 22: 11,
29: 20,  86: 2,
98: 16,  102: 24,
103: 3,  111: 24,
131: 19,  147: 11,
150: 11,  150: 25,
156: 6,  157: 4,
198: 1,  206: 4,
206: 19,  206: 23,
219: 24,  220: 7,
220: 15,  246: 23,
246: 24
Lastly 151: 18
late 17: 6,
181: 2,  207: 4
Later 131: 6,
142: 9,  142: 17,
160: 25,  167: 6,
177: 20,  181: 25,
182: 1,  199: 24,
209: 12,  216: 15,
218: 14,  233: 18,
245: 20
latter 254: 10
laughing 234: 8,
234: 9
Laughter 203: 4
Laughter.  78: 6
Laura 53: 24,
54: 16,  54: 18,
66: 16,  66: 17,
67: 5,  75: 14,
75: 19,  76: 6,
77: 8,  77: 11,
77: 13,  204: 18,
214: 16
Laureland 51: 20,
51: 22,  54: 18,
57: 8,  60: 5,
60: 6,  61: 6,
64: 25,  95: 2
Laureland.  59: 23
LAW 1: 37,  1: 45,
2: 13,  2: 22,

13: 5,  84: 10,
189: 16
lawsuit 256: 5,
256: 6,  256: 25,
257: 21
lawyers 28: 13,
188: 13,  188: 19,
189: 1,  246: 2
LB 2: 24
lead 148: 4
leaders 200: 5
leadership
104: 3,  106: 15,
194: 24
leading 87: 2,
88: 21,  123: 20,
124: 3,  148: 2,
165: 3,  168: 1,
172: 7
learned 36: 17
lease 108: 16,
197: 20
lease-up 108: 14
least 30: 17,
32: 19,  35: 13,
65: 19,  130: 19,
143: 17,  191: 8,
193: 4,  243: 6
leaves 197: 24,
247: 12
leaving 77: 20
Lee 1: 12,  1: 44,
9: 18,  12: 5,
12: 6,  15: 23,
22: 9,  22: 13,
53: 18,  81: 4,
119: 16,  119: 20,
123: 4,  123: 5,
127: 21,  143: 12,
144: 5,  144: 17,
167: 20,  168: 24,
174: 19,  174: 20,
177: 11,  180: 12,
187: 16,  227: 9,
227: 18,  251: 21
leeway 8: 24
left 35: 20,
38: 4,  65: 19,
77: 16,  123: 16,
173: 21,  174: 10,

246: 14,  252: 11
left-hand 141: 4,
201: 4
Legal 28: 9,
28: 10,  60: 20,
63: 2,  84: 15,
85: 21,  89: 14,
188: 8,  188: 11,
191: 3,  195: 16,
201: 1
legally 28: 14
legally-binding
237: 9
legitimate
155: 20,  193: 19,
206: 2,  206: 3,
208: 20
LEIGHA 1: 28
length 247: 5
Leo 46: 7,  78: 25
Leon 33: 17,
35: 22,  43: 18,
44: 9,  44: 11,
44: 16,  47: 3,
47: 6,  59: 21,
75: 22,  84: 22,
85: 2,  90: 10,
251: 1
less 37: 16,
246: 21,  249: 23
level 185: 18
leverage 55: 9,
55: 24,  56: 14,
63: 17,  63: 20,
245: 4
Lewis 7: 21,  8: 1,
253: 6
library 76: 12
lien 76: 21,
76: 23,  76: 25
life 100: 5,
175: 4,  181: 11,
257: 19
likelihood
95: 22,  96: 5
likewise 248: 5
limine 111: 17,
255: 1,  255: 5,
258: 2
Limited 36: 24,

91: 25,  111: 9,
115: 5,  117: 7,
259: 19,  264: 13
limits 82: 13,
83: 17
Linda 190: 24
line 22: 19,
35: 11,  35: 13,
53: 21,  61: 24,
68: 20,  81: 14,
164: 8,  201: 22,
241: 10,  241: 17,
242: 14,  243: 16
link 249: 5
Lipscomb 139: 19,
139: 20
list 4: 13,  4: 14,
4: 20,  5: 12,
10: 2,  71: 18,
72: 22,  72: 24,
72: 25,  73: 2,
118: 9,  153: 2,
153: 12,  153: 13,
218: 4,  223: 10,
246: 3,  246: 7,
247: 21,  248: 14,
250: 11,  250: 22,
250: 24,  252: 16,
253: 19,  253: 21,
253: 24
listen 159: 16,
160: 13,  176: 18,
177: 7
listening 34: 25,
244: 11
listing 185: 24
lists 175: 15,
196: 11,  246: 5
literally 54: 4
litigation 260: 2
little 13: 19,
19: 19,  84: 7,
90: 9,  136: 21,
216: 5,  216: 6,
231: 21,  246: 21
Littlejohn
12: 24,  13: 8
live 45: 24
lives 249: 25
LLP 2: 5

loan 198: 16
local  10: 4,
36: 18,  37: 24,
39: 4,  39: 16,
39: 21,  40: 6,
62: 1,  188: 24,
189: 6,  200: 4
locate 102: 17,
109: 12,  184: 16
located 105: 15,
107: 2,  108: 16
location 57: 24,
96: 15,  140: 19,
166: 25,  167: 2,
167: 10,  169: 2
locations
184: 22,  198: 16
Loew 194: 13,
199: 18
Loews 183: 11
logistics 59: 4
long 12: 21,
12: 24,  63: 22,
90: 12,  95: 16,
102: 24,  192: 13,
193: 3,  193: 6,
239: 21,  239: 23,
245: 6,  247: 22
longer 21: 13,
32: 20,  43: 18,
79: 15,  163: 11,
247: 3
looked 75: 22,
100: 20,  136: 5,
179: 23,  196: 25,
207: 7
Looking 73: 4,
108: 14,  134: 23,
153: 6,  154: 6,
160: 19,  181: 6,
181: 7,  192: 20,
209: 10,  209: 22
looks 68: 19,
149: 23,  186: 21
Loop 25: 10,
105: 15,  196: 20
lord 25: 6
lose 70: 14,
225: 15
losing 238: 2

lost 12: 23,
69: 25,  70: 5,
71: 7,  71: 13,
225: 18
lot 32: 23,  39: 5,
40: 15,  42: 13,
46: 16,  54: 25,
55: 4,  63: 25,
91: 14,  94: 24,
96: 17,  167: 13,
169: 22,  169: 25,
184: 13
Lott 253: 7,
253: 8
loudest 234: 11
Love 179: 12
lower 141: 4
Lunch 127: 7,
127: 9,  127: 25,
152: 1,  152: 5,
216: 22,  247: 14
LYNN 1: 20


< M >
M-C-G-I-L-L
98: 17
ma'am 19: 17,
24: 12,  66: 3,
91: 10,  98: 3,
114: 16,  115: 25,
117: 17,  150: 7,
180: 19,  192: 23,
222: 18
Maas 251: 18
Madeleine 251: 15
mail 151: 21,
197: 22
mailed 162: 13
Mainly 100: 3,
101: 4,  106: 12,
159: 8,  188: 13,
195: 25,  201: 9
maintain 129: 12
maintained
208: 20
major 159: 8,
184: 8
Mall  75: 11,
75: 15,  75: 20,

75: 23,  76: 5
man 241: 17,
241: 18
Management
173: 5,  194: 6,
201: 18
Manager 43: 5
managers 185: 18,
191: 11,  194: 2
managing 134: 24
manner 134: 3,
165: 19,  165: 22
manufacture
256: 22
manufacturing
256: 7
map 58: 9,  257: 18
March 79: 4,
89: 3,  116: 5,
116: 10
Marcus 110: 16,
112: 15,  207: 2,
221: 25
MARCUS BUSCH
1: 25
margin 132: 21,
225: 11
marital 148: 10
Mark 14: 16,
253: 3
marked 10: 23,
141: 24
market 109: 7,
185: 19
married 131: 14,
182: 2,  182: 10
Martin 252: 18,
253: 9
Martinez 198: 6
Marvin 179: 12
Mary 251: 23,
252: 2
Masterplan
24: 25,  26: 22,
26: 23,  78: 8,
84: 19
matching 187: 19
material 110: 7
Matlock 251: 19
Matt 253: 9

matter 11: 21,
19: 9,  33: 2,
91: 20,  110: 15,
117: 13,  154: 12,
240: 4,  255: 1,
257: 6,  268: 5
matters 155: 1
maximum 122: 7,
209: 21
Maxine 44: 23,
88: 5,  89: 2
Mayberry 251: 20
Mayor 15: 7,
32: 10,  32: 11,
32: 12,  32: 13,
46: 10,  46: 13,
47: 4,  50: 2,
50: 14,  75: 6,
140: 24,  166: 17,
192: 18,  199: 24,
214: 16
Meacham 1: 27,
6: 2,  7: 2,  85: 24,
163: 8,  263: 9
Meacham.  163: 3
Meaning 24: 22,
36: 18,  245: 6
means 55: 17,
147: 21,  158: 6,
171: 22,  188: 17,
210: 7,  212: 25,
213: 18,  217: 2,
217: 11,  228: 23,
244: 1,  246: 5,
247: 15,  250: 21
meant 97: 6,
157: 10,  157: 24,
161: 24,  171: 14,
172: 2,  212: 24,
224: 5
mechanical  2: 37
media 76: 17,
76: 18,  76: 19
Medlock 251: 21
meet 41: 19,
41: 22,  42: 7,
63: 6,  64: 3,
78: 24,  80: 23,
81: 1,  86: 18,
95: 9,  95: 12,

121: 18,  135: 21,
158: 20,  158: 21,
191: 11,  215: 10,
215: 13,  215: 23,
254: 21
meeting. 92: 25
meetings 11: 9,
42: 2,  42: 5,
49: 2,  53: 6,
65: 2,  94: 5,
101: 24,  102: 4,
102: 9,  140: 7,
140: 10,  140: 13,
143: 17,  143: 23,
143: 24,  144: 3,
184: 7,  184: 13,
184: 15,  226: 14,
226: 15,  226: 23,
226: 24
member 24: 16,
24: 17,  78: 14,
190: 12,  267: 8
members 38: 13,
40: 22,  41: 7,
94: 11,  94: 13,
94: 14,  101: 8,
101: 13,  101: 16,
101: 17,  101: 20,
101: 25,  102: 3,
102: 6,  102: 9,
116: 6,  124: 23,
127: 4,  187: 20,
204: 12
memo 38: 12,
38: 22,  60: 13,
153: 6,  153: 9,
154: 24
Memor 267: 7
memorandum 126: 8
Memorial 29: 7,
31: 13,  32: 24,
32: 25,  33: 6,
41: 20,  43: 12,
48: 10,  49: 15,
51: 8,  51: 23,
52: 16,  57: 8,
85: 5,  86: 5,
86: 21,  95: 3,
97: 4,  97: 19
memory 13: 8,

36: 10,  36: 13,
36: 15,  208: 7,
226: 16,  226: 25,
239: 3
mention 91: 7,
177: 5
mentioned 69: 18,
89: 6,  102: 12,
200: 13,  203: 3,
225: 20,  236: 9
mentions 204: 3
message 66: 21,
92: 24,  135: 23
met 24: 10,
32: 10,  42: 17,
79: 8,  131: 25,
142: 12,  142: 16,
180: 25,  198: 19,
198: 22,  207: 20,
207: 23,  215: 23,
216: 14,  216: 16,
216: 17,  217: 1,
218: 9,  218: 13,
219: 7,  219: 11,
229: 10,  242: 17,
242: 19,  257: 19
metropolitan
205: 9
mic 152: 10
Michael 191: 14,
191: 19,  195: 13,
252: 10
microphone 98: 21
middle 8: 21,
19: 3,  136: 7
midst 83: 18
Mike 185: 12
mile 30: 7,  36: 9,
49: 7
miles 97: 25
military 99: 16
millennium 116: 8
Miller 75: 6,
75: 14,  75: 19,
76: 6,  77: 8,
77: 11,  77: 13,
204: 18,  214: 16
million 107: 6,
107: 11,  109: 22
Mills 75: 22,

75: 23
mind 17: 5,
120: 16,  123: 13,
253: 22,  255: 8
Mine 52: 24,
164: 12
minimum 38: 25
minorities 73: 4,
73: 6,  73: 12
Minority 51: 12,
72: 4,  72: 14,
72: 22,  72: 24,
72: 25,  78: 11,
78: 14,  108: 3,
108: 11,  144: 19,
146: 8,  146: 10,
153: 1,  183: 18,
184: 17,  198: 4,
198: 15,  198: 16,
227: 23,  228: 1,
232: 21,  233: 3
minute 29: 21,
37: 14,  115: 22,
161: 12,  163: 20,
178: 10,  178: 11,
178: 13,  178: 15,
202: 2,  250: 10
minutes 79: 19,
111: 1,  114: 20,
123: 23,  152: 2,
192: 25,  193: 7,
225: 10,  225: 12,
239: 22,  239: 24,
245: 20,  247: 17,
264: 45
Minyard 186: 22
mirror 145: 12
misleading 60: 21
missed 29: 8
misspelling 4: 5
mistake 117: 10
misunderstood
213: 21
Mitch 50: 17
Mitchell-brooks
251: 22
mixed 216: 18
mixed-use 79: 12
mixer 162: 11
mobilize 79: 3

moment 12: 22,
13: 8,  21: 21,
30: 3,  91: 16,
111: 5,  148: 18,
163: 1,  163: 23,
229: 6
monitoring 39: 12
month 10: 17,
10: 18,  67: 17,
68: 19,  156: 16,
173: 4,  216: 15
monthly 151: 15,
151: 16
months 10: 18,
29: 15,  87: 19
moratorium
124: 18,  212: 15,
212: 24,  213: 2,
213: 5,  213: 7,
213: 12,  214: 7,
214: 14,  214: 16,
214: 19,  216: 8
Morgan 190: 24
morning 4: 17,
10: 17,  12: 18,
13: 16,  13: 18,
21: 12,  24: 8,
24: 9,  91: 13,
112: 13,  142: 7,
254: 24
mostly 188: 24
motion 111: 17,
210: 1,  255: 1,
255: 5
motivated
255: 12,  259: 13
motivation
123: 24,  124: 15,
124: 17,  125: 10,
125: 11,  146: 4,
212: 19,  214: 20,
216: 19,  216: 20
motive 112: 22,
117: 8,  146: 10,
255: 11,  255: 12,
256: 1,  256: 4
motives 119: 7,
123: 18
move 35: 14,
41: 23,  46: 5,

77: 22,  86: 25,
87: 15,  87: 18,
87: 20,  87: 23,
133: 17,  146: 16,
213: 3,  226: 19,
230: 10,  231: 21,
232: 9
moves 140: 2
movie 186: 15
moving 22: 6,
109: 2,  213: 15
MR. GREENE 8: 13,
8: 17,  9: 2,  9: 5,
9: 23,  13: 11,
13: 15,  14: 15,
14: 20,  14: 23,
14: 24,  15: 9,
15: 11,  20: 6,
22: 1,  22: 2,
23: 2,  23: 6,
23: 10,  23: 11,
24: 2,  143: 6,
143: 14,  144: 21,
144: 23,  254: 25,
255: 5,  255: 21,
256: 17,  258: 13,
260: 5,  260: 20,
260: 24,  261: 22
MR. MUREEN 3: 15,
4: 2,  4: 16,  4: 22,
4: 24,  5: 2,  5: 14,
5: 22,  6: 12
MR. VITAL 3: 11,
3: 13,  87: 2,
88: 21,  93: 13,
93: 24,  140: 14,
148: 2,  225: 4,
239: 20,  260: 10
Ms 10: 22,  12: 3,
12: 4,  13: 16,
14: 25,  15: 12,
21: 20,  24: 8,
35: 13,  63: 9,
74: 24,  82: 17,
86: 2,  92: 20,
98: 8,  131: 12,
139: 22,  156: 13,
161: 12,  183: 5,
231: 25,  239: 10,
260: 25

MS. DECKARD
10: 15,  10: 24,
11: 4,  11: 7,
11: 12,  239: 11,
239: 22
MS. SALDANA
11: 20,  261: 1,
261: 18
mulligan 5: 7
multi-family
57: 23,  57: 25,
58: 11,  58: 12,
58: 13,  58: 16,
71: 9,  78: 18,
78: 22,  118: 17,
124: 2,  124: 9,
124: 18,  125: 7
multi-step
254: 15
Mureen 2: 4,
3: 14,  5: 5,  5: 24,
8: 24,  23: 4,
81: 19,  267: 46
Murphy 187: 16,
190: 24
muscle 214: 11
mutually 261: 15
Myriad 82: 21,
267: 23
myself 106: 12,
127: 10,  142: 21,
143: 20,  144: 4,
162: 1,  202: 23,
217: 13,  227: 9


< N >
NAME 94: 18,
98: 16,  105: 11,
111: 11,  131: 11,
135: 11,  139: 9,
180: 23,  240: 3,
240: 24,  250: 21,
263: 2
names 4: 24,
74: 13,  250: 4
national 183: 21
Nationsbank
191: 15,  195: 13,
195: 14

naturally 101: 24
nature 19: 14,
97: 15,  133: 24,
166: 15,  246: 23
NBO 200: 19
NBO. 200: 18
Nealy 13: 12,
13: 16,  14: 25,
15: 12,  21: 20,
24: 8,  35: 13,
56: 13,  67: 7,
68: 3,  74: 24,
86: 2,  90: 16,
90: 21,  92: 20,
93: 9,  98: 8,
126: 20,  126: 22,
127: 8,  144: 7,
220: 10,  227: 9,
263: 4,  264: 4
near 136: 8
necessarily
55: 21,  234: 20
necessary
248: 13,  254: 5
need 11: 21,
34: 12,  37: 3,
58: 18,  67: 10,
84: 4,  140: 14,
147: 18,  213: 1,
213: 18,  226: 16,
228: 1,  247: 19,
248: 15,  248: 16,
248: 17,  249: 1,
249: 18,  250: 23
needed 21: 6,
79: 3,  81: 11,
81: 16,  82: 4,
82: 9,  86: 24,
87: 8,  87: 11,
102: 16,  120: 8,
120: 17,  125: 12,
188: 16,  224: 4,
224: 6,  224: 7,
248: 12
needs 83: 7
negotiate
107: 25,  125: 15,
214: 22
negotiations
108: 8,  128: 25,

205: 22
Neighborhood
38: 13,  184: 20,
267: 7
Neighborhood-bas
ed 200: 20
neighborhoods
185: 19
neither 117: 3
nervous 249: 9
New 4: 20,  4: 23,
5: 9,  5: 11,
19: 25,  43: 20,
94: 24,  97: 6,
105: 24,  105: 25,
106: 9,  106: 18,
107: 3,  112: 6,
176: 8,  181: 14,
198: 15,  200: 7,
201: 10
Next 4: 9,  24: 4,
36: 1,  36: 2,
36: 3,  82: 18,
92: 14,  98: 9,
116: 12,  130: 5,
136: 15,  139: 3,
145: 19,  160: 3,
162: 15,  164: 14,
175: 16,  203: 25,
215: 21,  244: 5,
247: 3,  252: 9,
254: 7
nice 245: 22
Nicole 252: 4
night 176: 7
noble 190: 4
nobody 250: 20
nod 98: 22
Nodding 14: 21,
22: 10,  44: 5
noisy 158: 21
non-profit 99: 25
non-profits
100: 1,  100: 2,
101: 1
None 83: 5,  84: 1,
96: 7,  97: 11,
110: 19,  116: 10,
116: 11,  148: 12,
229: 2

none-starter
32: 9
nonresponsive
41: 3,  107: 16
Nor 13: 25,  117: 3
normal 207: 1
Normally 20: 24,
226: 8,  226: 13
Norman 139: 22,
185: 15
North 73: 2
Northern 1: 2,
1: 30,  268: 15
Northwest 2: 23
Note 142: 3,
221: 21,  225: 11
notes 6: 18,
79: 17,  208: 1,
264: 24,  264: 31,
266: 18
Nothing 24: 2,
66: 25,  92: 16,
97: 14,  112: 22,
208: 21
notice 111: 14,
111: 16,  111: 17,
159: 20
noticed 110: 9
November 138: 10,
140: 1,  206: 25,
215: 10,  233: 14
numbered 7: 24
Numbers 7: 13,
8: 8,  8: 18,
10: 21,  246: 17


< O >
O'donnell 41: 17
Oak 185: 2,
185: 21,  185: 25,
186: 8,  187: 20,
188: 20,  197: 2,
197: 17,  198: 3
Object 6: 2,  6: 5,
11: 23,  35: 11,
41: 3,  84: 14,
88: 21,  93: 22,
95: 25,  96: 24,
97: 20,  107: 15,

137: 6,  140: 14,
142: 12,  143: 6,
143: 14,  144: 21,
148: 2,  160: 6,
165: 3,  168: 2,
172: 7,  173: 10,
223: 4
objected 6: 10
objecting 261: 17
Objection 6: 16,
7: 8,  8: 9,  9: 14,
10: 10,  10: 11,
10: 20,  11: 2,
11: 15,  12: 6,
20: 2,  38: 6,
47: 6,  60: 20,
75: 8,  75: 16,
87: 2,  91: 17,
91: 24,  93: 13,
94: 21,  111: 17,
111: 20,  111: 23,
113: 8,  113: 10,
113: 11,  114: 13,
117: 16,  123: 20,
124: 3,  133: 5,
170: 1,  171: 23,
209: 2,  225: 6,
258: 2
Objections 5: 16,
5: 17,  6: 3,  6: 22,
9: 6,  9: 10,  9: 16,
110: 18,  249: 17
objects 6: 24,
7: 1,  8: 2,  9: 7,
9: 9,  10: 21
obligation 63: 2
obtain 52: 11,
130: 14
obtained 105: 17,
106: 21
obtaining 201: 11
obvious 76: 11
Obviously 18: 24,
33: 14,  70: 23,
70: 24,  110: 7,
112: 20,  247: 2
occasion 121: 18,
173: 2,  177: 2,
177: 6,  226: 13,
226: 14

occasions 30: 11,
177: 2,  243: 2
occur 88: 11
occurred 11: 21,
30: 6,  30: 14,
34: 20,  154: 17,
154: 18,  164: 14,
166: 7,  170: 12,
178: 23,  206: 5,
241: 13
occurs 258: 6
October 133: 20,
137: 14,  171: 5,
194: 14,  206: 18,
206: 25,  215: 11,
223: 19,  233: 14
odd 88: 15,
95: 13,  258: 22,
259: 12
Odell 187: 16
Odyssey 65: 9,
86: 20,  149: 23
offended 250: 2
offense 117: 4,
120: 7,  123: 14,
207: 6,  207: 10,
207: 12,  207: 16,
209: 9
offer 3: 15,
3: 21,  4: 9,  6: 12,
7: 18,  7: 19,
7: 25,  8: 7,  8: 17,
9: 25,  10: 6,
10: 15,  38: 5,
111: 9,  111: 25
offered 6: 19,
8: 14,  8: 16,
8: 19,  9: 8,
25: 14,  91: 19,
91: 21,  113: 22,
117: 7
offering 11: 6
offers 5: 14
Office 2: 13,
2: 22,  17: 13,
56: 8,  56: 12,
64: 13,  66: 22,
92: 24,  101: 15,
158: 20,  191: 17,
196: 9,  209: 1,

264: 4
officeholder
175: 10
officer 104: 8,
149: 9,  192: 9,
198: 22,  201: 14
officers 12: 24,
13: 2,  13: 5,
257: 5
offices 206: 22,
207: 15,  248: 23
Official 75: 1,
133: 25,  134: 4,
198: 19,  236: 7,
258: 17,  268: 14
officials 13: 6,
63: 18,  63: 25,
73: 21,  208: 16,
208: 17
often 102: 15
Ola 149: 2,
149: 3,  265: 6
Once 4: 9,  48: 25,
107: 12,  243: 6
One.  49: 13,
74: 21,  78: 1,
186: 12,  254: 3,
260: 16
ones 4: 20,  5: 19,
8: 21,  11: 12,
247: 10
ongoing 184: 7
ongoing-forward
91: 1
onus 258: 20
open 129: 6,
221: 20,  222: 1,
248: 11,  257: 21
opened 103: 20
opening.  12: 17
openings 187: 4
openly 221: 14
openness 218: 25
openness.  128: 23
opens 258: 6
operate 27: 10
operating 192: 9
operations
184: 3,  185: 1
operators 191: 12

opinion 37: 9,
37: 11,  47: 20,
76: 15,  76: 18,
78: 13,  84: 13,
113: 12,  234: 7,
257: 24,  257: 25
opportunities
192: 5,  192: 6
opportunity
90: 4,  117: 9,
118: 25,  119: 1,
119: 6,  120: 8,
160: 19,  160: 23,
187: 2,  188: 15,
191: 10,  191: 11,
204: 7,  207: 7,
209: 10
opposed 29: 23,
39: 16
opposing 33: 24,
34: 1,  78: 17,
78: 22,  245: 13
opposition 25: 6,
49: 16,  49: 20,
49: 23,  51: 4,
95: 4,  124: 7,
124: 9,  125: 6
option 210: 1
order 117: 24,
125: 12
ordered 122: 11,
122: 12
organization
100: 10,  100: 20,
104: 12,  152: 24,
152: 25,  181: 6,
181: 7,  192: 3,
192: 15,  198: 4,
204: 10
organization.
195: 1
organizations
99: 25,  184: 9,
184: 10,  200: 20
organize 101: 4,
101: 5
organized
183: 17,  197: 5,
246: 3
organizing

182: 20
orient 105: 5
origin.  183: 21
Original 21: 12,
33: 4,  33: 5,
92: 4,  228: 8
originally
201: 22
others 4: 15,
6: 2,  9: 21,
83: 11,  158: 6,
183: 19,  185: 9,
246: 11
Otherwise 96: 3,
119: 1,  209: 5,
257: 22
Otis 252: 5
ought 194: 11
ourselves 3: 20,
201: 25,  228: 24
outcome 191: 12
outreach 136: 9
Outside 93: 20,
96: 10,  103: 24,
111: 5,  146: 18,
247: 6,  247: 9,
258: 4,  260: 22
outstanding
17: 4,  67: 7,
89: 22,  90: 2,
90: 6
outweighed
257: 12,  259: 21
outweighs
112: 25,  113: 1,
259: 18
overheard 113: 20
overlap 246: 19
overlaps 246: 8
Overruled 20: 3,
20: 5,  60: 22,
75: 17,  84: 16,
91: 24,  97: 22,
113: 10,  142: 13,
143: 8,  143: 16,
144: 22,  144: 24,
160: 8,  172: 9,
173: 12,  180: 15,
209: 5,  225: 6
overrules 114: 13

oversaw 107: 14
oversee 115: 15
overview 184: 3,
185: 1
owe 69: 10
owed 26: 13,
67: 11,  89: 7,
89: 11,  173: 17
own 19: 19,  81: 8,
85: 6,  85: 10,
85: 15,  86: 21,
118: 22,  118: 24,
189: 19,  260: 15
owned 85: 9,
85: 12,  206: 12,
206: 16
owner 33: 18,
57: 9,  191: 16
owners 149: 20,
149: 21,  197: 20
ownership 85: 16,
145: 24,  201: 12,
201: 17,  201: 21,
202: 4,  220: 11,
222: 6,  222: 9,
222: 12,  228: 11

< P >
P.  2: 12,  2: 30,
268: 3,  268: 13
p.m.  92: 23,
155: 9,  158: 12,
160: 25,  162: 16,
177: 20,  178: 24
Pace 253: 10
pages 35: 7,
79: 17
paid 26: 17,
39: 1,  69: 19,
70: 1,  70: 6,
89: 7,  89: 9,
103: 16,  133: 24,
134: 3,  134: 13,
134: 20,  134: 21,
134: 24,  147: 22,
147: 23,  148: 6,
169: 21,  170: 14,
170: 18,  170: 24,
170: 25,  171: 4,

182: 12,   189: 2,
213: 18,   213: 24,
214: 4,   214: 8,
214: 10,   231: 9,
231: 11,   233: 9,
233: 10,   237: 2
pair 47: 23
pan 68: 10
Pancake 92: 4
Pancakes 21: 13,
33: 4,   33: 5
Pappadeaux 79: 9,
80: 10,   126: 24,
127: 7,   142: 10,
142: 17,   142: 20,
142: 25,   143: 24,
215: 17,   216: 23,
226: 21
paragraph 57: 20,
130: 12,   131: 8,
131: 19,   133: 18,
133: 20,   135: 15,
136: 8,   136: 16,
147: 1,   149: 4,
150: 4,   150: 23,
150: 24,   150: 25,
198: 1,   203: 9
paranoia 258: 22
Pardon 39: 25,
256: 16
parentheses
131: 10
parents 149: 3
Park 29: 7,
31: 13,   32: 24,
32: 25,   33: 6,
41: 20,   43: 13,
48: 10,   51: 8,
51: 23,   52: 16,
57: 8,   85: 5,
86: 5,   86: 22,
95: 3,   97: 4,
97: 19,   190: 10
parking 91: 14,
167: 13,   169: 22,
169: 25
Parsons 195: 14
part 22: 6,   52: 9,
55: 9,   62: 10,
62: 21,   68: 3,

83: 14,   89: 22,
94: 2,   107: 24,
109: 7,   122: 6,
129: 18,   183: 1,
184: 2,   221: 4,
221: 6,   221: 10,
222: 10,   225: 15,
230: 2,   236: 4,
241: 16,   248: 18,
254: 10,   256: 13
part-time 91: 2
parte 248: 1,
248: 2
partial 246: 15
participate
103: 6,   145: 22,
145: 25
participated
126: 21,   128: 5,
187: 22
participating
228: 7,   228: 22
participation
72: 4,   136: 10,
198: 15
particular 14: 7,
65: 5,   72: 17,
74: 4,   74: 10,
103: 1,   113: 24,
119: 13,   128: 18,
133: 18,   138: 10,
138: 15,   149: 7,
152: 20,   153: 9,
159: 17,   162: 12,
184: 6,   200: 4,
256: 23,   257: 2,
259: 5
particularly
212: 25
parties 115: 8,
247: 25
partner 25: 21,
44: 16,   47: 3,
119: 1,   217: 11,
228: 7,   228: 22
partners 43: 18,
44: 14,   217: 8,
217: 23,   218: 4,
218: 7,   218: 9
Partnership

43: 20,   44: 6,
111: 9,   115: 5,
179: 7,   204: 20,
264: 13
parts 51: 12,
67: 24,   118: 16,
200: 14
party 82: 12,
82: 22,   83: 2,
83: 6,   83: 10,
83: 12,   84: 3,
84: 11,   176: 7
pass 87: 11,   98: 4
passed 22: 4,
29: 3,   29: 9,
41: 11,   49: 24,
50: 1,   50: 2,
50: 4,   50: 12,
51: 6,   60: 24,
72: 18,   109: 2,
140: 3,   161: 8,
232: 17
past 182: 24,
184: 4
Pastor 252: 6
Paul 200: 11
Pause 14: 23,
157: 13,   157: 20,
158: 16
pawn 186: 17
pay 26: 14,
26: 23,   46: 2,
52: 6,   71: 2,
71: 3,   83: 2,
89: 11,   147: 6,
169: 24,   173: 7,
212: 3,   212: 4,
212: 10,   231: 6,
236: 7
paying 26: 19,
71: 7,   90: 8
payment 17: 4,
132: 16,   237: 5,
237: 8,   237: 18
payments 171: 4,
171: 7,   171: 8,
237: 1,   237: 20
payoff 166: 21,
168: 6,   168: 8,
169: 18,   176: 17,

235: 4,   235: 11,
235: 18,   235: 23,
235: 25,   236: 3,
236: 14
Pecan 29: 2,
49: 14,   49: 19,
49: 24,   50: 11,
51: 5,   60: 11,
60: 15,   65: 10,
97: 5,   97: 18,
97: 25,   138: 5,
138: 6,   149: 5,
152: 23,   223: 11,
225: 20,   233: 9,
264: 41,   264: 45,
265: 6
Pemberton 25: 4
pending 60: 19,
124: 20,   161: 7,
212: 21,   223: 1,
223: 7,   260: 2
People 3: 22,
20: 13,   21: 7,
37: 12,   45: 2,
46: 15,   54: 6,
55: 25,   58: 14,
71: 2,   71: 3,
71: 25,   72: 13,
79: 3,   79: 7,
83: 2,   86: 12,
86: 14,   86: 18,
90: 23,   91: 2,
92: 7,   92: 8,
130: 19,   143: 19,
184: 2,   185: 2,
187: 15,   190: 15,
191: 10,   191: 20,
193: 22,   197: 9,
253: 18,   256: 22
per 67: 15,
132: 17,   133: 4,
188: 6,   188: 7,
189: 7,   189: 22
percent 136: 9,
205: 9,   219: 25,
220: 1,   220: 3,
220: 7,   220: 11,
220: 16
percentage
219: 22,   219: 23,

220: 8,  220: 18,
220: 19,  220: 20,
221: 1,  221: 3,
221: 13,  222: 5,
222: 9,  222: 12,
222: 15
percentages
222: 8
Perhaps 17: 5,
119: 4,  124: 8,
125: 17,  150: 17,
157: 16,  247: 4,
247: 25,  254: 12
period 54: 16,
54: 17,  102: 8,
105: 4,  140: 6
permit 258: 4,
258: 10,  260: 9,
260: 21,  261: 12
permitted 261: 21
permitting
259: 15
Perry 203: 16
person 15: 20,
18: 9,  18: 10,
18: 18,  19: 1,
19: 2,  19: 4,
45: 11,  48: 2,
63: 17,  71: 19,
118: 24,  127: 14,
127: 17,  127: 18,
127: 20,  127: 23,
132: 22,  134: 4,
144: 13,  144: 16,
144: 18,  244: 18,
245: 9,  245: 12,
257: 20
personal  12: 22,
28: 1,  54: 23,
76: 8,  76: 15,
76: 16,  118: 22,
197: 21,  260: 15
persons 44: 21,
45: 7,  71: 16,
78: 11,  114: 9,
245: 7
perspective
259: 8
peruses 126: 6
phase 107: 23,

121: 14
Phillip 251: 17
phone 24: 11,
151: 16,  162: 7,
166: 8,  240: 11,
241: 16,  244: 11
phonetic 250: 19
photograph
167: 5,  169: 16,
191: 14,  192: 17,
206: 9
photographs
106: 2,  106: 3,
166: 22,  167: 8,
168: 11,  170: 12,
190: 8,  193: 22
photos 167: 4
phrase 161: 24,
217: 7
physical 124: 24
pick 66: 24
picked 230: 18
picket 79: 4,
103: 1,  193: 16
picketers 102: 23
picketing
102: 12,  102: 14,
102: 22,  103: 3,
103: 5,  103: 6,
103: 15,  103: 19,
103: 24,  193: 19,
193: 22,  194: 1
pickets 101: 5,
102: 24
picture 23: 7,
169: 9
pictured 187: 15
piece 87: 20,
129: 3,  129: 4,
146: 7,  156: 19,
219: 16,  219: 17,
219: 18,  219: 20,
220: 22,  220: 23,
221: 24
pig 237: 24
pissing 159: 24
pivotal 223: 21,
225: 14
place 14: 9,
77: 24,  85: 19,

87: 25,  132: 15,
140: 10,  140: 13,
141: 10,  167: 12,
167: 18,  169: 15,
205: 15,  206: 25,
227: 4,  228: 13
placement 187: 10
places 186: 19
Plan 22: 4,  57: 8,
96: 11,  117: 9,
212: 8,  213: 10,
213: 13,  213: 15,
213: 16,  213: 17,
213: 18
planner 82: 24,
83: 3,  83: 10,
264: 24
Planning 22: 7,
41: 18,  87: 11,
205: 21,  205: 22,
235: 6
planning. 235: 9
plans 244: 12
play 14: 7,
14: 15,  22: 22,
22: 25,  23: 3,
81: 18,  107: 13,
107: 24,  155: 7,
156: 12,  157: 4,
160: 5,  163: 25,
164: 22,  166: 12,
178: 7,  179: 1,
182: 17,  184: 13
played 163: 16,
181: 7,  205: 1,
232: 6,  242: 5,
242: 6,  243: 13
player 177: 13
playing 160: 6
Plaza 115: 6,
115: 13,  206: 10
plea 10: 3,
122: 6,  122: 18,
209: 15,  209: 16,
211: 5,  256: 10
plead 122: 1,
180: 11,  256: 22
pleading 122: 3,
155: 15,  155: 21,
256: 19,  256: 24

pleasure 215: 22
pled 211: 6,
221: 8
pledged 25: 18
Plemons 253: 11
plot 221: 4,
221: 11,  222: 23,
223: 4,  223: 21,
224: 11,  224: 16,
225: 15,  228: 16,
228: 20,  228: 25,
233: 21,  236: 4
plus 38: 25,
136: 9
PO 180: 4
point 18: 8,
20: 11,  52: 10,
78: 17,  86: 2,
88: 11,  89: 6,
93: 1,  100: 4,
100: 9,  102: 7,
105: 21,  120: 17,
120: 18,  121: 1,
143: 20,  159: 25,
170: 13,  192: 22,
228: 25,  229: 24,
233: 12,  245: 17,
255: 7,  256: 6,
258: 19,  259: 5
point. 33: 2,
233: 7
pointed 86: 20
Pointing 184: 22
points 37: 16,
223: 21
poisoned 157: 9
Police 188: 1
policies 37: 19
political  56: 14,
63: 23,  90: 22,
176: 3,  240: 18,
241: 5
Politically
25: 25,  119: 4,
155: 25
politicians
33: 10
pop 124: 11
Port 75: 1
portion 22: 25,

35: 9, 36: 4,
66: 8, 68: 17,
87: 23, 95: 10,
95: 11, 154: 6,
154: 7, 242: 5
position 8: 23,
30: 1, 71: 13,
104: 4, 113: 17,
256: 11
positive 100: 19
Poss 251: 23
possibility
67: 13, 165: 23,
234: 21
possible 146: 8,
146: 10, 202: 3,
213: 2, 254: 2,
254: 4, 254: 9
possibly 124: 19,
153: 5, 212: 20,
228: 23, 252: 9
Post-it 142: 3
Potashniks
163: 9, 163: 12
potential 42: 17,
108: 1, 109: 12,
109: 16, 109: 17,
118: 9, 153: 10,
187: 2, 196: 24
potentially
118: 22
powering 203: 11
PRE-ADMITTED
267: 44
pre-development
69: 20, 70: 25,
71: 1
precaution
234: 16
preconstruction
107: 23
preference 37: 8,
37: 24, 40: 6,
62: 3
preferences
36: 18, 37: 1
preferred
131: 11, 153: 2,
153: 13
prejudice 249: 17

prejudicial
112: 25, 113: 1,
257: 13, 259: 18,
259: 21
Prentice 159: 5,
159: 7, 252: 24
preparation
117: 9
prepare 184: 3,
185: 23, 202: 18,
202: 24, 203: 1
prepared 182: 22,
185: 2
preparing
124: 16, 183: 1,
212: 19
prescribed 268: 7
presence 140: 8,
258: 4, 260: 22
present 11: 25,
76: 12, 121: 16,
166: 18, 167: 12,
227: 8
Presentation
124: 24, 125: 4,
182: 15, 182: 18,
182: 23, 194: 13,
202: 12, 206: 18,
259: 17
presented 124: 21
presidency
199: 13
President
104: 11, 104: 15,
115: 12, 116: 17,
116: 24, 117: 21,
132: 3, 171: 1,
171: 6, 185: 3,
185: 12, 192: 9,
200: 7, 203: 23
presidents
200: 10
pressure 119: 4,
119: 5, 125: 17,
157: 1, 176: 25,
212: 2, 212: 8,
213: 3, 213: 10,
213: 22, 214: 24,
215: 8, 216: 3,
216: 9, 216: 12,

216: 23, 219: 1
Pretty 26: 10,
45: 2, 109: 12,
129: 6, 155: 18,
160: 2, 162: 24,
227: 1
previously
13: 13, 256: 3
Price 73: 5
prices 109: 17
primary 125: 11,
214: 19, 214: 20
print 140: 23
printed 154: 7
prior 6: 23,
15: 25, 26: 25,
27: 4, 92: 13,
92: 15, 154: 23,
181: 12, 216: 22,
255: 10, 258: 22,
259: 14, 260: 8
private 100: 6,
196: 9, 244: 8,
249: 6
privately 253: 18
privilege 12: 22
Pro 32: 13,
140: 24, 188: 12,
188: 17, 191: 3,
195: 16, 201: 2
proactive 41: 23
probable 253: 21
probablies 246: 5
Probably 5: 17,
30: 1, 45: 1,
55: 4, 215: 23,
254: 25, 255: 7,
261: 15
probative
257: 12, 259: 19,
259: 20
problem 28: 14,
83: 21, 90: 9,
90: 13
problems 31: 15,
189: 14, 247: 25
procedure 16: 10
procedures 37: 19
proceed 3: 9,
13: 10, 114: 22

proceedings
2: 37, 268: 4
process 54: 2,
85: 8, 91: 8,
106: 7, 106: 11,
135: 16, 198: 20,
254: 15
proclamation
203: 25, 204: 1
Procurement
191: 5, 191: 11,
192: 5, 198: 15
produced 2: 38
productive
248: 18, 249: 15,
254: 15
Products 191: 17
Professional
82: 21, 121: 12,
121: 17
Professionally
46: 18
proffer 111: 6
profit 123: 19
program 182: 22,
183: 8, 184: 2,
185: 23, 187: 11,
189: 21, 190: 8,
193: 21, 196: 19,
197: 14, 202: 11,
202: 18, 202: 24,
203: 2, 203: 6,
203: 16, 204: 19
programs 183: 1,
187: 8, 199: 16
projec 91: 3
project. 145: 24
promise 122: 22,
210: 13, 210: 15
promises 209: 17
promote 198: 4
proper 7: 23,
171: 13
properties 54: 17
property 39: 24,
40: 1, 40: 2,
40: 5, 43: 2,
59: 10, 85: 6,
87: 14, 87: 15,
87: 20, 87: 24,

88: 2, 95: 2,
97: 5, 105: 22,
117: 25, 122: 15,
156: 19, 201: 9
proposal 132: 9
proposed 57: 24,
119: 8, 218: 14
proposes 58: 1
proposing 42: 11
proposition
248: 11
prosecute 211: 3,
211: 7, 211: 20
prosecuted
210: 22
prosecuting
211: 21
prosecution
202: 7
protect 13: 3
protests 197: 5
proud 196: 14
prove 9: 21,
117: 8
provide 29: 20,
71: 18, 86: 11,
147: 20, 183: 18,
187: 2, 199: 10,
205: 20, 205: 24
provided 40: 24,
64: 11, 66: 9,
107: 7, 153: 18
Provident 64: 21,
89: 21, 97: 5
provides 201: 2
provision 134: 5
public 63: 17,
63: 25, 73: 20,
121: 14, 130: 19,
134: 3, 184: 8,
200: 16, 208: 16,
236: 7, 258: 17
publicly 258: 16
pull 56: 14,
177: 4
Punked 20: 1
purchase 58: 22,
87: 9, 87: 15
purchaser
109: 10, 109: 14

purpose 91: 21,
91: 25, 93: 12,
93: 19, 117: 7,
117: 14, 117: 23,
138: 12, 146: 9,
147: 17, 153: 9,
166: 20, 183: 17,
184: 15, 185: 17,
187: 1, 188: 10,
191: 9, 191: 25,
197: 11, 201: 8,
205: 4, 227: 25
purposes 114: 14,
137: 10, 201: 16
pursue 100: 6
pursued 163: 13
pursuing 198: 13
push 156: 1
pushed 105: 24
pushing 39: 20
Put 11: 10, 23: 3,
35: 4, 35: 6,
64: 24, 65: 24,
69: 8, 69: 9,
87: 9, 107: 4,
109: 22, 112: 14,
116: 21, 125: 17,
144: 14, 155: 17,
157: 1, 164: 4,
171: 14, 177: 1,
184: 22, 213: 2,
213: 10, 213: 22,
214: 24, 216: 3,
216: 9, 216: 12,
216: 23, 229: 20,
252: 9, 253: 19,
258: 25, 260: 8,
260: 13
putting 37: 24,
58: 16, 82: 22,
87: 25, 157: 2,
210: 1, 215: 8,
260: 6


< Q >
quality 55: 24
questioner 98: 24
questioning
22: 19, 35: 12,

261: 5
questions 17: 12,
29: 20, 40: 15,
40: 18, 40: 20,
40: 21, 40: 24,
41: 6, 41: 16,
41: 25, 42: 13,
42: 21, 45: 21,
47: 14, 47: 22,
48: 22, 48: 24,
85: 22, 86: 3,
86: 8, 86: 15,
86: 17, 91: 4,
95: 15, 97: 11,
128: 18, 150: 8,
180: 17, 239: 10,
239: 11, 239: 14,
239: 18, 258: 8,
261: 9
quick 9: 13,
35: 17, 56: 19
quicker 23: 3
quickly 213: 1,
231: 22
Quinn 200: 11
quite 8: 22,
258: 14


< R >
R. 2: 4
RA-MILL 156: 7,
156: 10, 158: 6
race 74: 17,
183: 20
raid 207: 21,
238: 15
raided 206: 21,
207: 15
Raise 98: 15,
219: 1, 255: 4
raised 67: 17,
89: 22, 92: 3,
95: 5, 106: 8,
236: 21
raising 200: 17
ran 46: 20
range 5: 17,
73: 5, 73: 6
Rasansky 50: 17

rather 10: 6,
23: 2, 71: 25,
158: 20, 248: 22,
254: 16
Ray 1: 36, 240: 3
RDX 267: 28,
267: 31, 267: 34,
267: 37, 267: 40
re 264: 13,
264: 41, 264: 45,
265: 2, 265: 6
Re-ask 50: 9,
50: 10
Re-direct 263: 9
re-enforce
228: 17
re-think 255: 18
reach 253: 20
react 221: 25
Read 4: 24, 5: 2,
93: 8, 128: 13,
150: 23, 153: 24,
187: 25, 248: 13,
250: 4, 250: 9
reading 10: 3,
40: 10, 133: 20
reads 32: 8
ready 3: 9,
52: 14, 255: 2
real 9: 13,
28: 13, 35: 17,
42: 10, 86: 13,
249: 13
real-time 114: 19
reality 19: 19,
71: 24
realized 258: 19
really 13: 2,
16: 2, 33: 2,
47: 19, 59: 3,
60: 7, 85: 14,
120: 16, 125: 8,
127: 17, 168: 1,
198: 17, 226: 25,
227: 3, 227: 7,
232: 19, 241: 18,
241: 19, 253: 22
Realty 64: 21
reason 21: 5,
39: 20, 46: 19,

58: 20,   61: 11,
113: 24,   194: 1,
220: 21,   228: 12,
248: 17
reasons 219: 9
rebuilt 107: 12
recap 13: 19
receive 38: 23,
38: 24,   39: 16,
99: 19,   109: 24,
118: 5,   119: 24,
136: 12,   146: 11,
146: 13,   153: 5,
165: 10,   172: 6,
172: 13
received 65: 10,
66: 21,   118: 9,
149: 15,   153: 4,
170: 21,   174: 15
receives 39: 11
receiving 18: 10,
120: 2,   166: 8,
189: 21,   196: 3
recess 79: 24,
152: 1,   192: 25,
247: 19
recess.   12: 13,
80: 2,   152: 5
recessing 247: 13
recipient 74: 25
recognize 115: 2,
122: 25,   124: 12,
126: 11,   128: 11,
132: 21,   133: 8,
135: 6,   145: 14,
146: 18,   146: 20,
147: 13,   148: 15,
149: 14,   151: 10,
155: 12,   164: 19,
166: 25,   167: 4,
168: 14,   168: 20,
169: 8,   169: 11,
173: 8,   173: 13,
192: 1,   202: 13,
204: 11,   206: 7
recognized
203: 10
recognizing
203: 22
recollection

137: 9,   137: 21,
140: 4,   141: 16,
141: 17,   143: 9,
144: 2,   144: 3,
154: 23,   156: 8,
199: 8,   224: 24,
227: 1,   227: 3,
227: 7
recommend 72: 14,
74: 10
recommendation
57: 14,   85: 2
recommended
27: 12,   73: 20,
74: 5,   80: 11,
80: 17,   84: 24,
217: 8,   217: 10,
217: 23,   217: 24,
218: 4,   218: 6,
218: 8
reconsider
197: 12
record 18: 20,
19: 2,   21: 7,
23: 6,   75: 6,
98: 16,   113: 14,
114: 1,   114: 2,
114: 15,   148: 15,
163: 14,   194: 16,
202: 15,   268: 4
recorded 18: 10,
18: 11,   18: 24,
20: 12,   53: 18,
155: 4,   237: 23
recording 13: 25,
14: 4,   91: 5,
91: 23,   164: 1,
165: 16,   165: 19,
165: 20,   165: 21,
259: 1
recordings 11: 2,
11: 5,   11: 7,
11: 8,   11: 14,
159: 21,   159: 25,
160: 7
records 7: 22,
8: 1,   101: 14,
104: 16,   170: 18,
254: 3
recross 98: 6

rectified 194: 11
recused 28: 16
redactions
163: 9,   163: 11
redesignate 3: 26
REDIRECT 85: 24,
85: 25
redress 195: 18,
195: 22,   195: 24
reduced 17: 3,
132: 17,   208: 1
Reed 93: 9,   94: 6
Reese 44: 23,
251: 24
refer 100: 16
reference 54: 10,
141: 2,   156: 9,
254: 6
referendum
166: 17
referral 129: 13,
187: 10,   217: 12,
217: 14
referral.   128: 14
referrals 196: 7
referring
130: 18,   143: 24,
144: 5,   155: 16,
171: 20,   194: 16,
204: 25,   210: 3
refers 138: 4,
164: 9
reflect 35: 2,
68: 12,   73: 16,
142: 6
reflected 256: 4
reflecting
253: 17
reflects 68: 9,
186: 2,   203: 20
refresh 36: 10,
36: 15,   137: 8,
141: 14,   208: 7,
239: 3
refreshed 36: 12,
226: 17
refundable
132: 16
refused 26: 14
regard 102: 22,

111: 18,   127: 19,
127: 21,   156: 2,
255: 6,   261: 5
regarding 3: 17,
30: 6,   40: 22,
58: 21,   111: 25,
118: 6,   135: 17,
139: 8,   143: 1,
152: 23,   157: 5,
212: 14,   230: 6
Regardless
69: 15,   183: 20
regards 102: 13,
156: 21,   259: 2
regents 199: 3
registered 73: 1
regular 101: 17
regularly 102: 1
rehabilitation
201: 9
Reinvestment
191: 4
relate 110: 11,
110: 19,   149: 5
related 138: 5,
153: 18
relates 57: 24
relation 89: 4,
95: 1,   96: 22,
97: 4,   97: 17,
97: 18,   114: 11,
137: 1
relationship
16: 2,   54: 23,
95: 6,   95: 21,
129: 13,   148: 10,
159: 11,   159: 12
relatively
247: 1,   247: 7
relevance 75: 8,
257: 9
relevancy 114: 3
relevant 114: 12,
117: 8,   117: 13,
163: 11,   255: 15,
261: 12
religion 183: 20
relocated 100: 6,
103: 22
reluctant 155: 18

rely 3: 21
remain 255: 16,
257: 3
remaining 3: 16,
112: 16,  246: 25,
247: 5,  247: 9,
248: 3
remember 19: 24,
20: 15,  22: 14,
22: 19,  25: 16,
31: 10,  35: 1,
35: 18,  44: 22,
73: 16,  94: 8,
160: 12,  176: 9,
188: 23,  214: 25,
219: 23,  221: 10,
229: 13,  229: 15,
229: 17,  230: 4,
238: 14,  238: 16,
238: 18,  238: 20,
257: 22
remembers 261: 3
remind 222: 24,
247: 14
Renaissance
202: 12,  206: 5
repeat 74: 19,
87: 7,  219: 10,
223: 10
repeating 19: 16
repetitious
160: 7
Repetitive
35: 11,  144: 23
Rephrase 95: 15,
97: 1,  168: 3,
168: 9,  226: 3
report 175: 10,
187: 8,  196: 5,
196: 7
reported 2: 37
Reporter 2: 30,
46: 25,  74: 19,
98: 14,  98: 23,
250: 16,  268: 14
represent
120: 18,  140: 25,
170: 17,  172: 22,
180: 24,  233: 13,
240: 3

Representative
200: 1
represented
24: 23,  166: 3,
183: 19
represents
133: 23
Reputation
89: 16,  89: 17
request 72: 21,
91: 23,  124: 17
requested 29: 21
require 248: 7,
248: 8
requirement
136: 11
resemble 72: 1
residence 121: 8,
121: 11,  172: 23,
173: 24
Residential
65: 9,  86: 20,
149: 23
residents 197: 1,
197: 22,  200: 21
resolution
140: 3,  264: 41
resolution.
139: 8
resolved 26: 15,
89: 25,  188: 16
respect 81: 13,
115: 24,  117: 5,
117: 10,  117: 15,
255: 12,  257: 9
respected 55: 4
Respects 54: 25,
55: 2,  55: 4
respond 248: 1
responded 121: 22
responds 248: 2
response 129: 19,
202: 6
response. 6: 6,
9: 17,  30: 25,
31: 6,  33: 11,
34: 9,  34: 22,
44: 3,  44: 15,
45: 10,  45: 17,
46: 22,  49: 17,

50: 5,  55: 8,
55: 12,  60: 4,
61: 25,  62: 2,
62: 19,  79: 22,
93: 3,  94: 19,
138: 18,  190: 7,
207: 17,  218: 15,
220: 4,  221: 5,
223: 13,  250: 8,
254: 19,  254: 23,
261: 24
responsibility
89: 14
rest 160: 12,
161: 10
Restaurant
126: 24,  142: 18,
158: 21,  234: 10
restaurants
103: 22,  186: 13,
188: 3
restitution
122: 11
restriction
229: 19,  229: 21
restrictions
145: 2,  145: 5,
145: 6,  145: 7,
145: 21,  145: 22,
146: 1,  146: 5,
228: 3,  228: 5,
228: 6,  228: 16,
228: 22,  229: 4,
229: 14,  229: 18,
229: 22,  229: 23,
230: 1,  230: 6,
265: 3
restrictions.
145: 13
result 25: 13,
103: 19,  120: 2,
121: 25
resume 152: 1,
187: 10
Retail 79: 13,
80: 18,  80: 19,
105: 6,  105: 11,
105: 14,  109: 21,
116: 19,  178: 20,
179: 14,  179: 17,

181: 18,  185: 21,
186: 21
retained 101: 11
retainer 132: 16,
136: 18
retired 80: 1,
111: 3,  152: 4,
193: 2,  245: 23
return 109: 24
returned 12: 16,
114: 18,  193: 11
reveals 58: 9
revenue 38: 20,
38: 22
Reverand 25: 14,
25: 19,  25: 22,
51: 9,  51: 11,
53: 1,  267: 11
Reverend 26: 3,
51: 17,  52: 16,
53: 3,  53: 5,
139: 15,  252: 5
reversed 255: 10
review 67: 14,
113: 14
revision 210: 2,
220: 15
revisions
150: 13,  152: 22
revitalization
196: 25
revitalize 198: 2
reward 210: 4
rezoning 58: 18
rezoning.  58: 13
Richard 131: 22,
253: 10
Richards 185: 9
Rick 195: 14,
203: 16
Rickey 1: 15,
2: 20,  10: 15,
119: 15,  123: 9
right-hand 197: 8
Rights 196: 9
rigorous 41: 1
ring 208: 13
rise 12: 12,
79: 25,  111: 2,
152: 3,  193: 1,

245: 22
risk 70: 13
River 184: 17
rjackson@jackson
firm.net 1: 42
road 98: 1,
257: 18
Robertson 1: 15,
2: 20, 10: 14,
10: 16, 11: 16,
12: 7, 12: 8,
119: 16, 123: 9,
123: 11, 195: 20,
252: 12, 253: 12
Robinson 251: 25
role 72: 20,
106: 15, 107: 12,
107: 24, 181: 8,
182: 17, 184: 13,
205: 1
roles 244: 13
Ron 139: 24,
199: 21
room 110: 25
Rosemont 95: 1
Ross 2: 6
Royce 52: 11,
52: 19, 73: 21,
74: 4, 74: 9,
130: 15, 135: 17
RPR/CSR 2: 30,
268: 3, 268: 13
rude 256: 16
Rule 10: 4,
49: 13, 255: 16
ruling 258: 2
rumor 48: 12
rumored 48: 8
run 12: 21,
249: 17, 250: 14
Ryan 43: 4, 43: 8,
43: 11


< S >
safe 182: 6
salary 134: 13
Saldana 1: 26,
260: 25
sale 109: 18,

109: 25, 110: 20,
111: 10, 111: 13,
112: 1, 112: 8,
115: 21, 116: 5,
117: 24, 210: 20
Saleem 21: 16,
44: 12, 44: 16,
67: 5, 91: 14,
93: 9, 94: 6,
154: 8, 251: 14,
265: 9
SARAH 1: 26
Saturday 183: 8
savvy 25: 25
saw 4: 4, 34: 18,
102: 15, 103: 7,
132: 8, 133: 13,
181: 4, 212: 17,
218: 16, 220: 16,
229: 24
saying 11: 10,
28: 12, 28: 14,
28: 21, 28: 24,
37: 3, 50: 17,
55: 7, 62: 12,
62: 13, 62: 17,
68: 25, 71: 6,
73: 11, 77: 10,
81: 11, 83: 23,
116: 23, 184: 6,
202: 9, 204: 7,
217: 4, 220: 25,
221: 1, 237: 13,
237: 18, 243: 21,
257: 14, 257: 22
says 51: 20,
53: 24, 59: 20,
67: 6, 68: 21,
69: 1, 93: 8,
126: 18, 130: 16,
133: 14, 139: 7,
140: 23, 143: 15,
145: 12, 149: 23,
150: 11, 153: 17,
154: 8, 157: 22,
162: 10, 175: 19,
183: 17, 189: 21,
197: 16, 198: 1,
203: 19, 204: 23,
205: 12, 205: 20,

206: 12, 218: 25,
232: 25, 241: 17,
241: 21, 242: 23,
243: 16, 243: 17,
256: 6, 257: 22
scenario 246: 6
scenarios 20: 13
scene 54: 1,
63: 23
schedule 246: 14
scheduled 56: 10,
141: 10
scheduling
135: 16
scheme 112: 22,
218: 10, 222: 10,
237: 19
scholarship
190: 19
scholarships
189: 24, 190: 2,
191: 2, 195: 17,
199: 11, 200: 24
School 99: 13,
99: 14, 99: 15,
99: 16, 189: 24,
204: 24
Scott 131: 20
scratch 61: 6,
72: 3, 74: 3
screen 38: 10,
58: 2, 124: 11
screens 164: 11
screwed 29: 11,
29: 25
Scroll 35: 7,
35: 25, 58: 6,
130: 1, 130: 5,
131: 16, 153: 15,
167: 4, 168: 18,
168: 25, 169: 5,
232: 7, 232: 13
Scyene 32: 21,
54: 18, 59: 22,
60: 6
Scyene. 32: 16
search 121: 3,
121: 8, 121: 15,
154: 17
searching 121: 11

seat 255: 3
seated 3: 8,
80: 3, 114: 21,
193: 12, 246: 1
second 13: 16,
14: 23, 16: 3,
20: 7, 35: 13,
70: 9, 121: 7,
135: 15, 143: 18,
149: 4, 163: 25,
170: 9, 174: 11,
203: 9, 241: 9,
243: 15
seconds 80: 7,
81: 19
Secretary 199: 22
Sector 54: 16,
71: 25, 72: 11,
72: 14, 73: 3,
73: 8, 75: 7,
78: 18, 78: 22,
181: 18, 244: 23
security 12: 23,
13: 2, 13: 5,
34: 2, 74: 12,
78: 3
seeing 35: 18,
49: 18, 86: 9,
126: 7, 223: 10
seek 59: 21
seen 20: 1, 27: 4,
53: 4, 60: 24,
82: 20, 106: 2,
106: 3, 124: 14,
129: 23, 131: 7,
133: 21, 149: 16,
152: 21, 167: 8,
170: 18, 170: 23,
171: 4, 173: 1,
173: 3, 173: 11,
175: 11, 215: 19,
218: 7
select 195: 10
selected 195: 8,
195: 11
sell 42: 11,
43: 12, 109: 3
selling 109: 17
Senate 203: 25,
204: 1

Senator 130:15, 135:17
send 69:8, 110:22, 110:25, 209:1, 254:12
sending 67:10, 93:19
sends 93:10, 259:9
sengledow@sbcglobal.net 2:34
senior 185:18, 194:6, 198:19
seniors 189:25
sense 3:24, 213:25, 214:1, 222:10, 222:13, 222:14
sent 78:17, 78:21, 135:23, 136:5, 136:21, 151:20, 153:10, 215:21, 218:14, 221:21, 265:9
sentence 128:22, 129:7, 146:1, 147:1, 150:11, 150:23, 150:24, 150:25, 156:6
separate 252:16
separately 249:7, 250:13
separation 171:14
September 30:14, 61:16, 61:17, 126:22, 131:6, 216:22
series 86:2
serious 47:12
serve 185:19
served 22:9
Service 191:23, 191:25, 192:11, 195:9, 200:23, 204:13
services 64:19, 82:21, 147:20, 196:1, 205:21, 205:25

set 20:9, 20:13, 58:1, 105:24, 166:21, 201:23, 202:1, 202:3, 235:4
setback 58:1
seven 69:5
several 30:10, 58:9, 91:4, 124:14, 131:10, 236:21, 237:22, 243:2
sex 183:20
share 172:14, 201:18, 234:6, 238:19, 259:16, 260:17
sharing 161:16
Sheila 1:13, 2:3, 3:15, 6:4, 30:18, 31:3, 34:8, 81:19, 82:16, 119:19, 123:2, 172:22, 173:23, 174:20, 246:9, 252:9, 267:46
Sherman 121:19, 247:7, 253:13
Sheryl 190:25
shirt 47:23, 197:9
Shopping 105:12, 105:14, 106:7, 107:5, 107:12, 109:3, 109:11, 112:1, 112:8, 112:17, 115:5, 115:13, 115:16, 117:24, 134:23, 134:25, 196:20, 197:21, 206:10, 210:20, 264:13
shops 186:17
short 247:1, 247:2, 247:7, 254:5
shot 248:9
shouldn't 81:7
show 19:19,

19:24, 20:11, 53:14, 54:6, 86:4, 171:20, 172:21, 202:11, 218:21, 225:3
showed 142:22
showing 30:17, 49:18
shown 36:7, 61:7, 240:23, 240:24
shows 4:14, 36:7, 38:22, 39:7
shut 256:2
SHX 81:22, 267:19, 267:25
sic 80:15, 165:18, 179:23
side 35:20, 35:21, 93:14, 174:10, 197:8, 201:4
sidebar 93:13
sign 111:11, 116:23, 117:20, 155:18, 155:22, 178:4
signature 116:13, 116:14, 116:21, 116:24, 173:17, 173:19, 173:22, 178:19, 210:19, 211:9, 211:15
signatures 147:13, 147:15
signed 31:4, 31:9, 115:12, 115:18, 116:16, 116:22, 152:22, 165:1, 198:6, 204:17, 233:14, 233:19, 233:22, 264:31
significant 39:15, 192:2
signing 117:5
silence 13:8
similar 136:4,

136:20, 136:22
SIMONTON 1:28
simple 83:8
simply 225:12, 230:14, 247:24
Simpson 29:4, 32:25, 49:15, 49:19, 49:23, 64:25, 69:25, 70:18, 138:4
single 33:18
single-family 29:24, 42:16, 57:25, 58:15, 71:8
single-home 87:23
Sir 18:5, 19:16, 19:20, 66:2, 73:11, 84:4, 99:12, 111:5, 120:12, 146:20, 199:1
sit 97:3, 249:12
site 43:5, 51:20, 51:22, 85:5, 86:5, 225:22
sitting 247:17
situation 20:21, 21:2, 47:13, 49:7, 256:11, 258:17, 258:23, 258:24
six 6:1, 6:9
skip 161:10
slacks 47:24
slightly 254:4
slips 266:17
slow 213:19
slower 216:5
slum 25:6
small 140:23, 184:8, 191:10, 191:12, 191:20
Smith 84:19, 84:21, 84:24, 252:1
social 196:1, 200:23

socioeconomic 203: 10
soft 109: 8
softer 216: 6
sole 113: 24
solicit 182: 19
Somebody 45: 15, 70: 14, 84: 11, 85: 9, 86: 4, 89: 7, 178: 19, 190: 17, 226: 11, 253: 21
somehow 96: 18, 123: 18
Someone 26: 15, 116: 16, 116: 24, 135: 10, 151: 3, 157: 16, 157: 17, 159: 10
sometime 181: 22, 254: 7
sometimes 72: 21
somewhat 136: 20, 136: 22
soon 259: 4
Sorry 6: 17, 11: 4, 12: 19, 66: 14, 102: 5, 110: 24, 130: 13, 142: 11, 142: 16, 147: 5, 154: 6, 165: 21, 168: 9, 177: 24, 203: 3, 212: 6, 213: 14, 216: 4, 226: 19, 230: 11, 231: 18, 235: 21, 256: 15
sort 19: 18, 101: 17, 115: 4, 202: 7, 249: 13, 254: 16
Sotto 38: 2, 163: 3
sought 105: 23, 106: 18, 147: 8, 163: 9
source 118: 8
South 99: 17, 102: 17, 103: 20, 184: 16

Southeast 185: 2, 185: 21, 185: 25, 186: 8, 187: 20, 188: 19, 188: 20, 197: 2, 197: 17, 198: 3
Southern 26: 10, 54: 16, 63: 17, 64: 1, 71: 24, 72: 10, 72: 13, 73: 3, 73: 8, 75: 7, 78: 18, 78: 22, 181: 18, 244: 23
Southwest 25: 1, 26: 23, 32: 15, 43: 24, 44: 4, 49: 11, 59: 22, 60: 5, 60: 8, 61: 10, 61: 14, 61: 19, 69: 25, 70: 2, 70: 4, 75: 11, 75: 14, 75: 20, 75: 22, 76: 5, 77: 1, 89: 7, 89: 12, 95: 2, 95: 23, 96: 10, 96: 14
space 197: 20
spaces 108: 17
spas 205: 7
speaker 190: 13, 199: 20
speaking 22: 12, 30: 4, 48: 22, 78: 12, 124: 1, 226: 9
special 115: 23, 117: 2, 121: 18, 187: 19, 194: 23
specific 10: 5, 216: 23, 217: 22
specifically 73: 11, 145: 7, 215: 14, 216: 11, 237: 2
speculate 209: 5
Speculation 93: 24, 96: 1, 154: 22, 209: 3

speed 125: 18, 167: 9, 213: 19, 213: 23, 214: 2, 214: 3
spell 98: 16
spelled 250: 21
spelling 250: 19, 250: 23
Spencer 247: 4, 253: 14
spend 254: 16
spent 29: 24, 71: 10, 71: 11, 71: 12, 90: 14
Spigel 253: 15
spite 41: 11, 129: 4
split 228: 23, 236: 10
spoke 23: 23, 78: 12, 120: 10, 124: 8, 125: 6, 138: 20, 214: 12, 226: 6, 243: 3
spoken 30: 10, 123: 24, 217: 5, 219: 12
spokesperson 144: 12, 227: 13
sponsor 83: 6, 84: 11, 188: 12
sponsoring 83: 2, 200: 17
sponsors 200: 23
sporting 56: 6
spot 108: 25
spring 88: 12
Square 2: 14, 39: 8, 39: 10
squirming 159: 23, 261: 11
stability 197: 17
stabilization 196: 16, 196: 21, 196: 23
Staff 4: 5, 37: 13, 40: 20, 40: 22, 41: 7, 42: 2, 42: 5, 42: 20, 43: 1,

47: 15, 49: 2, 57: 13, 57: 19, 57: 22, 58: 11, 58: 14, 58: 19, 58: 24, 59: 9, 267: 17
Stand 98: 13, 255: 24, 257: 16
standpoint 118: 19, 243: 15
Stanley 253: 15
Starbucks 140: 18, 140: 19, 141: 6, 142: 7
start 5: 4, 14: 16, 34: 13, 53: 20, 66: 13, 67: 10, 67: 25, 70: 9, 70: 24, 190: 2, 213: 15, 226: 15, 240: 9, 241: 10, 245: 20
started 40: 11, 44: 9, 82: 1, 87: 16, 89: 20, 90: 8, 101: 25, 146: 1, 165: 10, 198: 20, 239: 25
starting 145: 23
starts 52: 5, 66: 16
State 28: 11, 39: 17, 39: 21, 40: 25, 41: 1, 94: 10, 94: 13, 98: 16, 100: 10, 100: 16, 115: 19, 116: 6, 118: 9, 135: 17, 136: 11, 136: 13, 183: 18, 194: 25, 199: 22, 200: 15, 203: 11, 204: 1, 204: 8, 210: 24, 211: 2
stated 202: 6
statement 54: 4, 83: 24, 105: 2, 135: 19, 153: 20, 175: 24, 214: 1
statements

246: 10
States 1: 1,  1: 5,
1: 21,  1: 29,
37: 25,  92: 24,
98: 10,  119: 25,
122: 19,  152: 17,
200: 1,  268: 8
statewide 194: 2,
194: 8
stay 195: 4
Steinke 2: 12,
2: 13,  9: 24,
56: 18,  110: 14,
111: 24,  112: 3,
112: 12,  114: 15,
115: 23,  180: 20,
180: 23,  193: 13,
222: 16,  225: 3,
263: 14
stenography 2: 37
step 98: 8,
111: 5,  256: 16
stepped 163: 21
steps 197: 19
steps. 197: 18
Steve 192: 18
stilled 26: 13
Stop 60: 17,
103: 15,  121: 7,
150: 5,  159: 3,
160: 10,  161: 14,
162: 19,  164: 3,
169: 6,  170: 9,
171: 10,  171: 18,
172: 19,  178: 2,
178: 9,  179: 3,
179: 10,  179: 21,
214: 7,  234: 24,
235: 1
stopped 17: 10,
213: 19
stopping 212: 9,
213: 12
Store 186: 22,
188: 22,  197: 13
stores 188: 3
straight 97: 25
strategy 109: 9
Street 1: 46,
2: 15,  29: 23,

85: 12,  95: 3
stretch 222: 17
stricken 132: 15
strictly 33: 5
stroke 171: 13
Strong 15: 6,
150: 12,  151: 4,
166: 17
structure 105: 15
structured
183: 18
struggle 195: 7
Stuart 29: 4,
32: 25,  64: 25,
138: 5
student 199: 10
study 185: 24
stuff 16: 11,
53: 24
stylistic 249: 14
subcontractor
108: 6,  230: 20
subcontractors
108: 9,  108: 11,
146: 8,  146: 12,
146: 14,  153: 4,
153: 13,  172: 15,
217: 12,  217: 19,
230: 18,  232: 22,
232: 23,  233: 3
subject 7: 25,
117: 8,  128: 14,
258: 20
subjects 229: 15
submit 69: 12
submitted 218: 4
subpoenaed 23: 21
substance 127: 24
substantial
67: 13,  210: 5,
210: 7
substantive
119: 20
substitute
261: 10,  261: 19
subtracted
173: 16
success 29: 8,
65: 10
successful

176: 25
sudden 29: 16
SUE 2: 30,
250: 12,  250: 17,
250: 23,  252: 15,
268: 3,  268: 11,
268: 13
suggest 10: 7,
71: 16,  250: 2,
256: 5
suggested
116: 25,  117: 20,
234: 15,  246: 23
suggesting 64: 6,
248: 17
suggestion
249: 2,  250: 2
suggestions 60: 2
suggests 174: 6,
256: 5
Suhm 252: 2
suit 47: 23,
257: 5
Suite 1: 39,
1: 47,  2: 24
sum 103: 16
summer 111: 15,
207: 4
supervisor 194: 9
supplement 7: 20,
7: 23
support 21: 13,
24: 24,  25: 15,
27: 7,  29: 15,
29: 22,  31: 5,
32: 15,  40: 12,
41: 10,  52: 11,
52: 19,  52: 20,
52: 21,  55: 20,
61: 10,  61: 18,
79: 12,  96: 12,
124: 7,  130: 14,
130: 20,  155: 25,
183: 18,  183: 25,
204: 8,  260: 7
supported 101: 4
supporter 46: 7,
46: 10,  77: 14
supporters 77: 15
supporting

31: 13,  32: 20,
32: 21,  46: 20
supportive
95: 23,  96: 14
suppose 219: 9
supposed 7: 21,
28: 5,  71: 19
surprise 43: 8
surveys 197: 22
Susan 250: 25
suspicion 165: 18
suspicious 45: 2,
48: 6,  166: 1
Sustained 41: 4,
47: 8,  75: 9,
87: 3,  88: 23,
94: 22,  97: 1,
107: 17,  123: 21,
124: 4,  133: 6,
165: 5,  168: 3,
171: 25
Suzan 230: 5,
265: 2
sweating 237: 24
Sworn 13: 12,
13: 13,  98: 18,
99: 4,  99: 6
sympathetic
192: 15,  249: 23
synchronized
80: 6
system 13: 3,
199: 3


< T >
table 55: 25,
56: 1,  95: 8,
260: 13
tabs 224: 20
tactics 150: 12,
151: 4
talked 24: 11,
33: 6,  49: 3,
49: 4,  54: 21,
76: 7,  82: 13,
83: 17,  90: 16,
109: 21,  178: 18,
201: 1,  209: 15,
227: 22,  230: 2,

230: 25,   237: 23,
243: 3,   243: 5,
243: 6,   243: 7
talks 164: 6,
204: 19,   244: 5
Tammy 252: 25
tape 14: 25,
16: 17,   21: 7,
22: 22,   22: 25,
23: 3,   23: 12,
164: 19
taped 234: 22
tapes 8: 21,
10: 25,   18: 15
taping 18: 15,
91: 9
target 120: 3,
121: 22,   160: 19,
207: 2,   209: 1,
229: 10
taught 99: 25
tax 39: 24,   40: 1,
53: 24,   54: 3,
54: 15,   54: 16,
60: 19,   70: 10,
76: 23,   76: 25,
136: 12
tax-exempt
136: 12
taxes 40: 2,   40: 5
TDHCA 35: 21,
36: 19,   37: 1,
37: 8,   39: 11
Team 25: 14,
26: 2,   173: 5,
205: 23
teams 53: 25
technical 200: 18
Ted 2: 13,   180: 23
telephone
110: 12,   111: 21,
113: 3,   113: 23,
155: 3,   155: 8,
158: 11,   158: 19,
170: 5,   178: 23,
217: 7
tells 222: 5,
242: 14,   242: 19,
243: 17
Tem 32: 13,

140: 24
ten 79: 19,
246: 24
tenants 108: 14,
108: 16,   197: 22
tentative 150: 13
term 132: 14,
209: 21,   221: 21
terminated 16: 21
terms 85: 16,
196: 25,   209: 24,
229: 21,   236: 9,
236: 20,   257: 9
Terrell 106: 12,
106: 13,   107: 24,
129: 8,   129: 10,
147: 2,   147: 16,
147: 25,   148: 8,
148: 11,   154: 5,
181: 25,   182: 6,
182: 7,   182: 8,
182: 9,   190: 22,
205: 16,   205: 18,
211: 7,   230: 24,
231: 4,   231: 6,
231: 8,   252: 3
Terry 185: 6
test 41: 1
testified 13: 13,
81: 4,   99: 6,
209: 16,   210: 19,
212: 14,   217: 6,
218: 23,   219: 4,
219: 18,   220: 7,
221: 23,   229: 3,
240: 5,   240: 11
testifies 257: 23
testify 21: 21,
23: 21
testifying
78: 19,   210: 10,
220: 13,   239: 7,
246: 9,   246: 12,
256: 24
testimony 16: 21,
30: 8,   30: 22,
34: 4,   134: 9,
178: 18,   178: 21,
220: 2,   220: 9,
246: 16,   248: 3,

255: 23,   256: 7,
257: 15,   258: 3,
261: 4,   261: 14
Texans 203: 19
Texas 1: 2,   1: 8,
1: 30,   1: 32,
2: 16,   2: 32,
73: 2,   100: 11,
100: 16,   115: 19,
118: 7,   136: 13,
185: 7,   194: 25,
199: 3,   199: 13,
199: 22,   200: 8,
200: 10,   200: 16,
203: 11,   204: 1,
204: 9,   211: 2,
268: 15
text 164: 4
Thanks 152: 18
theaters 186: 15
themselves
117: 15,   187: 25
THEODORE 2: 12
theory 114: 2,
255: 9,   256: 21,
259: 11
Theresa 41: 17,
41: 22
they'll 249: 5
Thigpen 252: 4
thinking 96: 25,
111: 15,   196: 24
Third 1: 31,
44: 1,   44: 14,
57: 20,   129: 7,
143: 14
Thomas 139: 13,
192: 8,   192: 12
Thomasville
99: 11,   99: 14
Thornton-reese
88: 5,   89: 3
though 19: 13,
26: 22,   51: 4,
68: 7,   103: 14
thousand 45: 6,
233: 11,   240: 20
three 79: 17,
86: 24,   91: 1,
106: 18,   130: 19,

132: 1,   187: 15,
195: 8,   225: 13,
249: 21
throughout
121: 14
throw 260: 10
throwing 105: 5
Thursday 248: 18,
248: 19,   249: 4,
254: 12
tied 67: 15
tight 26: 10
tighten 232: 19
tightened 233: 6
till 231: 23
Tim 253: 8
timid 78: 10
timing 114: 9
Title 10: 17,
11: 4,   11: 8,
11: 13,   104: 6
titled 7: 25
today 61: 8,
66: 21,   159: 21,
178: 21,   212: 17,
221: 11,   239: 7,
254: 18
together 17: 22,
44: 13,   56: 3,
229: 20,   254: 13
Tom 46: 19,
46: 20,   185: 3,
192: 17
tomorrow 245: 20,
250: 17,   254: 21,
255: 7
Toni 66: 21,   68: 5
Took 14: 9,   43: 4,
43: 8,   77: 24,
86: 18,   119: 23,
140: 10,   167: 12,
169: 15,   208: 25,
246: 4,   255: 24
top 35: 9,   36: 4,
129: 19,   136: 16,
138: 4,   139: 6,
140: 23,   153: 23,
200: 15,   229: 20,
242: 14
topic 127: 11,

127: 12,  144: 9
torn 105: 24
Toska 174: 19,
251: 21
Total 52: 7,
130: 8,  173: 7,
186: 2,  186: 8,
186: 10,  186: 11,
204: 20,  236: 13
totally 52: 22
tougher 219: 19
toured 185: 2
tours 184: 20,
185: 17
toward 192: 2,
204: 13
towards 132: 11,
154: 18,  192: 13,
203: 21
Townhomes 29: 8,
29: 23,  31: 14,
32: 24,  41: 20,
43: 13,  48: 10,
49: 15,  51: 8,
51: 23,  52: 16,
71: 8,  85: 5,
86: 5,  86: 22,
88: 2,  95: 3,
97: 4,  97: 19
track 75: 6
tracts 58: 10
Trade 200: 1
training 22: 17
transaction
112: 5
transcribe 249: 7
Transcript 1: 19,
2: 37,  14: 17,
23: 3,  53: 17,
232: 1,  241: 8,
242: 3,  242: 7,
265: 13,  265: 22,
265: 28,  265: 34,
265: 43,  265: 49,
266: 5,  266: 11,
266: 21,  266: 27,
266: 33,  266: 41,
268: 4,  268: 6
transcripts
3: 21,  3: 22,  4: 4,

4: 8,  5: 11,  8: 23,
10: 17,  10: 22,
10: 24,  11: 3,
11: 6
Translate 79: 18
trash 260: 11,
260: 13,  260: 15,
260: 17
TRI 107: 1,
109: 21,  116: 17,
116: 19,  116: 24,
117: 21,  117: 25,
180: 4
TRIAL 1: 19,  3: 5,
112: 10,  246: 14,
255: 17,  255: 22,
258: 6
triangle 16: 11,
16: 17
tried 19: 8,
86: 17,  90: 1,
90: 7,  95: 9,
157: 16,  195: 24
Trinity 102: 17,
184: 16
True 46: 16,
71: 15,  71: 20,
71: 21,  72: 2,
72: 3,  72: 20,
74: 24,  79: 11,
81: 15,  174: 24,
175: 24,  179: 17,
206: 14,  210: 17,
216: 3,  217: 3
truly 204: 9
trust 19: 4,
48: 3,  48: 4,
257: 19
trustworthy 19: 2
truth 19: 10,
91: 19
try 27: 1,  35: 10,
42: 1,  42: 11,
55: 24,  197: 12,
198: 19,  213: 3,
232: 16
trying 7: 3,
14: 6,  19: 12,
29: 19,  35: 2,
41: 9,  41: 16,

41: 25,  43: 12,
48: 14,  56: 15,
59: 25,  62: 16,
63: 5,  78: 2,
83: 14,  83: 20,
90: 13,  92: 12,
102: 17,  103: 4,
103: 8,  125: 15,
181: 18,  192: 16,
197: 23,  213: 22,
214: 22,  216: 2,
216: 12,  227: 12,
237: 11,  248: 21
Tucker 252: 5
Tuesday 141: 5,
141: 10
turn 205: 8,
249: 5
turned 21: 16,
88: 10,  91: 14,
129: 1
turning 29: 19
Turtle 1: 38
Two 10: 18,
29: 18,  31: 12,
32: 4,  32: 6,
52: 10,  60: 18,
70: 22,  74: 13,
86: 24,  87: 5,
87: 13,  91: 1,
113: 15,  114: 4,
125: 21,  132: 1,
135: 21,  135: 24,
137: 1,  143: 17,
143: 23,  143: 24,
188: 6,  188: 7,
207: 23,  208: 25,
209: 12,  209: 21,
209: 24,  215: 2,
219: 9,  226: 23,
227: 5
two.  178: 10
TX 1: 40,  1: 48,
2: 7,  2: 25
type 70: 10,
73: 4,  250: 13,
250: 18
types 94: 5,
188: 14

< U >
Ultimately
109: 3,  109: 18,
146: 9,  152: 22,
259: 15
unable 157: 24
unaware 30: 5,
104: 25,  154: 25
Unbeknownst
147: 25
uncommon 72: 10,
72: 13
uncovered 112: 5
understand
27: 22,  29: 2,
29: 7,  33: 20,
33: 23,  40: 4,
46: 7,  48: 1,
52: 23,  56: 16,
58: 14,  58: 23,
70: 5,  73: 15,
75: 11,  83: 15,
102: 21,  122: 6,
122: 13,  132: 23,
207: 11,  210: 10,
210: 24,  213: 14,
216: 20,  220: 6,
233: 2,  249: 24
understanding
95: 21,  120: 20,
122: 19,  130: 21,
164: 25,  165: 7,
177: 11,  183: 22,
213: 7
understood 103: 3
undeveloped
57: 22,  58: 10
uneasy 45: 7
United 1: 1,  1: 5,
1: 21,  1: 29,
98: 10,  119: 25,
122: 19,  152: 17,
200: 1,  268: 8
units 118: 23,
125: 9
University
199: 3,  199: 13,
200: 7,  200: 11
unless 72: 17,

96: 24
unsatisfactory
259: 8
until 39: 1,
67: 15, 103: 3,
157: 3, 209: 12,
215: 10
up. 164: 8, 214: 2
uphill 48: 20
upset 26: 19,
77: 19
upsetting 78: 14
upwards 29: 24
uses 57: 23,
57: 25
using 10: 7,
39: 4, 53: 5,
168: 8, 179: 16,
238: 20
usual 249: 11
UT 199: 10,
203: 23
utilize 73: 9
utilized 76: 22

< V >
V-I-L-A-A-L
74: 22
vacancy 199: 12
Valerea 187: 16,
190: 24
value 112: 25,
113: 1, 257: 12,
259: 19, 259: 20
varies 90: 22
various 58: 20,
59: 2, 90: 20,
100: 1, 100: 25,
108: 16, 159: 24,
200: 14, 264: 21
vary 101: 19
vein 30: 4
vendor 72: 22,
72: 24
vendors 51: 12,
72: 25, 74: 4,
74: 10
vengeful 255: 12
Venita 251: 2

version 19: 25
versions 113: 15
VERSUS 1: 8,
36: 19, 37: 25,
39: 21, 40: 8,
49: 15
via 111: 14
vice 104: 7,
104: 15, 185: 6
VICTOR 2: 3
victor.vital@bak
erbotts.com 2: 9
view 113: 7,
113: 11, 114: 8,
196: 20, 255: 16,
257: 3, 257: 8,
257: 11, 259: 16,
259: 18, 259: 19,
259: 21
vigilant 258: 11
Vilaal 74: 16,
74: 17, 74: 22
Village 22: 4,
32: 10, 32: 20,
32: 24, 32: 25,
59: 21, 60: 10,
60: 12, 60: 19,
60: 24, 65: 18,
80: 12, 80: 20,
161: 5, 196: 20,
197: 21, 223: 11,
225: 20, 233: 10
Villas 49: 16,
49: 19, 49: 23,
59: 22, 70: 1,
70: 18, 80: 15
violation 28: 7,
28: 8
violations 28: 12
vision 192: 2,
192: 4, 203: 20
Vital 2: 3, 3: 12,
13: 2, 30: 5,
34: 16, 49: 18,
61: 3, 61: 8,
239: 19, 239: 21
Vital. 38: 2
voce 38: 2, 163: 3
voice 23: 12,
155: 12, 164: 19

Volume 22 1: 18,
3: 2
volunteer
100: 25, 101: 7,
188: 13, 189: 1
volunteered
100: 25
volunteering
189: 4
Volunteers
182: 12, 182: 13,
187: 17
vote 29: 18,
31: 13, 32: 4,
32: 6, 50: 3,
60: 19, 61: 5,
61: 9, 78: 3,
138: 10, 165: 8,
223: 22, 224: 15,
224: 22, 225: 16,
226: 4, 245: 14
voted 54: 18,
61: 18, 61: 21,
61: 23, 137: 5,
137: 13, 223: 25,
224: 18, 224: 20
votes 34: 19,
60: 18, 96: 18
voting 27: 8,
34: 13

< W >
W. 1: 11, 1: 36,
140: 23
Wait 21: 20,
98: 24, 163: 20,
163: 23, 260: 11
waiting 15: 15,
247: 17
waived 113: 8,
113: 11
waiver 40: 12
walking 21: 14
Wallace 252: 6
wanting 73: 9,
155: 18
wants 66: 24,
245: 10
warm 259: 9

warrant 121: 15
warrants 121: 4,
133: 23
Warren 251: 8
wars 54: 10
wasted 80: 7
watch 28: 20,
28: 23
watched 20: 14
water 13: 17,
15: 12
ways 192: 13
wear 47: 23
wearing 81: 12,
81: 16, 81: 25,
82: 5, 82: 10
Wednesday
247: 12, 247: 13,
248: 16, 248: 17,
249: 4
week 4: 9, 69: 5,
111: 24, 131: 6,
189: 7, 246: 23,
246: 25, 249: 21,
254: 7, 254: 10
week. 147: 7
weekend 7: 20,
11: 21
weeks 29: 18,
31: 12, 32: 4,
32: 6, 248: 4,
249: 21
weight 238: 2
welcoming 194: 22
West. 130: 15
Whatever 69: 3,
171: 13, 244: 12,
258: 3
whenever 56: 8,
111: 16, 245: 9,
260: 22
whereas 37: 16
wherein 258: 16
wherewithal 48: 9
white 197: 8,
197: 9
whoever 78: 12
whole 52: 2,
54: 15, 73: 12,
249: 18, 257: 19

whom 118: 13,
154: 1
widely 203: 9
wife 106: 14,
107: 13,   129: 8,
129: 11,   131: 11,
147: 9,   147: 18,
148: 1,   152: 25,
153: 7,   190: 22,
205: 18,   211: 7,
211: 20,   211: 21
Wiley 73: 25
Wilkinson 253: 16
will  3: 15,   3: 20,
4: 9,   5: 7,   5: 11,
7: 22,   9: 21,
12: 21,   33: 9,
35: 14,   67: 18,
68: 24,   88: 4,
98: 25,   116: 1,
122: 20,   124: 11,
133: 24,   139: 6,
145: 23,   147: 6,
192: 24,   198: 3,
231: 20,   239: 21,
239: 23,   242: 6,
247: 3,   247: 4,
247: 7,   247: 8,
248: 13,   248: 25,
249: 5,   249: 6,
250: 1,   254: 7
William 252: 19
Williams 12: 12,
13: 2,   79: 25,
111: 2,   131: 22,
193: 1,   252: 10
Willie 89: 10,
89: 11
Wilson 121: 19,
185: 6,   261: 4
win 225: 15,
250: 20
wired 91: 11,
158: 22,   233: 24,
234: 1,   234: 5,
234: 13,   234: 15,
234: 17
wiretap 89: 1
wiretaps 3: 17,
3: 18,   5: 11,

18: 1,   18: 2
Wisdom 51: 22,
140: 20,   141: 6
Wisdom.  51: 21
wisely 4: 21
withdraw 47: 2
withdrawal
266: 17
withdrawn 103: 5
withheld 256: 20
within 4: 9,
30: 7,   36: 8,
49: 7,   148: 21,
197: 21
Without 11: 24,
58: 13,   58: 17,
111: 23,   120: 13,
134: 8,   141: 17,
219: 1,   223: 10,
249: 17
WITNESS 21: 24,
74: 20,   74: 22,
75: 25,   79: 16,
92: 1,   98: 4,
98: 9,   98: 17,
98: 18,   99: 5,
126: 6,   141: 21,
148: 4,   148: 18,
164: 12,   171: 24,
173: 11,   193: 9,
230: 9,   239: 12,
239: 15,   253: 23,
254: 5,   261: 20,
263: 2
witnesses
113: 19,   246: 3,
246: 4,   246: 7,
246: 18,   246: 24,
246: 25,   247: 6,
247: 9,   247: 21,
248: 3,   248: 12,
252: 14,   256: 8,
257: 9
Women 73: 5,
200: 10
won 225: 18
word 74: 2,
131: 10,   174: 10,
174: 11,   174: 15,
194: 23,   208: 14,

214: 1,   236: 21,
236: 23,   238: 20
words 28: 14,
117: 12,   168: 8,
209: 11,   238: 1
wore 47: 23
work 66: 17,
66: 19,   69: 5,
69: 13,   71: 17,
80: 11,   90: 7,
90: 12,   90: 13,
91: 3,   95: 16,
99: 23,   99: 24,
100: 2,   153: 4,
191: 3,   195: 16,
198: 3,   201: 2,
203: 22,   232: 18,
249: 3
worked 58: 21,
77: 16,   78: 7,
86: 21,   90: 17,
100: 1
Working 17: 1,
43: 23,   55: 6,
58: 25,   68: 12,
68: 13,   68: 25,
71: 3,   73: 8,
80: 14,   90: 24,
92: 6,   95: 19,
139: 1,   156: 2,
156: 3,   156: 24,
164: 11,   182: 9,
203: 20,   224: 14,
249: 11,   249: 20,
253: 24
works 18: 4,
18: 12,   257: 20
workshops 191: 4
worried 26: 19,
78: 13
worry 250: 23
worth 205: 12
wounds.  54: 7
Wright 252: 7
write 104: 19,
196: 5
writes 203: 9
Writing 45: 6,
45: 15,   146: 23,
151: 3

writing.  232: 20
written 6: 18,
132: 15,   149: 17,
150: 14,   150: 19,
197: 15
wrongdoing
208: 24
wrote 88: 5,
88: 6,   212: 15

< Y >
Y'all 12: 11,
46: 16,   48: 25,
56: 3,   58: 16,
78: 4,   182: 2,
227: 12,   235: 20,
235: 25,   236: 7,
237: 23,   238: 1,
243: 10,   255: 3
Year 39: 5,
39: 12,   40: 7,
40: 8,   54: 4,
88: 13,   102: 2,
110: 10,   176: 8,
182: 24,   184: 4,
184: 7,   185: 3,
186: 6,   188: 5,
188: 6,   188: 7,
189: 25,   191: 8,
191: 23,   195: 8,
196: 12,   203: 14,
205: 2,   264: 24
yearly 191: 7
years 19: 24,
24: 13,   24: 17,
39: 1,   56: 20,
87: 19,   88: 15,
90: 20,   101: 3,
101: 8,   109: 2,
122: 7,   208: 25,
209: 12,   225: 13
yeses 253: 22
yesterday 12: 23,
16: 20,   32: 10
York 107: 3,
112: 6,   181: 14
younger 192: 20
yourself 14: 25,
22: 23,   99: 9,

130: 18,   177: 15,
177: 21,   203: 1
Yvonne  190: 12


< Z >
Zero  96: 8,
194: 2,   194: 4,
194: 6
Zero.   67: 11,
186: 10,   186: 14,
186: 16,   212: 5
zoned  57: 23,
58: 10
zoning  16: 11,
34: 23,   58: 9,
58: 15